33 4T032

FILED

08 OCT 29 PM 1:28

STEPHEN R. LUDWIG, CLERK
U.S. DISTRICT COURT
FOR THE NORTHERN DISTRICT
OF INDIANA

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA

| | |
|---|---|
| Roman Finnegan, Lynnette Finnegan,<br>individually and on behalf of<br>Katelynn Salyer, her minor child, and<br>Tabitha Abair, | )<br>)<br>)<br>)<br>) |
| Plaintiffs, | ) |
| v. | )<br>) |
| Laurel Myers, Regina McAninch,<br>Tracy Salyers, Reba James, James Payne,<br>Jennifer McDonald, Antoinette Laskey, and<br>unnamed John Does 1-20, | )<br>)<br>)<br>)<br>) |
| Defendants. | ) |

**3:08CV 503**

Civil Action No.

## COMPLAINT

1.    In this action brought under 42 U.S.C. § 1983, Roman Finnegan, Lynnette

Finnegan, individually and on behalf of Lynnette's minor daughter, Katelynn Salyer, and

Tabitha Abair seek redress for the violation of their civil rights under state law, federal

law and the First, Fourth, Sixth and Fourteenth Amendments to the United States

Constitution.

2.    Jurisdiction is proper under 28 U.S.C. §§ 1331 and 1343.  Venue is proper in the

Northern District of Indiana under 28 U.S.C. § 1391(b) since all defendants reside in

Indiana and at least four of the seven (defendants McAninch, Salyers, Myers and

McDonald) live and/or work in the Northern District of Indiana.  In addition, a substantial

part of the events giving rise to the claims occurred in the Northern District of Indiana.

## The Plaintiffs

3.     Roman Finnegan, Lynnette Finnegan, Tabitha Abair and Katelynn Salyer are citizens of the United States. Roman, Lynnette and Katelynn reside at 14233 South 1050, West Wanatah, IN 46390. Tabitha lives in Francesville IN where she is a senior at West Central High School. She will be attending Ancilla College in the fall. Roman is a sergeant and training instructor for the Indiana State Department of Corrections. Lynnette, who suffers from epilepsy and a learning disability, is a stay-at-home mother of four: Johnathon Abair (age 20; currently finishing his studies at Lincoln Tech in Indianapolis); Tabitha (age 18); Jessica Salyer (deceased on December 20, 2005 at age 14); and Katelynn (age 12).

4.     At the time of the events in question, Roman and Lynnette lived in Pulaski County at 302 East Gordon Street, Francesville IN 47946. Tabitha and Katelynn lived with them except for the period November 1, 2006 to August 9, 2007, when they were detained in out-of-county foster care as a result of defendants' illegal actions.

## The Defendants

5.     Laurel Myers was the Director of the Pulaski County Department of Child Services (DCS) during the period in question. It is our understanding that she has recently retired.

6.     Regina McAninch is an investigator and caseworker for the Pulaski County Department of Child Services.

7.     Tracy Salyers is a caseworker for the Pulaski County Department of Child Services.

8.     Reba James is a Regional Manager for the Indiana Department of Child Services.

9.      James Payne is the Director of the Indiana Department of Child Services (DCS).

10.     Jennifer McDonald is a detective for the Indiana State Police (ISP) stationed in Lowell, Indiana.

11.     Antoinette Laskey is a pediatrician employed by Indiana University School of Medicine, Methodist Hospital and Riley Childrens Hospital. She is also the Chair of the Indiana State Child Fatality Review Team.

12.     John Does 1-20 are sued under fictitious names since their true names and capacities are unknown to the plaintiffs, who will amend this complaint to identify them when this information becomes available through discovery. Plaintiffs believe that John Does 1-20 are also responsible for the violations of civil rights alleged in this complaint.

13.     The defendants acted individually and jointly under color of state law to deprive the plaintiffs of their civil rights. Because they acted knowingly, recklessly and in disregard of well-established law, with no objectively reasonable basis for their actions, they do not have qualified immunity from damages under the standards set forth by the United States Supreme Court, the Seventh Circuit and this Court.

## Facts

14.     As set forth in the Coroner's Verdict, Jessica Salyer, Lynnette's 14 year old daughter, died on December 20, 2005 from a major prescription error, combined with her medical conditions, which included congenital heart disease and a seizure disorder. The Coroner's Verdict is supported by reports and/or affidavits from Dr. John Pless, Professor Emeritus of Forensic Pathology at Indiana University Medical School; Dr. Jan Leestma, neuropathologist and author of *Forensic Neuropathology*; Professor Bruce Lambert, School of Pharmacy, University of Illinois at Chicago, a national expert on medication

error; Professor Edith Nutescu, School of Pharmacy, University of Illinois at Chicago, an internally recognized and widely published expert on warfarin; Dr. Kenneth Ahler, emergency room physician and former Jasper County Coroner; Dr. Michael Innis, hematologist and pathologist; and Dr. Harold Buttram, family doctor. The Pless and Leestma reports are included in the Coroner's Verdict.

15.    Despite the medical evidence, the defendants claimed – and in some instances continue to claim – that Jessica died from a fatal beating on the day of death and/or a skull fracture occurring 24 hours before death, inflicted by Roman and Lynnette. As set forth in the Coroner's Verdict and reports of reviewing doctors, defendants' claims are physiologically impossible and have no objectively reasonable basis.

16.    These claims and resulting actions nonetheless caused irreparable harm to the family, including a nine month period of detention for Jessica's sisters, during which they were told (falsely) that their mother had beaten Jessica to death and subjected to improper investigative therapy; the arrest of Roman and Lynnette, with accompanying newspaper reports and public opprobrium; police interrogations in which Roman, Tabitha and Johnathon were told (falsely) that Jessica died an excruciating death from a fractured skull; and, ultimately, the loss of the family home. Each of the named defendants played a key role in this process. As Dr. James Kenny reported in a recent hearing, by the end of this process, the institutions charged to look out for the safety and well-being of the children had become the abusers.

17.    To date, the Finnegans have been vindicated and/or defendants' claims dismissed in five proceedings (the Coroner's Inquest, two criminal cases and two Children In Need of Services, or CHINS, cases). However, DCS is continuing to challenge the Coroner's

Verdict and medical evidence in hearings before Judge Blankenship, Pulaski County Superior Court. In these hearings, DCS has not offered any medical evidence but is asking the Court to reject the Coroner's Verdict and medical evidence based on statements by the family members, who have consistently denied abuse and neglect; Jennifer McDonald, a police detective whose reports have been rejected by the prosecutor and who is a named defendant in this suit; and three DCS workers, who have no medical expertise and one of whom (Regina McAninch) is also a named defendant. To understand the lack of any rational basis for defendants' claims and actions, it is necessary to understand Jessica's medical conditions.

18.    *Heart condition.* Jessica was born with tricuspid atresia with VSD, a condition that, without surgery, is invariably fatal. By age 6, she had many heart surgeries, including two open heart surgeries ("the Fontan procedure") that left her with a two-chambered, rather than a four-chambered, heart. The Fontan procedure was completed in 1996. Even with the best of care, the mortality rate for Fontan patients is high, with ten year survival rates in the 70-75% range. Fontan deaths are typically sudden and unexpected, caused by embolism (blood clots) or arrhythmia (the heart goes out of rhythm). Like most Fontan patients, Jessica became cyanotic (blue) when hot, cold, tired or stressed, and she had some restrictions on her activities.

19.    *Seizure disorder.* Jessica's heart condition was complicated by a fourth generation seizure disorder. Jessica's major seizures began when she was 2 months old and continued until she was approximately 6 years old. These long-lasting seizures carried a high risk of sudden death (20% according to the medical literature). Jessica's

seizures were potentially fatal since her seizures interacted with her heart condition and caused her to stop breathing, requiring CPR and airlifting to Riley Childrens Hospital.

20.    *Medications.*    To reduce the risk of sudden death, Jessica took three medications: warfarin (brand name Coumadin), digoxin and phenytoin (brand name Dilantin). Warfarin and digoxin are high-risk, narrow-range therapeutic drugs that require careful monitoring. Dilantin is an anti-seizure medication.

21.    *Warfarin.* Warfarin is the active ingredient in rat poison, and it carries an FDA black box warning, the highest level of alert, of the risk of major or fatal bleeding. The manufacturer's instructions confirm that bleeding may occur in any body part or tissue, and that major or fatal bleeding may occur even with therapeutic dosing. Warfarin also causes easy bruising, with large bruises often appearing from even minimal contact. Warfarin is a very difficult drug to prescribe since the response varies widely between individuals and fluctuates based on changes in medications, health and diet. As a result, the mortality rates for warfarin patients are high even with the best of care.

22.    Warfarin is particularly closely linked to brain hemorrhage. Once intracerebral hemorrhage begins, the fatality rates are extremely high (over 75% with minor impact, 45-50% without a fall). Because of the risk of hemorrhage, warfarin requires weekly, biweekly or monthly monitoring of the INR (international normalization ratio), a blood test that measures the ability of the blood to coagulate or clot.

23.    Under established medical protocols, it is the prescribing doctor's duty to monitor dosage and take regular INRs. In Jessica's case, her doctors tested her warfarin levels less frequently than recommended since she had been on a low dose of warfarin for most

of her life, with low INRs and without incident. In the last months of her life, however, the failure to take regular INRs was disastrous.

24.    *Digoxin.*  Digoxin controls the heartbeat. Like warfarin, it is a relatively high risk drug that is responsible for many emergency room admissions.

25.    *Dilantin.*  To control her seizures, Jessica took Dilantin (phenytoin), an anti-epileptic drug. As a child, she had seizures requiring hospitalization when she was taken off Dilantin or could not keep her medications down due to vomiting. Once her medications were stabilized in approximately 2000, she continued to have small (absence) seizures but no major seizures. One side effect of Dilantin is reduced bone density, which increases fracture risk.

26.    *Stabilization.*  After her surgeries were complete and her medications stabilized, Jessica saw a pediatrician or family doctor for prescription refills, school communications and general health needs, with periodic checkups with a pediatric cardiologist at Riley. At home, Jessica's mother monitored her activities, often keeping all four children (Johnathon, Tabitha, Jessica and Katelynn) in so that Jessica would not feel left out. School records and teacher affidavits confirm that Lynnette, who was herself disabled, was a caring and responsible mother who kept the school fully advised of Jessica's medical issues. Teacher affidavits also confirm that Jessica was a well-loved child and that there were no signs of abuse or neglect in the family. As a result of the care provided by her mother, doctors and teachers, Jessica led a relatively normal life for 14 years, with activities including bicycle riding and horseback riding at her grandmother's ranch.

27.    *Move to Francesville (May 2005).*  Lynnette married Roman, a sergeant and training instructor for the Department of Corrections, in May 2004. After they married,

Roman bought a home in Francesville so that Lynnette, who could not drive due to epilepsy, could walk to the stores and the children could attend the nearby West Central schools, which had a good reputation and were conveniently located on one campus. Roman took a demotion so that he could work at the Medaryville facility, close to home, enabling him to participate in school conferences and family life. After the move, Roman and Lynnette continued to take the children to the family doctor in Knox.

28.     When Jessica's cardiologist postponed a routine checkup, originally scheduled for June 23, 2005, the Finnegans continued her care with the family doctor. In June, Tabitha collapsed near the train tracks, requiring a hospital visit and follow-up neurological care. On July 19, all four children had back-to-school physicals with the family doctor, who confirmed that they were in good health apart from a rash on Jessica's legs. A photograph taken at a family reunion on August 27 shows four healthy, happy children.

29.     *School conference.* Jessica started 8th grade at West Central Middle School in August. On August 10, Lynnette gave West Central the same information she had given the Culver schools for eight years. She identified Jessica's conditions as "epilepsy, heart condition, seizures," identified her doctors, authorized emergency care, and gave specific directions on Jessica's medical conditions, including instructions to have Jessica helicoptered to Riley in Indianapolis if she should have a seizure since "her heart reacts with seizures every time."

