# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA
### SOUTH BEND DIVISION

ROMAN FINNEGAN*, et al.*,    )
                             )
Plaintiffs,                  )
                             )
vs.                          )    NO. 3:08-CV-503
                             )
LAUREL MYERS, *et al.*,      )
                             )
Defendants.                  )

## OPINION AND ORDER

This matter is before the Court on the: (1) Defendant Antoinette Laskey's Motion for Judgment on the Pleadings, filed by Defendant, Antoinette Laskey, on April 14, 2010 (DE #44); (2) Defendant Antoinette Laskey's Motion to Strike Exhibits Attached to Plaintiffs' Response to Motion for Judgment on the Pleadings, filed by Defendant, Antoinette Laskey, on May 13, 2010 (DE #48); and (3) Motion to Supplement Response to Defendant's Motion for Judgment on the Pleadings, filed by Plaintiffs on June 1, 2010 (DE #53). For the reasons set forth below, the motion for judgment on the pleadings (DE #44) is **DENIED**; the motion to strike exhibits (DE #48) is **DENIED**; and the motion to supplement response (DE #53) is also **DENIED**.


BACKGROUND

Plaintiffs have sued several defendants in this case, including Dr. Antoinette Laskey, a licensed physician hired by the Department of Children Services ("DCS") to give a medical opinion as to whether the death of Plaintiffs' 14-year old daughter, Jessica Salyer, was due to accident or parental abuse. Defendant Laskey filed the current Motion for Judgment on the Pleadings, arguing she is not a proper party to the action because she did not act under "color of law," she did not violate Plaintiffs' civil rights, and she is entitled to absolute immunity. Plaintiffs, Roman Finnegan (Jessica's stepfather), and Lynnette Finnegan (Jessica's mother), controvert each of these claims.

Dr. Laskey has also moved to strike certain exhibits attached to Plaintiffs' response to the motion for judgment on the pleadings. Specifically, Dr. Laskey requests that the Court strike Exhibit 1, labeled "Coroner's Verdict and Pless report," Exhibit 2, the 2006 opinion letter written by Dr. Laskey, and Exhibit 3, labeled "cover letter on joint letterhead of Dr. Laskey and Governor Daniels." Dr. Laskey contends that because she has not offered any materials outside of the pleadings, to preserve her motion as one made pursuant to Rule 12(c), the Court should strike the documents attached as exhibits to Plaintiffs' response. In response, Plaintiffs claim that all three exhibits are proper, arguing Dr. Laskey's opinion letter is central to Plaintiffs' claims, and the other two exhibits are public documents which the

Court may take judicial notice.

Finally, Plaintiffs move for leave to supplement their response to the motion for judgment on the pleadings with a final state court decision rendered by Judge Blankenship of the Pulaski County Superior Court, which was filed on January 28, 2010. Dr. Laskey disagrees, arguing that it is improper for the Court to consider that opinion when ruling on the instant motion for judgment on the pleadings.

All three motions are fully briefed and are therefore ripe for adjudication.


DISCUSSION

A motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) "is reviewed under the same standard as a motion to dismiss under 12(b) . . . ." *Flenner v. Sheahan*, 107 F.3d 459, 461 (7th Cir. 1997); *see also R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Eng'rs, Local Union 150*, 335 F.3d 643, 647 (7th Cir. 2003). Where the plaintiff moves for judgment on the pleadings, "the motion should not be granted unless it appears beyond doubt that the non-moving party cannot prove facts sufficient to support his position." *Housing Auth. Risk Retention Group, Inc. v. Chicago Housing Auth.*, 378 F.3d 596, 600 (7th Cir. 2004)(quotation omitted). In other words, "[a] court will grant a Rule 12(c) motion only when it appears beyond a doubt

that the plaintiff cannot prove any facts to support a claim for relief and the moving party demonstrates that there are no material issues of fact to be resolved." *Brunt v. Serv. Employees Int'l Union*, 284 F.3d 715, 718-19 (7th Cir. 2002). In ruling on a motion for judgment on the pleadings, the court must accept as true "all well-pleaded allegations" and view them in the light most favorable to the non-moving party, as well as accept as true all reasonable inferences to be drawn from the allegations. *R.J. Corman*, 335 F.3d at 647; *see also Forseth v. Village of Sussex*, 199 F.3d 363, 368 (7th Cir. 2000). A court may rule on a judgment on the pleadings under Rule 12(c) based upon a review of the pleadings alone, which include the complaint, the answer, and any written instruments attached as exhibits. *See Northern Indiana Gun & Outdoor Shows, Inc. v. City of South Bend,* 163 F.3d 449, 452-53 (7th Cir. 1998); *see also* Fed. R. Civ. P. 10(c)(providing that written instruments attached as exhibits to a pleading are part of the pleading for all purposes).

Motion to Strike Exhibits

Dr. Laskey requests that the Court strike: Exhibit 1 to Plaintiffs' response, labeled "Coroner's Verdict and Pless report," which is the Jasper County Coroner's Verdict, results from the Coroner's Inquest, letters and a declaration from Plaintiffs' medical experts, and what appears to be notes from a meeting with

4

one of the experts; Exhibit 2, an opinion letter written by Dr. Laskey; and Exhibit 3, labeled "cover letter on joint letterhead of Dr. Laskey and Governor Daniels." (DE #46, p. 9; Exs. 1-3.)

