# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA
### SOUTH BEND DIVISION

| | | |
|---|---|---|
| ROMAN FINNEGAN, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | NO. 3:08-CV-503 |
| | ) | |
| LAUREL MYERS, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

This matter is before the Court on the: (1) State Defendants' Motion to Dismiss First Amended Complaint, filed by Defendants, James Payne, Laurel Myers, Regina McAninch, Tracy Salyers, Reba James, and Jennifer McDonald (collectively "State Defendants") on September 6, 2012 (DE #121); and (2) State Defendants' Motion to Strike, filed by the State Defendants on October 22, 2012 (DE #134). For the reasons set forth below, the Motion to Dismiss (DE #121) is **GRANTED IN PART and DENIED IN PART**. The motion is **GRANTED** as to: Katelynn, Johnathon, and Tabitha's first amendment violation claims in Count 1; Count 3; the equal protection and ADA claims in Count 4; and the request for injunctive relief, which are **DISMISSED WITH PREJUDICE**. The motion is **DENIED** as to the remaining claims against the State Defendants, which **REMAIN PENDING**. Additionally, the Motion to Strike (DE #134) is **DENIED**.

BACKGROUND

As this Court has stated before, the background of this case is extensive. Plaintiffs have sued multiple defendants, including the instant Defendants, James Payne, Laurel Myers, Regina McAninch, Tracy Salyers, Reba James, and Jennifer McDonald. They filed an amended complaint on June 20, 2012 (DE #91), adding Plaintiff Johnathon Abair and Defendant Dr. John Cavanaugh. The amended complaint, pursuant to section 1983, alleges that the defendants repeatedly and wrongfully claimed that Roman and Lynnette Finnegan medically neglected or murdered Lynnette's 14-year old daughter, Jessica Salyers, despite the eventual conclusion that she died on December 20, 2005, from a major prescription error combined with congenital heart disease (post-Fontan) and a seizure disorder.

Plaintiffs have sued several defendants in this case, including the aforementioned State Defendants. James Payne is the Director of the Indiana Department of Child Services (DCS). (First Amended Complaint "FAC" ¶ 9.) Laurel Myers was the Director of the Pulaski County Department of Child Services during the period in question. (*Id.* ¶ 5.) Regina McAninch is an investigator and caseworker for the Pulaski County Department of Child Services. (*Id.* ¶ 6.) Tracy Salyers is a caseworker for the Pulaski County Department of Child Services. (*Id.* ¶ 7.) Reba James is a Regional Manager for the Indiana Department of Child Services. (*Id.* ¶ 8.) Jennifer McDonald is a detective for the Indiana State Police

("ISP") stationed in Lowell, Indiana. (*Id.* ¶ 10.)

These State Defendants filed a motion to dismiss the first amended complaint under Rule 12(b)(6) for failure to state a cause on September 6, 2012 (DE #121). The State Defendants contend dismissal is appropriate for multiple defendants on the claims enumerated in the first amended complaint. (*See* DE #121, pp. 1-6.) Plaintiffs filed a response in opposition on October 4, 2012 (DE #130). The State Defendants then filed a reply on October 22, 2012 (DE #135), thus this motion is fully briefed and ripe for adjudication.

A motion to strike is also before this Court. The State Defendants moved to strike references to deposition testimony in the Plaintiffs' memorandum, reference to the state judicial review administrative proceeding, and other allegations they claim are not contained in the first amended complaint. (DE #134.) This motion is also fully briefed and ripe for adjudication.


DISCUSSION

Under Rule 12(b)(6), the purpose of a motion to dismiss is to test the legal sufficiency of the complaint, not to decide the merits. *Triad Assocs., Inc. v. Chicago Housing Auth.*, 892 F.2d 583, 586 (7th Cir. 1989) (abrogated on different grounds). In determining the propriety of dismissal under Federal Rule of Civil Procedure 12(b)(6), the court must accept all facts alleged in the

complaint as true and draw all reasonable inferences in the light most favorable to the plaintiff. *Johnson v. Rivera*, 272 F.3d 519, 520 (7th Cir. 2001).

A complaint need only state a federal claim and provide the defendant with sufficient notice of the claim, including the grounds upon which the claim rests. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). However, "the factual allegations in the complaint must be enough to raise a right to relief above the speculative level." *Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 618 (7th Cir. 2007) (quotation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 566 U.S. 662, 678 (2009).

Motion to Strike

The State Defendants request that the Court strike: references to deposition testimony, a judicial review opinion authored by Judge Patrick B. Blankenship, Judge of the Pulaski Circuit Court which was attached to Plaintiffs' response (DE #130-2), and certain details from the Plaintiffs' response that the State Defendants contend refer to information not in the complaint. Those details are:

1. The assertion that Regina McAninch woke up the Finnegans.

4

2. The assertion that Mrs. Finnegan followed the Doctor's instructions while Jessica was ill.

3. The assertion that Jennifer McDonald was a new police detective and child advocate.

4. The assertion that DCS bore the costs of the exhumation and second autopsy.

5. The assertion that the exhumation order and search warrant for the house were based on false information provided by Detective McDonald, stating that Detective McDonald did not provide the Court with all of the information available to her at that stage of her investigation and that she should have known better regarding matching the coffee table to an internal injury.

6. The assertion that McDonald destroyed her notes after writing them up.

7. The assertion that DCS knew that the Laskey report was wrong at the time it substantiated death from physical abuse and a health/life threatening environment for the siblings, detailing that the substantiations occurred on March 30 and that Dr. Laskey's deposition testimony was 16 days later on April 16.

8. The assertion that DCS workers Myers and McAninch were asked to leave the autopsy and then continued to observe through a glass window.

9. The assertion that on May 3, 2007, DCS counsel told Dr. Laskey that DCS could not prove its claims of physical abuse.

10. The assertions that Johnathon is a special education student and that he was picked up from school by police to be interviewed by Detective McDonald.

(DE #136, pp. 3-4.) In response, Plaintiffs argue that most of this information is in the first amended complaint, and even if it is not, the Court may consider additional facts consistent with the amended complaint. (DE #137, p. 1.) Additionally, Plaintiffs

believe that the Court may take judicial notice of the state court decision.

