# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA
### SOUTH BEND DIVISION

ROMAN FINNEGAN*, et al.*,           )
                                    )
Plaintiffs,                         )
                                    )
vs.                                 )     NO. 3:08-CV-503
                                    )
LAUREL MYERS, *et al.*,             )
                                    )
Defendants.                         )

## OPINION AND ORDER

This matter is before the Court on Defendant Laskey's Motion for Summary Judgment, filed by Defendant, Antoinette Laskey, on October 6, 2014 (DE #195), and Defendant Laskey's Motion to Strike Inadmissible Testimony and Documents from Plaintiffs' Designated Evidence Submitted in Support of Plaintiffs' Corrected Response to Defendants' Motions for Summary Judgment, filed by Defendant, Antoinette Laskey, on November 21, 2014 (DE #261). For the reasons set forth below, both motions are **DENIED**.

BACKGROUND

Plaintiffs have sued several defendants in this case, including Dr. Antoinette Laskey ("Dr. Laskey"), a licensed physician hired by the Pulaski County Department of Child Services ("DCS") to give a medical opinion as to whether the death of

Plaintiffs' 14-year old daughter, Jessica Salyer ("Jessica"), was due to accident or parental abuse. Dr. Laskey filed the current motion for summary judgment, arguing she is not a proper party to the action because she did not act under "color of law," she did not violate Plaintiffs' constitutional rights, and because she is entitled to immunity. Plaintiffs controvert each of these claims.

DISCUSSION

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Not every dispute between the parties makes summary judgment inappropriate; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* In determining whether summary judgment is appropriate, the deciding court must construe all facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010). "However, our favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." *Fitzgerald*

*v. Santoro*, 707 F.3d 725, 730 (7th Cir. 2013) (citing *Harper v. C.R. Eng., Inc.*, 687 F.3d 297, 306 (7th Cir. 2012)).

A party opposing a properly supported summary judgment motion may not rely on allegations or denials in her own pleading, but rather must "marshal and present the court with the evidence she contends will prove her case." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). If the nonmoving party fails to establish the existence of an essential element on which he or she bears the burden of proof at trial, summary judgment is proper. *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006).

## Preliminary Evidentiary Issues

Dr. Laskey has filed a motion to strike various documents attached in support of Plaintiffs' response in opposition to Defendants' motions for summary judgment. In essence, Dr. Laskey takes issue with Plaintiffs' counsel's attempt to authenticate the disputed documents via his own Declaration because he does not have the requisite personal knowledge of their authenticity to do so. Dr. Laskey lists forty exhibits and argues generally that the exhibits are hearsay and that "[n]o witness with personal knowledge of the contest (sic) of these exhibits has authenticated the exhibits." She also argues that the State Fatality Review Team Privilege Log is irrelevant and speculative, that the invoices and check for Dr. Laskey's services and deposition lack the proper

foundation to qualify as business records under the hearsay exception, and that the Board Certification on Child Abuse Pediatrics and AAP Professionalism in Pediatrics Statement of Principles are from treatises and are hearsay. Plaintiffs respond by arguing that Dr. Laskey has misstated the procedural requirements at the summary judgment stage regarding authentication and is relying on outdated case law to support her arguments. Plaintiffs point out that Dr. Laskey does not assert that any of the documents in question are not what they purport to be or that they cannot be presented in a form that would be admissible in evidence. In her reply brief, Dr. Laskey doubles down and states that "[t]he straightforward issue here is that Plaintiffs' Counsel's *Declaration* cannot authenticate or render admissible for purposes of summary judgment those documents previously identified in Dr. Laskey's *Motion to Strike*. This improper authentication cannot be used by Plaintiffs to create an issue of material fact and these documents should be stricken." (emphasis in original).

On a motion for summary judgment, "[a] party may object that the material cited to support or dispute a fact *cannot* be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2) (emphasis added). "In other words, the Court must determine whether the material can be presented in a form that would be admissible at trial, not whether the material is admissible in its present form." *Stevens v. Interactive Fin.*

*Advisors, Inc.*, 2015 WL 791384, *2 (N.D. Ill. Feb. 24, 2015); see also *Olson v. Morgan*, 750 F.3d 708, 714 (7th Cir. 2014) ("We note that the Federal Rules of Civil Procedure allow parties to oppose summary judgment with materials that would be inadmissible at trial so long as *facts* therein could later be presented in an admissible form.") (emphasis in original).

As far as authentication is concerned, the Federal Rules of Evidence provide simply that, "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a).  Rule 901 provides several examples of proper authentication methods, including testimony of a witness with knowledge, expert or trier of fact comparisons, distinctive characteristics, and evidence about public records; the Rules acknowledge that the list is not complete.  Fed. R. Evid. 901(b).  "Rule 901 requires only a prima facie showing of genuineness and leaves it to the jury to decide the true authenticity and probative value of the evidence." *United States v. Harvey*, 117 F.3d 1044, 1049 (7th Cir. 1997).  Additionally, Rule 902 notes that certain evidence, including but not limited to certified copies of public records, official publications, newspapers and periodicals, commercial paper, and certified domestic records of a regularly conducted activity, is self-authenticating and requires no extrinsic evidence of authenticity in order to be admitted.  Fed. R. Evid. 902.

The Seventh Circuit has noted that "[a]uthentication relates only to whether the documents originated from [their purported source]; it is not synonymous to vouching for the accuracy of the information contained in those records," and the "very act of production [i]s implicit authentication." *United States v. Brown*, 688 F.2d 1112, 1116 (7th Cir. 1982); see also *Kasten v. Saint-Gobain Performance Plastics Corp.*, 556 F.Supp.2d 941, 948 (W.D. Wis. 2008) (rejecting authenticity challenge at summary judgment as disingenuous where the challenged e-mails "were documents produced by defendant during discovery"); *Fenje v. Feld*, 301 F.Supp.2d 781, 809 (N.D. Ill. 2003) ("[d]ocuments produced by an opponent during discovery may be treated as authentic."); *In re Greenwood Air Crash*, 924 F.Supp. 1511, 1514 (S.D. Ind. 1995) ("Production of a document by a party constitutes an implicit authentication of that document."). As to emails specifically, the Seventh Circuit has acknowledged that they may be authenticated via circumstantial evidence such as viewing the content of the email in light of the factual background of the rest of the case and identifying the sender and/or recipient by unique email address. *United States v. Fluker*, 698 F.3d 988, 999-1000 (7th Cir. 2012); see also *Fenje*, 301 F.Supp.2d at 809 ("E-mail communications may be authenticated as being from the purported author based on an affidavit of the recipient; the e-mail address from which it originated; comparison of the content to other evidence; and/or

statements or other communications from the purported author acknowledging the e-mail communication that is being authenticated.").