30.     Although Jessica's prior schools had worked with the family doctors, West Central insisted on working with a pediatric cardiologist, and Lynnette provided an authorization for the release of Jessica's medical information from Dr. Hurwitz, Jessica's pediatric cardiologist. A few days later, Lynnette confirmed that Jessica was covered

under Roman's Anthem Blue Cross/Blue Shield health insurance plan, the highest level of insurance offered to Indiana state employees. On August 31, the school nurse e-mailed Lynnette saying that Dr. Hurwitz could not sign the forms since he had not yet seen Jessica that year. The nurse asked Lynnette to set up an appointment as soon as possible, or to call her and let her know the plans. Six days later, the school nurse filed a complaint with Regina McAninch at the Pulaski County DCS.

31.    *School complaint.* Ms. McAninch's report indicates that, according to the school nurse, the school needed a medical safety plan for Jessica but that Lynnette was not cooperating; that Jessica probably needed to have surgery again; and that Lynnette told them that Jessica had no insurance. All of this information was incorrect, as verified by the school records.

32.    *Initial DCS contact.* In her initial call to the Finnegans, Ms. McAninch accused Roman and Lynnette of not having insurance, refusing to obtain needed heart surgery for Jessica, and not caring about Jessica. She also ordered them to come to DCS at 9 a.m. on September 9 to address these issues. Needless to say, the Finnegans were very upset.

33.    *Roman's complaint.* Roman complained about Ms. McAninch's conduct and lack of sensitivity to his state legislator, Mary Kay Budak, and Laurel Myers, Ms. McAninch's supervisor, saying that in his 15 years with the Department of Corrections, he had "never talked to an offender in the manner that my wife and I have been talked to today." Ms. Budak forwarded Roman's letter to the Governor's Office, which sent it to DCS for a response by James Payne, the Director of DCS.

34.    When contacted, Ms. Myers told DCS headquarters that Roman told Ms. McAninch that he wasn't going to pay for medical care when the bio dad had insurance

and that "when a child needs cardiac surgery and they haven't taken any steps to address it, one is led to assume that priorities are not the child's health." All of this information was incorrect. In fact, Roman had Anthem Blue Cross/Blue Shield health insurance for Jessica; David Salyer, Jessica's biological father, was a disabled drug user with no health insurance; Jessica did not need cardiac surgery; and Roman had been providing comprehensive medical care for all the children and paying the deductibles without complaint.

35.    After the September 9 meeting, Ms. Myers advised DCS headquarters that they had reached an agreement that Jessica would be seen by her pediatric cardiologist. On September 10, Roman e-mailed Ms. McAninch, giving additional information on Jessica's and Lynnette's concerns, providing Dr. Hurwitz's phone and fax information, and providing his own government e-mail for easier communication.

36.    *Riley appointment.* When Lynnette called, Dr. Hurwitz' office initially scheduled a checkup for October. However, after receiving a call, presumably from DCS, saying that Jessica was in respiratory distress and that Lynnette was refusing to provide medical care, Dr. Hurwitz moved the appointment up to September 15, and Lynnette arranged for blood work the prior day, as she had always done.

37.    At the September 15 appointment, Dr. Hurwitz found that DCS' concerns were unjustified. He assured Lynnette that Jessica was doing well and increased her warfarin prescription slightly (from 2.5 to 3 mg). In a letter to the family doctor, Dr. Hurwitz confirmed his findings, recommended blood testing in 2-3 weeks, and asked the family doctor to deal with the school. He confirmed that Jessica could participate in physical education except for varsity sports and excessively stressful activities, such as rope

climbing, and that she should be allowed to rest when tired. This was the same information that Lynnette had previously provided. In a September 16 e-mail, Roman notified DCS of Dr. Hurwitz' findings. At that point, the Finnegans thought the problem had been resolved.

38.   *Continued investigation.* Despite Dr. Hurwitz' assurances, DCS told the school nurse on October 4 that it was continuing its investigation. On October 11, the school principal filed a second complaint with DCS, claiming that Jessica had reported that Roman and Lynnette were locking up the food and not allowing her to eat. After investigating the house and interviewing the children, DCS found that this report was unsubstantiated. To anyone who knows Lynnette, this complaint was absurd: as the children have repeatedly made clear, *no one* goes hungry at Lynnette's.

39.   *Prescription errors.* In the meantime, the Finnegans were providing the same medical care to Jessica that they had always provided. In addition to routine prescription refills, they took Jessica to Riley on September 29 to check on a rash on her legs, and on October 4 and 12, they took Jessica to the family doctor for blood tests. On the second visit, the family doctor didn't take an INR (which would likely have been within the appropriate range) but instead wrote prescriptions that increased Jessica's warfarin prescription from 3 mg to 7 mg (5 mg and 2 mg) and eliminated Dilantin.

40.   This increase in warfarin was contrary to Dr. Hurwitz' instructions and outside the bounds of any accepted medical protocol, and there was no medically indicated reason for removing Dilantin. Every reviewing doctor has therefore concluded that these were prescription errors. These errors were not detected since, although Jessica was taking very different medications, she was taking the same number of pills. Thus, no one

– Jessica, Jessica's mother or the pharmacist – noticed that Jessica's prescriptions had changed in a manner that placed her at high risk of internal bleeding, seizure and sudden death.

41.    _Vaccinations._  On November 17, the school nurse e-mailed Lynnette advising that Jessica had only 4 DPT and 3 polio vaccines and asking Lynnette to either confirm that Jessica had had additional vaccines or take her to the Public Health Department for additional vaccines.  It is unclear why the nurse wanted additional vaccines since the school required only 4 DPT and 3 polio vaccines.  On November 28, the school nurse and principal advised Lynnette, by phone and in writing, that Jessica would be excluded from school if she had not had a 5th DPT and 4th polio vaccine by December 7.  After Lynnette consulted with the family doctor, Jessica had the vaccines at the Pulaski County Health Department on December 5.  As the Coroner notes in his Verdict, these vaccinations would have altered Jessica's immune system in an unknown and unpredictable way.

42.    _December 5 Substantiation._  On December 5, DCS substantiated medical neglect, stating that Lynnette and Roman would not have obtained appropriate medical care for Jessica without DCS intervention.  DCS notified the school of the substantiation but did not notify Roman, Lynnette or Jessica's doctors.  In reaching its conclusion, DCS did not mention the 14 years of medical care that Lynnette provided without DCS intervention. The care provided from June to December 2005, a period that included the period of alleged medical neglect, was typical:

| | |
|---|---|
| June 18 | filled prescriptions, Francesville (digoxin, Dilantin, warfarin) |
| July 19 | back-to-school physical, Knox (no concerns; rash) |
| July 20 | filled prescriptions, Francesville (digoxin, Dilantin, warfarin) |
| Sept. 2 | filled prescriptions, Francesville (digoxin, Dilantin, warfarin) |
| Sept. 14 | visit to family doctor, Knox; blood work at Starke Memorial Hospital |

| | |
|---|---|
| Sept. 15 | Riley cardiology checkup, Indianapolis (excellent report on health, small increase in warfarin) |
| Sept. 16 | filled prescription, Francesville (warfarin) |
| Sept. 29 | Riley dermatology appointment, Indianapolis (allergy to fleas or insects; prescribed medication) |
| Oct. 3 | filled prescription, Francesville (mupirocin, for rash) |
| Oct. 4 | blood test, Knox, to monitor warfarin increase. |
| Oct. 12 | returned to doctor, Knox, for blood test; family doctor did not take blood test and erroneously prescribed more than double dose of warfarin while eliminating Dilantin |
| Oct. 13 | filled prescriptions, Francesville (2 warfarin, digoxin) |
| Nov. 18 | filled prescriptions, Francesville (2 warfarin, digoxin) |
| Nov. 28 | doctor appointment, Knox, re vaccinations |
| Dec. 5 | mandatory vaccinations at Pulaski County Public Health, Winamac |
| Dec. 13 | return to Pulaski County Public Health re possible adverse reaction to vaccines (vomiting, diarrhea, tongue) |
| Dec. 13 | took Jessica to family doctor, Knox, who diagnosed flu and thrush, prescribed fungicide and suppository, recommended clear liquid diet, and instructed to return in a week if not better |
| Dec. 13 | filled prescription, Knox (suppository) |
| Dec. 14 | filled prescription, Francesville (fungicide) |
| Dec. 21 | planned to take Jessica to Riley if not better |

43.    During this period, Lynnette also obtained full physicals for Tabitha, Johnathon

and Katelynn, as well as follow-up neurology care for Tabitha.  In 14 years, Jessica's

doctors did not express any concern with missed appointments, indicate that Lynnette

failed to fill prescriptions or follow instructions, or suggest any type of abuse or neglect,

which they would have been required to report.  Ms. McAninch's failure to address or

consider any of this information in the December 5, 2005 substantiation was a violation

of the family's due process rights.

44.    While the medical records did not support a finding of medical neglect, they do

demonstrate a lack of coordination between Jessica's doctors.  On September 13, Dr..

Hurwitz's office told Ms. McAninch that Jessica needed to have monthly blood tests, but

a few hours later the family doctor told Ms. McAninch that no blood tests were being

performed.  DCS did not relay this information to Jessica's doctors or her parents.  On

September 16, Dr. Hurwitz' office again told Ms. McAninch that Jessica needed monthly blood tests. Once again, DCS did not relay this information to the family doctor or Jessica's parents.

45.    By December 5, when DCS substantiated medical neglect, the prescription errors had been in effect for nearly two months, and Jessica was at imminent risk of death from internal bleeding, seizure and/or heart failure, with some internal bleeding already present. Had DCS provided a copy of the substantiation to the Finnegans, as they are required to do, or notified the Finnegans or Jessica's doctors that monthly blood tests were needed but were not being taken, proper testing would have been implemented and the prescription errors would have been caught. Instead, DCS kept this information to itself, and Jessica died.

46.    *Jessica's illness.* On December 7, Jessica had a headache and trouble breathing (congestion). On December 8, she felt better and went to school. On December 9, she became sick at school, with a stomach ache but no vomiting or fever. On the 10th, Lynnette cancelled Jessica's weekend visit with her father since her back and lower stomach were hurting. On the 12th, she had vomiting, diarrhea and a sore tongue. On the 13th, Lynnette took Jessica back to the Pulaski County Health Department to see if her symptoms were related to the vaccinations. When the Health department told her that there was no connection, Lynnette took Jessica to the family doctor, who diagnosed flu and thrush, gave prescriptions for a fungicide and suppository, recommended a clear liquid diet, and said to bring her back in a week if she wasn't better. The doctor did not take an INR, and his instructions would have increased the impact of warfarin. The

doctor later told DCS that Jessica did not have a fever and was smiling and conversing during the appointment.

47.      That night, Jessica started her first period, with stomach ache and cramps.  She also bit her lip or tongue, causing it to bleed.  From December 14-18, she had stomach cramps, back ache, and a sore on her lip or tongue that bled when she bit or picked at it. She ate very little but kept down liquids and continued to talk, watch TV and play cards with the family.  By Sunday, December 18, her cramps and backache had gone, and a photograph shows her standing with her siblings, looking a little ill but otherwise normal. Apart from her first menstrual period, the only abnormalities noted by her family were that she was pale, took many baths, bit at her lip or tongue, causing it to bleed,  and didn't fight with her siblings, as she often did.  On December 19, the evening before her death, she had a headache, and she and her mother talked about going back to the doctor or to Riley.  However, her headache resolved with children's Tylenol, and she slept through the night.  The next morning, she was sleeping comfortably when her siblings left for school. Since Roman worked the late shift, Lynnette went back to bed after checking on Jessica. These facts have been confirmed – and re-confirmed – by all five family members in interviews, interrogations, affidavits, deposition testimony and trial testimony over a two year period.

48.      *Jessica's death*.  At about 2 p.m. on December 20, Lynnette found Jessica lying face down by the side of her bed, not breathing, with a small amount of blood by her mouth or nose.  Lynnette started CPR, and Roman, a trained CPR instructor, took over while Lynnette called 911.  CPR was unsuccessful, and Roman carried Jessica to the living room to give the paramedics room to work.  When the paramedics rolled her over,

a mixture of blood and mucous came from her mouth. She was then taken by ambulance to Jasper Hospital.