In *Menominee Indian Tribe of Wisconsin v. Thompson*, 161 F.3d 449, 456 (7th Cir. 1998), the Seventh Circuit held that "documents attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim." In that case, because the Plaintiffs had referred to treaties in the complaint, and the treaties were central to the Plaintiffs' claims, the Court found the materials were not outside the pleadings, and considered them for purposes of the Rule 12(c) motion to dismiss. *Id.* Additionally, the Court took judicial notice of historical documents without converting the motion to dismiss into a motion for summary judgment. *Id.* "Judicial notice of historical documents, documents contained in the public record, and reports of administrative bodies is proper." *Id.* (citations omitted).

The Coroner's Verdict, including the reports of Dr. Pless and Dr. Leestma (Ex. 1), are public documents that should not be stricken. *See, e.g., Harris v. Quinn*, No. 10-CV-02477, 2010 WL 4736500, at *4 (N.D. Ill. Nov. 12, 2010) (taking judicial notice of ten documents submitted in support of motion to dismiss because they were matters of public record and central to plaintiffs' claims, including executive orders, collective bargaining

agreements, and a judicial order); *Opoka v. I.N.S.*, 94 F.3d 392, 394 (7th Cir. 1996) ("it is a well-settled principle that the decision of another court or agency . . . is a proper subject of judicial notice"). The two reports are incorporated by reference in the Coroner's Verdict, and included in the 98-page Verdict filed in the Jasper County Circuit Court in July 2007. (*See* DE #46-1, including the file stamp.) The Verdict and the reports are pertinent to Plaintiffs' claims as they state opinions that (contrary to Dr. Laskey's opinion), it is not possible to have a fatal beating without exhibiting external evidence of trauma in a patient taking Warafin, and that the skull fractures that Dr. Laskey attributed to Jessica's mother and stepfather were instead created post-mortem, possibly at the first autopsy.

The Court will also take judicial notice of Dr. Laskey's October 28, 2006, opinion letter, in which she states "it is my expert medical opinion that this child sustained a fatal beating on the day that she died and that this beating was the direct cause of her death." (DE #46-2.) Oftentimes, Courts analyze what documents may be attached to a motion to dismiss. *See, e.g., Menominee*, 161 F.3d at 456 ("documents attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim."). However, the facts are slightly different in this case, where the Plaintiffs (not the Defendant) have attached the additional documents to their

response in objection to the motion for judgment on the pleadings. Such action is also proper on behalf of the Plaintiffs opposing the motion:

> A party moving for judgment on the pleadings must limit the basis of the motion to the pleadings and to documents attached to or referred to in the pleadings and certain matters of public record. A party opposing such motion, however, is free to oppose the motion by suggesting in a brief the existence of facts that are not inconsistent with the party's allegations in the pleadings. There is no reason why the opposing party cannot add rhetorical support for such suggestions with some supporting documents - indicating that there is a substantial basis for the assertions - though the opponent risks possible conversion of the motion into a summary judgment motion.

*Marwil v. Farah*, No. 1:03-cv-0482-DFH, 2003 WL 23095657, at *2 (S.D. Ind. Dec. 11, 2003) (citations omitted). However, like in *Marwil*, the Court here finds that Plaintiffs have not converted the motion to one for summary judgment. In her memorandum in support of the motion for judgment on the pleadings, Dr. Laskey argues that the Plaintiffs would be "unable to prove under any set of circumstances that Dr. Laskey's allegedly improper conduct was related to her position as an employee of Indiana University." (DE #45, p. 8.) In response, Plaintiffs have pointed out that Dr. Laskey's opinion letter was written on Indiana University letterhead, and signed by her as an Assistant Professor of Pediatrics. (*See* DE #46-2.) Dr. Laskey's opinion letter dated October 28, 2006, is referenced numerous times in the complaint, and clearly central to Plaintiffs' claim. (Compl. ¶¶ 57-63, 150-

7

51.) The letter assists Plaintiffs in supporting their argument that Dr. Laskey is indeed a proper defendant in this case who acted under color of state law, it is central to their case, and it was referred to in the complaint. Therefore, the Court will not strike it.

Similarly, the Court will consider Dr. Laskey's letter written as Chair of the State Child Fatality Review Team on January 8, 2007 (DE #46-3). In her motion, Dr. Laskey argues that her opinion letter regarding the cause of Jessica's death was unrelated to her position as Chair of the State Fatality Review Team, which she described as mainly administrative. (DE #45, p. 8.) The letter attached to Exhibit 3 is used by Plaintiffs to rebut this argument. In this letter, Dr. Laskey states that the State Fatality Review Team's task is "to review the sudden, unexplained, and unexpected deaths in children," and that they have "broadened [their] scope and redoubled [their] efforts to understand how Hoosier children are dying." (DE #46-3.) Dr. Laskey's position as the Chair of the State Fatality Review Team was referred to in the Complaint (¶¶ 11, 150), and the instant letter which introduced the annual report of the State Fatality Review Team for the period that Jessica's death was under investigation, is a public record which the Court may also take judicial notice.

As such, the Court finds that all three documents attached to Plaintiffs' response are documents to which the Court may properly

take judicial notice.  The motion to strike is therefore **DENIED**.