A motion under Rule 12(b)(6) can be based only on the complaint itself, documents attached to the complaint, documents that are critical to the complaint and referred to in it, and information that is subject to proper judicial notice. *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012); *see* Fed. R. Civ. P. 10(c). "A plaintiff, however, has much more flexibility in opposing a Rule 12(b)(6) motion and in appealing a dismissal . . . a party opposing a Rule 12(b)(6) motion may submit materials outside the pleadings to illustrate the facts the party expects to be able to prove." *Id.; see also Early v. Bankers Life and Cas. Co.,* 959 F.2d 75, 59 (7th Cir. 1992) (reversing dismissal finding plaintiff is free to assert new facts in brief opposing motion to dismiss); *Roe v. Bridgestone Corp.*, 492 F.Supp.2d 988, 1007 (S.D. Ind. 2007) ("Such documents are not evidence, but they provide a way for a plaintiff to show a court that there is likely to be some evidentiary weight behind the pleadings the court must evaluate."). In fact, the Seventh Circuit suggested that in the wake of turmoil stirred up by *Iqbal* and *Twombly*, that it might actually be "prudent" for a plaintiff to assert new facts in opposition to a motion to dismiss for illustrative purposes. *Geinosky,* 675 F.3d 743, 745 n.1. Additionally, it is recognized that a "complaint may not be dismissed unless it is impossible to prevail under any set

of facts that could be proved consistent with the allegations . . . That is why we have held that a plaintiff may supplement the complaint with factual narration in an affidavit or brief." *Albiero v. City of Kankakee*, 122 F.3d 417, 419 (7th Cir. 1997) (citations omitted). Here, the Plaintiffs are clear that they did not intend to convert the motion to dismiss to a motion for summary judgment. (DE # 137.)

Following the Seventh Circuit's recognition in *Geinosky* that plaintiffs may submit materials outside the pleadings to illustrate the facts the party expects to be able to prove, this Court **DENIES** the motion to strike the deposition testimony and the additional details in Plaintiffs' brief which are all consistent with the amended complaint, and which simply illustrate to the Court the facts Plaintiffs believe they will be able to prove.

With regard to the state court decision of Judge Blankenship of the Pulaski County Superior Court, dated January 28, 2010, the motion to strike will also be **DENIED**. Judge Blankenship ordered DCS to unsubstantiate all claims of abuse or neglect against the Finnegans, and to remove the Finnegans from the child protection index. (DE #130-2, p. 71.) He also found that DCS's actions arbitrarily and capriciously violated the family's civil rights. (*Id.*, pp. 67-70.) The first amended complaint refers in detail to Judge Blankenship's decision. (FAC ¶¶ 295-98.) As this Court has found:

> A party opposing [a motion for judgment on the pleadings] is free to oppose the motion by suggesting in a brief the existence of facts that are not inconsistent with the party's allegations in the pleadings. There is no reason why the opposing party cannot add rhetorical support for such suggestions with some supporting documents - indicating that there is a substantial basis for the assertions . . . .

*Marwil v. Farah*, No. 1:03-cv-482-DFH, 2003 WL 23095657, at *2 (S. D. Ind. Dec. 11, 2003) (citations omitted). Moreover, "it is a well-settled principle that the decision of another court or agency . . . is a proper subject of judicial notice." *Opoka v. I.N.S.*, 94 F.3d 392, 394 (7th Cir. 1996) (citations omitted).

The Court acknowledges that in a previous motion for judgment on the pleadings, submitted by defendant, Dr. Laskey, the Court denied the Defendants' motion for leave to supplement their response with Judge Blankenship's order, noting that it was "a public document subject to judicial notice," however, the "Plaintiffs have not established that this document is necessary for resolution of their motion." (DE #61, p. 9.) There is now a different motion pending before this Court, and the Court concurs with Plaintiffs that Judge Blankenship's order arguably supports Plaintiffs' contention that their claims rise above the speculative level and should survive a motion to dismiss. Therefore, the Court takes judicial notice of Judge Blankenship's order (without addressing the precedential value of the decision at this time).

Motion to Dismiss

Facts

The facts in this case have now been recited by this Court in two previous orders. (*See* DE #61, pp. 10-15; DE #143, pp. 4-8.) The Court will not rehash those facts again, but will note those that are specific to this motion.

In September 2005, the school nurse at West Central Middle School, where Jessica attended, filed a complaint with the Pulaski County Department of Child Services ("DCS") concerning Jessica's medical care. (FAC ¶ 30.) The report of McAninch, a DCS employee, indicated that Lynnette was not cooperating with the school medical safety plan, that Jessica probably needed another surgery, and that Lynnette told them that Jessica had no insurance. (*Id.* ¶ 31.) This was incorrect, Jessica had health insurance and had already had the surgery. *Id.* McAninch contacted Roman and Lynnette and ordered them to attend a hearing on September 9, 2005, at DCS. (*Id.* ¶ 32.) Plaintiffs state in their brief that McAninch woke them up with her call, accused them of not caring about Jessica, and ignored their explanations. (DE #130, p. 3.) Roman Finnegan wrote to his state legislature, Mary Kay Budack, and complained about McAninch's conduct and lack of sensitivity. (FAC ¶ 33.) The state legislature forwarded the letter to the Governor's Office, which sent it to DCS for a response by James Payne, the current Director of DCS. *Id.*

Lynnette and Roman attended the DCS meting, provided proof of insurance, and reached an agreement about Jessica's care. (*Id.* ¶ 35.) At a September 15, 2005 doctor's appointment with Dr. Hurwitz, Jessica's pediatric cardiologist found that DCS' concerns were unjustified, and assured Plaintiffs that Jessica was doing well. (*Id.* ¶ 37.)

On October 12, 2005, Plaintiffs took Jessica to the family doctor for a blood test, and at this appointment Jessica's doctor accidentally increased her dosage of Warfarin and eliminated her Dilantin, placing her at risk of death from internal bleeding and/or seizure. (FAC ¶¶ 39-40.) Jessica had vaccinations on December 5, 2005, the same day that DCS substantiated medical neglect, stating Lynnette and Roman would not have obtained appropriate medical care for Jessica without DCS intervention. (*Id.* ¶ 42.) DCS provided a copy of the substantiated medical neglect to the school, but not the Finnegans, and Plaintiffs allege that if they had notified them, proper testing would have been initiated and the prescription errors would have been caught prior to Jessica's death. (*Id.* ¶ 45.)

From December 7 - 18, 2005, Jessica had symptoms including a stomach ache and sore tongue, and she was taken to the doctor who diagnosed the flu and thrush. (*Id.* ¶¶ 46-47.) On December 20, 2005, Lynnette found Jessica dead, lying face down by the side of her bed. (*Id.* ¶ 48.) Lynnette started CPR and Roman took over

when Lynnette called 911.  *Id.*

The emergency personnel, and initial hospital investigators, found Jessica's death was related to her heart condition and Warfarin, with no signs of abuse or neglect.  (*Id.* ¶ 49.)  At the hospital, Dr. Klockow (the Jasper County Coroner), and Dr. Ahler (the emergency room doctor and former Jasper County Coroner), found no signs of abuse or neglect.  (*Id.* ¶ 51.)

Defendant McAninch and Mike Bardsley of the prosecutor's office interviewed Jessica's siblings (Johnathon, age 17, Tabitha, age 16, and Katelynn, age 9) and questioned them for approximately 6 hours.  (*Id.* ¶ 52.)  There were no indications of abuse, neglect, or inappropriate discipline.  (*Id.* ¶ 53.)  DCS also questioned the Finnegans, and when Lynnette tried to see her children (who had by then been held for questioning for approximately 5 hours), Defendant Salyers threatened her with arrest.  (*Id.* ¶ 54.)