The Court agrees with Plaintiffs that Dr. Laskey has not adequately argued that any of the documents are not what they purport to be or that they cannot be presented in a form that would be admissible at evidence, and, as such, her motion fails as a matter of law. Even looking to the merits, to the extent that Dr. Laskey objects to the evidence on grounds of authenticity, Plaintiffs have provided adequate support at this stage that the evidence is or can easily be authenticated by source. (See DE #265, pp. 8-9.) A *prima facie* showing of genuineness has been made, and the Court will leave it to the trier of fact to determine the true probative value of the evidence.

Furthermore, it is the function of the Court, with or without a motion to strike, to carefully review the evidence and to eliminate from consideration any argument, conclusions, and assertions unsupported by the documented evidence of record offered in support of the statement. See, e.g., *S.E.C. v. KPMG LLP*, 412 F.Supp.2d 349, 392 (S.D.N.Y. 2006); *Sullivan v. Henry Smid Plumbing & Heating Co., Inc.*, No. 04 C 5167, 05 C 2253, 2006 WL 980740, at *2 n.2 (N.D. Ill. Apr. 10, 2006); *Tibbetts v. RadioShack Corp.*, No. 03 C 2249, 2004 WL 2203418, at *16 (N.D. Ill. Sept. 29, 2004); *Rosado v. Taylor*, 324 F.Supp.2d 917, 920 n.1 (N.D. Ind. 2004).

Motions to strike are heavily disfavored, and are usually only granted in circumstances where the contested evidence causes prejudice to the moving party. *Kuntzman v. Wal-Mart*, 673 F.Supp.2d 690, 695 (N.D. Ind. 2009); *Gaskin v. Sharp Elec. Corp.*, No. 2:05-CV-303, 2007 WL 2228594, at *1 (N.D. Ind. July 30, 2007). This Court has sifted through the voluminous evidence and has considered it under the applicable federal rules, giving each piece the credit to which it is due. For example, the Court has determined relevancy concerns pursuant to Federal Rules of Evidence 401 and 402 and has evaluated potential hearsay pursuant to the exceptions and exemptions found within Federal Rules of Evidence 801-805. The Court has also kept in mind that hearsay is defined as out-of-court statements "offer[ed] in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c); *United States v. Rettenberger*, 344 F.3d 702, 707 (7th Cir. 2003). Evidence presented for purposes other than to prove the truth of the matter asserted is not hearsay and has not been treated as such. Accordingly, the Court **DENIES** the motion to strike as unnecessary.

Facts

Many of the basic background facts of this case are largely undisputed and have been set forth in numerous previous Court orders. The Court will set forth the background facts briefly in

this section for contextual purposes but will focus on any relevant factual disputes below.

Before her death at age fourteen, Jessica lived with her mother and step-father, Roman and Lynnette Finnegan (the "Finnegans" and/or "Roman and Lynnette"), in Pulaski County, Indiana. Jessica was born with a congenital heart condition that required multiple surgeries, concluding in a 1996 surgery (the Fontan procedure), which left her with a two-chambered, rather than a four-chambered heart. Even with good care, the mortality rate for Fontan patients is high. Jessica also had a fourth generation seizure disorder, for which she took 3 medications: warfarin, digoxin and phenytoin (brand name Dilantin). Warfarin in particular is a high risk drug as it can result in bleeding, bruising, and is linked to a risk of brain hemorrhage.

In September of 2005, shortly after Jessica started the eighth grade, the school nurse at West Central Middle School filed a complaint with the DCS concerning Jessica's medical care. Based on that complaint, Regina McAninch, an investigator and caseworker for DCS ("Defendant McAninch"), called the Finnegans on September 6, 2005, to discuss the need to schedule a follow up appointment with Jessica's pediatric cardiologist, Dr. Hurwitz, and to provide additional information about Jessica's medical care; during that call, Defendant McAninch directed the Finnegans to attend a hearing on September 9, 2005, at DCS. Roman Finnegan sent a letter of

complaint to his state legislator concerning Defendant McAninch's conduct and sensitivity during the phone call. The state legislator forwarded the letter to the Governor's Office, which in turn sent the letter to James Payne, former director of the Department of Child Services ("Defendant Payne"), for a response. The letter was then referred to Laurel Myers, the director of DCS ("Defendant Myers"), for review and resolution.

The Finnegans attended the DCS meting, provided proof of insurance, and reached an agreement about Jessica's care. At a September 15, 2005, doctor's appointment, Dr. Hurwitz examined Jessica and assured the Finnegans that she was doing well.

On October 11, 2005, a second complaint was submitted to DCS regarding a claim that the Finnegan household did not have enough food for the children. DCS investigated and found the report of neglect to be unsubstantiated.

Later that same month, the Finnegans took Jessica to the family doctor, and at this appointment, Jessica's doctor, Dr. Bartush, accidentally increased her dosage of warfarin from 3 mg to 7 mg and eliminated her Dilantin, placing her at risk of death from internal bleeding and/or seizure.

Jessica had vaccinations on December 5, 2005. That same day, DCS substantiated medical neglect, stating that the Finnegans would not have obtained appropriate medical care for Jessica without DCS intervention. DCS provided a copy of the substantiated medical

neglect to the school, but the Finnegans claim that they did not receive a copy of the December 2005 substantiation of medical neglect until April of 2007.

From December 7-18, 2005, Jessica had symptoms including a stomachache, headache, congestion, and tongue pain, and she was taken to Dr. Bartush who diagnosed the flu and thrush. On December 20, 2005, Lynnette found Jessica lying face down by the side of her bed. Roman began performing CPR while Lynnette called 911; however, the attempts at CPR were unsuccessful, and Jessica died.

Immediately following her death, the emergency medical personnel, law enforcement personnel, and initial hospital investigators found Jessica's death was related to a fall, her heart condition, and warfarin, with no signs of abuse or neglect reported. At the hospital, R. Gordon Klockow, D.D.S., the Jasper County Coroner (the "Coroner" or "Dr. Klockow"), and Dr. Ahler (the emergency room doctor and former Jasper County Coroner), also did not report any signs of abuse or neglect.

Defendant McAninch and Mike Bardsley of the prosecutor's office subsequently interviewed Jessica's siblings (Johnathon Abair ("Jonathon"), age 17, Tabitha Abair ("Tabitha"), age 16, and Katelynn Salyer ("Katelynn"), age 9) and questioned them for approximately six hours. DCS also questioned the Finnegans.