49.    _Initial investigations_.    The initial investigators found that Jessica's death was related to her heart condition and warfarin, with no signs of abuse or neglect. The emergency personnel found Jessica's death to be consistent with her heart condition and warfarin, and claims by DCS that Jessica had a laceration on her head and had been found lying in a pool of blood were determined to be unfounded. The first law enforcement investigator, Troy Yeoman of the Pulaski County Sheriff's Department, saw no signs of abuse or neglect and left the home at the same time as the ambulance. After a call from DCS, law enforcement was told to treat the home as a crime scene. The emergency reports indicate that "it is C.Y.A. 'cover your ass' here."

50.    At the house, Sgt. Yeoman, Deputy Coroner Dale Brunton and Sgt. Datzman of the Indiana State Police found no signs of neglect or abuse. Mr. Brunton told DCS that he imagined that Jessica hit her head, that the blood thinner (warfarin) might be a factor in the amount of blood, and that the parents were open and cooperative. At approximately 6 p.m., Sgt. Yeoman told DCS that the investigation at the residence was complete and that nothing was out of line. Sgt. Datzman took photographs and a video, which were consistent with a warfarin death.

51.    _Hospital and autopsy reports_. Given DCS' concerns, Dr. Kenneth Ahler (the emergency room physician and former Coroner for Jasper County), Mike Leskiw, R.N., Dr. Gordon Klockow (the Jasper County Coroner), and Dr. John Cavanaugh (the forensic pathologist who conducted the autopsy) carefully examined Jessica's body, finding no signs of abuse or neglect. Dr. Ahler ordered an x-ray of the skull, which showed no

fractures, and consulted with Dr. Hurwitz, Jessica's pediatric cardiologist, who told him that there were only about 200 surviving patients in the country with Jessica's condition and that 2/3 of the deaths were sudden, as in this case. After examining Jessica's body, talking to Dr. Hurwitz and interviewing the parents, Dr. Ahler attributed Jessica's death to congenital heart disease and sudden death syndrome. Dr. Klockow, the Coroner, also examined Jessica's body and advised DCS that he found no signs of abuse and that the death appeared to be natural.

52.    *Children's interview.*  Shortly after the children came home from school, DCS picked them up and held them for questioning for approximately six hours. The final interview, which ended at 9 p.m., was conducted by two DCS workers, including Ms. McAninch, and Mike Bardsley of the prosecutor's office. In the interview, which was surreptitiously tape recorded, the children are pleasant, open and polite, and they describe Jessica's illness in detail. They said Jessica had bitten her tongue or lip in her sleep, possibly during a seizure; that she had thrown up and had a fever; that she had gone to the doctor; that she drank tea, pop and juice but wasn't eating much; that she was having a menstrual period; that she had put some bloody tissues in a wastebasket; that she had been up and about between the bathroom, bedroom and living room; and that she took medicines. Katelynn said that the night before, Jessica "told mom she had a headache and that's all." Tabitha said Jessica took a chewable pill for the headache.

53.    The children seemed puzzled when DCS questioned them about their home life. Johnathon indicated that the family got along pretty well other than Jessica, who was "not too bad most of the time." Tabitha said that she liked her home "a lot." The children described sibling rivalries and stepparent adjustments, mostly due to Jessica wanting to

live with her father, and arguments "between the girls." There were no indications of abuse, neglect or inappropriate discipline. The DCS notes indicate that "after talking to the other three children in the home, we were not able to gain any additional information from them regarding their sister's health or environment. There was no concern that they were in jeopardy. All three stated that they were not usually sick so no medical neglect is evident there."

54.    *Roman and Lynnette's interviews.* Roman and Lynnette were interviewed at the house by Sgt. Yeoman (Lynnette) and Mr. Bardsley (Roman). They were cooperative, and the interviews contain no information suggesting abuse or neglect. When Roman and Lynnette went to DCS to pick up the children, Ms. McAninch, Ms. Salyers and others detained them for 2 ½-3 hours for further questioning. When Lynnette tried to see her children, who by then had been held for questioning for approximately 5 hours, Ms. Salyers threatened her with arrest.

55.    *Autopsy.* An autopsy conducted the day after death found no signs of abuse or neglect, and the preliminary autopsy report attributed Jessica's death to blunt force injury of the head consistent with a fall, with coagulopathy (Coumadin) as a contributing factor. This is a standard description of a warfarin death. The preliminary autopsy report does not note any fractures, and there were no bruises other than an old bruise on the knee and possibly a light contusion on the forehead consistent with the position in which she was found. The manner of death was undetermined, but was understood by the Coroner and Sgt. Datzman to be natural in nature. An autopsy report dated May 24 reached the same conclusions but also noted a skull fracture that was not noted in the preliminary report or mentioned at the autopsy.

56.    *DCS death investigation and related proceedings.*  Since DCS was unhappy with the medical investigations, which found no signs of abuse or neglect, and the law enforcement investigations, which were closed, Ms. McAninch and Ms. Myers conducted their own investigation.  After receiving the second autopsy report, they retained Dr. Antoinette Laskey, a pediatrician, to determine the cause and manner of death.  Ms. McAninch also contacted the schools for reports on Johnathon (age 18), Tabitha (nearly 17) and Katelynn (11).  The school counselors indicated that there were no signs of abuse or neglect and no concerns for any of the children.  Ms. McAninch and Ms. Myers also contacted the prosecutor, who agreed to call the Indiana State Police and to try to meet with the Coroner "to see if he will work with us rather than against us on medical neglect."

57.    *Laskey report.*  Shortly after receiving documents from DCS, Dr. Laskey told DCS that this was a homicide. DCS responded, saying, "Thank heaven someone other than the local Director [Ms. Myers] and FCM [Ms. McAninch] agree this child died from physical abuse."  As this confirms, Ms. McAninch, Ms. Myers and Dr. Laskey all knew that the Coroner, the forensic pathologist, the pediatric cardiologist, the emergency room doctor, and the law enforcement investigators did not agree with their position.

58.    Despite this knowledge, on October 28, Dr. Laskey wrote an opinion letter in which she concluded that Jessica died from a fatal beating on the day of death, causing internal hemorrhages and skull fracture.  Dr. Laskey attributed the beating to the caretakers at the time of death, *i.e.,* Roman and Lynnette, and said she had "grave concerns" for the safety of the remaining children.  In reaching this opinion, Dr. Laskey did not consult with the Coroner or any of the other investigators.

59.    At a subsequent deposition, Dr. Laskey advised that she was not qualified to determine the cause or manner of death, and that she was unfamiliar with Jessica's medical conditions. As numerous experts have since pointed out, her theory was also physiologically impossible: since warfarin causes easy bruising, the absence of bruising *precluded* any significant impact in the days up to and including the day of death, let alone a fatal beating or an impact sufficient to cause a skull fracture.

60.    Dr. Laskey's letter is filled with highly misleading and/or erroneous statements about Jessica's medical conditions and medications, confirming a recklessness in making accusations that were outside her area of expertise, as well as a complete indifference to the truth or the consequences of her actions. In particular, Dr. Laskey misrepresented the dangers of the Fontan procedure and warfarin, which are well-known and readily discoverable in a 30 minute internet search of reliable government sources.

61.    Dr. Laskey stated that Jessica's heart malformation was "considered repaired as of the completion of her Fontan procedure" but failed to mention that the Fontan procedure left Jessica with a two chambered heart and a high risk of sudden death from embolism or arrhythmia. After stating that Jessica's last recorded INR was 1.18 (it was actually 1.7, close to her target INR), Dr. Laskey claimed that warfarin does not cause spontaneous bleeding, that "it is medically reasonable to assume that [Jessica] was well within a safe range and was likely near or below her target INR of 2.0," and that simply being on warfarin could not explain *any* of her hemorrhages (emphasis in original). These statements are untrue. As the medical literature and FDA-mandated black box warning make clear, warfarin can cause spontaneous bleeding even in therapeutic doses, and it is *never* medically reasonable to assume that a warfarin patient is within a safe range,

particularly if ill, on dietary restrictions or taking other medications, factors that increase the impact of warfarin and were present here. While Dr. Laskey did not look at Jessica's prescription records and thus was not aware of the increased warfarin prescriptions, she should have noticed that post-mortem toxicology showed a high level of warfarin, which she viewed as "therapeutic," and no Dilantin, confirming that Jessica was at substantial risk of internal bleeding and seizure.

62.    Dr. Laskey's description of Jessica's hemorrhages as extensive and severe was also wrong: all of the hemorrhages were small, consistent with warfarin and inconsistent with a fatal beating. Her statement that Jessica's "injuries would have all resulted in immediate onset of symptoms that would have been severe and persistent until her death" was equally wrong. In fact, there were no injuries, just small hemorrhages consistent with warfarin. Such hemorrhages are typically asymptomatic or produce at most flu-like symptoms. Even her minor facts were wrong. For example, Dr. Laskey stated that "there were no sheets on the bed," yet the scene photos clearly show the sheets, which had small bloodstains consistent with a menstrual period and/or warfarin.

63.    Dr. Laskey further stated that she reached her conclusions following "extensive discussions with multiple pediatric cardiologists familiar with tricuspid atresia and Fontan procedures." At her deposition, Dr. Laskey retracted most of her errors but refused on advice of counsel to identify the pediatric cardiologists with whom she consulted, apart from a five minute hallway chat with Dr. Hurwitz, who did not provide this information. Since no competent pediatric cardiologist would have provided the information set forth in Dr. Laskey's letters, it is reasonable to assume that these

conversations did not occur. After two hours, Dr. Laskey walked out of the deposition, claiming a technical defect in service.

64.    *CHINS petitions*.    Based on Dr. Laskey's letter, DCS seized Tabitha and Katelynn on November 1, 2006, telling them that their mother had beaten Jessica to death and placing them in a secret out-of-county location for questioning and "therapeutic" foster care. At the November 3 CHINS hearing, Ms. McAninch testified that Tabitha and Katelynn were physically healthy and had no bruises and that she "truly believe[d] that they do not know how their sister died." Ms. McAninch nonetheless asked for continued detention so that DCS could continue its investigation and provide grief counseling for the loss of their sister, who died 10 months earlier. DCS records confirm that Tabitha and Katelynn, were distraught at their removal from their family and made very clear that they had seen nothing suggesting abuse or neglect.

65.    *Mental health evaluations*.    On November 28, mental health evaluations confirmed that Tabitha and Katelynn did not have any mental health issues and that the "only presenting issue" was that they needed a home while DCS finalized its investigation into the cause and manner of Jessica's death. A December 6 letter from a DCS-retained therapist confirmed that he was attempting to "jog" the children's memories of events leading up to Jessica's death on behalf of DCS. He reported that re-living Jessica's death would be very hard on Tabitha but hoped that she would hold the key to Jessica's death. The reports confirm that this process was even harder on Katelynn, whose separation from her family was, according to DCS reports, causing "uncontrollable stress." DCS reports also confirm that the family was emotionally bonded and that Lynnette was very protective of Tabitha and Katelynn.

66.    *December 18 CHINS hearing.*    At the December 18 CHINS hearing, Ms. McAninch testified that Tabitha and Katelynn were in need of services because the Finnegans had not accepted DCS-sponsored grief counseling on the day of Jessica's death, ten months earlier. According to Ms. McAninch, "[Tabitha and Katelynn] needed treatment. Those children have not grieved. They are slowly disclosing and I think if we keep them out of the home until the conclusion of the investigation it's in their best interest." In fact, all that Tabitha and Katelynn were disclosing was that they had not seen any signs of abuse or neglect and that they desperately wanted to go home, with Katelynn tearful and asking to go home almost daily. In urging detention until DCS could determine the cause of Jessica's death and assess the children's mental stability, Ms. McAninch did not disclose that the children's mental health evaluations were positive and that they had nothing to add to their earlier descriptions of Jessica's illness and death.