Motion to Supplement Response to Defendant's Motion for Summary
Judgment on the Pleadings

Plaintiffs also move for leave to supplement their response with a final state court decision of Judge Blankenship of the Pulaski County Superior Court, dated January 28, 2010, in which he orders DCS to unsubstantiate all claims of abuse or neglect against the Finnegans and to remove the Finnegans from the child protection index.  Although this is also a public document subject to judicial notice, the Court declines to allow Plaintiffs to supplement their response with this decision simply because Plaintiffs have not established that this document is necessary for resolution of their motion.  *See Harris v. Quinn*, No. 10-cv-02477, 2010 WL 4736500, at *4 (N.D. Ill. Nov. 12, 2010) (declining to take judicial notice of documents where defendants did not establish that they were necessary for resolution of the motion).  Unlike the previous three exhibits discussed which go towards establishing whether Dr. Laskey acted under color of law, or whether she is entitled to absolute immunity, the present written decision is not relevant to the issues in the instant Motion for Judgment on the Pleadings.  Consequently, the motion to supplement their response is **DENIED**.

<u>Motion for Judgment on the Pleadings</u>

 <u>Facts</u>

 This case arises from the death of 14-year old Jessica Salyer, who lived with her mother and step-father, Roman and Lynette Finnegan, in Pulaski County, Indiana. (Compl., ¶¶ 3, 4.) Jessica was born with a congenital heart condition that required multiple surgeries, concluding in a 1996 surgery (the Fontan procedure), which left her with a two-chambered, rather than a four-chambered, heart. (*Id.* ¶ 18.) Even with good care, the mortality rate for Fontan patients is high, with ten year survival rates in the 70-75% range. *Id.* Jessica also had a fourth generation seizure disorder, for which she took 3 medications: Warfarin, Digoxin and Phenytoin (brand name Dilantin). (*Id.* ¶¶ 19, 20.) Warfarin in particular is a high risk drug as it can result in bleeding, bruising, and is linked to a risk of brain hemorrhage. (*Id.* ¶¶ 21, 22.)

 Shortly after Jessica started the 8th grade at West Central Middle School, the school nurse filed a complaint with the Pulaski County Department of Child Services ("DCS"), stating the school needed a medical safety plan for Jessica, but that Lynette was not cooperating, that Jessica probably needed to have surgery again, and that Lynette told them Jessica had no insurance. (Compl. ¶ 31.) All of this information was incorrect, as verified by the school records. *Id.* Nevertheless, the following month, the principal of West Central Middle School filed another complaint

with DCS based upon Jessica's alleged complaints of neglect – stating that Roman and Lynnette were locking up the food and not allowing her to eat. (*Id.* ¶ 38.) On December 5, 2005, DCS substantiated medical neglect, stating that Lynnette and Roman would not have obtained appropriate medical care for Jessica without DCS intervention. (*Id.* ¶ 42.) In reaching its conclusion, DCS notified the school of the substantiation, but did not notify Roman, Lynnette, or Jessica's doctors, and did not mention the 14 years of medical care that Lynnette had previously provided without DCS intervention. (*Id.* ¶ 42.) Plaintiffs claim that had DCS provided a copy of the substantiation to the Finnegans, or notified Jessica's doctors that monthly blood tests were needed but not being taken, proper testing could have been implemented, and the prescription errors (which were eventually uncovered in this case) could have been caught before Jessica's death. (*Id.* ¶ 45.)

On December 20, 2005, just 15 days after DCS substantiated the school's claims of medical neglect, Lynnette found Jessica lying face down by the side of her bed, not breathing, and with a small amount of blood by her mouth or nose. (Compl. ¶ 48.) Lynnette and Roman called 911, and performed CPR until the paramedics arrived. *Id.* The CPR was unsuccessful, and Jessica died. At DCS's direction, law enforcement officials from Pulaski County and the Indiana State Police, along with the Jasper County Coroner, investigated Jessica's death. (*Id.* ¶¶ 49-50.) They did not find

11

any signs of abuse or neglect. *Id.* Additionally, Dr. Kenneth Ahler (the emergency room physician and former Coroner for Jasper County), examined Jessica's body, interviewed her parents, and consulted with Dr. Hurwitz, Jessica's pediatric cardiologist. (*Id.* ¶ 51.) Dr. Hurwitz told him that there were only about 200 surviving patients in the country with Jessica's condition, and that 2/3 of the deaths were sudden, like in this case. *Id.* Dr. Ahler concluded that Jessica's death was due to congenital heart disease and sudden death syndrome. (Compl. and Laskey Answ. ¶ 51.) An autopsy conducted the day after her death found no signs of abuse or neglect, "and the preliminary autopsy report attributed Jessica's death to blunt force injury of the head consistent with a fall, with coagulopathy (Coumadin) as a contributing factor." (Compl. ¶ 55.) DCS then conducted interviews with Jessica's siblings, her parents, and conducted a home investigation. (*Id.* ¶¶ 52-54.) No indication of abuse or neglect was found, so the Sheriff's office, Indiana State Police, and prosecutor closed their investigations. (*Id.* ¶ 56.)

In an effort to investigate the circumstances surrounding Jessica's death further, ten months after her death, DCS enlisted the help of Dr. Antoinette Laskey. (Co-Defs.' Answ. ¶ 56.) Dr. Laskey was on staff at the Indiana University School of Medicine, where she was employed to teach and research pediatrics. (Compl. ¶ 11; Laskey Answ. ¶ 11.) Dr. Laskey also served as Chair of

Indiana's State Child Fatality Review Team ("Fatality Review Team"), an organization charged with reviewing deaths of children that are sudden, unexpected, or unexplained. (Ans. ¶ 11; Ind. Code § 31-33-24-6(a).)