The next day, on December 21, 2005, Dr. Cavanaugh (a forensic pathologist retained by the Coroner), conducted an autopsy in which he found no signs of abuse or neglect.  (*Id.* ¶ 55.)  He attributed the death to blunt force injury of the head consistent with a fall complicated by Warfarin, with the manner of death undetermined. *Id.*  Dr. Cavanaugh did not mention a fracture in his preliminary autopsy report; however, such was noted on his autopsy report dated May 24, 2006.  *Id.*

Plaintiffs allege that McAninch and Myers then conducted their

11

own investigation and retained Dr. Antoinette Laskey, a pediatrician. (*Id.* ¶ 56.) On October 28, 2006, Dr. Laskey authored a report stating that Jessica died from a fatal beating on the day of her death, causing internal hemorrhages and skull fracture. (*Id.* ¶ 58.) In reliance upon this opinion (which Plaintiffs allege is uninformed, misleading, and "physiologically impossible given the lack of bruising") (DE #130, p. 6), DCS seized Tabitha and Katelynn on November 1, 2005, "telling them that their mother had beaten Jessica to death and placing them in a secret out-of county location for questioning and 'therapeutic' foster care." (FAC ¶ 64.) Interviews and mental health evaluations did not reveal any indication of abuse. (*Id.* ¶ 64.)

In the meantime, with the assistance of other doctors, the Finnegans discovered the prescription error, and on December 18, 2006, the Finnegans' attorney provided the prescription records to DCS along with an email from Dr. Harold Buttram, a family practitioner, who advised, "it was glaringly apparent . . . that Jessica died from a hemorrhagic [bleeding] disorder of some sort." (*Id.* ¶¶ 71-72.)

On January 15, 2007, Detective McDonald arranged for an order to exhume Jessica's body and search the Finnegans' house. (*Id.* ¶ 73.) Plaintiffs allege that the search warrant was to find objects that matched the shape of the internal hemorrhages and that McDonald gave the Court false information in obtaining the order.

*Id.*

The January 25, 2007 exhumation and second autopsy determined that the skull fracture was created at the first autopsy, and that the subdural hemorrhage occurred before the morning of death, consistent with the prescription errors. (*Id.* ¶ 77.) Four days after the exhumation, Detective McDonald interrogated Johnathon, a high school senior, for four hours, and falsely told him that his mother was blaming Jessica's death on him. (*Id.* ¶¶ 79-81.)

When DCS and Detective McDonald refused to acknowledge the prescription errors, the Finnegans provided DCS with volumes of material in support. (*Id.* ¶ 85.) In March 2007, McAninch and Myers sent Roman and Lynnette substantiations of death from physical abuse (relying on Dr. Laskey's opinion) and a health/life threatening environment for the siblings. (*Id.* ¶ 87.) In her April 16, 2007 deposition, Dr. Laskey testified she was not qualified to determine the cause and manner of death, and admitted that the hemorrhages were consistent with Warfarin. (*Id.* ¶ 89.)

Plaintiffs allege that McDonald responded by writing up a false account of the children's interviews, and by providing a probable cause affidavit that contained false reports, which was used to obtain arrest warrants for the Finnegans. (*Id.* ¶¶ 91-94.) After his arrest, McDonald interrogated Roman Finnegan and repeatedly told him a blow to Jessica's head caused her skull fracture and death. (*Id.* ¶ 95.)

On May 25, 2007, DCS withdrew its initial CHINS petition and filed a new one, alleging medical neglect and contending the other children were still in serious danger of physical harm. (*Id.* ¶ 98.)

Plaintiffs allege that DCS and Detective McDonald had autopsy slides, but from January 2007-June 2007, refused to provide the Finnegans with them. (*Id.* ¶ 104.) The Finnegans finally got this information in mid-June to mid-July from third parties, including the prosecutor, through subpoenas and Brady requests, and the slides showed the death was caused by prescription error, the hemorrhages were from Warfarin, and the skull fracture was post-mortem. *Id.*

Shortly before the July 2007 fact finding hearing, Cavanaugh told McAninch and DCS counsel the autopsy slides showed the bleeds were old and he had omitted this information from his autopsy report. (*Id.* ¶¶ 245-46, 302.) The fact finding hearing was changed to a detention hearing. (*Id.* ¶ 111.) Just before the hearing, the Coroner ruled that Jessica died an accidental death from the prescription errors, and that the skull fractures were created at the first autopsy. (*Id.* ¶ 113.)

At the July 18-19, 2007 hearing, DCS did not offer any witnesses or evidence to support its claims, and the Court ordered DCS to produce Tabitha, who testified she had never seen or been subject to abuse or neglect. (*Id.* ¶ 114.) At McDonald's urging,

the prosecutor was given 2 weeks to depose the girls, after which they would return home. *Id.* Again, the girls testified there was no abuse. (*Id.* ¶ 116.) DCS still refused to return the girls, so the Finnegans filed a contempt motion - there, the Court ordered DCS to return the girls immediately. (*Id.* ¶¶ 121-24.)

On August 27, 2007, the prosecutor agreed she did not have probable cause to pursue the criminal charges, and on September 7, 2007, the CHINS judge recused himself based upon ex parte contacts with DCS and the prosecutor. (*Id.* ¶¶ 127-28.) On September 10, 2007, the prosecutor filed amended charges that Roman and Lynnette knowingly endangered Jessica's health by failing to provide emergency care for her. (*Id.* ¶ 129.) Detective McDonald was the only named witness. *Id.* From August through November, 2007, DCS made reunification difficult, and a counselor who reported to DCS said "at times it seems that all of the services being offered only serve to add to the chaos being felt emotionally by this family." (*Id.* ¶ 130.)

Ultimately, on October 24, 2007, the prosecutor moved to dismiss Roman's criminal charges, and on November 2, the prosecutor moved to dismiss Lynnette's charges. (*Id.* ¶ 132.) DCS finally dismissed the CHINS petitions, but refused to amend the March 23 substantiations, including death from physical abuse. (*Id.* ¶ 134.)

On administrative review, Defendant, Reba James, did not allow the Finnegans to present evidence or participate in the review.

(*Id.* ¶ 135.) James re-substantiated all of the March substantiations and added two additional substantiations (inappropriate discipline and death from medical neglect). *Id.* Plaintiffs claim her deposition testimony shows that she did not read or consider the Coroner's Verdict or any materials provided by the Finnegans. (DE #130, p. 10.)

For 2 and a half more years, Plaintiffs allege the DCS Defendants continued to make the same false claims. This ended in May 2010, when DCS finally withdrew its appeal of Judge Blankenship's January 2010 ruling that DCS' December 2005 and March 2007 substantiations were arbitrary and capricious.

In the present motion to dismiss, the State Defendants move to dismiss the first amended complaint, claiming that: (1) they are immune from suit under the 11th Amendment; (2) the complaint does not state any constitutional claims; (3) they are entitled to qualified immunity; (4) the *Rooker-Feldman* doctrine precludes suit; (5) the Plaintiffs cannot obtain injunctive relief as this would prevent DCS from performing its statutory obligations; and (6) Johnathon has no cognizable claim. (DE #126.) Plaintiffs' response takes issue with these arguments. (DE #130.) The State Defendants also filed a reply. (DE #135.)