After being retained by the Coroner, John E. Cavanaugh, M.D., a forensic pathologist working in Lake County Indiana ("Dr.

Cavanaugh"), conducted an autopsy on December 21, 2005. During the autopsy, it was Dr. Cavanaugh's own impression that he caused a skull fracture when he opened the skull because he heard a classic "pop." In his handwritten Preliminary Report of Postmortem Examination, Dr. Cavanaugh attributed Jessica's death to a subdural hemorrhage due to blunt force trauma of the head consistent with a fall complicated by warfarin, with the manner of death undetermined. Dr. Cavanaugh did not mention the basal skull fracture as a listed finding on the front page of his preliminary report. However, the right anterior basal skull fracture was noted (without explanation of his previous impression that it was an artifact of the autopsy) in his Report of Autopsy dated May 24, 2006. The May report states that there were no postmortem injuries. It indicates that Dr. Cavanaugh had recovered tissue samples for histology and microscopic examination; however the samples were not prepared for examination at that time. DCS received a copy of the May report in June of 2006.

Following the release of the May 24, 2006, autopsy report, Defendant McAninch and Defendant Myers continued investigating the Finnegans because they believed her death may have been the result of homicide. In October of 2006, DCS retained Dr. Laskey in order to obtain her opinion on the matter. Email records indicate that Dr. Laskey communicated with Defendant McAninch regarding the case prior to issuing a final report on the matter. On October 23-24,

2006, Dr. Laskey emailed Defendant McAninch to let her know that it was her belief that Jessica's injuries were "NOT consistent with a simple fall from a short surface" and that her report would conclude that Jessica's medical condition "did NOT contribute to her death and that the death is consistent with a homicide." Defendant McAninch responded with, "[t]hank heaven someone other than the local Director and FCM agree that this child died from physical abuse." To which Dr. Laskey replied:

> EVEN IF this child fell our of bed and IF she in fact had easier bleeding due to her meds, there IS NO WAY she would have sustained these injuries from a fall. In fact, I am contacting Dr. Cavanaugh to find our why he isn't calling it a homicide. This is NOT an ambiguous case.

On October 28, 2006, Dr. Laskey authored a report stating that Jessica died from a fatal beating on the day of her death, which caused lethal trauma. Dr. Laskey noted that Jessica's injuries were severe, out of proportion to "falling out of bed" or other routine household events or accidents, and that the manner of death was consistent with a homicide. Dr. Laskey concluded her report by stating that, "it is my expert medical opinion that this child sustained a fatal beating on the day that she died and that this beating was the direct cause of her death." The report was received by DCS on October 31, 2006. DCS seized Tabitha and Katelynn on November 1, 2006, and they were subsequently placed into foster care. Tracy Salyers, a family case manager for DCS

("Defendant Salyers") was assigned to be the girls' ongoing case manager to supervise their care and treatment. Jennifer McDonald, an Indiana State Police detective ("Defendant McDonald") was assigned to investigate the circumstances surrounding Jessica's death.

On November 2, 2006, Dr. Cavanaugh faxed a letter to DCS that summarized his May 2006 autopsy report and stated that the "primary cause of death was blunt force injury of the head, with a basal skull fracture, intracranial hemorrhage, and cerebral edema." The letter went on to explain that the extent of Jessica's injuries was "inconsistent with a simple fall of approximately 2 feet from a bed, especially since the apparent primary impact is on the top or crown of the head causing a basal skill fracture . . . ." Dr. Cavanaugh acknowledged that while warfarin would have "exacerbated the *extent* of the hemorrhage, it would not have been causative nor would it account for the skull fracture." The letter makes no mention that the basal skull fracture was a suspected autopsy artifact. Dr. Cavanaugh concluded by stating, "due to the apparent lack of competent explanation for these injuries, the manner of death is undetermined."

In the meantime, with the assistance of other doctors, the Finnegans had discovered the warfarin prescription error, which had accidentally increased Jessica's warfarin dose from 3 mg to 7 (5 + 2) mg daily and eliminated her seizure medication. On December 13,

2006, David Geisler, the Finnegans' counsel, provided those pharmacy records to DCS.  The pharmacy records called into question Dr. Laskey's conclusions, which were based on her belief that although Jessica "did not have a recent INR in order to determine the extent of her anticoagulation, it is medically reasonable to assume that she was well within a safe range and was likely near or below her target INR of 2.0" since her dose of Coumadin was only incrementally increased.  Instead, the prescription errors offered an alternate explanation for the hemorrhages and death.  As additional exculpatory information was received, the Finnegans provided DCS with material in support of their position on an ongoing basis.

On January 25, 2007, Jessica's body was exhumed under the observation of Dr. Michael Baden, a board certified forensic pathologist and director of the medicolegal investigations unit of the New York State Police ("Dr. Baden").  Dr. Cavanaugh also attended and participated in the second autopsy.  Dr. Cavanaugh arranged to have the tissue specimens from the first and second autopsy processed for microscopic viewing.  The chain of evidence and request for histology services sent to St. Catherine Hospital Laboratory indicated that he needed the slides processed by February 22, 2007.

On January 29, 2007, Defendant McDonald interviewed Jonathon for almost six hours about the circumstances leading up to

Jessica's death. On January 31, 2007, Defendant McDonald interviewed Tabitha on that same subject for roughly four hours.

In March of 2007, the Finnegans provided DCS with additional medical literature, including medical and pharmacological affidavits describing the prescription errors and other aspects of Jessica's medical conditions and death. Later that same month, DCS substantiated physical abuse (bruises, cuts and/or welts, internal injury, skull fracture/brain damage) and medical neglect in connection with Jessica's death against the Finnegans; DCS also substantiated life/health endangering conditions for Jonathon, Tabitha, and Katelynn. The court set the CHINS matter for a hearing date of July 18-20, 2007.

At her April 16, 2007, deposition, Dr. Laskey agreed that Jessica had no external signs of a beating, that warfarin can cause fatal or major bleeding in any body part or tissue, and that Jessica had a higher risk of bleeding because was on warfarin. Dr. Laskey testified that, apart from the skull fracture, Jessica's autopsy findings consisted entirely of internal bleeding consistent with warfarin. She also testified she is not qualified to determine the cause and manner of death. With Dr. Laskey's input, DCS made the decision that Dr. Laskey would not testify at the CHINS hearings.