67.    *Coroner's Inquest.*    In the meantime, the Coroner's Inquest was continuing. In ten months, the Coroner had not found any indications of abuse or neglect but was continuing to investigate DCS' concerns, at considerable expense to Jasper and Pulaski counties. When DCS seized the girls based on Dr. Laskey's letter, the Coroner issued an administrative subpoena to DCS for all information relating to Jessica's death. When DCS refused to respond to the subpoena, the Coroner obtained a judicial subpoena from the Jasper County Court. When DCS moved to quash the subpoena in Pulaski County, the Pulaski County Court ordered DCS to provide the Coroner with access to the documents. Even so, DCS did not provide critical material, including the December 20,

2005 taped interview of the children and DCS case notes. In October 2007, DCS was held to be in contempt of court for its failure to provide these materials to the Coroner.

68.    *Roman's investigation.*    After the girls were seized, Roman and Lynnette learned that DCS and Dr. Laskey were claiming that Jessica had been fatally beaten on the day of her death. Roman, who conducts investigations for the Department of Corrections, immediately began his own investigation. Initially, he assumed that Dr. Laskey was right and that Jessica had indeed been beaten on the day of death. After creating a timeline, he excluded Lynnette (and himself) as possible perpetrators since they were together the morning that Jessica died. Since Jessica was alive when the other children left for school, he could also exclude Jessica's siblings. He then tried to determine whether an intruder could have come into the house. However, an intruder who entered through the doors would have had to pass the family Doberman, who was in the living room, and entry through the windows seemed unlikely since the storm windows were undisturbed. In either case, the Doberman, who was very protective, would never have allowed an intruder, or even a family member, to beat Jessica. After making the timeline, Roman realized that Dr. Laskey must be wrong. He therefore turned to the Internet and asked for help in interpreting Dr. Laskey's letter and the autopsy report.

69.    *Discovery of prescription errors.*    Several doctors, a former schoolteacher and an attorney responded to Roman's questions. From a medical perspective, the case wasn't difficult. As the Coroner recognized, in the absence of bruising, the small amounts of internal bleeding throughout Jessica's body had to be caused by warfarin, rather than impact. As a dentist, the Coroner was familiar with warfarin since special precautions must be taken in providing dental care to warfarin patients, who bleed and bruise easily

during even routine dental care. In this case, the absence of bruising *precluded* the possibility of a beating or an impact sufficient to cause a skull fracture.

70.     The skull fracture noted in the second autopsy report was more puzzling, particularly since it did not appear in the post-mortem x-rays or preliminary autopsy report. Given the lack of bruising or significant bleeding, it seemed unlikely that it was recent. Since skull fractures cannot generally be timed, from a medical perspective, a fracture could have occurred almost anytime in the past 14 years, most likely from a seizure or during activities such as horseback riding. Since Jessica had been on Dilantin for over a decade, a small skull fracture would not be uncommon.

71.     Given the medical issues, the Finnegans were told to obtain all of Jessica's medical records. Within weeks, this resulted in the discovery of the prescription errors, which explained Jessica's symptoms and death. The importance of the prescription errors cannot be over-emphasized: the increase in warfarin and elimination of Dilantin placed Jessica at high risk of internal bleeding and seizure and, if not caught, would almost inevitably be fatal.

72.     On December 18, the Finnegans' attorney, David Geisler, provided the prescription records to DCS, along with an e-mail from Dr. Harold Buttram, a family practitioner, who advised that, based on the autopsy findings, it was "glaringly apparent . . . that Jessica died from a hemorrhagic [bleeding] disorder of some sort," with vaccines as a possible triggering factor. Since there were no signs of blunt force injuries, he suggested that there would be a medical explanation for the skull fracture. At Mr. Geisler's request, Heather Kirkwood, a Seattle attorney, spoke to Det. McDonald and the prosecutor in early January to ensure that they understood the significance of the

prescription errors. By January 12, the Finnegans had provided Det. McDonald with medical articles on the mortality rates for Fontan and warfarin patients; an affidavit from Dr. Innis. a hematologist and pathologist, pointing out the obvious errors in Dr. Laskey's letter; and an affidavit from Professor Lambert, one of the nation's leading experts on medication error, who confirmed the likely impact of the prescription errors.

73. *Search warrant and exhumation*. On January 15, Det. McDonald and the prosecutor obtained an order to exhume Jessica's body and search the Finnegan's home. The stated purposes of the exhumation were: (a) to attempt to match the shape of two internal hemorrhages (most notably, a subdural hemorrhage) sketched by Dr. Cavanaugh to a design on a magazine rack in the Finnegan's home, and (b) to re-examine the skull fracture that appeared for the first time in the May 2007 autopsy report. The search warrant was to find objects that matched the shape of the internal hemorrhages.

74. In obtaining the exhumation order, Det. McDonald did not tell the Court of: (a) the prescription errors, which explained the hemorrhages; (b) the post-mortem skull x-ray, which did not show any fractures; (c) the medical literature on the mortality rates for Fontan and warfarin patients; or (d) Dr. Innis' and Dr. Lamberts' declarations. Det. McDonald further misled the Court by implying that she was attempting to match the shape of an *external* injury to the design on the magazine rack. In fact, a subdural hemorrhage is an *internal* hemorrhage, deep inside the skull, that cannot be matched to anything, let alone a design on a magazine rack. As a former nurse, Det. McDonald must have known that there was no medical basis for her claims.

75.    *Search of home (January 15)*.  At the Finnegan home, Det. McDonald seized the magazine rack and a wooden paddle made by Johnathon in a woodworking class.  Det. McDonald did not interview Roman and Lynnette, who were home and very cooperative.

76.    *Exhumation (January 25)*.  On January 25, Jessica's body was exhumed and a second autopsy performed by Dr. Michael Baden, a New York State Police pathologist who was assisted by Rob Appleton of the New York State Police and Dr. Cavanaugh. The exhumation was also attended by the Coroner; a Deputy Coroner; Det. McDonald and her partner, Brian Schnick; two ISP technicians, Sgt. Datzman and Sgt. Kintzele; and several DCS employees, including Ms. Myers and Ms. McAninch.  Heather Kirkwood attended on behalf of the Finnegans, who could not afford a medical expert.

77.    At the exhumation, the Coroner and Sgt. Kintzele, an ISP technician, determined that the fracture(s) came off the saw line, with fractures below but not above the cut, indicating that the fractures were created at the first autopsy.  The subdural hemorrhage was small and old, indicating that it was not the cause of death and occurred well before the morning of death, consistent with the prescription errors.  Dr. Baden refused to attempt to match the subdural to the design on the magazine rack and confirmed that there were no signs of external trauma and no additional findings.

78.    On January 31, Dr. Klockow and Sgt. Kintzele confirmed the post-mortem nature of the skull fracture(s) based on the exhumation photographs.  Det. McDonald and her partner did not write reports on the exhumation, and the Finnegans did not learn of the post-mortem nature of the skull fracture until May-June 2007, following their arrest.

79.    *Johnathon's interrogation  (January 29)*.  Four days after the exhumation, Det. McDonald and her partner, Det. Schnick, interrogated Johnathon, a high school senior,

for six hours, focusing on Johnathon's relationship with his parents. Johnathon confirmed that the children were sometimes grounded for disrespecting their parents and described several fights with Roman and Lynnette, but said that "most of these fights were a result of his and his sisters' disrespect and that they, for the most part, deserved what they got." Johnathon said that Jessica was the only child who would argue and swear at Lynnette, but that he didn't recall Lynnette ever getting physical with her.

80.    Johnathon said Jessica had seizures in the past but not recently, and again described Jessica's illness in the days before her death. Thus, he described a sore or sores on Jessica's mouth and/or tongue that bled when she picked at them and attributed the bloody tissues to these sores. He was pretty sure that Jessica had started her period but didn't recall much blood around the house before her death. He said that the night before she died, Jessica ate Ramen noodles for dinner, spent time with the family on the couch, and went to bed around 9 p.m., joking that she didn't want to "throw up on everyone." He said she complained of stomach ache and headache, and that Lynnette gave her a children's pain reliever before she went to bed. He insisted that he didn't see anything that would have caused a skull fracture, and that he had thought Jessica died from a complication with her heart and illness.

81.    According to Det. McDonald, Johnathon also said that Jessica was crying and "begging" to go to the hospital the night before she died. This description is contrary to the December 2005 taped interview of the children, the statements made by the other children, and Johnathon's other statements, which described Jessica "joking" on the night before she died. Even when Det. McDonald told Johnathon, falsely, that his mother was blaming Jessica's death on him, Johnathon insisted that he didn't see anything happen to

Jessica around the time of her death that could have caused injuries. Det. McDonald said she was "very shocked to see [Johnathan's] lack of response when I told him that his mother was blaming the injuries and subsequent death of his sister on him." However, recorded messages from Johnathon, in which he is virtually hysterical, reveal the extent of the damage. Since then, the relationship between Johnathon and his parents has not been fully repaired.

82.     *Tabitha's Interrogation*.  On January 31, Det. McDonald questioned Tabitha, a high school sophomore, for 4½ hours.  Her partner took notes, which have apparently been lost.  Nearly three months later, Det. McDonald wrote up a report of the interrogation.  Despite the fact that Det. McDonald knew that the Coroner and Sgt. Kintzele believed the skull fracture to be post-mortem, Det. McDonald insisted that Tabitha attempt to recall an incident in which Jessica fractured her skull.  Tabitha could not recall such an incident and said she had always been under the impression that Jessica died from complications from her heart.  Tabitha's description of Jessica's illness prior to her death was the same as the children's earlier description:  Jessica threw up; was pale; didn't eat much though sometimes ate Ramen noodles; took multiple baths; slept a lot; had bleeding in her mouth, seemingly from biting her tongue; and was having a menstrual period.  She spent a lot of time on the couch with her family conversing and laughing until the last couple days, when she seemed "out of it."  Tabitha agreed that Jessica was the sickest she had ever seen her, and said she saw Jessica in her bed, covered up, sleeping on the morning she died.

83.     In her report, Det. McDonald claimed that Tabitha also said that "blood would pool in [Jessica's] lower lip and teeth as she was talking," that she had seen Lynnette "hit

Jessica in the face with a closed fist in the past," that Jessica asked Lynnette "to take her

to the hospital, crying" the night before she died, and that Lynnette told her that

Johnathon might be responsible for Jessica's injuries.  These statements are contrary to

statements made by Tabitha over a two year period in therapy sessions, taped interviews,

and sworn trial and deposition testimony.  Since Det. McDonald did not question Tabitha

about these alleged inconsistencies in a subsequent taped interview or at the CHINS

hearing, where Det. McDonald sat at counsel table and was available to testify – and

since Tabitha did not seem to know what the DCS attorney was talking about when she

mentioned blood "pooling" in Jessica's mouth – it appears that Det. McDonald added

these flourishes to the report, which was written three months after the interview.

84.    *Tabitha's participation in proceedings.*    Despite legal requirements, DCS and

Tabitha's Guardian ad Litem (GAL) refused to allow Tabitha to attend or testify in the

CHINS proceedings or the Coroner's Inquest despite her expressed desire to do so.  In

February, the GAL moved to quash the Coroner's subpoena for Tabitha's testimony,

claiming that it would be detrimental to Tabitha's best interests to have to testify and that

to the best of the GAL's knowledge no party had ever alleged that Tabitha was present

when Jessica died or that she could give any evidence or testimony that would assist the

Coroner in determining the cause of death.  This was contrary to DCS' and Det.

McDonald's claim that Tabitha was a key witness, a claim that DCS and later Det.

McDonald used to justify the children's detention.  Based on the GAL's representations,

the Coroner withdrew his subpoena.

85.    *Discovery requests and March submissions.*    When DCS and Det. McDonald

refused to acknowledge the prescription errors or address the medical issues, the

30

Finnegans submitted interrogatories, document requests and requests for admissions. They also filed a memorandum identifying the medical issues and provided DCS with three volumes of material, including: (a) the pharmacy records establishing the prescription errors; (b) Jessica's medical records; (c) the medical literature on Jessica's medical conditions and medications, including the mortality rate for the Fontan procedure, the risks of warfarin, and the risks of skull fracture in epilepsy; (d) the declarations from Dr. Innis and Professor Lambert; (e) declarations of family members on Jessica's conditions; and (f) declarations from teachers and co-workers. DCS moved to strike this information on the ground that it contained "evidence and opinion" and was an attempt "to get evidence in front of the court" prior to a full hearing on the merits. The Court did not strike the materials but considered them to be "evidentiary matters" that would not be considered by the Court until a full hearing. The Court also ordered that all motions be made in writing.