On October 28, 2006, Dr. Laskey authored a report stating that Jessica "sustained a fatal beating on the day that she died and that this beating was the direct cause of her death." (Laskey Answ. ¶ 15; DE #46-2.) Dr. Laskey's report listed that Jessica's autopsy revealed:

> multiple blunt force traumas to the head (abraded contusion of the left frontal region, bilateral hemorrhages at the temples, a subdural hemorrhage [bleeding around the brain], subarachnoid hemorrhage [bleeding immediately adjacent to the brain], right ventral cerebral contusion [bruise on the brain near the top], right anterior basilar skull fracture [fracture at the base of the skull, near where the spinal column attaches, on the right front side], an epidural hemorrhage [bleeding outside of the dura, underneath the skull], bleeding in the nose and throat with aspiration of the blood and cerebral edema [swelling of the brain]).

(Laskey Answ. ¶ 58.) Dr. Laskey claimed she based her opinion on her "consultation with pediatric cardiologists at Riley Hospital for Children" and "extensive discussions with multiple pediatric cardiologists familiar with tricuspid atresia and Fontan procedures." (DE #46-2.)[1] Dr. Laskey also wrote in her opinion

---

[1] However, at her deposition, on advice of counsel, Dr. Laskey refused to identify the pediatric cardiologists with whom she consulted. (Compl. and Laskey Answ. ¶¶ 63, 89.)

letter that she had "grave concerns about the safety of other children in the care of the caregivers at the time of these injuries." (DE #46-2; Laskey Answ. ¶ 58.) Plaintiffs insist that Dr. Laskey misstated the medical literature on the risks of the Fontan procedure and Warfarin, confused small hemorrhages typical of Warfarin with blunt force trauma caused by beating, and failed to recognize that her theory was medically impossible given the lack of bruising on Jessica's body. (Compl. ¶¶ 59-63.)

After Dr. Laskey's opinion letter was issued, DCS responded saying "[t]hank heaven someone other than the local Director [Ms. Myers] and FCM [Ms. McAninch] agree this child died from physical abuse." (Compl. ¶ 57.) Based upon Dr. Laskey's letter, DCS Defendants McAninch and Myers placed Jessica's siblings, Tabitha (nearly 17), and Katelynn (10), in out-of county foster care for more than 9 months. (*Id.* ¶¶ 64-66.)

The judicial proceedings stemming from this allegation of physical abuse went on until Judge Blankenship's decision in January 2010. In July 2007, the Coroner finally ruled that Jessica died from the prescription errors and pre-existing medical conditions, and that the skull fracture attributed by Dr. Laskey to Jessica's parents was created postmortem, at the first autopsy. (DE #46-1.) Plaintiffs now claim that Dr. Laskey's report was biased, incomplete, reckless, unsupported by the evidence, and was directly responsible for the seizure of their children. (Compl. ¶¶

57-64, 150.)

In the present motion for judgment on the pleadings, filed on April 14, 2010, Dr. Laskey argues: (1) she is not a proper defendant because she did not act under "color of law"; (2) Dr. Laskey's conduct did not deprive Plaintiffs of any Constitutional rights, privileges, or immunities; and (3) Dr. Laskey is entitled to absolute immunity. (DE #45.) Plaintiffs' response, filed on May 3, 2010, takes issue with each of these arguments. (DE #46.) Finally, Defendant Laskey filed a reply on May 13, 2010. (DE #47.)

Material Issues of Fact Exist as to Whether Dr. Laskey Acted
Under Color of State Law

Dr. Laskey admits that Plaintiffs correctly identified that she is a pediatrician employed by the Indiana University School of Medicine ("Indiana University"), and that she currently serves as Chair of the Fatality Review Team. (Def.'s Mem., DE #45, p. 6.) However, Dr. Laskey claims that just because she was employed by the State of Indiana in some capacities, does not establish that she acted under "color of law" when rendering her opinion in this case.

In order to establish a claim under § 1983, Plaintiffs must establish that Dr. Laskey acted "under color of state law" when depriving them of rights, privileges, or immunities guaranteed by the Constitution or the laws of the United States. 42 U.S.C. § 1983; *Parratt v. Taylor*, 451 U.S. 527, 535-36 (1981). A public

15

employee only functions under color of state law while acting in her official capacity or while exercising her responsibilities pursuant to state law. *Gibson v. Chicago*, 910 F.2d 1510, 1516-17 (7th Cir. 1990) (finding police officer who had been placed on medical roll and declared unfit for duty did not act under color of state law, and affirming dismissal of claim against him). In *Gibson*, the Seventh Circuit found that the "essential inquiry" was whether the plaintiff had "created a triable issue of fact concerning whether [Defendant police officer's] actions related in some way to the performance of a police duty." *Id.* at 1517. "In distinguishing private action from state action, the general inquiry is whether 'a state actor's conduct occurs in the course of performing an actual or apparent duty of his office, or . . . is such that the actor could not have behaved in that way but for the authority of his office.'" *Zambrana-Marrero v. Suarez-Cruz*, 172 F.3d 122, 125 (1st Cir. 1999) (denying summary judgment for off-duty policeman) (quoting *Martinez v. Colon*, 54 F.3d 980, 986 (1st Cir. 1995)).

The Supreme Court has held that "[i]f an individual is possessed of state authority and purports to act under that authority, his action is state action. It is irrelevant that he might have taken the same action had he acted in a purely private capacity or that the particular action which he took was not authorized by state law." *Griffin v. Maryland*, 378 U.S. 130, 135

16

(1964). Thus, the fact that Dr. Laskey could have made a report on her opinion about Jessica's death without being cloaked in any state authority is not controlling. The controlling issue is whether Dr. Laskey possessed state authority and whether she purported to act under that authority.