The Question Of Whether All Counts Run Against All State Defendants

As a preliminary matter, this Court must address the Plaintiffs' first argument in their response. In their motion to dismiss, the State Defendants request that specific defendants be dismissed from specific counts, seemingly based on whether each defendant is mentioned by name in those counts. (DE #126, pp. 1-2.) However, the State Defendants contend that the counts are against all State Defendants. (DE #130, pp. 14-15.) It is true that the actions are identified in the body of the complaint, and before the "Legal Claims" section of the complaint, it states that "Paragraphs 1-153 are incorporated by reference into each of the following Counts" (FAC ¶ 154) and before the newly added legal claims related to Defendant Dr. Cavanaugh and Plaintiff Johnathon Abair, the complaint states that "Paragraphs 1-302 are incorporated by reference into each of the following Counts." (FAC ¶ 303.)

The Seventh Circuit has addressed this point in a similar case involving family rights:

> At this point, we again must consider which defendants are subject to suit for the alleged violation. We need not dwell on each individual defendant's involvement, however, because, as detailed above, [plaintiff] alleged that the defendants conspired to violate his constitutional rights - including his right to familial relations - and he presented sufficient facts to support a reasonable inference that each defendant . . . joined the conspiracy, and thus was responsible for causing the alleged substantive due process violation.

*Brokaw v. Mercer Cnty.*, 235 F.3d 1000, 1009 (7th Cir. 2000). Here, Plaintiffs have structured the first amended complaint to allege

that each Defendant is responsible for the acts of the conspiracy that resulted in the deprivation of the Plaintiffs' constitutional rights. Count 1 is entitled "Defendants' actions violated the plaintiffs' 1st Amendment right to petition the government" (FAC ¶ 154); Count 2 "Defendants' actions violated the plaintiffs' 4th Amendment right to freedom from unreasonable search and seizure" (FAC ¶ 155); Count 3 "Defendant's actions violated the plaintiffs' 6th Amendment right to effective assistance of counsel" (FAC ¶ 159); Count 4 "Defendants' actions violated the plaintiffs' 14th Amendment right to procedural and substantive due process" (FAC ¶ 161); Count 5 "Defendants' actions constituted a broad-based conspiracy to violate the plaintiffs' civil rights" (FAC ¶ 164); Counts 6 and 7 specifically deal with the newly added Defendant, Dr. Cavanaugh; and Count 8 "Defendants' actions violated Plaintiff Johnathon Abair's 1st Amendment right to petition the government, 4th Amendment right to freedom from unreasonable search and seizure, and 14th Amendment right to procedural and substantive due process, and constituted a broad-based conspiracy to violate his civil rights (FAC ¶ 305). As such, the first amended complaint sufficiently notifies the State Defendants that each count runs against each Defendant.

Whether Plaintiffs' Claims Are Barred By The Eleventh Amendment

The State Defendants argue that Plaintiffs' section 1983

claims are barred by Eleventh Amendment immunity. Specifically, they argue Defendants were sued in their official (not individual) capacities:

> [S]ince the State Defendants are being sued for their actions taken during related criminal and child protection investigations pursuant to their positions with the Indiana State Police and the Indiana Department of Child Services, the allegations in the Amended Complaint lead to a conclusion that the State Defendants are sued in their official capacities.

(DE #126, p. 12.) Yes, such a suit would be barred against Defendants in their "official capacity," but as the Seventh Circuit has recognized, "the 'capacity' in which litigation proceeds is largely the plaintiff's choice . . . [t]he plaintiff may plead a claim either way . . . ." *Walker v. Rowe*, 791 F.2d 507, 508 (7th Cir. 1986). A claimant can impose personal liability on a government official under section 1983 by demonstrating that the official, acting under color of state law, caused the deprivation of a federal right. *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). "Under the law of the Seventh Circuit, when a complaint alleges the tortious conduct of an individual acting under color of state law, an individual capacity suit plainly lies, even if the plaintiff failed to spell out the defendant's capacity in the complaint." *Severson v. Bd. of Trustees of Purdue Univ.*, 777 N.E.2d 1181, 1190 (Ind. Ct. App. 2002) (quoting *Hill v. Shelander*, 924 F.2d 1370, 1374 (7th Cir. 1991)).

Plaintiffs cite *Crawford*, arguing the first amended complaint

indicates that the State Defendants were sued in their official capacity. *Crawford v. Cnty. of Muncie*, 655 N.E.2d 614 (Ind. Ct. App. 1995). However, *Crawford* realized that "[o]ne indicia of the capacity in which a government agent has been sued under § 1983 is the language of the caption of the case . . . [and] [n]aming a defendant by his position or office raises a presumption that he has been sued in his official capacity." *Crawford*, 655 N.E.2d at 620. Indeed, in *Crawford*, the defendants were referenced as "police officer[s]" in the caption which was a "critical factor upon which [the] Court focus[ed]" and thus a presumption arose that the defendants were sued in their official capacities. *(Id.* at 620-21.) In contrast, in this case, the State Defendants are identified in the caption by only their names - there are no titles or affiliations in the caption. (FAC.)

Additionally, *Crawford* counsels to look at the allegations and language used in the body of the complaint. *Id.* at 620. Here, the complaint does identify the state entity with which each defendant is affiliated, which is required under section 1983, and alleges that: "[t]he defendants acted individually and jointly under color of state law to deprive the plaintiffs of their civil rights. Because they acted knowingly, recklessly and in disregard of well-established law, with no objectively reasonable basis for their actions, they do not have qualified immunity . . . ." (FAC ¶ 13.) The Seventh Circuit has treated section 1983 suits as

individual capacity claims when defendants have asserted the defense of qualified immunity. *See Brokaw*, 235 F.3d at 1009 ("Because the state defendants have treated [plaintiff's] suit as an individual capacity claim - as demonstrated by their assertion of the defense of qualified immunity - we will too."); *Stevens v. Umsted*, 131 F.3d 697, 707 (7th Cir. 1997) (finding the assumption that a suit against a government is assumed to be an official capacity suit is negated if the parties have treated it as an individual capacity suit by asserting the defense of qualified immunity). Here, Plaintiffs raised qualified immunity in the first amended complaint (¶ 13), and the State Defendants asserted it in their original answer and motion, negating any claim that Plaintiffs sued them in their official capacities. (DE #25, Defenses, pp. 52-54; DE #121 ¶ 13.)

Finally, the State Defendants assert that if retrospective (monetary) relief is sought, then a state official is being sued in his official capacity. (DE #126, pp. 12-13.) However, the case they cite for this proposition, *Severson v. Bd. of Trustees of Purdue Univ.*, 777 N.E.2d 1181, 1188 (Ind. Ct. App. 2002), is not on point, and merely addresses whether a state agency is a "person" amendable to suit under section 1983. *Id.* ("If a plaintiff requests retrospective relief, then a state official sued in his official capacity is also not a "person" under § 1983.") Here, Plaintiffs have not sued a stage agency, but have instead stated

claims against the individual defendants in their personal capacities.