In April of 2007, after investigating the case for approximately six months, Defendant McDonald wrote a probable cause

affidavit which was used to obtain arrest warrants for the Finnegans. The Finnegans were charged with medical neglect on April 23, 2007, and they were arrested on April 24, 2007.

On May 23, 2007, Defendant McDonald submitted a bill of $4,677.40 from St. Catherine Hospital for the cutting, staining, and processing of the microscopic slides of Jessica's postmortem body tissue and bones; the memo attached to the bill noted that the purpose of the slides was for the pathologist to review them to determine the ages of Jessica's injuries, among other medical findings, and it acknowledged that the "timing of Jessica's injury/injuries is a critical element of this case."

On May 25, 2007, DCS withdrew its allegations of physical abuse in the CHINS proceedings and filed amended petitions alleging medical neglect and contending the other children were still in serious danger of physical harm.

The Finnegans allege that, although the findings of the microscopic tissue slides were available to the Defendants much sooner, they only received this information in mid-June to mid-July from third parties, including the prosecutor, through subpoenas and *Brady* requests; the slides show the death was caused by prescription error, the hemorrhages were from warfarin, and the skull fracture was post-mortem.

On July 8, 2007, Dr. Cavanaugh issued his Final Report of Autopsy. The report indicates that Dr. Cavanaugh reviewed the

slides, but it does not go into any detail regarding their significance. The report describes the basal skull fracture as evidence of blunt force trauma to the head without making clear that it was an autopsy artifact.

On July 11, 2007, Dr. Cavanaugh sent an email to Sheryl Pherson, counsel for DCS, which stated, in part:

> Thought I'd give you a heads-up on the final report. Although I didn't go into detail in the report, there has been some significant new information that changes certain opinion details: . . . 2. There is both new and old bleeding in the skull – certain portions of the clot examined microscopically after the 2nd autopsy (more specimens submitted) look to be in the 5-10 day range or older. This means more than one bleeding episode, with possibly 2 weeks of noticeable neurologic symptoms and/or pathologic bleeding. The scalp contusions also appear to be of two different ages. 3. Portions of the skull fracture are indeed autopsy artifact. . . .

On July 12, 2007, DCS moved for a continuance of the factfinding hearing, and the hearing was changed to a detention hearing on the amended CHINS petitions.

On July 17, 2007, the Coroner ruled that Jessica died an accidental death from the prescription errors and that the skull fractures were artifacts of the first autopsy. The Verdict states that there was no trauma noted to the back or the legs and that there were no significant findings. It concludes, "[i]n a highly unusual nature, I have included forensic pathologist consultations as part of the autopsy report and of this Coroner's from Dr. John

Pless, M.D. and Dr. Jan Leestma, M.D."

At the July 18-19, 2007, hearing, DCS did not offer any witnesses or evidence to support its claims; Tabitha testified she had never seen or been subject to abuse or neglect. At the conclusion of the hearing, upon the parties' agreement, the court ordered the return of Tabitha and Katelynn to Lynnette. The order stated that the girls were to be transitioned back to the Finnegans' home according to the following schedule: seven days of supervised visits to allow the prosecutor an opportunity to depose the girls, followed by seven days of unsupervised visits, and "[a]t the conclusion of [the seven] day period of unsupervised visits, the child[ren] shall be placed in the home of [their] mother."[1] Upon being deposed by the prosecutor, the girls both testified there was no abuse. By August 6, 2007, DCS had still not returned the girls, so the Finnegans filed a contempt motion, and DCS filed a motion to clarify the return order. On August 9, 2007, pursuant to a hearing on both motions, the court ordered DCS to return the girls that same evening. Tabitha and Katelynn were returned to the Finnegans on August 9, 2007.

On August 27, 2007, the prosecutor agreed she did not have probable cause to pursue the criminal charges. On September 7, 2007, the CHINS judge recused himself due to *ex parte*

---

[1] The order related to Tabitha also addresses the issue of termination of jurisdiction with a handwritten note directly following it that says, "if dispute is resolved regarding best interests and reasonable efforts." It is not clear who wrote the additional phrase.

communications with DCS and the prosecutor, and the cases were reassigned. On September 10, 2007, the prosecutor filed amended charges that Roman and Lynnette knowingly endangered Jessica's health by failing to provide emergency care for her. Detective McDonald was the only named witness. From August through November of 2007, DCS provided reunification services, but the Finnegans claim that the services were more disruptive than helpful to their family.

On October 24, 2007, the prosecutor moved to dismiss Roman's criminal charges, and on November 2, the prosecutor moved to dismiss Lynnette's charges. DCS had previously withdrawn the CHINS petitions, including death from physical abuse; and, on November 27, 2007, the CHINS court dismissed the CHINS petitions.

Following dismissal of the CHINS petitions, the cases were returned to DCS for administrative review. The Finnegans provided the reviewer, Reba James, a regional manager for the Department of Child Services ("Defendant James"), with three volumes of information. On December 13, 2007, Defendant James re-substantiated the March 2007 substantiations, including the substantiation of death from physical abuse; two additional substantiations (inappropriate discipline and death from medical neglect for Jessica) were also added. The decision does not explain the reason for the re-substantiation nor does it address any of the medical evidence that was favorable to the Finnegans,

including the Coroner's Verdict. The Finnegans appealed Defendant James' decision to DCS Administrative Law Judge Dawn Wilson, who was also handling the Finnegans' appeal of the December 2005 substantiation for medical neglect.

DCS's claims against the Finnegans continued for over two more years until May of 2010, when DCS withdrew its appeal of Pulaski Circuit Court Special Judge Patrick Blankenship's January 28, 2010, ruling that found DCS' December 2005 and March 2007 substantiations to be arbitrary and capricious, ordered DCS to immediately unsubstantiate those substantiations, and directed DCS to remove the Finnegans from the child protection index.


ANALYSIS

Under Color of Law

Dr. Laskey argues that there is no genuine dispute that she was acting as a private citizen and not under color of state law when she authored her report in this case. Plaintiffs disagree.