86.    *March motions.*    In response to the Court's order, on March 23, the Finnegans filed written motions and a Statement of Facts summarizing the issues and evidence. In the motions, the Finnegans requested appointment of counsel for Lynnette, Roman and the children; funding for experts; partial exclusion of Ms. McAninch's testimony; release of Tabitha and Katelynn from detention; and dismissal of the CHINS petition. The Finnegans also asked the Court to assume oversight of the visitation schedule and order DCS to disclose all exculpatory information.

87.    *March substantiations.*    In a letter dated March 30, Ms. McAninch and Ms. Myers sent Roman and Lynnette substantiations of death from physical abuse, internal injury, bruises/cuts/welts, skull fractures/brain damage, medical neglect, and environment

life/health endangering conditions for Jessica, with Roman and Lynnette identified as the perpetrators. They also substantiated environment life/health endangering conditions for Johnathon, Tabitha and Katelynn. In these substantiations, Ms. McAninch and Ms. Myers do not mention the prescription errors; the post-mortem nature of the skull fracture; Tabitha's and Katelynn's failure to disclose abuse or neglect during five months of investigative therapy; the medical literature provided by the Finnegans; the declarations of Dr. Innis and Professor Lambert; or any other exculpatory information. Ms. McAninch's and Ms. Myer's failure to address or consider any of this information violated the family's due process rights.

88.    *DCS Interrogatory Responses.*  In April, DCS moved to delay or quash the Finnegans' initial discovery requests. In addition, in response to the Finnegans' second set of interrogatories, which asked them to identify which of the autopsy findings DCS contended were caused by abuse, DCS stated that this information was not within DCS' knowledge but required that DCS give medical opinions, which it was not qualified to do, or obtain information from other sources, which it was not obligated to do. In short, DCS was still unable to explain the basis for its theories.

89.    *Laskey deposition.*  On April 16, Dr. Laskey testified that she was not qualified to determine the cause and manner of death and that she was not aware of the prescription errors when she wrote her letter. She further testified that she was not familiar with Jessica's medical conditions (particularly, the Fontan procedure); that the internal bleeding she had attributed to a fatal beating was consistent with warfarin; that there were no external signs of bruising or a beating; and that the skull fracture that she had attributed to a beating on the day of death could not be dated. Apart from the five minute

hallway chat with Dr. Hurwitz, Dr. Laskey refused on advice of counsel to identify the "multiple pediatric cardiologists" with whom she had the "extensive discussions" on which she based her opinion. Dr. Laskey also maintained that the family doctor only intended to increase Jessica's warfarin prescription to 5 mg rather than 7 mg, a claim was unsupported by the evidence and would likely have made no difference to the outcome. This argument suggests that Dr. Laskey was working with Det. McDonald, who, unbeknownst to the Finnegans, also advanced this claim. After two hours, Dr. Laskey walked out of the deposition.

90.     Immediately after Dr. Laskey's deposition, the Finnegans counsel advised Deniece Safewright, Deputy General Counsel for DCS, that Dr. Laskey had retracted critical portions of her October 28 letter, which was the sole basis for the detention of the children. Ms. Safewright told the Finnegans' counsel that DCS would not consider any new information, even if fully exculpatory, and that Roman and Lynnette therefore needed to prepare for trial.

91.     *April 16-17 ISP reports on Tabitha's interrogation.* On April 16, the same day as Dr. Laskey's deposition and the meeting with Ms. Safewright, Det. McDonald wrote up her recollections of Tabitha's January interrogation. As indicated, this write-up included statements that are contrary to all of Tabitha's other statements. The following day, Det. McDonald wrote up a meeting with Dr. Cavanaugh, in which Dr. Cavanaugh reportedly claimed that the skull fracture occurred 24 hours before death. There is, however, no medical basis for dating a skull fracture in this manner, and Dr. Cavanaugh has never made this claim in his written reports. According to Det. McDonald, Dr. Cavanaugh also

said that he may have extended the fracture at autopsy but could not have caused it, and that it was not possible to determine its cause, which could include fall, seizure or blow.

92.     In the April 17 report, Det. McDonald also claimed that, in their January interrogations, both children reported "copious amounts of blood coming from [Jessica's] mouth for a few days before her death." Since "copious" is not a word these children would use, Det. McDonald was likely confusing the children's statements with EMT reports indicating that, during intubation, "copious amounts of bright red blood [were] yankered from oral/nasal cavities," as is typical in warfarin deaths. In the remainder of the report, Det. McDonald attacks the care provided to Jessica by her parents, doctors and teachers starting in 1995 (the year before the final open heart surgery), blames Lynnette for the doctors' failure to take monthly INRs, and states that she will provide this information to the prosecutor for possible filing of charges.

93.     *Criminal charges (April 23).* For months, the prosecutor and Det. McDonald had refused to discuss the medical evidence with the Finnegans or their counsel. However, in early April, the prosecutor agreed to meet with the Finnegans' counsel to discuss the medical evidence at 10 a.m. on April 24, the prosecutor's first available date. On April 23, the Finnegans provided DCS with a copy of the Laskey deposition. On the same day, the prosecutor and Det. McDonald filed criminal charges against the Finnegans, charging them with medical neglect. On April 24, as the Finnegans and their counsel were leaving to meet with the prosecutor, Det. McDonald arrested the Finnegans. On the way to the jail, Det. McDonald mocked Lynnette, telling her that she had gotten "all dressed up for nothing."

94.    The criminal charges, which list Det. McDonald as the only witness, were based on an alleged failure to obtain medical care for Jessica from 2000-2005 and for failure to obtain medical care in the two days before death that, according to Det. McDonald, resulted in swelling of the brain and loss of bodily function. In her probable cause affidavit, Det. McDonald repeated misinformation provided by DCS, specifically, Ms. McAninch and Ms. Myers, and did not disclose that: (a) Jessica's brain was unusually small, not swollen; (b) the skull fracture was post-mortem, as determined by the Coroner and Sgt. Kintzele; (c) the medical records contained more than 1,000 pages of medical care provided by Lynnette, with 18 appointments and prescription refills in the six months before death alone; (d) the increase in warfarin and elimination of Dilantin placed Jessica at high risk of sudden death, as confirmed by Dr. Innis and Professor Lambert; and (e) Dr. Laskey had retracted most of her earlier accusations and was no longer retained by DCS. Det. McDonald also blamed the doctors' failures to order INRs on Lynnette and got the jurisdiction wrong: Roman and Lynnette did not move to Pulaski County until May 25, 2005. Based on the criminal charges, Roman, a well-respected 17 year trainer for the Department of Corrections, was automatically suspended without pay from his job.

95.    *Roman's interrogation.* Immediately after Roman's arrest, Det. McDonald and her partner interrogated him. In the videotaped interrogation, Det. McDonald and her partner insisted that Jessica died from a skull fracture. Over and over, they told Roman that a blow to Jessica's head caused her skull to fracture, her head to split open and her brain to swell, causing her death. They also claimed that it was "scientifically" and "medically" established that she had the fracture before the day of death. This

interrogation took place 3 months after the exhumation and more than 2½ months after the Coroner and Sgt. Kintzele confirmed that the fracture was created at the first autopsy. Not surprisingly, Roman had not seen any events that might have caused a skull fracture or any symptoms that might have been caused by a skull fracture.

96.     *ISP investigation records*.   In May, the prosecutor provided the Finnegans' counsel with a copy of the investigation binder given to her by Jennifer McDonald, saying that she had not had time to look at it. This binder contained the Kintzele report confirming the post-mortem nature of the skull fracture and indicated that four sets of autopsy slides had been prepared. The Finnegans' counsel immediately attempted to obtain the fracture photographs and autopsy slides. In response to a subpoena, Det. McDonald advised that the photographs had been sent to ISP headquarters and would take "a long time" to copy.  Dr. Cavanaugh told the Finnegans counsel that he had obtained four sets of autopsy slides – one for him, one for the Coroner, one for Det. McDonald, and one for defense counsel – and that he had given defense counsel's set to Det. McDonald for delivery to defense counsel. Det. McDonald refused to provide defense counsel with the slides, and defense counsel eventually learned that she had sent defense counsel's slides to Dr. Baden, who offered to return them to defense counsel. When Det. McDonald objected, Dr. Baden returned them to Det. McDonald, who again refused to provide them to defense counsel. After several rounds of negotiations, the prosecutor produced the photographs and arranged for the delivery of the slides, which were exculpatory.

97.     *Nutescu affidavit*.  Professor Nutescu is a Professor of Pharmacy, Director of the Anticoagulation Clinic at the University of Illinois at Chicago, and one of the world's

36

leading experts on warfarin. In a May 29 affidavit, Professor Nutescu made clear that the increase in warfarin from 3 to 7 mg (or even 5 mg) was outside the bounds of acceptable medical practice and placed Jessica at a high risk of potentially fatal internal bleeding. Given this error, it was possible that Jessica's INR could have increased exponentially to 20 or even been so high as to be unreadable. Professor Nutescu made clear that it is the responsibility of the prescribing doctor, not the patient or the parents, to order and monitor a patient's INRs, and to educate and re-educate patients on the dangers of warfarin. Dr. Nutescu further confirmed that warfarin deaths may be asymptomatic or characterized by sudden collapse after a minor illness or flu-like symptoms; that the internal hemorrhages found at Jessica's autopsy were characteristic of death from over-anticoagulation; and that the absence of bruising precluded the possibility that the internal bleeding was caused by a beating or external force.

98.    *Amended CHINS petitions (May 25)*. On May 25, DCS withdrew its earlier CHINS petition and all claims of physical abuse, substituting a claim of medical neglect by Lynnette in the two days before death. At a hearing, DCS counsel confirmed it was not claiming "swelling of the brain" or "blunt force trauma," but refused to explain its theory or provide any evidence to support it. The petition alleged that Tabitha and Katelynn were in serious danger of physical harm based on DCS' concern that Lynnette might not provide adequate medical care should they become ill, but this appeared to be a pretext since DCS also opposed grandparent placement stating that "it's our belief that until the criminal case is finished there's too much possibility of undue influence, and basically witness tampering with what is a critical witness." The witness in question was

presumably Tabitha.  The Court set a hearing on grandparent placement for June 19 and a
fact finding hearing on the CHINS petition for July 18-20.

99.    *DCS discovery responses (May 29).*   In its responses to the Finnegans' discovery
requests, DCS denied that Jessica's warfarin prescription had been increased despite
pharmacy records and handwritten prescriptions confirming the increase, which had been
subpoenaed from the pharmacy and acknowledged by Det. McDonald and the family
doctor.  DCS also denied that Jessica had ever taken Dilantin on a regular basis despite
pharmacy records showing a decade of filled prescriptions.  DCS admitted for the first
time that complications of the Fontan procedure included heart failure, stroke and sudden
death, including late term death (*i.e.,* death occurring many years after the procedure);
that warfarin may cause fatal bleeding and increases the tendency to bruise; and that
Jessica had no significant bruising.  However, DCS refused to answer interrogatories on
these issues and claimed that any medication errors were irrelevant.

100.    DCS also stated that it was relying on the Indiana State Police to conduct its
investigation, and that its experts were Dr. Cavanaugh and Dr. Laskey.  However, Dr.
Cavanaugh had never addressed – and was not qualified to address – the quality of care
provided by Jessica's cardiologist and family doctors, and Dr. Laskey had already
recanted her earlier letter and was no longer retained by DCS.  In its discovery responses,
DCS admitted that it had made a tape recording of the children's Dec. 20, 2005 interview
but said that it had given the recording to Det. McDonald, who refused to provide it.