Of course, the motion at hand in this case is a motion for judgment on the pleadings pursuant to Rule 12(c), made after the parties have filed a complaint and answer, which can be granted "only when it appears beyond a doubt that the plaintiff cannot prove any facts to support a claim for relief and the moving party demonstrates that there are no material issues of fact to be resolved." *Supreme Laundry Serv., LLC v. Hartford Cas. Ins. Co.*, 521 F.3d 743, 746 (7th Cir. 2008). In this case, there are material issues of fact raised by Plaintiffs as to whether Dr. Laskey acted under color of law when she issued her opinion letter.

First, Dr. Laskey wrote her opinion letter on Indiana University letterhead, and under her signature, included her title of "Assistant Professor of Pediatrics Indiana University School of Medicine." (DE #46-2.)[2] This alone supports the conclusion that she acted under color of state law. *See, e.g., Corbitt v. Anderson,* 778 F.2d 1471, 1475 (10th Cir. 1985) (affirming jury verdict on issue of "color of state law" where director of publicly

_____

[2]In their memorandum in opposition, Plaintiffs claim Dr. Laskey charged $300/hour for her opinion letter, which was to be paid to Indiana University. (DE #46, p. 10.) However, since these facts are not in the pleadings, the Court will not consider them at this time.

funded counseling service made disparaging statements about the plaintiff on political subdivisions' letterhead and signed statement in his capacity as the director). Neither party disputes that "[a] state university without question is a state actor." *National Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 192 (1988). Nor does Dr. Laskey argue that she had a private medical practice. However, Dr. Laskey does argue that she was employed by Indiana University for the purposes of teaching and researching, not for rendering expert opinions to DCS. (Laskey Ans. ¶ 11; DE #45, p. 7-8.) Even if this is true, it does not preclude her opinion as being deemed one under color of law – as Plaintiffs argue, "scope of employment" is relevant only if the plaintiff seeks to hold the employer responsible for the plaintiff's damages under a respondeat superior theory, which is not at play in this case. *Coleman v. Smith*, 814 F.2d 1142, 1147-48 (7th Cir. 1987); *see also Coles v. City of Chicago*, 361 F.Supp.2d 740, 746 (N.D. Ill. 2005) ("under color of law" and "scope of employment" inquiries "should not be confused"). As Plaintiffs contend, it is possible for a fact finder to conclude that Dr. Laskey's opinion was in fact sought out by Defendants McAninch and Myers (who admittedly retained the services of Dr. Laskey), because of her pedigree and affiliation with Indiana University. (DCS Defs.' Answ. ¶ 56.)

Second, Dr. Laskey is Chair of the Fatality Review Team, which

is an "organization charged with the task or reviewing deaths of children that are unexpected, unexplained, and/or sudden." (Laskey Answ. ¶ 11; DE #46-3.) The State Child Fatality Review Committee is created by statute, its members are appointed by the Governor, and its Chair - Dr. Laskey - is selected by the Governor. I.C. §§ 31-33-25-8, 9. DCS has a close knit relationship with the State Child Fatality Review Committee - DCS trains Committee members, collects and disseminates data on individual child deaths reviewed by the Committee, and pays Committee expenses from funds appropriated to DCS. I.C. §§ 31-33-25-12, 13, 15. Additionally, the Coroner is ordered to immediately notify the local DCS office and the local or statewide fatality review committee of apparently unexpected or suspicious deaths. I.C. § 36-2-14-6.3. On written request, the Coroner is required to provide the autopsy report to DCS and the Committee. I.C. § 36-2-14-18. Because of her position on the Committee, and as the Chair of the Indiana State Child Fatality Review Team, there is definitely a factual dispute that precludes summary adjudication as to whether Dr. Laskey acted under color of state law.

In this case, Plaintiffs have plausibly alleged that Dr. Laskey deprived them of a federal constitutional right while acting under color of state law. *Kramer v. Village of North Fond du Lac*, 384 F.3d 856, 861 (7th Cir. 2004). There is an issue of fact as to whether Laskey possessed state authority and purported to act under

that authority.  *Griffin*, 378 U.S. at 135.  As noted previously, Dr. Laskey could have possessed state authority under at least three possible routes: (1) as an employee of Indiana University; (2) as Chair of the State Child Fatality Review Committee; and (3) because she works with or through the Department of Child Services.[3]

> Plaintiffs Have Sufficiently Alleged That Dr. Laskey's Conduct
> <u>Violated A Constitutional Right</u>

Dr. Laskey argues that she did not violate a constitution right, and if any deprivations did occur, she is immune from personal liability.  First she contends Plaintiffs have no Constitutional right to "proper investigation." (DE #45, p. 12.) Then, she argues that Dr. Laskey had no duty to reveal exculpatory information and that she had no duty to agree with other medical experts.  (DE #45, pp. 14-15.)  As Plaintiffs point out, these arguments miss the mark of whether Plaintiffs have stated a sufficient claim that Dr. Laskey violated their 4th and 14th Amendment rights.

It is now well established that due process encompasses a parent's liberty interest in familial relations.  *See Troxel v. Granville*, 530 U.S. 57, 65 (2000) (collecting cases); *M.L.B. v.*

---

[3] As such, at this stage of the proceedings, the Court does not reach the issue of whether the allegation that Dr. Laskey conspired with state actors is sufficient to permit a finding that she acted under color of law.