Count 1 - Violation of First Amendment Right To Petition The Government

Count 1 of the Amended Complaint alleges that McAninch, Myers and Payne retaliated against Plaintiffs for exercising their First Amendment right to petition the Government for a redress of grievances. (FAC ¶¶ 33-35, 142, 144, 146, 148, 155.) Specifically, Roman Finnegan wrote to his state legislature, Mary Kay Budack, and complained about McAninch's conduct and lack of sensitivity on the telephone. (FAC ¶ 33.) The state legislature forwarded the letter to the Governor's Office, which sent it to DCS for a response by James Payne, Director of DCS. *Id.* Plaintiffs allege the State Defendants retaliated by initiating a false substantiation of medical neglect on December 5, 2005, followed by a retaliatory investigation, illegal detention of the children, and finding of abuse and neglect that were never supported by the evidence. (*Id.* ¶ 155.)

In his January 2010 decision, Judge Blankenship stated that "DCS' failure to follow up with Jessica's parents or doctors suggests that the December 5, 2005 substantiation was simply a face-saving effort, possibly in retaliation for Mr. Finnegan's original complaint to his legislator." (DE #130-2, p. 59.)

The State Defendants cite *Gunville v. Walker*, 583 F.3d 979, 984 n. 1 (7th Cir. 2009), and *Fairley v. Andrews*, 578 F.3d 518 (7th Cir. 2009), for the proposition that a "heightened measure of causation" is applicable, specifically, that Plaintiffs must establish "but-for causation" instead of merely establishing that the speech was a motivating factor in Defendants' decision to take retaliatory actions. However, *Gunville* and *Fairley* both involve an employment relationship, and were at the summary judgment stage – the State Defendants have provided no legal support for the argument that a heightened measure of causation would be applicable during a motion to dismiss like this one. Under the typical "motivating factor" test, the allegations in the first amended complaint are sufficient to withstand dismissal.

The State Defendants also claim that the speech must be a matter of public interest, citing *Connick v. Myers*, 461 U.S. 138 (1983) (involving speech of an assistant district attorney), and *Pickering v. Board of Educ.*, 391 U.S. 563 (1968) (involving action by dismissed teacher against board of education). However, Plaintiffs pinpoint how the Seventh Circuit looks at this specific issue, in this exact context:

> The public criticism of governmental policy and those responsible for government operations is at the very core of the constitutionally protected free speech. We think it plain that presenting complaints to responsible government officials about the conduct of their subordinates with whom the complainer has had official dealings is analogously central to the protections of the right

to petition. It matters not that the subject of the grievance may not be political, in the sense of raising public policy issues. . . . Indeed, the fact that a grievance may not arouse sufficient public concern to generate political support makes the individualized exercise of the right to petition all the more important. Unless the grievance embodies a violation of established and judicially enforceable state or federal right, individual petitioning may be the only available means of seeking redress.

*Stern v. U.S. Gypsum, Inc.*, 547 F.2d 1329, 1342-43 (7th Cir. 1977) (internal citations omitted).

The State Defendants also argue that no retaliatory motive is suggested, and the timing of the complaint and alleged retaliation is not sufficient. (DE #126, pp. 14-15.) However, as noted by Plaintiffs, most of the cases cited by them were at the summary judgment stage. (DE #130, p. 18, n.4.) At this stage in the proceedings, when the Court must accept as true all well-pleaded allegations and view them in the light most favorable to the non-moving party, as well as accept as true all reasonable inferences to be drawn from the allegations, the Court believes the first amended complaint does contain allegations that "state a claim to relief that is plausible on its face" and that the "factual allegations [are] enough to raise a right to relief above the speculative level." *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555. Facts have been alleged that would sufficiently let a fact finder determine that the State Defendants retaliated within days after Mr. Finnegan criticized them by providing false information

to the Central Office, which resulted in the December 5, 2005 substantiation of medical neglect. This is sufficient at this stage of the proceedings.

The one portion of this claim that does need to be dismissed is the children's assertion of a First Amendment claim. Although the Plaintiffs contend the damages to the children are "collateral" to their parents, they cite to no case law, and this Court is not aware of any, supporting such a claim. As such, Katelynn, Johnathon, and Tabitha's first amendment violation claims in Count 1 are dismissed.


Count 2 – Violation of Fourth Amendment Rights

Count 2 of the first amended complaint states violations of the Fourth Amendment rights for the following alleged unconstitutional searches or seizures: (1) the December 20, 2005 emergency detention and seizure of Jessica's siblings without court order; (2) the November 6, 2006 seizure of Tabitha and Katelynn; (3) the exhumation of Jessica's body on January 25, 2007 and the search of the Finnegan home; (4) the April 23, 2007 arrests of Mr. and Mrs. Finnegan; (5) the January 2007 interrogations of Johnathon and Tabitha; and (6) the seizures of Tabitha and Katelynn pursuant to the May 2007 Amended CHINS petition. (FAC ¶¶ 156-58.) The State Defendants concede that the first four actions constituted searches or seizures subject to Fourth Amendment constraints (DE

#126, p. 16), however, they claim they were reasonable in light of the facts and circumstances of this case. The State Defendants urge the last two are not properly addressed in this motion.[1] The Court is careful to keep in mind the admonition that to state a claim for relief, a complaint must contain factual allegations that plausibly suggest an entitlement to relief, to a degree that rises above the speculative level. *Iqbal*, 556 U.S. at 677-80; *Twombly*, 550 U.S. at 555.

The Fourth Amendment states it is "the right of the people to be secure in their person, houses, papers, and effects against unreasonable searches and seizures[.]" U.S. Const. Am. IV. To determine whether a cause of action has been stated, courts determine whether the alleged conduct constituted a search or seizure, and if so, whether it was unreasonable in light of the facts. A person has been "seized" for purposes of the Fourth Amendment "if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). "The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, and

---

[1]As noted earlier in this decision, a party may assert new facts in response to a motion to dismiss as long as they are consistent with the complaint. *See, e.g., Geinosky*, 675 F.3d 743, 745 n.1. The facts of these alleged seizures are in the first amended complaint, and will therefore also be considered by the Court. (FAC ¶¶ 81, 98, 226.)

its proper application requires careful attention to the facts and circumstances of each particular case." *Brokaw*, 235 F.3d at 1010 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