In order to sustain a claim under section 1983, Plaintiffs must establish that Dr. Laskey acted "under color of state law" when depriving them of rights, privileges, or immunities guaranteed by the Constitution or the laws of the United States. 42 U.S.C. § 1983; *Parratt v. Taylor*, 451 U.S. 527, 535-36 (1981). A public employee only functions under color of state law while acting in her official capacity or while exercising her responsibilities

pursuant to state law. *Gibson v. Chicago*, 910 F.2d 1510, 1516-17 (7th Cir. 1990) (finding police officer who had been placed on medical roll and declared unfit for duty did not act under color of state law, and affirming dismissal of claim against him). In *Gibson*, the Seventh Circuit found that the "essential inquiry" was whether the plaintiff had "created a triable issue of fact concerning whether [defendant police officer's] actions related in some way to the performance of a police duty." *Id.* at 1517. "In distinguishing private action from state action, the general inquiry is whether 'a state actor's conduct occurs in the course of performing an actual or apparent duty of his office, or . . . is such that the actor could not have behaved in that way but for the authority of his office.'" *Zambrana-Marrero v. Suarez-Cruz*, 172 F.3d 122, 125 (1st Cir. 1999) (denying summary judgment for off-duty policeman) (quoting *Martinez v. Colon*, 54 F.3d 980, 986 (1st Cir. 1995)). "A state university without question is a state actor." *National Collegiate Athletic Ass'n v. Tarkanian*, 488 U.S. 179, 192 (1988).

The Supreme Court has held that "[i]f an individual is possessed of state authority and purports to act under that authority, his action is state action. It is irrelevant that he might have taken the same action had he acted in a purely private capacity or that the particular action which he took was not authorized by state law." *Griffin v. Maryland*, 378 U.S. 130, 135

(1964). Thus, the fact that Dr. Laskey could have made a report on her opinion about Jessica's death without being cloaked in any state authority is not controlling. The controlling issue is whether Dr. Laskey possessed state authority and whether she purported to act under that authority.

In her motion, Dr. Laskey points out that, at the time the report was written, she was an employee of both Indiana University School of Medicine ("IU") and University Pediatric Associates, Inc. ("UPA"), a private physician group. As an assistant professor at IU, she performed research, taught, trained and supervised physicians and medical students, while as an employee of UPA, she treated patients and specialized in child abuse pediatrics. She was occasionally contacted by DCS to assist them in understanding medical issues involving possible child abuse or neglect.[2] Dr. Laskey argues that she was not acting in her official capacity as a state university employee when she rendered her opinion in this case because her responsibilities at IU did not include reviewing or evaluating medical records. However, Dr. Laskey's argument that she could not be deemed to have been acting under color of law due to the fact that her responsibilities at IU did not include reviewing or evaluating medical records is unavailing. Again, the controlling issue is whether Dr. Laskey possessed state authority and whether she purported to act under that authority.

---

[2] None of these facts are disputed by Plaintiffs.

While Dr. Laskey states that it is beyond dispute that she was acting solely as an employee of UPA, Plaintiffs argue that evidence in the record suggests otherwise. As noted in a variety of previously filed documents, Dr. Laskey issued her report as to Jessica on IU letterhead and signed it as Antoinette L. Laskey, MD, MPH, Assistant Professor of Pediatrics, Indiana University School of Medicine. (See DE #201-4.) Additionally, Plaintiffs point out that the October 2006 invoice to Defendant Myers for Dr. Laskey's review of Jessica's case states "[m]ake all checks payable to Indiana University with Antoinette Laskey, MD, MPH in the memo." (DE #224-5, p. 1.) Similarly, the April 2007 invoice to Heather Kirkwood, Plaintiffs' attorney, for Dr. Laskey's deposition testimony states the same. (*Id*. at 2.) The check written by Attorney Kirkwood to Indiana University[3] for Dr. Laskey's deposition was cashed by the Trustees of Indiana University. (DE #224-6, p. 1.) Furthermore, in response to a non-party subpoena, UPA stated: "Dr. Laskey was asked by DCS to review medical records and provide a report regarding whether the injuries were consistent with accidental trauma. This is not work that is compensated by UPA." (DE #224-7, p. 1.) Finally, Plaintiffs argue that Dr. Laskey's status as an assistant professor at IU was arguably important to DCS because an email written in June of 2007 by

---

[3] The check was originally written to Dr. Laskey directly, but during her deposition, Dr. Laskey corrected Attorney Kirkwood on the record and stated that the fees (for her review services) were to go to Indiana University. (Laskey Dep., DE #169-5, p. 6.)

Defendant Myers to Defendant McAninch indicated that "[Dr. Laskey] is a big wig . . . she would carry weight with the Judge. He reads the Star and knows she is quoted all the time." (DE #226, p. 1.)

Citing to *Tierney v. Vahle*, 304 F.3d 734 (7th Cir. 2002), Dr. Laskey attempts to minimize the fact that her opinion was written on IU letterhead and included her title at IU in the signature block. She correctly notes that *Tierney* provides:

> the fact that a personal letter is written on judicial stationery cannot reasonably be thought to show, all by itself, that the sending of the letter was an act done under color of state law. It can give coloration to other facts indicative of an invocation of official power but no case holds that it is enough by itself, and it would make little sense to hold that.

*Tierney v. Vahle*, 304 F.3d 734, 741 (7th Cir. 2002). Dr. Laskey states that, as with the juvenile court judge defendant in *Tierney*, the IU letterhead was her only stationary, and she used it for all correspondence. (Laskey Aff., DE #197-1, p. 6.) Not only does the record belie this assertion,[4] but *Tierney* is distinguishable from the instant case. Here, Plaintiffs have presented evidence above and beyond that of the use of the IU stationary alone. The invoices, the check itself, the check cashing, the subpoena response by UPA, and the email noted above all lend credence to the indication that there was arguably an "invocation of official

---

[4] The record contains a letter written by Dr. Laskey in January of 2007 which is on letterhead from the State Child Fatality Review Team. (DE #46-3.)

power" by Dr. Laskey. Also, while Dr. Laskey argues that Plaintiffs' assertion that her affiliation with IU was important to DCS is "purely speculative," the Court agrees with Plaintiffs that, based on the email from Defendant Myers to Defendant McAninch, it is certainly reasonable for a fact finder to infer that DCS considered Dr. Laskey a "big wig" because of her status with IU rather than her status as a private practice pediatrician.

Based on the foregoing, it is possible for a fact finder to conclude that Dr. Laskey possessed state authority and purported to act under that authority. See *Griffin*, 378 U.S. at 135. Because Plaintiffs have presented evidence contradicting Dr. Laskey's position that she was acting as a private citizen and was not acting under color of state law at the time she authored her report, Dr. Laskey's motion for summary judgment must be denied.[5]

<u>Violations of Constitutionally Protected Rights</u>

Dr. Laskey next argues that her actions did not deprive Plaintiffs of any constitutionally protected rights because: (1) DCS had already made a determination to substantiate abuse in Jessica's death on October 23, 2006, which predated Dr. Laskey's report dated October 28, 2006, that "put into motion DCS's removal of the children from the home" and the resultant deprivation of

---

[5] Because summary judgment must be denied due to factual disputes related to Dr. Laskey's affiliation with IU, her arguments regarding her position as Chair of the Statewide Child Fatality Review Committee need not be addressed in this order.