101.    *June ISP interview: Tabitha (June 11).*   On June 11, Det. McDonald re-
interviewed Tabitha.  In this tape-recorded session, Det. McDonald told Tabitha that
Jessica died from a skull fracture that caused her brain to swell and get "tighter and

tighter and tighter" within her skull, like a coconut, putting pressure on all parts of her brain. Det. McDonald also told Tabitha that, based on microscopic slides taken at autopsy, the doctors could time the skull fracture to about 24 hours before Jessica's death.

102.    In fact, there were no autopsy slides of the fracture, and it was by then well known that the exhumation photographs established that the fracture was created at the first autopsy and that Det. McDonald's theory of a skull fracture occurring 24 hours before death was physiologically impossible. Again, Tabitha could not recall any incident in which Jessica might have fractured her skull prior to her death.

103.    *June 19 hearing (grandparent placement).* Under federal and state law, DCS was required to consider relative placement in preference to foster care. However, DCS consistently refused to do so. Since the only claim in the May CHINS petition was that Tabitha and Katelynn were in physical danger because Roman and Lynnette might not obtain adequate medical care, Dr. Heinsen, a family practitioner whose office had previously treated all four children, offered to assume responsibility for Tabitha's and Katelynn's physical health so that they could return home or be placed with their grandparents. Ms. Salyers and Ms. Myers refused to accept this plan, which was comprehensive and included weekly checkups, supplemented by cell phone communication. On June 19, the Court cancelled the grandparent hearing, which had been fully briefed.

104.    *Autopsy slides, photographs and medical reviews (June – July 2007).* From January to June, DCS and Det. McDonald refused to provide the Finnegans with the autopsy slides, autopsy photographs or the December 20, 2005 interview tape. However, by mid-June to mid-July, the Finnegans were beginning to obtain this material from third

parties, including the prosecutor, through subpoenas and *Brady* requests. The reports on this material were unanimous and unequivocal: the death was caused by prescription error, the hemorrhages were from warfarin, the skull fracture was post-mortem, and the children had not seen or experienced neglect or abuse.

105.    *Leestma report (June 18)*.   On June 18, Dr. Leestma, a leading neuropathologist and author of *Forensic Neuropathology,* provided an affidavit confirming that the prescription errors placed Jessica at high risk of internal bleeding, seizure and sudden death. Based on photographs, he confirmed that the subdural hemorrhage was old (consistent with the prescription error) and unlikely to have caused death, and that the absence of significant bleeding or bruising confirmed that she had not had a significant impact to her head in the days before death. Dr. Leestma indicated that Dr. Cavanaugh's autopsy report was a standard description of a warfarin death caused by a minor fall, but noted that the clinical history suggested that the immediate cause of death might be heart arrhythmia (due to the Fontan procedure) and seizure, triggered by prescription error. Heart arrhythmia and seizure are not detectable at autopsy. Based on the available information, Dr. Leestma attributed Jessica's death to her heart condition, seizure disorder, and medications.

106.    *Leestma report (June 29)*.   After receiving the autopsy slides and x-ray, Dr. Leestma provided a more detailed review of the medical evidence. He confirmed that the subdural was weeks to months old, consistent with the prescription error and inconsistent with a blow to the head; the fracture was post-mortem; and the brain was small, as is typical of congenital heart disease. The hemorrhages were caused by warfarin, with no indication of physical force or trauma. Dr. Leestma pointed out that Dr. Laskey was not

qualified to determine the cause or manner of death or to review the histology (microscopic slides), which are critical in determining timing as well as causation. Dr. Leestma concluded that the death was due to cardiac arrest due to congenital cyanotic heart disease post-Fontan, with coagulopathy (warfarin), epilepsy and possibly dehydration as contributing factors.

107.    *Pless report (July 10)*.    On July 10, Dr. John Pless provided a report confirming that the hemorrhages were spontaneous and due to Coumadin therapy; that the fracture was post-mortem, as admitted to him by Dr. Cavanaugh; and that the death was predictable due to the severity of Jessica's heart anomaly. As Dr. Pless noted, it is not possible to have internal bleeding from blunt force injury without external evidence of trauma, particularly in warfarin patients. Dr. Pless commended the care provided to Jessica by her parents and her doctors at Riley, noting that it was a credit to Jessica's parents that she was able to survive as long as she did.

108.    *Nutescu deposition (July 2)*.    At her videotaped deposition, Professor Nutescu explained warfarin therapy in considerable detail and testified that the internal hemorrhages were consistent with warfarin and inconsistent with a beating, which would have caused extensive bruising. Professor Nutescu confirmed that changes in Jessica's medications were prescription errors and that Jessica's flu-like symptoms were typical of a warfarin death from over-anticoagulation.

109.    *Pretrial conferences*.    At the July 5 conference of counsel, the Finnegans identified more than two dozen witnesses, including the Coroner, Dr. Pless, Dr. Leestma, Dr. Ahler, Dr. Buttram, Professor Lambert, Professor Nutescu, two ISP investigators, and Jessica's 4th-7th grade teachers. Since the Court had not approved funding, all of the

Finnegans' experts were testifying on a *pro bono* basis at their own expense. The Finnegans also furnished an exhibit list.

110.    DCS identified its primary witnesses as Johnathon, Tabitha, Regina McAninch and Dr. Cavanaugh (by deposition) but advised that they had not yet spoken to Dr. Cavanaugh, Johnathon or Tabitha and did not know what they might say. Shortly thereafter, DCS cancelled Dr. Cavanaugh's deposition, without explanation. DCS indicated that they would not call Dr. Laskey, that they might or might not call some of the investigators, and that they would call Det. McDonald for rebuttal only, if at all. DCS did not furnish an exhibit list.

111.    At the July 12 pretrial conference, DCS moved for a continuance of the CHINS factfinding hearing. The Court granted the motion, turning the factfinding into a detention hearing at which DCS was to produce evidence to support its amended petitions, and the Finnegans were to produce evidence to the contrary.

112.    *Interview tape and therapy notes.*   Shortly before the CHINS hearing, the Finnegans obtained the December 2005 interview tape, Tabitha's June interview tape, and the girls' therapy notes. All of these materials were exculpatory. As Dr. Krupsaw noted in his June affidavit, and as Dr. Kenny subsequently confirmed, the children's failure to disclose abuse or neglect despite nine months of improper investigative therapy was strong evidence that they had not seen or experienced abuse or neglect.

113.    *Coroner's Verdict.*  On July 17, 2007, the Coroner ruled that Jessica died an accidental death from the prescription errors, causing seizure, cerebral anoxia (lack of oxygen to the brain) and sudden cardiac arrest. The Coroner also ruled that all skull fractures were created at the first autopsy.

114.    *CHINS hearing (July 18-19).*  On July 18, DCS appeared in Court with no

witnesses other than Ms. McAninch.  DCS told the Court they had not brought Tabitha or

Katelynn since they did not want them to miss summer school.  After the opening

arguments, which included a thorough review of the medical evidence, DCS did not offer

any witnesses, and the Court ordered DCS to produce Tabitha.  In her testimony, Tabitha,

a mature and responsible 17-year-old, provided the same information that she had been

giving for a year and a half, namely, that Jessica had flu-like symptoms in the week

before her death; that she was pale, took frequent baths and didn't eat much; and that

closer to when she died, she had a headache.  She also had "bleeding from the mouth,"

which Tabitha described as a thin outline of dry blood on our bottom and top lip.  Tabitha

made clear that she "really liked her home," that her mother was overprotective and

provided good care, and that Roman (whom she calls Ray) was always kind to her.  She

laughed when asked if she was afraid of her mother or Ray, and laughed again when

asked if Katelynn was afraid of Ray or her mother. Tabitha said she and Katelynn missed

her mother, Roman, her home and the animals, and she did not understand why DCS was

claiming that she and Katelynn could not safely return home.

115.    Tabitha further testified that she felt that Det. McDonald twisted her words and

that she had wanted to participate in the CHINS hearings in November and December but

was not allowed to do so.  She did not appear to know that she had been subpoenaed for

the Coroner's Inquest.  When asked if she had anything else she would like to tell the

Court, Tabitha said that she wanted to go home.

116.    *Other witnesses.*  On the second day of the hearing, nearly two dozen of the

Finnegans' witnesses, including Dr. Klockow, Dr. Ahler, Mike Leskiw (R.N.), Sgt.

Kintzele, Sgt. Datzman and a variety of teachers, including Jessica's 4th-7th grade teachers, assembled outside the courtroom, prepared to testify on behalf of the Finnegans. Dr. Leestma, Dr. Pless and Professor Lambert were scheduled to testify the following morning. However, DCS continued to insist on its right to call the first witnesses, while simultaneously refusing to call them. The Finnegans finally called two witnesses named as potential witnesses by DCS – Sgt. Datzman and Sgt. Kintzele – simply to get the process moving. When Sgt. Datzman and Kintzele confirmed their reports, including the results of the second autopsy, DCS agreed to return the children.

117.    Det. McDonald immediately notified the prosecutor that DCS had agreed to return the children, and the prosecutor sought a restraining order prohibiting the children from returning home. The Court compromised by giving the prosecutor one week to depose the children. DCS agreed to draft the order, which allowed a staged reunification, with the girls to return home permanently and Tabitha's petition to be dismissed by August 3.

118.    *Ex parte contact (July 25)*.  On July 25, Ms. Myers, the local DCS Director, contacted the Court *ex parte* saying that Tabitha and Katelynn had expressed a desire not to go home. The Court informed all parties of this contact. On information and belief, Ms. Myers also advised the Court that Tabitha would be "giving up" years of college funding should she be allowed to return home before her 18th birthday.

119.    *Tabitha's and Katelynn's depositions (July 26)*.  On July 26, the prosecutor deposed Tabitha and Katelynn, who provided the same information they had been providing since Jessica died. They testified that they got along well with their mother and Roman, and that they had never seen an argument between Jessica and Lynnette or Roman become physical. They also testified about Jessica's illness in the days before

death, saying that she took many baths; appeared to have bitten her lip or tongue, possibly during a seizure; and had flu-like symptoms, possibly from her first menstrual period. Like Tabitha, Katelynn testified that she wanted to go home. After the depositions, the prosecutor agreed that the children could return home.

120.    *July 19 Orders*. Despite the agreement, which was placed on the Court record, DCS initially refused to draft an order and ultimately providing orders that contained findings that were contrary to the record. Presumably in response to Ms. Myers' contact, the Court added provisions relating to college funding for Tabitha but told counsel for both parties that the girls were to return home by August 3. DCS was also to provide the Finnegans with a list of approved psychologists so that the Finnegans could select a psychologist, with psychological evaluations to be completed within a month, to be paid for by DCS.

121.    From July 26 to August 3, DCS repeatedly confirmed that the girls would be coming home on August 3. However, contrary to the Court's order, Ms. Myers did not provide the Finnegans with a list of all approved psychologists and instead scheduled psychological evaluations with a psychologist of DCS' choosing, scheduling the appointments for August 3, the day of the girls' scheduled return. When the Finnegans' counsel insisted that DCS comply with the court order, DCS initially threatened to detain the girls but then assured the Finnegans' counsel that they were making arrangements for the girls' return on August 3. These assurances continued through the morning of August 3, with the Finnegans waiting by the phone for instructions on the pick-up. At 3 pm, DCS cancelled the girls' return, indicating that they did not intend to return the girls until at least October.

122.    *Contempt motion.*  On August 6, the Finnegans filed a contempt motion for the return of the girls, the provision of a list of all DCS-approved psychologists, and attorney fees.  The Court scheduled a hearing for August 9.

123.    *E-mail from Tabitha (August 8).*  The day before the hearing, Tabitha told her parents that DCS was offering to pay full college, room and board for four years if she would agree to remain in foster care.  On August 8, Tabitha e-mailed the Finnegan's counsel, outlining DCS' offer.  She closed her e-mail by stating, **"another thing I have NEVER told anyone that I didn't want to come home."**

124.    *August 9 hearing.*  At the August 9 hearing, the Court ordered DCS to return the girls and their belongings to Lynnette and Roman at 8:30 p.m. that day, at the Marathon gas station in Plymouth.  DCS never did provide a list of psychologists.

125.    *Motion to dismiss Tabitha's CHINS petition.*  On August 13, DCS moved to dismiss Tabitha's CHINS petition.