*S.L.J.*, 519 U.S. 102, 116 (1996); *Brokaw v. Mercer County*, 235 F.3d 1000, 1018 (7th Cir. 2000) (reiterating "[t]he Supreme Court has long recognized as a component of substantive due process the right to family relations."). Children have a "corresponding familial right to be raised and nurtured by their parents." *Berman v. Young*, 291 F.3d 976, 983 (7th Cir. 2002). However, the right to familial relations is not without limits. It is bounded by the Government's compelling interest in protecting children. *Brokaw*, 235 F.3d at 1019; *Doe*, 327 F.2d at 520 ("[t]he right to familial relations is not, however, absolute."). The Court must balance "the fundamental right to the family unit and the state's interest in protecting children from abuse, especially in cases where children are removed from their homes." *Brokaw*, 235 F.3d at 1019 (citation omitted).

In *Brokaw*, which Plaintiffs' rely upon heavily, the Seventh Circuit found that a person "causes a constitutional violation if he sets in motion a series of events that defendant knew or should have known would cause others to deprive the plaintiff of constitutional rights." *Brokaw*, 235 F.3d at 1012. In that case, the plaintiff alleged that relatives and a deputy sheriff conspired to end his parents' marriage by filing "baseless and scurrilous" claims of child neglect with DCFS that they believed "would cause [plaintiff] and his sister to be removed from their parents' home, and in turn prompt [the father] to divorce his wife and leave his

family." *Id*. at 1007. Subsequently, without explanation, two police officers walked into the plaintiff's home and grabbed him and his three-year-old sister, carrying them crying out of the house. *Id.* The children remained in foster care for almost four months before being returned home. *Id.* at 1008. Plaintiff's complaint alleged violation of the Fourth Amendment and his substantive due process right to familial relations. *Id.* at 1009-10, 1017-18. Although the district court dismissed the claims for failure to state a claim or, alternatively, on the basis of immunity, the Seventh Circuit reversed. The Seventh Circuit found that a DCFS caseworker who was not present for the actual seizure, but "the allegations read in the light most favorable to [plaintiff] indicate that she directed those who removed the children to do so," could be liable under section 1983 for the 4th Amendment violation. *Id*. at 1014. *See also Morris v. Dearborne*, 181 F.3d 657, 672 (5th Cir. 1999) (holding defendant, child's teacher, who was moving force behind the removal of children was responsible for causing allegedly unconstitutional removal). The Court did note:

> Before closing the Fourth Amendment discussion, it is important to reiterate two points. First, our holding should not be read as creating a constitutional claim any time a child is removed from his home and a later investigation proves no abuse occurred. The alleged facts here go much beyond that scenario, and our holding is limited to the unique circumstances of this case. Second, it is important to remember that this case is here on 12(b)(6) dismissal. Further proceedings and

22

> discovery may well narrow this case substantially,
> but at this point the question is solely whether
> [plaintiff] can succeed under any set of facts.

*Brokaw*, 235 F.3d at 1017.

This Court believes this case is one of those rare instances, like *Brokaw*, which at this stage of the proceedings, has successfully alleged a deprivation of Constitutional rights based upon Plaintiffs' children being removed from the home. *Brokaw* teaches that a defendant is personally responsible if she "acts or fails to act with a deliberate or reckless disregard of plaintiff's constitutional rights, or if the conduct causing the constitutional deprivation occurs at her direction or with her knowledge or consent." *Id.* at 1012 (quoting *Smith v. Rowe*, 761 F.2d 360, 369 (7th Cir. 1985)). Plaintiff's allege that Dr. Laskey's opinion letter stating "it is my expert medical opinion that this child sustained a fatal beating on the day that she died and that this beating was the direct cause of her death. . . . I have grave concerns about the safety of other children in the care of the caregivers at the time of these injuries," did just that – recklessly set into motion a series of events that she should have known would culminate in the seizure of Tabitha and Katelynn. (DE #46-2.) The *Brokaw* Court noted that "to the extent the defendants knew the allegations of child neglect were false, or withheld material information, and nonetheless caused, or conspired to cause [the child's] removal from his home, they violated the Fourth

Amendment." *Brokaw*, 235 F.3d at 1012 (citation omitted). The allegations in this case - that Dr. Laskey wrote her letter without consulting the Coroner or any other investigators, that she admitted during her deposition that she was not qualified to determine the cause or manner of death, that she was unfamiliar with Jessica's medical conditions, that her letter contains highly misleading and/or erroneous statements about Jessica's medical conditions and medications, that she knowingly and/or recklessly misrepresented the medical literature on Jessica's medical condition and medications, that she falsely claimed to base her opinions on extensive discussions with multiple pediatric cardiologists, and that she abused her position as Chair of the State Fatality Review Team and assistant professor at Indiana University School of Medicine, together, satisfy the burden of alleging a violation of Plaintiffs' 4th Amendment rights. (Compl. ¶¶ 57-63, 89-90, 150.)

Similarly, Plaintiffs have also sufficiently alleged a violation of their 14th Amendment substantive and procedural due process rights. A parent's interest in the care and custody of her children, and the children's right to care and nurturing by their parents, is protected by the 14th Amendment. *Troxel*, 530 U.S. at 65; *see* Compl. ¶¶ 162-64. Although the Government has an interest in protecting children from abuse, the State does not have an interest in protecting children from their parents "unless it has

some definite and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse." *Brokaw*, 235 F.3d 1019 (citation omitted). Here, because Tabitha and Katelynn were removed from the house and subjected to questioning for nine months, long after Plaintiffs allege there was no evidence of abuse, neglect, or danger, Plaintiffs have stated a sufficient claim of violation of their substantive due process rights.