The parties exhaustively discuss each admitted search and seizure, debating whether or not it was reasonable. The State Defendants rely on facts and arguments such as the removal of Katelynn and Tabitha from the home was authorized by court order, the search of the home was done after obtaining a search warrant, the exhumation of Jessica was done with probable cause, and the arrest of Roman and Lynnette were done pursuant to valid warrants. (DE #126, pp. 17-19.) However, this is a motion to dismiss - the Court must accept as true all well- pleaded allegations and view them in the light most favorable to the non-moving party, as well as accept as true all reasonable inferences to be drawn from the allegations. The State Defendants have alleged: the December 20, 2005 seizures of the siblings and interrogations were done without a court order, lasted six hours, and Mrs. Finnegan was told she would be arrested if she attempted to see the children (FAC ¶ 54); on November 1, 2006, Tabitha and Katelynn were seized from school even though no affidavit, sworn testimony or other documents were provided to the Court to support the need for an emergency detention, and then DCS told the girls their mother had beaten Jessica to death and placed them in an out-of-county location for questioning and "therapeutic" foster care (*Id.* ¶¶ 64-65); the

exhumation of the body was based upon knowingly false information that it was needed to determine the existence and cause of a skull fracture and attempt to match the shape of objects in the Finnegans' home to the shape of an internal bleed in Jessica's head (*Id.* ¶¶ 70, 73-78); the April 2007 arrests of Lynnette and Roman were based upon McDonald's probable cause affidavit, which was filled with false information (DE ¶¶ 93-95); Tabitha was interrogated after the exhumation and Johnathon was interrogated for 6 hours when McDonald told him, falsely, that Jessica had been murdered and his mother was accusing him (FAC ¶ 81); and the amended CHINS petition eliminated the claims that the girls were in danger, but instead claimed DCS was detaining the girls as witnesses against their parents, which was false because neither child had disclosed abuse or neglect. (*Id.* ¶¶ 98, 226.)

These allegations in the first amended complaint are sufficient to allege the State Defendants violated Plaintiffs' Fourth Amendment rights. The Seventh Circuit established in *Brokaw* that under severe circumstances, if the defendants knew the allegations of child abuse were false or withheld material information, but nonetheless caused or conspired to cause the child's removal from the home, they violated the Fourth Amendment. *Brokaw*, 235 F.3d at 1012. The Court did note:

> Before closing the Fourth Amendment discussion, it
> is important to reiterate two points. First, our
> holding should not be read as creating a
> constitutional claim any time a child is removed

> from his home and a later investigation proves no
> abuse occurred.  The alleged facts here go much
> beyond that scenario, and our holding is limited to
> the unique circumstances of this case.  Second, **it
> is important to remember that this case is here on
> 12(b)(6) dismissal.  Further proceedings and
> discovery may well narrow this case substantially,
> but at this point the question is solely whether
> [plaintiff] can succeed under any set of facts.**

*Brokaw*, 235 F.3d at 1017 (emphasis added).  This case is one of those rare instances, like *Brokaw*, which at this stage of the proceedings, has successfully alleged a deprivation of Constitutional rights based upon the searches and seizures associated with Plaintiffs' children being removed from the home. The allegations in the first amended complaint satisfy the burden of alleging a violation of Plaintiffs' 4th Amendment rights.

Count 3 – Sixth Amendment Right to Counsel

Plaintiffs have withdrawn their claim based upon violation of the Sixth Amendment.  (DE #130, p. 26.)  As such, Count 3 is dismissed.

Count 4 – Fourteenth Amendment Right to Substantive and Procedural Due Process

Plaintiffs allege that Defendants Myers, McAninch, and Payne deprived them of substantive due process by refusing to comply with laws that protect "the constitutional rights to family relations, including the parents' right to raise their children and the

children's right to be with their parents." (FAC ¶ 164.) As this
Court has found in its previous order on Defendant Antoinette
Laskey's motion for judgment on the pleadings (DE #61), and as
conceded by the State Defendants (DE #126, p. 22), due process does
encompass a parent's liberty interest in familial relations. *See*
*Troxel v. Granville*, 530 U.S. 57, 65 (2000) (collecting cases);
*M.L.B. v. S.L.J.*, 519 U.S. 102, 116 (1996); *Brokaw,* 235 F.3d at
1018 (reiterating "[t]he Supreme Court has long recognized as a
component of substantive due process the right to family
relations.").

Plaintiffs have sufficiently alleged a violation of their 14th
Amendment substantive and procedural due process rights. A
parent's interest in the care and custody of her children, and the
children's right to care and nurturing by their parents, is
protected by the 14th Amendment. *Troxel*, 530 U.S. at 65; *see*
Compl. ¶¶ 162-64. Although the Government has an interest in
protecting children from abuse, the State does not have an interest
in protecting children from their parents "unless it has some
definite and articulable evidence giving rise to a reasonable
suspicion that a child has been abused or is in imminent danger of
abuse." *Brokaw*, 235 F.3d at 1019 (citation omitted). Here,
because Tabitha and Katelynn were removed from the house and
subjected to questioning for nine months, long after Plaintiffs
allege there was no evidence of abuse, neglect, or danger,

Plaintiffs have stated a sufficient claim of violation of their substantive due process rights.

Plaintiffs have also sufficiently stated a claim for violation of procedural due process under the 14th Amendment. "[N]o matter how much process is required, at a minimum, it requires the government officials not misrepresent the facts in order to obtain the removal of a child from his parents." *Brokaw*, 235 F.3d at 1020 (citing *Malik v. Arapahoe Cnty. Dep't of Soc. Servs.*, 191 F.3d 1306, 1315 (10th Cir. 1999)). Plaintiffs have alleged that the plaintiffs "refuse[]d to address the medical evidence or acknowledge basic medical precepts; sabotaging the Coroner's investigation; failing to provide exculpatory information or information that was subpoenaed and/or properly requested under the Indiana Rules of Trial Procedure; omitting exculpatory information and including false information in their reports; assessing evidence in a biased and partial manner; and acting without reasonable or probable cause and with deliberate indifference to the plaintiffs' rights." (FAC ¶ 163.) These are sufficient allegations to support a deprivation or procedural due process.

These allegations are echoed in the findings of Judge Blankenship:

> In addition to this obvious substantive problem, the record contains reports of numerous procedural irregularities . . . beginning with the six hour detention of the children for questioning on the day of Jessica's death, and culminating in nine months of detention in 2006-2007 that appeared to

be largely if not entirely designed to obtain
information from the children, rather than to
protect them. The Finnegans also state (and DCS
largely does not contest) that DCS did not provide
case plans in a timely manner, did not allow
Tabitha to participate in the CHINS proceedings,
denied relative placement for what appear to be
spurious reasons, failed to provide evidence to
support the amended Petitions or continued
detention in May 2007, had at least one *ex parte*
contact with the Court in an effort to prevent
reunification, offered Tabitha college funding if
she would agree to remain in foster care rather
than return home, and generally made reunification
as difficult as possible . . . this pattern of
conduct not only constituted bad faith but deprived
the Finnegans of the due process of law guaranteed
by the U.S. and Indiana constitutions.

(DE #130-2, pp. 69-70.)

The State Defendants argue that allegedly ignoring and
withholding exculpatory evidence cannot have interfered with the
Plaintiffs' constitutional rights because "[t]he charges against
Plaintiffs were dismissed well before trial." (DE #126, p. 25.)
However, Plaintiffs have alleged plenty of prejudice including 9
months of detention and investigatory therapy for the children,
criminal charges against the parents, the loss of Mr. Finnegan's
job, and the loss of their family house.