Plaintiffs' rights; and (2) she is not liable for any alleged deprivations because she was acting in "good faith based upon her knowledge, training, and experience and the information DCS provided to her." Plaintiffs disagree with these claims.

It is well established that due process encompasses a parent's liberty interest in familial relations. *See Troxel v. Granville*, 530 U.S. 57, 65 (2000) (collecting cases); *M.L.B. v. S.L.J.*, 519 U.S. 102, 116 (1996); *Brokaw v. Mercer County*, 235 F.3d 1000, 1018 (7th Cir. 2000) (reiterating "[t]he Supreme Court has long recognized as a component of substantive due process the right to family relations."). Children have a "corresponding familial right to be raised and nurtured by their parents." *Berman v. Young*, 291 F.3d 976, 983 (7th Cir. 2002). However, the right to familial relations is not without limits. It is bounded by the Government's compelling interest in protecting children. *Brokaw*, 235 F.3d at 1019; *Doe*, 327 F.2d at 520 ("[t]he right to familial relations is not, however, absolute."). The Court must balance "the fundamental right to the family unit and the state's interest in protecting children from abuse, especially in cases where children are removed from their homes." *Brokaw*, 235 F.3d at 1019 (citation omitted).

In *Brokaw*, the Seventh Circuit found that a person "causes a constitutional violation if he sets in motion a series of events that defendant knew or should have known would cause others to deprive the plaintiff of constitutional rights." *Brokaw*, 235 F.3d

at 1012.  In that case, the plaintiff alleged that relatives and a deputy sheriff conspired to end his parents' marriage by filing "baseless and scurrilous" claims of child neglect with DCFS that they believed "would cause [plaintiff] and his sister to be removed from their parents' home, and in turn prompt [the father] to divorce his wife and leave his family." *Id.* at 1007. Subsequently, without explanation, two police officers walked into the plaintiff's home and grabbed him and his three-year-old sister, carrying them crying out of the house. *Id.*  The children remained in foster care for almost four months before being returned home. *Id.* at 1008.  The plaintiff's complaint alleged violations of the Fourth Amendment and his substantive due process right to familial relations. *Id.* at 1009- 10, 1017-18.  Although the district court dismissed the claims for failure to state a claim or, alternatively, on the basis of immunity, the Seventh Circuit reversed.  The Seventh Circuit found that a DCFS caseworker who was not present for the actual seizure, but "directed those who removed the children to do so," could be liable under section 1983 for the Fourth Amendment violation. *Id*. at 1014. *See also Morris v. Dearborne*, 181 F.3d 657, 672 (5th Cir. 1999) (holding defendant, child's teacher, who was moving force behind the removal of children was responsible for causing allegedly unconstitutional removal). *Brokaw* teaches that a defendant is personally responsible if she "acts or fails to act with a deliberate or

reckless disregard of plaintiff's constitutional rights, or if the conduct causing the constitutional deprivation occurs at her direction or with her knowledge or consent." *Id.* at 1012 (quoting *Smith v. Rowe*, 761 F.2d 360, 369 (7th Cir. 1985)). The *Brokaw* Court noted that "to the extent the defendants knew the allegations of child neglect were false, or withheld material information, and nonetheless caused, or conspired to cause [the child's] removal from his home, they violated the Fourth Amendment." *Brokaw*, 235 F.3d at 1012 (citation omitted).

Additionally, a parent's interest in the care and custody of her children, and the children's right to care and nurturing by their parents, is protected by the Fourteenth Amendment. *Troxel v. Granville*, 530 U.S. 57, 65. Although the Government has an interest in protecting children from abuse, the State does not have an interest in protecting children from their parents "unless it has some definite and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse." *Brokaw*, 235 F.3d 1019 (citation omitted).

Finally, procedural due process under the Fourteenth Amendment provides that, "no matter how much process is required, at a minimum, it requires the government officials not misrepresent the facts in order to obtain the removal of a child from his parents." *Brokaw*, 235 F.3d at 1020 (citing *Malik v. Arapahoe County Dep't of Soc. Servs.*, 191 F.3d 1306, 1315 (10th Cir. 1999)).

Dr. Laskey first argues that her actions did not contribute to Plaintiffs' deprivations because DCS's determination to substantiate abuse in Jessica's death predated her written report by several days. (See DE #197-6, p. 2.) However, Plaintiffs have presented evidence from which a trier of fact could determine otherwise. For example, an email Dr. Laskey sent to Defendant McAninch in response to an inquiry on October 5, 2006, stated that "a fall of 2 feet, especially in a 14y old is unlikely to cause a clinically significant, let alone fatal injury. A skull fracture can happen but not bad enough to kill her and certainly not a ruptured spleen." (DE #224-8, p. 1.) Later, on October 23, 2006, the day DCS substantiated abuse, Dr. Laskey wrote the following to Defendant McAninch via email:

> Hi – I just finished the review. I'm going to talk to the cardiology folks tomorrow to clarify one thing but based on the information I have at this time, this child should be considered a victim of physical abuse resulting in death. There is no plausible explanation for a simple fall out of the bed that would result in the extent of injury that she had. Further, though she was on anti-coagulant, her levels were not so high as to cause her to have the amount of bleeding that she had. I am going to re-clarify this issue with cardiology. Further, her head injury was extensive and severe, NOT consistent with a simple fall from a short surface. It would be really helpful to me if there were scene photos; did LE take any? I will write an official report tomorrow when I have the information from cardiology.

(DE #224-31, p. 1.) The next day, Dr. Laskey emailed Defendant

McAninch to let her know that she had "discussed this case with cardiology and reviewed the file. Kelly is getting me the scene photos for the sake of completeness. After that, I will get you my report. The report will conclude that her medical condition did NOT contribute to her death and that the death is consistent with a homicide." (*Id.*) About an hour later, Defendant McAninch responded to Dr. Laskey with, "[t]hank heaven someone other than the local Director and FCM agree this child died from physical abuse." (DE #224-1, p. 1.) Dr. Laksey replied:

> EVEN IF this child fell out of bed and IF she in fact had easier bleeding due to her meds, there IS NO WAY she would have sustained these injuries from a fall. In fact, I am contacting Dr. Cavanaugh to find out why he isn't calling it a homicide. This is NOT an ambiguous case.