126.    *Psychological evaluations.*  Since DCS refused to provide a list of approved psychologist, the Finnegans retained Dr. James Kenny, a highly respected psychologist who co-authored the Indiana parenting guidelines and who currently sits on a Governor's commission on DCS and foster care.  On August 25, Dr. Kenny submitted favorable psychological evaluations for Roman and Lynnette.  Dr. Kenny was impressed by Lynnette's knowledge, caring and concern for her children, and also noted her learning disorder.  He further noted Roman's letters of reference and commendation, which repeatedly described him as reliable, compassionate, patient, conscientious, hardworking, respected by both staff and offenders, honest, well-liked, even-tempered and having good communication skills – skills that are equally applicable to parenting.

127.   *Lack of probable cause (criminal charges).*  On August 27, the prosecutor agreed that she did not have probable cause to pursue the criminal charges and asked for an extension to September 10 to file amended charges.

128.   *Recusal of Judge (September 2007).*  On September 7, the CHINS judge recused himself based on *ex parte* contacts with DCS and the prosecutor that focused on means of removing the Finnegans' *pro hac vice* counsel from the case.

129.   *Revised criminal charges.*  On September 10, the prosecutor charged Roman and Lynnette with knowingly endangering Jessica's life or health by failing to provide emergency care for her "observed" bleeding and "overall decline in health" from December 14-20.  These charges presumably referred to Jessica's menstrual period, the sore on her lip or tongue, and the flu-like symptoms described by the children.  None of these symptoms related to Jessica's seizure disorder or heart condition, which would have presented with seizure, cyanosis or respiratory problems.  The only named witness was Det. McDonald.

130.   *Reunification (August – November).*  From August to November, DCS made reunification very difficult, provoking protests from Ms. Graham, a counselor who reported to DCS, and Dr. Kenny.  Ms. Graham told DCS in a written report that Katelynn was doing well at home and at school, but that "at times it seems that all of the services being offered only serve to add to the chaos being felt emotionally by this family."  Ms. Graham also recommended changing Katelynn's therapist.  Dr. Kenny concurred, finding that the DCS counselor was damaging to Katelynn and that DCS was putting obstacles in the family's way.  Ms. Salyers and Ms. Myers ignored these concerns.

131.    *Motion to dismiss Katelynn's CHINS petition*.  On October 11, DCS moved to dismiss Katelynn's CHINS petition.

132.    *Dismissal of criminal cases*.  On October 24, the prosecutor moved to dismiss Roman's criminal charges, which were dismissed the same day.  On November 2, the prosecutor moved to dismiss Lynnette's charges on the ground that "previous medical opinions and prior witness statements which led to the charges herein have not been supported by subsequent written medical opinion and sworn statements in depositions." In short, Det. McDonald's interview reports did not comport with the evidence. Lynnette's charges were dismissed with prejudice.

133.    *Request for findings*.  On November 19, the Finnegans asked DCS to remove the March substantiations, which were based on the allegations of death from physical abuse that DCS had withdrawn in May.  When DCS refused, the Finnegans asked the CHINS court to make findings that would remove these substantiations, attaching the Coroner's Verdict and medical affidavits.  DCS promptly moved to strike the request and supporting documentation, claiming that Lynnette and her counsel were attempting to mislead the Court with unsupported statements.  DCS did not identify any errors in the presentation or medical evidence.

134.    *Dismissal of CHINS petitions*.  On November 27, the CHINS court dismissed the CHINS petitions but kept jurisdiction over the outstanding contempt motion.  The Court granted DCS' motion to strike the request for findings, agreeing that the March substantiations should be returned to DCS for administrative hearings on the cause and manner of Jessica's death.

135.  *Administrative review*.  DCS assigned the Administrative Review to Reba James, who did not allow the Finnegans to present evidence or participate in the review, instead sending them a Notice of Administrative Review Decision dated December 21 advising them that the review had been held on December 13.  In her Decision, Ms. James re-substantiated all of the March substantiations and added two additional substantiations (inappropriate discipline and death from medical neglect).  Ms. James did not give any reasons for rejecting the Coroner's Verdict or the medical evidence, or for adding the additional substantiations. Ms. James did not disclose that she had been involved in the case from the beginning.

136.  *Administrative appeal.*   In the Administrative Appeal, the Administrative Law Judge indicated her intent to hold a full trial on the cause and manner of death, and both sides again identified witnesses and documentary evidence, essentially repeating the July hearing.  The Finnegans provided witness summaries for 39 witnesses, including the Coroner, Dr. Pless, Dr. Leestma, Dr. Innis, Dr. Buttram, Professor Nutescu, and Professor Lambert as well an updated version of the exhibit list provided for the July CHINS hearing.  To support its challenge to the Coroner's Verdict and medical evidence, DCS identified eight witnesses: four family members (Roman, Lynnette, Johnathon and Tabitha), all of whom denied abuse or neglect; Det. McDonald; and three DCS workers (Regina McAninch, Deb Wallingford and Allison Cheney).  DCS' exhibits consisted of Det. McDonald's reports, the Coroner's Verdict (minus the Pless and Leestma reports), unproven DCS allegations against Lynnette dating from 1990 and 1999, and a few law enforcement reports, none of which suggest neglect or abuse.

137.   DCS objected to the Finnegans' medical witnesses, claiming that the cause of Jessica's death was irrelevant to the March substantiations. This was patently false since the March substantiations substantiate death from physical abuse, with skull fractures, bruising and internal injury attributed to Roman and Lynnette. DCS also objected to the designation of Laurel Myers and Reba James as witnesses, claiming that they had no independent knowledge of any material issue and that their testimony would be heresay [sic] and duplicative. This claim was remarkable since Ms. Myers signed the March substantiations and Ms. James re-substantiated them, adding two of her own. DCS also objected to most of the Finnegan exhibits.

138.   After several exchanges of this nature, the Administrative Law Judge sent the matter to Judge Blankenship, Pulaski County Superior Court, for decision. By agreement of the parties, Judge Blankenship had placed an earlier petition for judicial review on hold pending completion of the agency's review process.

139.   *Petition for Judicial Review.* When Judge Blankenship scheduled a hearing and permitted a short set of interrogatories, the Administrative Law Judge attempted to reclaim jurisdiction. After a hearing, Judge Blankenship said that the Finnegans had been forced to jump through enough hoops, and that it was time to review the evidence on the merits. Since DCS did not want live witnesses and the Finnegans did not have the financial or emotional resources to withstand another trial, in which the focus would be on exhumation photographs, it was agreed that the Court would make its decisions on a joint record containing evidence exchanged in the CHINS proceedings.

140.   In the ongoing hearings, Judge Blankenship is charged with determining whether DCS' witnesses and documents establish by a preponderance of the evidence that the

Coroner's Verdict is wrong, and that Jessica died from physical abuse inflicted by Roman and Lynnette, causing skull fractures, brain damage and internal injury. Judge Blankenship will also determine whether, as a result of the circumstances of Jessica's death, Johnathon, Tabitha and Katelynn were placed in an environment that posed a serious threat to their physical and/or mental health.

### Actions by Named Defendants

141.    The defendants violated the family's civil rights personally and through their participation in a conspiracy to achieve this end, with all actions taken under color of state law. In accusing Roman and Lynnette and detaining Tabitha and Katelynn, each defendant acted without rational basis and recklessly and/or knowingly violated clearly established laws and legal standards, including the First Amendment right to petition the government, the Fourth Amendment right to freedom from unreasonable search and seizure, the Sixth Amendment right to effective assistance of counsel, the Fourteenth Amendment right to substantive and procedural due process, the and the Americans with Disabilities Act. In addition, they deprived the Finnegans of due process of law by subverting the Coroner's Inquest and taking upon themselves the tasks assigned by law to the Coroner, including the determination of the cause and manner of death.

142.    The DCS defendants (Ms. McAninch, Ms. Myers, Ms. Salyers and Mr. Payne) further violated provisions of the federal statutes that are unambiguous, intended to protect families and children, and mandatory, as well as the state laws and manuals that implement the federal requirements and provide a presumptively constitutional plan that balances the need to protect abused or neglect children against the constitutional rights of families. The applicable federal statutes and regulations include 42 U.S.C. 5106(a)

(appeal); 42 U.S.C. 671(a)(15)(D) (circumstances excusing states from making reasonable efforts to avoid removal or foster reunification); 42 U.S.C. 675(1)(A) (case plans); U.S.C. 675(5) (case review and proximate placement); and 45 C.F.R. 1356.21 (case plans). These requirements are implemented in the Indiana CHINS statutes (IC 31-34-1-1 et seq) and the Department of Child Services Welfare Manual. While not every violation of these statutes and regulations constitutes a civil rights violation, these statutes and regulations give defendants ample notice on the likely legality of their actions. In this case, the defendants ignored and rejected virtually *all* aspects of the regulatory scheme, resulting in illegal detention, harassment, retaliation, and a private right of action under 42 U.S.C. § 1983.

143.     In addition to the actions set forth above, individual defendants engaged, *inter alia,* in the following violations of the plaintiffs' civil rights.

144.     *Regina McAninch.* Ms. McAninch's violations of the plaintiffs' civil rights included, *inter alia*:

   (a) retaliating against the Finnegans for complaining about her conduct to their legislator;

   (b) substantiating medical neglect on December 5, 2005 despite multiple doctor appointments and assurances by Dr. Hurwitz that Jessica was doing well;

   (c) detaining the children for questioning on December 20, 2005 for six hours despite being told by the Coroner and investigators that the death appeared to be natural, with no indications of abuse or neglect;

(d) subverting the Coroner's Inquest by refusing to cooperate in the Inquest and retaining a pediatrician to provide an opposing opinion on the cause and manner of death;

(e) seizing the children on November 1, 2006 without proper investigation and with full knowledge that the children showed no signs of abuse or neglect and that Dr. Laskey's letter was contrary to the findings of all other investigators;

(f) failing to comply with federal and state law, including placing the children in out-of-county foster care, detaining them for purposes of mental health evaluations and investigative therapy, telling them, falsely, that their mother had beaten their sister to death, refusing to allow them to participate in the CHINS proceedings; and refusing to consider relative placement;

(g) substantiating neglect and abuse in March 2007 without mentioning or addressing the exculpatory evidence, including the prescription errors, medical literature, medical affidavits, and post-mortem nature of the skull fracture;

(h) concealing exculpatory documents, including the December 2005 tape of the children's interview; and

(i) refusing to provide accommodations to Lynnette under the Americans with Disabilities Act.

145.    _Tracy Salyers_.    Ms. Salyers, the caseworker assigned to the Finnegans after the girls were taken into custody, violated the plaintiffs' civil rights by, _inter alia_:

(a) refusing to work with the parents to complete a case plan or to provide a case plan to the parents in the time periods required by law;

(b) refusing to consider relative placement despite the availability of well-qualified relatives;

(c) refusing to expand visitation or to allow the Finnegans to participate in the children's therapy;

(d) refusing to allow the children, particularly Tabitha, to participate in the CHINS proceedings or the Coroner's Inquest;

(e) maintaining the children in out-of-county detention for the sole purpose of highly improper investigative therapy by DCS and police interrogation;

(f) refusing to return the girls on August 3, as required by court order; and

(h) refusing to reduce DCS services despite warnings by two psychologists and the DCS-assigned counselor that the services were harming the children and the family.

146.   *Laurel Myers*.   As Ms. McAninch's and Ms. Salyers' supervisor, Ms. Myers participated in, directed and endorsed all of Ms. McAninch's and Ms. Salyers' actions. In addition, Ms. Myers independently violated the family's civil rights by, *inter alia*:

(a) providing false and/or misleading information to DCS headquarters concerning Roman's September 7, 2005 letter to his legislator, followed by retaliation;

(b) denying requests for grandparent placement for eight months claiming that the grandmother's fingerprints, taken at the Pulaski Sheriff Department's Office, had "smudged;"

(c) continuing the detention of the children in May 2007 for the sole purpose of
sequestering a witness and failing to bring Tabitha to the July 18 CHINS
hearing despite naming her as a key witness;

(d) providing false information in an *ex parte* contact with the Court on July 25,
2007, namely, that the girls did not want to go home;

(e) claiming, falsely, that DCS would pay four years of college room, board and
tuition if Tabitha would agree to remain in foster care;

(f) refusing to comply with the July 19 court order by refusing to provide a list of
DCS-approved counselors and refusing to return the girls on August 3; and

(g) attempting to subvert reunification by requiring the family to participate in
counseling and other sessions for up to 20 hours a week.