Finally, Plaintiffs have also sufficiently stated a claim for violation of procedural due process under the 14th Amendment. "[N]o matter how much process is required, at a minimum, it requires the government officials not misrepresent the facts in order to obtain the removal of a child from his parents." *Brokaw*, 235 F.3d at 1020 (citing *Malik v. Arapahoe County Dep't of Soc. Servs.*, 191 F.3d 1306, 1315 (10th Cir. 1999)). Because Plaintiffs have alleged that Dr. Laskey's opinion letter contributed to the children's removal, and that Dr. Laskey conspired with the DCS defendants, who allegedly denied Tabitha access to the CHINS court and Coroner's Inquest, and engaged in ex parte communications with the CHINS court to deny or limit Plaintiffs' constitutional rights, these allegations are sufficient at this stage of the proceedings to state a claim for violation of procedural due process. (Compl. ¶¶ 115, 123, 128.)

<u>Dr. Laskey Is Not Entitled To Absolute Immunity</u>

Lastly, Dr. Laskey argues that even if she was found to be a state actor, she should be held immune from prosecution under § 1983. Specifically, she argues she is entitled to: (1) absolute witness immunity; (2) absolute immunity for providing information to DCS; and (3) absolute prosecutorial immunity. (DE #45, pp. 16-22.)

Providing immunity to a state official "spare[s] a defendant not only unwarranted liability, but unwarranted demands customarily imposed upon those defending a long drawn out lawsuit." *Siegert v. Gilley*, 500 U.S. 226, 232 (1991). Therefore, the "quick and early" resolution of immunity issues furthers the purpose of immunity by protecting government officials from the costs of trial and burdens of discovery. *See Blessing v. Kulak*, No. 86-C-10227, 1987 WL 7614, at *2 (N.D. Ill. June 19, 1987). As "[a]llowing defendants discovery would only assist them in a challenge to the factual basis for allegations in the complaint," it is not warranted before the court can make the determination of immunity. *Id.* Thus, it is appropriate for the Court to decide the issue of Dr. Laskey's potential entitlement to immunity based upon the motion for judgment on the pleadings in this case.

Because it is a complete defense to liability, "[a]bsolute immunity from civil liability for damages is of a rare and exceptional character," *Auriemma v. Montgomery*, 860 F.2d 273, 275

26

(7th Cir. 1988) (quotation omitted), and there is a presumption against granting it to government officials. *Houston v. Partee*, 978 F.2d 362, 365 (7th Cir. 1992). The burden of establishing absolute immunity rests on its proponent, who must show that overriding considerations of public policy require that the defendant be exempt from personal liability for unlawful conduct. *Auriemma*, 860 F.2d at 275; *Walrath v. United States*, 35 F.3d 277, 281 (7th Cir. 1994).

## Witness Immunity

It is true that witnesses are given absolute immunity under § 1983 for in-court testimony, in order to permit them to testify truthfully without fear of litigation or potential liability. *See Briscoe v. LaHue*, 460 U.S. 325, 334-35 (1983) (absolute immunity for trial testimony); *Kincaid v. Eberle*, 712 F.2d 1023, 1023-24 (7th Cir. 1983) (extending *Briscoe* to grand jury testimony). However, it is undisputed that Dr. Laskey never testified as a witness in any court relating to this litigation (including the CHINS cases), or the criminal cases, or the Coroner's Inquest. Yet Dr. Laskey contends that this immunity should extend to her deposition testimony in this case. Even assuming, *arguendo*, that her deposition testimony was protected (and the Court makes no such finding at this point in time), this does not save Dr. Laskey from prosecution under Section 1983. Plaintiffs' allegations about Dr.

Laskey stem from her October 2006 opinion letter, which was not signed under oath.

Although Defendants contend that Dr. Laskey is entitled to witness immunity under *Briscoe*, and *Kurzawa v. Mueller*, 732 F.2d 1456 (6th Cir. 1984), these cases are readily distinguishable. In *Briscoe*, the Supreme Court recognized that immunity applied to police officers allegedly giving perjured testimony at a criminal trial. 460 U.S. at 341. Dr. Laskey is neither a police officer, nor did she actually testify at any proceedings in this case.

*Kurzawa*, a case from the Sixth Circuit, which is not controlling on this circuit, found that defendants who were social services employees, and a guardian ad litem, were entitled to absolute immunity because they were "state employees who [were] responsible for the prosecution of child neglect and delinquency petitions in the Michigan courts." *Kurzawa*, 732 F.2d at 1458. Additionally, the psychologist and two psychiatrists (whom Dr. Laskey likens herself to), had a successful statute of limitations defense. *Id.* However, the Court noted in dicta that the psychologist and psychiatrists "would have also been entitled to immunity. . . . [t]heir findings [were] used by the Department of Social Services and the Michigan courts to determine what environment best serves the interests of the child. This function of providing information is analogous to that of a witness and under *Briscoe* would have also entitled them to immunity." *Id.*