Count 4 - Equal Protection and ADA Claims

Plaintiffs allege that the State Defendants further deprived
them of their equal protection and due process rights by refusing
to comply with the applicable state and federal CHINS laws and
regulations, and by violating the American with Disabilities Act

("ADA") which required defendants to provide appropriate accommodations to Lynnette. (FAC ¶ 164.) Plaintiffs allege Lynnette is disabled – she suffers seizures with migraines, has attended special education classes, received social security payments, and has a learning (communications) disorder. (FAC ¶¶ 26-27, 164.) Plaintiffs state that McAninch and Myers made fun of Lynnette's need to wear sunglasses due to her migraines and mocked her spelling and communication difficulties. (DE #130, p. 31.) Additionally, McDonald taunted her for getting dressed up and made her hop up the courthouse stairs in shackles. *Id.*

The Equal Protection Clause of the Fourteenth Amendment directs that no State shall "deny to any person within its jurisdiction equal protection of the laws." U.S. Const., Amend. XIV § 1. It has "been limited to instances of purposeful or invidious discrimination rather than erroneous or even arbitrary administration of state powers. The gravamen of equal protection lies not in the fact of deprivation of a right but in the invidious classification of persons aggrieved by the state's action." *Briscoe v. Kusper*, 435 F.2d 1046, 1052 (7th Cir. 1970). If the governmental action discriminates on the basis of a suspect classification, a reviewing court is to employ the strict scrutiny analysis; however, "[i]f no suspect class or fundamental right is involved . . . [courts] employ a rational test to determine whether [action] is constitutional." *Vision Church v. Village of Long*

*Grove*, 468 F.3d 975, 1000-1001 (7th Cir. 2006) (quoting *Eby-Brown Co., LLC v. Wisconsin Dep't of Agric.*, 295 F.3d 749, 754 (7th Cir. 2002) (internal quotation marks omitted)). As the Seventh Circuit has stated:

> With due deference to the congressional approach to legislation affecting the disabled, this Court chooses to follow the lead of our fellow circuit courts and the direction indicated by the Supreme Court to conclude that the disabled are not a suspect or quasi-suspect class. Therefore, we apply rationality review to claims of discrimination made by persons in this class.

*United States v. Harris*, 197 F.3d 870, 876 (7th Cir. 1999); *see also Board of Trustees Univ. of Alabama v. Garrett*, 531 U.S. 356, 366 (2001) (discrimination against persons with disabilities subject to rational relation scrutiny under Equal Protection Clause).

Here, the Plaintiffs have not satisfied their burden of alleging facts to support a reasonable inference that Lynnette's disabilities motivated the State Defendants' actions. While this Court by no means condones the alleged actions, dismissal is appropriate where there is no suspect classification, and no facts to support a reasonable inference that Lynnette's disabilities motivated the Defendants' actions.

Plaintiffs' ADA claim fails as well. Even assuming, *arguendo*, that Lynnette is a qualified individual, the Court must next turn to the question of whether the requested accommodation was reasonable. This issue of "whether a requested accommodation is

reasonable or not is a highly fact-specific inquiry and requires balancing the needs of the parties." *Rauen v. U.S. Tobacco Mfg. Ltd. P'ship*, 319 F.3d 891, 896 (7th Cir. 2003) (quoting *Oconomowoc Residential Programs, Inc. v. City of Milwaukee*, 300 F.3d 775, 784 (7th Cir. 2002)). In this case, Plaintiffs fail to allege that Lynnette requested an accommodation(s), or what specific accommodation was needed. As such, Plaintiffs fail to state a claim for violation of the ADA.

Count 5 - Conspiracy To Deprive Plaintiffs of Their Constitutional <u>Rights</u>

Count 5 alleges that all defendants engaged in a conspiracy and "repeatedly did whatever it took, including deliberate lies, false arrests and concealment of critical information, to create a case against the Finnegans, in the absence of rational belief or probable cause." (FAC ¶ 165.) The extensive first amended complaint (consisting of 95 pages) identifies the members of the conspiracy, identifies the dates of September 2005 through May 2010, and alleges a purpose of trying to deprive Plaintiffs of their constitutional rights. At this stage, this is sufficient. *See, e.g., Brokaw*, 235 F.3d at 1016 (plaintiffs' conspiracy allegations under § 1983 were sufficient, and no more was required at that stage of the proceedings, because they "alleged all of the necessary facts: the who, what, when, why, and how. No more is required at this stage."); *Loubser v. Thacker*, 440 F.3d 439, 443

(7th Cir. 2006) (to survive a motion to dismiss plaintiff must allege "the parties, the general purpose, and the approximate date of the conspiracy.").

Although the State Defendants argue the Plaintiffs allege no purpose for the conspiracy, the complaint specifically alleges that the State Defendants, through lies and concealing information, tried to "create a case against the Finnegans" in violation of their rights. That is enough detail to survive dismissal. Finally, the State Defendants complain that this constitutes an "intracorporate conspiracy," and "a conspiracy cannot exist solely between members of the same entity." (DE #126, p. 30 (quoting *Payton v. Rush-Presbyterian-St. Luke's Med. Ctr.*, 184 F.3d 623 (7th Cir. 1999).) However, this argument is inapplicable because Plaintiffs have specifically alleged a conspiracy between employees of DCS, the Indiana State Police, Riley Children's Hospital, and Dr. John Cavanaugh. (FAC ¶¶ 5-11, 305.)

### Whether The State Defendants are Entitled to Immunity

The State Defendants urge that Myers, McAninch, Salyers and James are entitled to "absolute immunity for most, if not all, of the actions which form the basis of plaintiffs' claims." (DE #126, p. 31.) After scant analysis, and only citing general case law, they conclude that "[g]iven the breadth of quasi-judicial immunity afforded under federal and state law, Defendants Myers, McAninch,

Salyers, James and McDonald are absolutely immune from liability for any claim arising from the allegations in the Amended Complaint." (DE #126, p. 32.)

Because it is a complete defense to liability, "[a]bsolute immunity from civil liability for damages is of a rare and exceptional character," *Auriemma v. Montgomery*, 860 F.2d 273, 275 (7th Cir. 1988) (quotation omitted), and there is a presumption against granting it to government officials. *Houston v. Partee*, 978 F.2d 362, 365 (7th Cir. 1992). The burden of establishing absolute immunity rests on its proponent, who must show that overriding considerations of public policy require that the defendant be exempt from personal liability for unlawful conduct. *Auriemma*, 860 F.2d at 275; *Walrath v. United States*, 35 F.3d 277, 281 (7th Cir. 1994).

Here, the State Defendants fail to identify the actions for which they seek absolute immunity. They do claim that in the context of the CHINS proceedings, the participants are entitled to absolute immunity. (DE #126, p. 32, citing *H.B. v. State of Indiana*, 713 N.E.2d 300, 302 (Ind. Ct. App. 1999) (stating "[a]bsolute judicial immunity therefore extends to persons performing tasks so integral or intertwined with the judicial process that these persons are considered an arm of the judicial officer who is immune."). The State Defendants concede that "the DCS defendants are entitled to immunity for in-court testimony and

some aspects of court preparation," yet those actions constitute a small part of the actions Plaintiffs allege violated their Constitutional rights.   (DE #130, p. 35.)