(*Id.*) Based on the foregoing, the Court agrees with Plaintiffs that there is a genuine dispute as to whether Dr. Laskey's actions, including those taken prior to her official written report, materially contributed to the removal of the children from the home resulting in the deprivation of Plaintiffs' rights.

Next, Dr. Laskey argues that this case is distinguishable from *Brokaw*, cited above, because there is nothing in the record to suggest that Dr. Laskey made knowingly false allegations of child abuse or withheld any material information. Instead, Dr. Laskey argues, the evidence shows only that Dr. Laskey rendered her report in good faith based on her extensive expertise. Plaintiffs

31

disagree and point to several pieces of evidence in support of their position. Specifically, Plaintiffs note that, while Dr. Laskey claims that the conclusions in her report were based, in part, on her consultation with her colleagues at Riley Hospital for Children and Dr. Cavanaugh, there is evidence to the contrary. Emails to Defendant McAninch suggest that Dr. Laskey rendered her report on October 28, 2006, and *then* contacted Dr. Cavanaugh to discuss her opinion and question his findings on November 2, 2006. (See DE #224-46, p. 1; see also DE #224-1, p. 1.) As noted above, on October 24, 2006, Dr. Laskey expressed serious concerns to Defendant McAninch regarding Dr. Cavanaugh's conclusions, stating to Defendant McAninch that she was going to "contact[] Dr. Cavanaugh to find out why he isn't calling it a homicide. This is NOT an ambiguous case." (DE #224-1, p. 1.) As of October 31, 2006, three days after she rendered her report, Dr. Laskey indicated to Defendant McAninch that she still hadn't had time to contact Dr. Cavanaugh. (*Id.*) In fact, Dr. Laskey testified that she had reached her conclusion that Jessica's "medical condition did not contribute to her death and that the death is consistent with a homicide" before she ever spoke with Dr. Cavanaugh. (DE #169-7, p. 24.)

Similarly, Plaintiffs argue that while Dr. Laskey's October 28, 2006, report states that she based her opinion on "consultation with pediatric cardiologists at Riley Hospital for Children"

including "extensive discussions with multiple pediatric cardiologists familiar with tricuspid atresia and Fontan procedures"[6] (DE #201-4, pp. 2, 4), Dr. Laskey later testified only that she had a five minute hallway conversation with Dr. Hurwitz in October of 2006[7] before she prepared her report, and that he allegedly told her that he did not know that Jessica had died. (DE #169-5, p. 7.) However, a letter sent by Dr. Hurwitz to Lynnette Finnegan dated December 23, 2005, indicates that he knew of Jessica's death within days of its occurrence. (DE #224-34.) In a subsequent deposition, when asked to identify the additional cardiologists with whom she had consulted, Dr. Laskey testified that she did not recall "because it was curbside, not specific to the case, it was more general information, so I honestly don't recall." (DE #169-7, p. 23.) When presented with an oral list of cardiologists practicing within the hospitals Dr. Laskey had privileges, she testified that she could not remember whom she spoke with because the conversations were short, unscheduled conversations that lasted for less than an hour in total. (*Id*. at 23-24.) The Court agrees with Plaintiffs that there is a factual

_____

[6] Dr. Laskey's affidavit also states that in evaluating the matter, she "consulted with cardiologist Dr. Roger Hurwitz, along with a few other cardiologists at Riley, to get a better understanding of Jessica's medical history, which included a Fontan procedure and Coumadin." (DE #197-1, p. 5.)

[7] Dr. Laskey testified that she typically reviews records and prepares reports in a relatively short turnaround time, so the conversation with Dr. Hurwitz likely took place in October of 2006. (DE #169-5, p. 7.)

dispute as to whether Dr. Laskey consulted with Dr. Cavanaugh or her colleagues at Riley Hospital for Children (as she indicated that she did) before finalizing her report; that, in and of itself, creates a relevant factual dispute appropriate for the trier of fact to decide.

In addition, Plaintiffs have presented evidence that by the spring of 2007, Dr. Laskey was aware that Tabitha and Katelynn were being detained based in large part on her report (DE #224-15), that additional information -- including the prescription error -- had surfaced calling that report into question (see e.g. DE #224-4; DE #224-14), and that she did not ever correct or update her report (see e.g. DE #224-44, pp. 6-8). For example, in April of 2007, Dr. Laskey communicated with Sheryl Pherson, DCS's retained local counsel in the CHINS and subsequent proceedings ("Pherson"), regarding her deposition, stating:

> So what is the deal, do I stick only to what I knew based on the info previously reviewed and my existing report or do I need "new" info? Additionally, you should know that 7mg of Coumadin would not kill a horse, or a person. There are people who take that dose. Whether Jessica was or not is questionable.

(DE #224-4, p 2. .) Pherson responded to Dr. Laskey, noting that "[o]bviously, your opinion could change based upon additional information, including the second autopsy, but you don't have that information at this time. You are not required to review her 3 volumes of crap prior to your deposition, and so I decided not to

provide it to you." (*Id*.) In her August 18, 2011, deposition, Dr. Laskey testified that she was aware that numerous people disagreed with her findings and that if a doctor becomes aware of mistakes, "it is important to correct that." (DE #224-44, pp. 5-6.) Dr. Laskey also testified that she was aware of the American Academy of Pediatrics, Professionalism in Pediatrics: Statement of Principles with regard to reliability and responsibility that requires "acceptance of responsibility for errors made, including the willingness to acknowledge and discuss errors and their consequences with the family and with peers, and collaborate in the search for systematic actions to prevent future harm." (*Id*. at 6-7.) Dr. Laskey agreed that she believed this principle applied to her profession. (*Id*. at 7.)[8] Again, it is up to the trier of fact to determine whether Dr. Laskey acted in good faith as she claims.