147.    *Reba James*.  In December 2007, Ms. James conducted the administrative review
of the December 2005 and March 2007 substantiations requested by the Finnegans.
Although Ms. James purported to be an independent reviewer, she had been involved in
the case since September 2005 and her review was a sham, as evidenced by the fact that
the Finnegans were not permitted to present evidence and were not informed of the
review until more than a week after it occurred.  Ms. James' re-substantiation of the
March substantiations and addition of new substantiations violated the family's due
process rights and confirmed that internal agency review was meaningless.

148.    *James Payne*.  As the Director of DCS, Mr. Payne was responsible for ensuring
that the agency followed federal and state law.  Instead, he endorsed the actions of the
agency employees, which violated the Finnegans' civil rights.  Mr. Payne's direct
involvement is evidenced by:

(a) his personal response to Roman's September 7, 2005 letter to Mary Kay Budak;

(b) his appearance on a television program in which he defended the agency's actions against the Finnegans; and

(c) his active participation in administrative and judicial review decisions, as confirmed through e-mails, and personal verification of judicial bias on a motion to recuse the judge hearing the petition for judicial review.

Given Mr. Payne's personal involvement, it is reasonable to believe that he was also involved in the Administrative Law Judge's attempt to reassume jurisdiction over the case after the ALJ had sent it to the Pulaski Circuit Court for decision. It also seems unlikely that DCS' continued rejection of the Coroner's Verdict and the medical evidence could have continued without Mr. Payne's approval and support.

149. *Jennifer McDonald.*   Rather than conducting an impartial investigation, Det. McDonald used deliberate deceit, made claims that had no objectively reasonable basis, and violated clearly established law. Her actions included, *inter alia*:

(a) conducting a constitutionally deficient investigation in which she refused to interview key participants, including Dr. Ahler, Dr. Hurwitz and the parents;

(b) creating false reports of key interviews;

(c) providing false information and concealing key medical issues and facts, resulting in a constitutionally deficient exhumation order, search warrant, criminal charges, and continued detention of the children in July 2007;

> (d) preventing the Finnegans from meeting with the prosecutor to discuss the medical evidence, including the Laskey deposition, by arresting them as they were leaving for this meeting;
>
> (e) providing false information to witnesses (including Johnathon, Tabitha and Roman), including a claim that Jessica died from a skull fracture that had been "medically, scientifically" timed to 24 hours before death; and
>
> (f) concealing and withholding exculpatory information, including autopsy slides, autopsy photographs and the December 2005 taped interview of the children.

Det.. McDonald took these steps knowing that there was no objectively reasonable basis for her theories and that her conclusions were contrary to the findings of the Coroner, Jessica's doctors, the medical experts, and her fellow Indiana State Police investigators.

150.   *Antoinette Laskey.*   Dr. Laskey's provision of an opinion on the cause and manner of death was biased and incompetent. In providing this opinion, she abused her position as Chair of the State Fatality Review Team and assistant professor at the Indiana University School of Medicine. Specific wrongful actions included, *inter alia*:

> (a) providing an opinion on the cause and manner of death that she was not qualified to provide and that she knew was contrary to the opinions of the Coroner, the reviewing doctors, and the law enforcement investigators;
>
> (b) knowingly and/or recklessly misrepresenting the medical literature on Jessica's medical condition and medications;
>
> (c) claiming, falsely, to be basing her opinions on extensive discussions with multiple pediatric cardiologists;

(d) misrepresenting small hemorrhages, consistent with warfarin, as extensive and "enormous" and claiming, falsely, that that they could only be caused by an "enormous blow" or "massive impacts;"

(e) claiming, falsely, that the medical evidence established a fatal beating on the day of death, with enormous blows to the head and multiple impacts to the abdomen, whereas in fact the medical evidence precluded such blows or impacts;

(f) claiming, falsely, that the skull fracture and internal bleeding could be timed to a period shortly before death, when the medical evidence indicated that the skull fracture was post-mortem and the internal bleeding old; and

(g) interfering with the Coroner's Inquest by refusing to testify without payment ($300 an hour) and attempting to persuade the forensic pathologist retained by the Coroner to change his opinion on the manner of death.

151.    Since reliable information on Jessica's medical conditions and medications is readily available on government sites, Dr. Laskey's provision of false, misleading, incomplete and forensically and scientifically unsupported information on the cause and manner of Jessica's death confirms that Dr. Laskey acted in knowing and/or reckless disregard of the truth and the Finnegans' civil rights, with deliberate indifference to the consequences.

152.    On information and belief, Dr. Laskey has provided similarly false information in other cases, causing false prosecutions of parents and caretakers whose children died natural or accidental deaths.  In so doing, Dr. Laskey acted as a *de facto* Coroner and forensic pathologist, positions for which she was not elected and has no training.

153.    *Unnamed John Does 1-20.*  Without discovery, it is not possible to determine all

of the participants at DCS or elsewhere who conspired to subvert the Coroner's Inquest

and deny the Finnegans their civil rights.  Additional defendants may therefore be added

as discovery progresses.

### Legal Claims

154.    Paragraphs 1-153 are incorporated by reference into each of the following Counts.

### COUNT 1:
### Defendants' actions violated the plaintiffs'
### 1st Amendment right to petition the government.

155.    Defendants Regina McAninch, Laurel Myers and James Payne violated the

Finnegans' First Amendment right to petition the government for redress of grievances

by retaliating against the Finnegans for Roman's September 7, 2007 letter to his

legislator, in which he complained of Ms. McAninch's conduct.  This retaliation led to a

false substantiation of medical neglect on December 5, followed by a retaliatory

investigation, illegal detention of the children and findings of abuse and neglect that have

never been supported by the evidence.

### COUNT 2:
### Defendants' actions violated the plaintiffs'
### 4th Amendment right to freedom from unreasonable search and seizure.

156.    The seizure of Tabitha and Katelynn by defendants McAninch and Myers,

supported and abetted by defendants Laskey and Payne, had no objectively reasonable

basis and therefore violated the family's Fourth Amendment right to be free from

unreasonable seizure.  The continued detention of the children for the purpose of

continued questioning, despite exculpatory evidence, constituted a continuing violation of

this Fourth Amendment right.

157.   The exhumation of Jessica's body and search of the Finnegan home was based on false information provided by defendant McDonald. There was no objectively reasonable basis for the exhumation and search, which violated the family's Fourth Amendment right against unreasonable seizure.

158.   The April 24 arrest of Roman and Lynnette was based on false information provided by defendant McDonald. Since there was no objectively reasonable basis for the arrests, these arrests violated their Fourth Amendment right against unreasonable seizure.

159.   In all instances, these unreasonable searches and seizures were willful, induced by fabricated evidence, and undertaken in bad faith and in complete disregard for the plaintiffs' rights.

COUNT 3:
Defendant's actions violated the plaintiffs'
6th Amendment right to effective assistance of counsel.

160.   Following the Finnegans' arrest, Roman and Lynnette were represented in the CHINS and criminal cases by Kevin Tankersley, who was court appointed, and Heather Kirkwood, who had previously represented the Finnegans in the CHINS proceeding on a *pro bono* basis and who continued to participate on the same basis. In August 2007, the Finnegans' counsel learned that there had been *ex parte* contacts between counsel for DCS and the Court, and between the prosecutor and the Court, designed to persuade the Court to revoke Ms. Kirkwood *pro hac vice* license. While initially successful, this strategy ultimately resulted in the recusal of the judge and reassignment of the cases to four special judges. These efforts, which were presumably directed by Ms. Myers and

approved by Mr. Payne, constituted a deliberate effort to sabotage the Finnegans' Sixth Amendment right to effective assistance of counsel.

161.     Defendants have further prevented effective representation of counsel by raising the costs of representation to such an extent that it is not possible for any counsel, no matter how dedicated, to adequately represent the Finnegans. The issues in this case were very simple, yet defendants raised the costs exponentially by: (a) requiring defense counsel to spend more than two years proving and re-proving medical facts that can be easily verified in half-hour internet searches of government websites; (b) refusing to acknowledge pharmacy records establishing an increase in warfarin and elimination of dilantin; and (c) insisting that the issues that have been addressed in earlier proceedings be addressed and re-addressed in administrative and additional judicial proceedings. As a practical matter, such a defense would not be within the grasp of ordinary Americans. Even in this case, *pro bono* counsel is weary of taking the time and expense to prove and re-prove the obvious. As this case has established, it is virtually impossible to provide effective assistance of counsel when the defendants do not play by the rules.

COUNT 4:
Defendants' actions violated the plaintiffs'
14th Amendment right to procedural and substantive due process.

162.     Throughout these proceedings, defendants have trampled on the plaintiffs' rights to procedural and substantive due process. The plaintiffs are now in the fifth set of proceedings (sixth set including this case) in which the defendants Myers, McAninch and Payne (and initially Laskey) have asserted that Jessica died from physical abuse, yet the defendants have yet to produce any witnesses or evidence to support this claim. In this case, the Pulaski County Sheriff's Department, the original Indiana State Police

investigators, the Prosecutor's Office, Jasper County Hospital and the Coroner conducted competent and impartial law enforcement and medical investigations following Jessica's death. However, these investigations were sabotaged by the defendants, who deprived the plaintiffs of procedural and substantive due process.

163.    Defendants deprived the plaintiffs of due process by refusing to address the medical evidence or acknowledge basic medical precepts; sabotaging the Coroner's investigation; failing to provide exculpatory information or information that was subpoenaed and/or properly requested under the Indiana Rules of Trial Procedure; omitting exculpatory information and including false information in their reports; assessing evidence in a biased and partial manner; and acting without reasonable or probable cause and with deliberate indifference to the plaintiffs' rights.

164.    Defendants further deprived the plaintiffs of their equal protection and due process rights by refusing to comply with the applicable state and federal CHINS laws and regulations, which provide a presumptively constitutional framework that balances the need to protect neglected or abused children against the constitutional rights to family relations, including the parents' right to raise their children and the children's right to be with their parents; the Coroner's Code (IC 36-2-14 et seq), which places the responsibility for determining the cause and manner of death on the Coroner, not DCS or the Indiana State Police; and the American with Disabilities Act (42 U.S.C. § 12101 et seq), which required defendants to provide appropriate accommodations to Lynnette, whose established disabilities include disability and a learning (communication) disorder.

COUNT 5:
### Defendants' actions constituted a broad-based conspiracy to violate the plaintiffs' civil rights.

165.    Given the defendants' broad-ranging accusations against Roman and Lynnette, including accusations that were physiologically impossible, it is not possible to justify defendants' actions as simply mistaken interpretations of the law or as individual acts. Instead, all defendants repeatedly did whatever it took, including deliberate lies, false arrests and concealment of critical information, to create a case against the Finnegans, in the absence of rational belief or probable cause. Such efforts constituted a conspiracy under 42 U.S.C. § 1983 that encompasses violations of state and federal CHINS law, the basic constitutional requirements, the Coroner's Code, and the ADA.

### RELIEF REQUESTED

166.    Each of the above counts constitutes a separate violation of 42 U.S.C. § 1983. For each of these violations, Roman Finnegan, Lynnette Finnegan, Tabitha Abair and Katelynn Salyer seek to recover the following:

1.    compensatory damages in an amount to be determined by a jury;

2.    punitive damages in an amount to be determined by a jury;

3.    reasonable attorney and expert fees pursuant to 42 U.S.C. § 1988;

4.    an injunction against DCS or Dr. Laskey making any determinations on the cause and manner of death in pediatric injury cases;

5.    any further relief that may be appropriate.

Respectfully submitted,

Kevin Tankersley
Attorney for Roman and Lynnette Finnegan,
Tabitha Abair and Katelynn Salyer