28

Reading the facts in *Kurzawa*, it is difficult to discern whether the defendant psychologist and psychiatrists were appointed by the State. In referring to the lower court's decision, it becomes evident that defendant Wallenbrock, the psychologist, was indeed appointed by the Probate Court to conduct a psychiatric examination of the child, and she testified at the termination hearing. *Kurzawa v. Mueller*, 545 F. Supp. 1254, 1258 n. 4 (E.D. Mich. 1982). As to the two psychiatrists, Dr. Onate was a resident from Children's Psychiatric Hospital (CPH) in Ann Arbor, and Dr. Tooley was Onate's supervisor. *Id.* at 1257. It is unclear whether Onate and Tooley were court-appointed, but it is certainly possible, since the Court had previously ordered the child to be placed *at* CPH*. Id.* at 1257. The complaint suggests that defendant Onate may have testified at one hearing. *Id.* at 1257 n. 3. Additionally, the guardian ad litem in *Kurzawa* presented the testimony from Onate and Tooley at a hearing before a probate judge. *Id.* at 1257. This Court chooses to follow the Seventh Circuit's take on *Kurzawa*, which is that "[g]uardians ad litem and court-appointed experts, including psychiatrists, are absolutely immune from liability for damages when they act at the court's direction." *Cooney v. Rossiter*, 583 F.3d 967, 970 (7th Cir. 2009). The *Cooney* Court goes on to explain that:

> Experts asked by the court to advise on what disposition will serve the best interests of a child in a custody proceeding need absolute immunity in order to be able to fulfill their

29

> obligations without the worry of intimidation and
> harassment from dissatisfied parents.

*Id.* (quotation omitted.)  In this case, because Dr. Laskey was not

a court-appointed expert, and she did not present testimony at any

hearing, she is not protected by absolute witness immunity.


### "Reporting" Immunity

Dr. Laskey also argues that she is entitled to "witness

immunity," relying solely on *Kurzawa*.  As discussed in detail in

the previous section, the dicta of that Sixth Circuit case is not

applicable here, where Dr. Laskey did not act at the Court's

direction, was not a treating doctor of Jessica's, and did not

testify in Court.


### Prosecutorial Immunity

Finally, Dr. Laskey argues that she is entitled to

prosecutorial immunity.  Prosecutors are absolutely immune, both

individually and in their official capacities, from liability under

section 1983 for evaluating evidence, initiating a prosecution, and

presenting the State's case.  *Imbler v. Pachtman*, 424 U.S. 409

(1976).  A civil claim against a prosecutor is absolutely barred if

the prosecutor was performing functions "intimately associated with

the judicial phase of the criminal process."  *Id.* at 430.  In

determining whether a person is entitled to judicial immunity, the

court should look at the nature of the functions performed, not the

identity of the actor who performed them. *H.B. v. State of Indiana*, 713 N.E.2d 300, 302 (Ind. Ct. App. 1999) (citing *Forrester v. White*, 484 U.S. 219, 224 (1988)).

This immunity is absolute and shields a prosecutor "even if he initiates charges maliciously, unreasonably, without probable cause, or even on the basis of false testimony or evidence." *Henry v. Farmer City State Bank*, 808 F.2d 1228, 1238 (7th Cir. 1986). The immunity applies to a prosecutor's deliberate suppression of exculpatory evidence at trial. *Houston v. Partee*, 978 F.2d 362, 365 (7th Cir. 1992); *see also Spiegel v. Rabinovitz*, 121 F.3d 251, 257 (7th Cir. 1997) (finding absolute immunity shields prosecutor who willfully submitted incomplete and inadequate assessment of case that provided basis for decision to prosecute). The immunity also applies to a prosecutor's evaluation of evidence in determining whether to prosecute. *Davis v. Zirkelbach*, 149 F.3d 614, 617 (7th Cir. 1998); *Spiegel*, 121 F.3d at 257. However, this immunity does not apply "when a prosecutor gives advice to police during a criminal investigation . . . or acts as a complaining witness in support of a warrant application." *Van de Kamp v. Goldstein*, 129 S. Ct. 855, 861 (2009). Therefore, absolute immunity did not protect a prosecutor who certified the factual basis for a warrant of probable cause as she was functioning as a witness, not a prosecutor. *Kalina v. Fletcher*, 522 U.S. 118, 130-31 (1997).

As the person seeking absolute immunity, Dr. Laskey bears the burden of showing immunity is justified. *Burns v. Reed*, 500 U.S. 478, 486 (1991). The main case cited by Dr. Laskey in her initial memorandum is *Wolf v. Napier*, 742 F. Supp. 1014 (N.D. Ind. 1990). In that case, the Court found immune defendant, Napier, who was a Deputy Sheriff employed by Tippecanoe County, Indiana, and also a member of the Arson Task Force, which was an arson investigation team drawn from local law enforcement and fire fighting agencies, and appointed by the prosecuting attorney for Tippecanoe County. *Id.* at 1017. In contrast to the defendant in *Wolf*, Dr. Laskey was not on a team appointed by the prosecuting attorney. Rather, she was hired by DCS, and Plaintiffs allege she was unqualified to interpret Jessica's medical conditions, to review autopsies, or to determine the cause or manner of death. (Compl. and Laskey Answ. ¶¶ 18-25, 58-63). Additionally, in *Wolf*, after conducting his investigation of the fire, the defendant submitted his final report directly to the office of the prosecuting attorney for Tippecanoe County, Indiana, and the prosecuting official prepared an Affidavit of Probable Cause which the defendant signed. *Wolf*, 742 F. Supp. at 1017-18. In contrast, Dr. Laskey never created an affidavit, and never testified on behalf of DCS. Rather, she provided what Plaintiffs allege was an ad hoc opinion letter that misrepresented the facts. She was not intimately associated with the judicial phase of this case. As such, Dr. Laskey is not entitled to

prosecutorial immunity.

CONCLUSION

For the aforementioned reasons, the motion for judgment on the pleadings (DE #44) is **DENIED**; the motion to strike exhibits (DE #48) is **DENIED**; and the motion to supplement response (DE #53) is **DENIED**.


DATED: March 1, 2011                    /s/ RUDY LOZANO, Judge
                                        United States District Court