Plaintiffs point out that McAninch was the only DCS defendant who testified in the CHINS proceedings, and she had a limited role. Rather, when looking at the nature of the function performed by the State Defendants, Plaintiffs point out their numerous allegations of reckless investigatory and out of court actions including, but not limited to: the December 5, 2005 substantiation of medical neglect, the detention of the family on December 20, 2005, the retention of an alleged unqualified pediatrician in October 2006 to subvert the Coroner's investigation, the seizure of the girls on November 1, 2006 for investigative purposes, the placement of the girls in a secret out-of-county location and refusal to consider relative placement, the refusal to comply with the Coroner's subpoenas, the direction of 9 months of investigatory therapy designed to recover memories, the failure to consider exculpatory information, the refusal to provide case plans, reunification services and reasonable visitation, the March 23, 2007 substantiation of death from physical abuse for Jessica and life/health endangering conditions for her siblings which was based on false information and omitted exculpatory information (including prescription errors and expert affidavits); the May 25 amendment of the CHINS petition and continued detention of the girls; the

concealment of exculpatory information including information from Dr. Cavanaugh on July 11; *ex parte* contact in which Myers provided false information to the court on July 25; an offer of college funding if Tabitha agreed to stay in foster care; the refusal to return the girls on August 3, as ordered by the court; an escalation of efforts to destroy the family after the girls' return; and the confirmation of the substantiations and addition of new substantiations on December 13, 2007. (DE #130, pp. 35-36.) These are all out of court acts to which the State Defendants are not entitled immunity. *See, e.g., Brokaw*, 235 F.3d at 1012 (if defendants knew allegations of child neglect were false or withheld material information but nonetheless caused the child's removal from the home, they violated the Fourth Amendment and absolute immunity does not protect a social worker for her role in gathering evidence or initiating the child's removal); *Millspaugh v. Cnty. Dep't Of Pub. Welfare of Wabash Cnty.*, 937 F.2d 1172, 1176 (7th Cir. 1991) (holding "absolute immunity does not protect the gathering of evidence [by a social worker]"); *Pelham v. Albright*, No. 3:11-cv-99, 2012 WL 1600455, at *7 (N.D. Ind. May 4, 2012) (denying absolute immunity for investigatory actions). As such, the State Defendants have failed to satisfy the heavy burden that they are entitled to absolute immunity.

If not absolute immunity, the State Defendants then claim they are entitled to qualified immunity. Under the doctrine of

qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "The contours of a clearly established right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Sivard v. Pulaski Cnty.*, 17 F.3d 185, 189 (7th Cir. 1994) (quotation omitted). This standard provides ample protection "to all but the plainly incompetent or those who knowingly violate the law." *Millspaugh*, 937 F.2d at 1176 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Here, the State Defendants claim their actions were reasonable, and thus as state actors, they are entitled to qualified immunity. (DE #126, p. 34.) They cite *Brokaw* in support of their argument, yet in that case the Seventh Circuit specifically denied the defendants' motion to dismiss on the ground that their acts were protected by qualified immunity, stating it could not "conclude that the individual defendants [were] entitled to qualified immunity because the facts once uncovered may turn out to be so severe and obviously wrong that the defendants should have known they were violating [the plaintiff's] constitutional rights." *Brokaw*, 235 F.3d at 1023. The first amended complaint specifically alleges that the State Defendants intentionally acted outside of

their statutory authority, presented false information to the prosecutor and the court, wrongly subjected the children to interrogations and wrongfully seized them from the home, and engaged in a laundry list of other illegal actions. Certainly this is sufficient at this stage of the proceedings. *See, e.g. Martin v. Kim*, No. 2:03-CV 536, 2005 WL 2293797, at *8 (N.D. Ind. Sept. 19, 2005) (denying motion to dismiss on ground of qualified immunity as premature); *Alvarado v. Litscher*, 267 F.3d 648, 651 (7th Cir. 2001) (quotation omitted) ("Because an immunity defense usually depends on the facts of the case, dismissal at the pleading stage is inappropriate: The plaintiff is not required initially to plea factual allegations that anticipate and overcome a defense of qualified immunity."). As the Seventh Circuit has recently held:

> [C]ourts should usually refrain from granting Rule 12(b)(6) motions on affirmative defenses. Rule 12(b)(6) tests whether the complaint states a claim for relief, and a plaintiff may state a claim even though there is a defense to that claim. The mere presence of a potential affirmative defense does not render the claim for relief invalid. Further, these defenses typically turn on facts not before the court at that stage in the proceedings.

*Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012). For this reason, dismissal is not appropriate at this stage of the proceedings on the basis of the alleged defense of immunity.


Applicability of the Rooker-Feldman Doctrine

The *Rooker-Feldman* doctrine precludes federal subject matter jurisdiction when: (1) a losing party in state court files suit in federal court complaining of an injury caused by the state court judgment, and seeks review and rejection of that judgment; and (2) the losing party files a federal claim after the state court proceedings have ended. *See Holt v. Lake Cnty. Bd. Of Comm'rs*, 408 F.3d 335, 336 (7th Cir. 2005); *TruServ Corp. v. Flegles, Inc.*, 419 F.3d 584, 590 (7th Cir. 2005). The State Defendants' argument that this doctrine precludes the Plaintiffs from bringing their claims in federal court is misguided - rather, the Plaintiffs ultimately prevailed in the underlying proceedings. Thus, the doctrine is inapplicable.


Request For Injunctive Relief

Plaintiffs have withdrawn their request for injunctive relief as to the State Defendants making determinations on the cause and manner of death.


Johnathon Abair's Claims

The State Defendants claim that Johnathon Abair has no cognizable claims in this action. This Court has already addressed and rejected similar arguments in its order on Plaintiff's motion to amend/correct the complaint (DE #90), and the order overruling objections to the Magistrate Judge's order allowing the amendment

42

(DE #105).  No new case law or support has been provided by the State Defendants.  Therefore, dismissal of Plaintiff Johnathon Abair's claims is inappropriate.


CONCLUSION

For the aforementioned reasons, the Motion to Dismiss (DE #121) is **GRANTED IN PART and DENIED IN PART**.  The motion is **GRANTED** as to:  Katelynn, Johnathon, and Tabitha's first amendment violation claims in Count 1; Count 3; the equal protection and ADA claims in Count 4; and the request for injunctive relief, which are **DISMISSED WITH PREJUDICE**.  The motion is **DENIED** as to the remaining claims against the State Defendants, which **REMAIN PENDING**. Additionally, the Motion to Strike (DE #134) is **DENIED**.



**DATED: June 5, 2013**          **/s/ RUDY LOZANO, Judge**
                                   **United States District Court**