Finally, while Dr. Laskey asserts that it is undisputed that her report was rendered in good faith because it was based on her extensive expertise, Plaintiffs have provided evidence to dispute that assertion. (See e.g. DE #224-9; DE #224-10; DE #161-5.) Dr. Laskey's experience, qualifications, and expertise can be fleshed

---

[8] Dr. Laskey objects to the use of the American Academy of Pediatrics, Professionalism in Pediatrics: Statement of Principles as hearsay because it has not been established as reliable authority by expert testimony. However, Dr. Laskey's testimony regarding the statement is appropriate at this stage to show her understanding or belief as to the principle, not necessarily to show the truth of the matter asserted. Additionally, based on the reports submitted by Plaintiffs' numerous expert witnesses, it would seem that the principle could be established as reliable via expert testimony should it be later relied upon for the truth of the matter asserted.

out at trial and ultimately determined by the trier of fact, but what is relevant for purposes of this motion is that Plaintiffs have presented evidence sufficient to support a finding that Dr. Laskey knew she was not qualified to offer an opinion on the cause and manner of Jessica's death but that she did so anyway. For example, in her affidavit, Dr. Laskey acknowledges that the coroner is the only proper person to issue an opinion regarding "cause and manner of death" in cases such as this, and, as a result, she "would not offer an opinion" on it. (DE #197-1, pp. 5-6.) However, on October 24, 2006, Dr. Laskey emailed Defendant McAninch to inform her that there was "NO WAY she would have sustained these injuries from a fall. In fact, I am contacting Dr. Cavanaugh to find out why he isn't calling it a homicide. This is NOT an ambiguous case." (DE #224-1, p. 1.) More importantly, her October 28, 2006, official report specifically notes that the "manner of death would be consistent with a homicide" and that "it is my expert opinion that this child sustained a fatal beating on the day that she died and that this beating was the direct cause of her death." (DE #201-4.) Dr. Laskey concluded her report by noting that she had "grave concerns about the safety of other children in the care of the caregivers at the time of these injuries." (*Id.*) Notably, in April of 2007, Dr. Laskey testified that she did indeed express opinions in her report on the cause and manner of Jessica's death. (DE #201-11, p. 12.)

36

Based on the Court's review of the record as a whole and the foregoing specific factual disputes, the question of whether Dr. Laskey acted or failed to act with a deliberate or reckless disregard of plaintiff's constitutional rights, or if the conduct causing the constitutional deprivation occurred with her knowledge or consent, is best left to the jury. The Court agrees that there is a genuine dispute as to whether Dr. Laskey knew her findings were false, or withheld material information, and nonetheless caused, or conspired to cause the children's removal from their home. See *Brokaw*, 235 F.3d at 1012 (citation omitted). Thus, the motion for summary judgment is **DENIED**.

Absolute Immunity

Dr. Laskey asserts that she is entitled to absolute immunity for her evaluation of Jessica's injuries in good faith based on the information that DCS provided to her. Plaintiffs argue that Dr. Laskey has not provided undisputed evidence that she acted in good faith and that there is evidence that the Finnegans challenged Dr. Laskey's report in the CHINS proceedings.

Because it is a complete defense to liability, "[a]bsolute immunity from civil liability for damages is of a rare and exceptional character," *Auriemma v. Montgomery*, 860 F.2d 273, 275 (7th Cir. 1988) (quotation omitted), and there is a presumption against granting it to government officials. *Houston v. Partee*,

978 F.2d 362, 365 (7th Cir. 1992). The burden of establishing absolute immunity rests on its proponent, who must show that overriding considerations of public policy require that the defendant be exempt from personal liability for unlawful conduct. *Auriemma*, 860 F.2d at 275; *Walrath v. United States*, 35 F.3d 277, 281 (7th Cir. 1994). As noted in this Court's previous opinion (DE #61), the "quick and early" resolution of immunity issues furthers the purpose of immunity by protecting government officials from the costs of trial and burdens of discovery. *See Blessing v. Kulak*, No. 86-C-10227, 1987 WL 7614, at *2 (N.D. Ill. June 19, 1987). As "[a]llowing defendants discovery would only assist them in a challenge to the factual basis for allegations in the complaint," it is not warranted before the court can make the determination of immunity. *Id.* Thus, the Court ruled on the issue in March of 2011 and found that Dr. Laskey was not entitled to absolute immunity. (See DE #61, pp. 26-33.) Dr. Laskey's current motion provides no basis to reverse that finding.

To the extent that Dr. Laskey relies on Indiana law to extend federal absolute immunity provisions to good faith reporters of child abuse or neglect, the Court is not convinced that there is a basis to do so in this particular case. As noted previously by this Court, "[c]onduct by persons acting under color of state law which is wrongful under 42 U.S.C. § 1983 . . . cannot be immunized by state law." *Hampton v. City of Chicago, Cook County, Ill.*, 484

F.2d 602, 607 (7th Cir. 1973). This is because "[a] construction of the federal statute which permitted a state immunity defense to have controlling effect would transmute a basic guarantee into an illusory promise; and the supremacy clause of the Constitution insures that the proper construction may be enforced." *Id.* (citing *McLaughlin v. Tilendis*, 398 F.2d 287, 290 (7th Cir. 1968)). Dr. Laskey's arguments related to *Briscoe v. LaHue*, 460 U.S. 325, 334-35 (1983) and *Kurzawa v. Mueller*, 732 F.2d 1456 (6th Cir. 1984) have already been addressed and rejected by this Court. (See DE #61, pp. 27-30.)

Here, as noted in detail above in the preceding section, Dr. Laskey has not presented undisputed evidence that she was acting in good faith based on her expertise and/or consultations with Dr. Cavanaugh and cardiologists at Riley Hospital for Children when she rendered her opinion as to Jessica's death, and Plaintiffs have presented evidence that by the spring of 2007, Dr. Laskey was aware that Tabitha and Katelynn were being detained based in large part on her report, that additional information had surfaced calling that report into question, and that she did not ever correct or update her report. Furthermore, despite Dr. Laskey's claims that her services with DCS concluded when she submitted the October 2006 report, Plaintiffs have presented evidence that she was significantly involved in the case for much longer than she suggests. (See e.g. DE #224-12; DE #224-13, DE #224-14; DE #224-

15; DE #224-16; DE #224-21; DE #224-23; DE #224-24.)  Dr. Laskey's argument that she is entitled to absolute immunity on the basis of good faith is unavailing, and therefore, her motion for summary judgment is **DENIED**.[9]


CONCLUSION

For the aforementioned reasons, Defendant Laskey's Motion for Summary Judgment (DE #195) and Defendant Laskey's Motion to Strike Inadmissible Testimony and Documents from Plaintiffs' Designated Evidence Submitted in Support of Plaintiffs' Corrected Response to Defendants' Motions for Summary Judgment (DE #261) are **DENIED**.


**DATED: September 8, 2015**                **/s/ RUDY LOZANO, Judge**
                                            **United States District Court**


---

[9]  Finally, while Dr. Laskey briefly argues that Plaintiffs failed to challenge her credentials and the report's credibility during the CHINS proceedings and should therefore be precluded from doing so now, the Court agrees with Plaintiffs that there is evidence in the record to suggest that Plaintiffs did indeed challenge Dr. Laskey's expertise and findings during the CHINS proceedings.  (See e.g. DE #201-20, pp. 5-6; DE #224-26, pp. 16-39; DE #224-26, pp. 40-51.)