# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF INDIANA
### SOUTH BEND DIVISION

| | | |
|---|---|---|
| ROMAN FINNEGAN, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | NO. 3:08-CV-503 |
| | ) | |
| LAUREL MYERS, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>OPINION AND ORDER</u>

This matter is before the Court on the Motion for Summary Judgment, filed by Defendants Laurel Myers, Regina McAninch, Tracy Salyers, Reba James, James Payne, and Jennifer McDonald (collectively, the "State Defendants") on October 6, 2014 (DE #200) and the Motion to Strike Plaintiffs' Inadmissible Evidence, filed by the State Defendants on November 7, 2014 (DE #248). For the reasons set forth below, both motions are **DENIED**.


<u>BACKGROUND</u>

Plaintiffs, Roman Finnegan, Lynnette Finnegan, Jonathon Abair, Tabitha Abair, and Katelynn Salyer (collectively, "Plaintiffs"), have sued several defendants in this case, including the following State Defendants: Laurel Myers, the Director of the Pulaski County Department of Child Services ("DCS") during the period in question ("Defendant Myers"), Regina McAninch, an investigator and

caseworker for DCS ("Defendant McAninch"), Tracy Salyers, a family case manager for DCS ("Defendant Salyers"), Reba James, a regional manager for the Department of Child Services ("Defendant James"), James Payne, former director of the Department of Child Services ("Defendant Payne"), and Jennifer McDonald, an Indiana State Police detective ("Defendant McDonald"). The State Defendants have filed the current motions, ultimately arguing that Plaintiffs have failed to establish any of the claims against them. Plaintiffs respond by stating that evidence exists, when viewed in the light most favorable to them, that support their claims and preclude summary judgment.

DISCUSSION

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Not every dispute between the parties makes summary judgment inappropriate; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* In determining whether summary judgment is appropriate, the deciding court must construe

2

all facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010). "However, our favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." *Fitzgerald v. Santoro*, 707 F.3d 725, 730 (7th Cir. 2013) (citing *Harper v. C.R. Eng., Inc.*, 687 F.3d 297, 306 (7th Cir. 2012)).

A party opposing a properly supported summary judgment motion may not rely on allegations or denials in her own pleading, but rather must "marshal and present the court with the evidence she contends will prove her case." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). If the nonmoving party fails to establish the existence of an essential element on which he or she bears the burden of proof at trial, summary judgment is proper. *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006).


Preliminary Evidentiary Issues

The State Defendants have filed a motion to strike various documents that Plaintiffs rely on to oppose the various Defendants' motions for summary judgment. Specifically, the State Defendants take issue with: (1) the January 28, 2010, opinion and order of Pulaski Circuit Court Special Judge Patrick Blankenship ("Judge Blankenship") (DE #130-2); (2) Plaintiffs' Exhibit 26, which contains documents from the stipulated agency record (DE #224-26,

pp. 1-243); and (3) Plaintiffs' Exhibit 30, which consists of handwritten notes (DE #224-30, pp. 1-2).

On a motion for summary judgment, "[a] party may object that the material cited to support or dispute a fact *cannot* be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2) (emphasis added). "In other words, the Court must determine whether the material can be presented in a form that would be admissible at trial, not whether the material is admissible in its present form." *Stevens v. Interactive Fin. Advisors, Inc.*, 2015 WL 791384, *2 (N.D. Ill. Feb. 24, 2015); see also *Olson v. Morgan*, 750 F.3d 708, 714 (7th Cir. 2014) ("We note that the Federal Rules of Civil Procedure allow parties to oppose summary judgment with materials that would be inadmissible at trial so long as *facts* therein could later be presented in an admissible form.") (emphasis in original).

It is the function of the Court, with or without a motion to strike, to carefully review the evidence and to eliminate from consideration any argument, conclusions, and assertions unsupported by the documented evidence of record offered in support of the statement. See, e.g., *S.E.C. v. KPMG LLP*, 412 F.Supp.2d 349, 392 (S.D.N.Y. 2006); *Sullivan v. Henry Smid Plumbing & Heating Co., Inc.*, No. 04 C 5167, 05 C 2253, 2006 WL 980740, at *2 n.2 (N.D. Ill. Apr. 10, 2006); *Tibbetts v. RadioShack Corp.*, No. 03 C 2249, 2004 WL 2203418, at *16 (N.D. Ill. Sept. 29, 2004); *Rosado v.*

*Taylor*, 324 F.Supp.2d 917, 920 n.1 (N.D. Ind. 2004). Motions to strike are heavily disfavored, and usually only granted in circumstances where the contested evidence causes prejudice to the moving party. *Kuntzman v. Wal-Mart*, 673 F.Supp.2d 690, 695 (N.D. Ind. 2009); *Gaskin v. Sharp Elec. Corp.*, No. 2:05-CV-303, 2007 WL 2228594, at *1 (N.D. Ind. July 30, 2007).

*Judge Blankenship's Decision*

The State Defendants assert that Judge Blankenship's January 28, 2010, decision (DE #130-2) contains inadmissible hearsay and should be stricken as substantive evidence. Plaintiffs, on the other hand, argue that the decision is a proper subject of judicial notice and does not run afoul of the hearsay rules.

In this Court's previous opinion, judicial notice was taken of Judge Blankenship's decision. (DE #152, pp. 7-8.) Citing to *Opoka v. I.N.S.*, 94 F.3d 392, 394 (7th Cir. 1996), this Court noted that it is a well-settled principle under Seventh Circuit law that the decision of another court or agency is a proper subject of judicial notice. (*Id.* at 8.) *Opoka* makes it clear that:

> [t]his court, however, has the power, in fact the obligation, to take judicial notice of the relevant decisions of courts and administrative agencies, whether made before or after the decision under review. Determinations to be judicially noticed include proceedings in other courts, both within and outside of the federal judicial system, if the proceedings have a direct relation to matters at issue.

*Opoka*, 94 F.3d at 349; see also Fed. R. Evid. 201(b)(2) (b) ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.").

Here, it is clear that Judge Blankenship's decision involved proceedings that have a direct relation to the matters at issue, so it is proper to judicially notice the ultimate judicial determination of the substantiation appeal. In this case, it is also undisputed that Judge Blankenship relied on a stipulated agency record of more than 8,000 pages as the basis of his findings of fact to support his conclusions of law. (See DE #130-2, pp. 10-53.) The stipulation itself (a document not challenged by the State Defendants) states that the parties jointly prepared a list of documents which formed the stipulated agency record and that they "submitt[ed] all documents listed to the Court as joint documents" to create the "exclusive evidence upon which the Court may base its decision." (DE #224-25, p. 1.) Judge Blankenship notes the following in the initial paragraphs of his decision:

> 2. In addressing the December 5, 2005 substantiation, the Finnegans offer findings by Jessica's family doctor and cardiologist that Jessica was doing well during the period of alleged neglect and medical records confirming approximately 15 appointments and prescription refills during this period. In addressing the March 2007 substantiations, the Finnegans provide the Coroner's Verdict and medical reports finding that Jessica died from

> prescription errors by her family doctor
> combined with her congenital heart condition
> and seizure disorder, with internal
> hemorrhages caused by warafin and all skull
> fractures created at the first autopsy. 3.
> *DCS states that it is not contesting this
> medical evidence.* Respondents' Brief in
> Opposition to Petition for Judicial Review
> (DCS Brief) at 28.

(DE #130-2, pp. 2-3) (emphasis added). While the Court acknowledges that the procedural posture of the state proceedings is clearly distinct from this federal action, it is notable that the foregoing is unique and makes it less likely that the stipulated facts are subject to reasonable dispute because they can readily determined from a source whose accuracy cannot reasonably be questioned. See Fed. R. Evid. 201(b)(2) (b). In any event, at least for purposes of summary judgment, it is clear that this Court may consider Judge Blankenship's decision in determining whether there are disputed questions of fact requiring trial.

Furthermore, even assuming *arguendo* that Judge Blankenship's decision may not be used as substantive evidence, it may undoubtedly be used for other purposes at this stage; the State Defendants' request to strike the decision in its entirety is overly broad. For example, as Plaintiffs correctly point out, the decision may be used to show the procedural history of the underlying proceedings and to show what evidence was (or was not) provided by the parties during those proceedings. As is its normal practice, this Court has sifted through the voluminous evidence and

has considered it under the applicable federal rules, giving each piece the credit to which it is due. The Court has also kept in mind that hearsay is defined as out-of-court statements "offer[ed] in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c); *United States v. Rettenberger*, 344 F.3d 702, 707 (7th Cir. 2003). Evidence presented for purposes other than to prove the truth of the matter asserted is not hearsay and has not been treated as such. Accordingly, the motion to strike Judge Blankenship's decision is **DENIED**.

*Exhibit 26*

The State Defendants also argue that Exhibit 26 (DE #224-26) should be stricken in its entirety because it contains inadmissible hearsay. The Plaintiffs disagree and assert that the information is being offered "to show the information that was available to, and received by, the State Defendants during their investigation regarding Jessica's death, not for the truth of the underlying statements." They contend that:

> [t]he fact that the State Defendants possessed these documents is directly relevant to the issue of whether the State Defendants behaved recklessly, a key issue in this case. The relevance does not depend on whether the underlying statements in the documents are true but on the fact that the Defendants were provided this information when they engaged in the alleged course of misconduct.

(DE #264, p. 9.) For much of the same reasons listed above, the

Court agrees with Plaintiffs that Exhibit 26 need not be stricken. Again, not only is the State Defendants' request overly broad, it is unnecessary; the Court is capable of considering the evidence under the applicable federal rules and giving it the weight it deems appropriate.

As far as authentication is concerned, the Federal Rules of Evidence provide simply that, "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). Rule 901 provides several examples of proper authentication methods, including testimony of a witness with knowledge, expert or trier of fact comparisons, distinctive characteristics, and evidence about public records; the Rules acknowledge that the list is not complete. Fed. R. Evid. 901(b). "Rule 901 requires only a prima facie showing of genuineness and leaves it to the jury to decide the true authenticity and probative value of the evidence." *United States v. Harvey*, 117 F.3d 1044, 1049 (7th Cir. 1997). Additionally, Rule 902 notes that certain evidence, including but not limited to certified copies of public records, official publications, newspapers and periodicals, commercial paper, and certified domestic records of a regularly conducted activity, is self-authenticating and requires no extrinsic evidence of authenticity in order to be admitted. Fed. R. Evid. 902.

The Seventh Circuit has noted that "[a]uthentication relates

only to whether the documents originated from [their purported source]; it is not synonymous to vouching for the accuracy of the information contained in those records," and the "very act of production [i]s implicit authentication." *United States v. Brown*, 688 F.2d 1112, 1116 (7th Cir. 1982); *see also Kasten v. Saint-Gobain Performance Plastics Corp.*, 556 F.Supp.2d 941, 948 (W.D. Wis. 2008) (rejecting authenticity challenge at summary judgment as disingenuous where the challenged e-mails "were documents produced by defendant during discovery"); *Fenje v. Feld*, 301 F.Supp.2d 781, 809 (N.D. Ill. 2003) ("[d]ocuments produced by an opponent during discovery may be treated as authentic."); *In re Greenwood Air Crash*, 924 F.Supp. 1511, 1514 (S.D. Ind. 1995) ("Production of a document by a party constitutes an implicit authentication of that document."). As to emails specifically, the Seventh Circuit has acknowledged that they may be authenticated via circumstantial evidence such as viewing the content of the email in light of the factual background of the rest of the case and identifying the sender and/or recipient by unique email address. *United States v. Fluker*, 698 F.3d 988, 999-1000 (7th Cir. 2012); *see also Fenje*, 301 F.Supp.2d at 809 ("E-mail communications may be authenticated as being from the purported author based on an affidavit of the recipient; the e-mail address from which it originated; comparison of the content to other evidence; and/or statements or other communications from the purported author

10

acknowledging the e-mail communication that is being authenticated.").

The State Defendants do not argue that any of the documents are not what they purport to be or that they cannot be presented in a form that would be admissible at evidence. Based on the rules outlined above and the fact that the evidence was stipulated to by the parties for purposes of state court review (see also DE #264-1; DE #264-3), a *prima facie* showing of genuineness has been made; the Court will leave it to the trier of fact to determine the true probative value of the evidence during trial. See *Olson*, 750 F.3d at 714 ("We note that the Federal Rules of Civil Procedure allow parties to oppose summary judgment with materials that would be inadmissible at trial so long as *facts* therein could later be presented in an admissible form.") (emphasis in original). Accordingly, the motion to strike Exhibit 26 is **DENIED**.

*Exhibit 30*

Finally, the State Defendants argue that Exhibit 30 (DE #224-30) is a copy of handwritten notes that contains inadmissible hearsay and should be stricken. Plaintiffs respond by asserting that the notes (handwritten by John E. Cavanaugh, M.D. during a conference call prior to the second autopsy – see DE #169-2, p. 40) are not being offered to prove their truth (that an exhumation was not necessary) but instead are being used to show that the

statement was made to Defendant McDonald, who subsequently informed the court that there was indeed a need for an exhumation. The Court agrees with Plaintiffs that, pursuant to this use, the notes are not inadmissible hearsay. Accordingly, the motion to strike Exhibit 30 is **DENIED**.


Facts

The basic background facts of this case are largely undisputed and have been set forth in numerous previous Court orders. The Court will set forth the background facts briefly in this section for contextual purposes but will focus on any relevant factual disputes below.

Before her death at age fourteen, Jessica Salyer ("Jessica") lived with her mother and step-father, Roman and Lynnette Finnegan (the "Finnegans" and/or "Roman and Lynnette"), in Pulaski County, Indiana. Jessica was born with a congenital heart condition that required multiple surgeries, concluding in a 1996 surgery (the Fontan procedure), which left her with a two-chambered, rather than a four-chambered heart. Even with good care, the mortality rate for Fontan patients is high. Jessica also had a fourth generation seizure disorder, for which she took 3 medications: warfarin, digoxin and phenytoin (brand name Dilantin). Warfarin in particular is a high risk drug as it can result in bleeding, bruising, and is linked to a risk of brain hemorrhage.

In September of 2005, shortly after Jessica started the eighth grade, the school nurse at West Central Middle School filed a complaint with DCS concerning Jessica's medical care. Based on that complaint, Defendant McAninch called the Finnegans on September 6, 2005, to discuss the need to schedule a follow up appointment with Jessica's pediatric cardiologist, Dr. Hurwitz, and to provide additional information about Jessica's medical care; during that call, Defendant McAninch directed the Finnegans to attend a hearing on September 9, 2005, at DCS. Roman Finnegan sent a letter of complaint to his state legislator concerning Defendant McAninch's conduct and sensitivity during the phone call. The state legislator forwarded the letter to the Governor's Office, which in turn sent the letter to Defendant Payne for a response. The letter was then referred to Defendant Myers for review and resolution.

The Finnegans attended the DCS meting, provided proof of insurance, and reached an agreement about Jessica's care. At a September 15, 2005, doctor's appointment, Dr. Hurwitz examined Jessica and assured the Finnegans that she was doing well.

On October 11, 2005, a second complaint was submitted to DCS regarding a claim that the Finnegan household did not have enough food for the children. DCS investigated and found the report of neglect to be unsubstantiated.

Later that same month, the Finnegans took Jessica to the

family doctor, and at this appointment, Jessica's doctor, Dr. Bartush, accidentally increased her dosage of warfarin from 3 mg to 7 mg and eliminated her Dilantin, placing her at risk of death from internal bleeding and/or seizure.

Jessica had vaccinations on December 5, 2005. That same day, DCS substantiated medical neglect, stating that the Finnegans would not have obtained appropriate medical care for Jessica without DCS intervention. DCS provided a copy of the substantiated medical neglect to the school, but the Finnegans claim that they did not receive a copy of the December 2005 substantiation of medical neglect until April of 2007.

From December 7-18, 2005, Jessica had symptoms including a stomachache, headache, congestion, and tongue pain, and she was taken to Dr. Bartush who diagnosed the flu and thrush. On December 20, 2005, Lynnette found Jessica lying face down by the side of her bed. Roman began performing CPR while Lynnette called 911; however, the attempts at CPR were unsuccessful, and Jessica died.

Immediately following her death, the emergency medical personnel, law enforcement personnel, and initial hospital investigators found Jessica's death was related to a fall, her heart condition, and warfarin, with no signs of abuse or neglect reported. At the hospital, R. Gordon Klockow, D.D.S., the Jasper County Coroner (the "Coroner" or "Dr. Klockow"), and Dr. Ahler (the emergency room doctor and former Jasper County Coroner), also did

not report any signs of abuse or neglect.

Defendant McAninch and Mike Bardsley of the prosecutor's office subsequently interviewed Jessica's siblings (Johnathon Abair ("Jonathon"), age 17, Tabitha Abair ("Tabitha"), age 16, and Katelynn Salyer ("Katelynn"), age 9) and questioned them for approximately six hours. DCS also questioned the Finnegans.

After being retained by the Coroner, John E. Cavanaugh, M.D., a forensic pathologist working in Lake County, Indiana ("Dr. Cavanaugh"), conducted an autopsy on December 21, 2005. During the autopsy, it was Dr. Cavanaugh's own impression that he caused a skull fracture when he opened the skull because he heard a classic "pop." In his handwritten Preliminary Report of Postmortem Examination, Dr. Cavanaugh attributed Jessica's death to a subdural hemorrhage due to blunt force trauma of the head consistent with a fall complicated by warfarin, with the manner of death undetermined. Dr. Cavanaugh did not mention the basal skull fracture as a listed finding on the front page of his preliminary report. However, the right anterior basal skull fracture was noted (without explanation of his previous impression that it was an artifact of the autopsy) in his Report of Autopsy dated May 24, 2006. The May report states that there were no postmortem injuries. It indicates that Dr. Cavanaugh had recovered tissue samples for histology and microscopic examination; however the samples were not prepared for examination at that time. DCS

15

received a copy of the May report in June of 2006.

Following the release of the May 24, 2006, autopsy report, Defendant McAninch and Defendant Myers continued investigating the Finnegans because they believed her death may have been the result of homicide. In October of 2006, DCS retained Antoinette Laskey, a pediatrician who was employed at Riley Hospital for Children and also served on the State Child Fatality Review Team ("Dr. Laskey"), in order to obtain her opinion on the matter. Email records indicate that Dr. Laskey communicated with Defendant McAninch regarding the case prior to issuing a final report on the matter. On October 23-24, 2006, Dr. Laskey emailed Defendant McAninch to let her know that it was her belief that Jessica's injuries were "NOT consistent with a simple fall from a short surface" and that her report would conclude that Jessica's medical condition "did NOT contribute to her death and that the death is consistent with a homicide." Defendant McAninch responded with, "[t]hank heaven someone other than the local Director and FCM agree that this child died from physical abuse." To which Dr. Laskey replied:

> EVEN IF this child fell our of bed and IF she in fact had easier bleeding due to her meds, there IS NO WAY she would have sustained these injuries from a fall. In fact, I am contacting Dr. Cavanaugh to find our why he isn't calling it a homicide. This is NOT an ambiguous case.

On October 28, 2006, Dr. Laskey authored a report stating that Jessica died from a fatal beating on the day of her death, which

16

caused lethal trauma. Dr. Laskey noted that Jessica's injuries were severe, out of proportion to "falling out of bed" or other routine household events or accidents, and that the manner of death was consistent with a homicide. Dr. Laskey concluded her report by stating that, "it is my expert medical opinion that this child sustained a fatal beating on the day that she died and that this beating was the direct cause of her death." The report was received by DCS on October 31, 2006. DCS seized Tabitha and Katelynn on November 1, 2006, and they were subsequently placed into foster care. Defendant Salyers was assigned to be the girls' ongoing case manager to supervise their care and treatment. Defendant McDonald was assigned to investigate the circumstances surrounding Jessica's death.

On November 2, 2006, Dr. Cavanaugh faxed a letter to DCS that summarized his May 2006 autopsy report and stated that the "primary cause of death was blunt force injury of the head, with a basal skull fracture, intracranial hemorrhage, and cerebral edema." The letter went on to explain that the extent of Jessica's injuries was "inconsistent with a simple fall of approximately 2 feet from a bed, especially since the apparent primary impact is on the top or crown of the head causing a basal skill fracture . . . ." Dr. Cavanaugh acknowledged that while warfarin would have "exacerbated the *extent* of the hemorrhage, it would not have been causative nor would it account for the skull fracture." The letter makes no

mention that the basal skull fracture was a suspected autopsy artifact. Dr. Cavanaugh concluded by stating, "due to the apparent lack of competent explanation for these injuries, the manner of death is undetermined."

In the meantime, with the assistance of other doctors, the Finnegans had discovered the warfarin prescription error, which had accidentally increased Jessica's warfarin dose from 3 mg to 7 (5 + 2) mg daily and eliminated her seizure medication. On December 13, 2006, David Geisler, the Finnegans' counsel, provided those pharmacy records to DCS. The pharmacy records called into question Dr. Laskey's conclusions, which were based on her belief that although Jessica "did not have a recent INR in order to determine the extent of her anticoagulation, it is medically reasonable to assume that she was well within a safe range and was likely near or below her target INR of 2.0" since her dose of Coumadin was only incrementally increased. Instead, the prescription errors offered an alternate explanation for the hemorrhages and death. As additional information that was helpful to the Finnegans' position was received, they provided it to DCS on an ongoing basis.

On January 25, 2007, Jessica's body was exhumed under the observation of Dr. Michael Baden, a board certified forensic pathologist and director of the medicolegal investigations unit of the New York State Police ("Dr. Baden"). Dr. Cavanaugh also attended and participated in the second autopsy. Dr. Cavanaugh

18

arranged to have the tissue specimens from the first and second autopsy processed for microscopic viewing. The chain of evidence and request for histology services sent to St. Catherine Hospital Laboratory indicated that he needed the slides processed by February 22, 2007.

In March of 2007, the Finnegans provided DCS with additional medical literature, including medical and pharmacological affidavits describing the prescription errors and other aspects of Jessica's medical conditions and death. Later that same month, DCS substantiated physical abuse (bruises, cuts and/or welts, internal injury, skull fracture/brain damage) and medical neglect in connection with Jessica's death against the Finnegans; DCS also substantiated life/health endangering conditions for Jonathon, Tabitha, and Katelynn. The court set the CHINS matter for a hearing date of July 18-20, 2007.

At her April 16, 2007, deposition, Dr. Laskey agreed that Jessica had no external signs of a beating, that warfarin can cause fatal or major bleeding in any body part or tissue, and that Jessica had a higher risk of bleeding because was on warfarin. Dr. Laskey testified that, apart from the skull fracture, Jessica's autopsy findings consisted entirely of internal bleeding consistent with warfarin. She also testified she is not qualified to determine the cause and manner of death. After receiving Dr. Laskey's input, DCS made the decision that she would not testify at

the CHINS hearings.

In April of 2007, after investigating the case for approximately six months, Defendant McDonald wrote a probable cause affidavit which was used to obtain arrest warrants for the Finnegans. The Finnegans were charged with medical neglect on April 23, 2007, and they were arrested on April 24, 2007.

On May 23, 2007, Defendant McDonald submitted a bill of $4,677.40 from St. Catherine Hospital for the cutting, staining, and processing of the microscopic slides of Jessica's postmortem body tissue and bones; the memo attached to the bill noted that the purpose of the slides was for the pathologist to review them to determine the ages of Jessica's injuries, among other medical findings, and it acknowledged that the "timing of Jessica's injury/injuries is a critical element of this case."

On May 25, 2007, DCS withdrew its allegations of physical abuse in the CHINS proceedings and filed amended petitions alleging medical neglect and contending the other children were still in serious danger of physical harm.

The Finnegans allege that, although the findings of the microscopic tissue slides were available to the Defendants much sooner, they only received this information in mid-June to mid-July from third parties, including the prosecutor, through subpoenas and *Brady* requests; the slides show the death was caused by prescription error, the hemorrhages were from warfarin, and the

skull fracture was post-mortem.

On July 8, 2007, Dr. Cavanaugh issued his Final Report of Autopsy. The report indicates that Dr. Cavanaugh reviewed the slides, but it does not go into any detail regarding their significance. The report describes the basal skull fracture as evidence of blunt force trauma to the head without making clear that it was an autopsy artifact.

On July 11, 2007, Dr. Cavanaugh sent an email to Sheryl Pherson, counsel for DCS, which stated, in part:

> Thought I'd give you a heads-up on the final report. Although I didn't go into detail in the report, there has been some significant new information that changes certain opinion details: . . . 2. There is both new and old bleeding in the skull - certain portions of the clot examined microscopically after the 2nd autopsy (more specimens submitted) look to be in the 5-10 day range or older. This means more than one bleeding episode, with possibly 2 weeks of noticeable neurologic symptoms and/or pathologic bleeding. The scalp contusions also appear to be of two different ages. 3. Portions of the skull fracture are indeed autopsy artifact. . . .

On July 12, 2007, DCS moved for a continuance of the factfinding hearing, and the hearing was changed to a detention hearing on the amended CHINS petitions.

On July 17, 2007, the Coroner ruled that Jessica died an accidental death from the prescription errors and that the skull fractures were artifacts of the first autopsy. The Verdict states that there was no trauma noted to the back or the legs and that

there were no significant findings.  It concludes, "[i]n a highly unusual nature, I have included forensic pathologist consultations as part of the autopsy report and of this Coroner's from Dr. John Pless, M.D. and Dr. Jan Leestma, M.D."

At the July 18-19, 2007, hearing, DCS did not offer any witnesses or evidence to support its claims; Tabitha testified she had never seen or been subject to abuse or neglect.  At the conclusion of the hearing, upon the parties' agreement, the court ordered the return of Tabitha and Katelynn to Lynnette.  The order stated that the girls were to be transitioned back to the Finnegans' home according to the following schedule: seven days of supervised visits to allow the prosecutor an opportunity to depose the girls, followed by seven days of unsupervised visits, and "[a]t the conclusion of [the seven] day period of unsupervised visits, the child[ren] shall be placed in the home of [their] mother."[1] Upon being deposed by the prosecutor, the girls both testified there was no abuse.  By August 6, 2007, DCS had still not returned the girls, so the Finnegans filed a contempt motion, and DCS filed a motion to clarify the return order.  On August 9, 2007, pursuant to a hearing on both motions, the court ordered DCS to return the girls that same evening.  Tabitha and Katelynn were returned to the Finnegans on August 9, 2007.

_____

[1]  The order related to Tabitha also addresses the issue of termination of jurisdiction with a handwritten note directly following it that says, "if dispute is resolved regarding best interests and reasonable efforts."  It is not clear who wrote the additional phrase.

On August 27, 2007, the prosecutor agreed she did not have probable cause to pursue the criminal charges. On September 7, 2007, the CHINS judge recused himself due to *ex parte* communications with DCS and the prosecutor, and the cases were reassigned. On September 10, 2007, the prosecutor filed amended charges that Roman and Lynnette knowingly endangered Jessica's health by failing to provide emergency care for her. Detective McDonald was the only named witness. From August through November of 2007, DCS provided reunification services, but the Finnegans claim that the services were more disruptive than helpful.

On October 24, 2007, the prosecutor moved to dismiss Roman's criminal charges, and on November 2, the prosecutor moved to dismiss Lynnette's charges. DCS had previously withdrawn the CHINS petitions, including death from physical abuse; and, on November 27, 2007, the CHINS court dismissed the CHINS petitions.

Following dismissal of the CHINS petitions, the cases were returned to DCS for administrative review. The Finnegans provided the reviewer, Defendant James, with three volumes of information. On December 13, 2007, Defendant James re-substantiated the March 2007 substantiations, including the substantiation of death from physical abuse; two additional substantiations (inappropriate discipline and death from medical neglect for Jessica) were also added. The decision did not explain the reason for the re-substantiation nor did it address the Finnegans' materials or the

Coroner's Verdict.    The Finnegans appealed Defendant James'
decision to DCS Administrative Law Judge Dawn Wilson, who was also
handling the Finnegans' appeal of the December 2005 substantiation
for medical neglect.

DCS's claims against the Finnegans continued for over two more
years until May of 2010, when DCS withdrew its appeal of Pulaski
Circuit Court Special Judge Patrick Blankenship's January 28, 2010,
ruling that found DCS' December 2005 and March 2007 substantiations
to be arbitrary and capricious, ordered DCS to immediately
unsubstantiate those substantiations, and directed DCS to remove
the Finnegans from the child protection index.


ANALYSIS


Applicability of the Rooker-Feldman Doctrine

The State Defendants first argue that the Court lacks
jurisdiction over Plaintiffs' claims pursuant to the *Rooker-Feldman*
doctrine.   The *Rooker-Feldman* doctrine precludes federal subject
matter jurisdiction when: (1) a losing party in state court files
suit in federal court complaining of an injury caused by the state
court judgment, and seeks review and rejection of that judgment;
and (2) the losing party files a federal claim after the state
court proceedings have ended.   *See Holt v. Lake Cnty. Bd. Of
Comm'rs*, 408 F.3d 335, 336 (7th Cir. 2005); *TruServ Corp. v.*

*Flegles, Inc.*, 419 F.3d 584, 590 (7th Cir. 2005). "[T]he doctrine also precludes federal jurisdiction over claims inextricably intertwined with a state court determination." *Brokaw v. Weaver*, 305 F.3d 660, 664 (7th Cir. 2002) (citation omitted). As noted by this Court in its previous opinion (DE #152, p. 42), the doctrine is inapplicable where, as here, Plaintiffs ultimately prevailed in the underlying proceedings and are not seeking to challenge or change those decisions. See also *Parker v. Lyons*, 757 F.3d 701, 705-06 (7th Cir. 2014) (discussing timing of the federal suit). The State Defendants' argument that the present case is distinguishable from *Brokaw* is unavailing. As noted correctly by the State Defendants, the pivotal inquiry in applying the doctrine is whether the federal plaintiff seeks to set aside a state court judgment or whether he is, in fact, presenting an independent claim. See *Remer v. Burlington Area Sch. Dist.*, 205 F.3d 990, 996 (7th Cir. 2000). Here, as in *Brokaw*, the Court finds that the *Rooker-Feldman* doctrine does not apply because Plaintiffs have alleged claims that are separate and distinct from any state court judgment, namely that the parties involved in the CHINS proceedings independently violated their constitutional rights. *Brokaw*, 305 F. 3d at 665.

<u>First Amendment Right To Petition The Government</u>

The State Defendants argue that there is no evidence that the Finnegans were retaliated against after Roman sent the September 7, 2005, letter to his state legislator complaining about Defendant McAninch's treatment of he and Lynnette. Plaintiffs respond by stating that there is a genuine dispute as to whether the Finnegans were retaliated against for exercising their First Amendment rights.

In order to make out a *prima facie* case of First Amendment retaliation, a plaintiff must show: (1) that he engaged in protected activity; (2) that he suffered an adverse action that would likely deter free speech; and (3) that the protected activity was a motivating factor in the decision to take adverse action against him. See *Peele v. Burch*, 722 F.3d 956, 959 (7th Cir. 2013); *Mays v. Springborn*, 719 F.3d 631, 634 (7th Cir. 2013); *Redd v. Nolan*, 663 F.3d 287, 294-95 (7th Cir. 2011); *Greene v. Doruff*, 660 F.3d 975, 977-78 (7th Cir. 2011). If the plaintiff is able to furnish evidence to support the *prima facie* showing, the burden then shifts to the defendant to show that the retaliatory motive was not a "but for" cause and that the harm would have occurred anyway. *Greene*, 660 F.3d at 980. As summarized by the Seventh Circuit:

> [i]n the end, the plaintiff must demonstrate that, but for his protected speech, the employer would not have taken the adverse action. . . . But preliminarily at summary

> judgment, the burden of proof is split between
> the parties.  Initially, to establish a *prima
> facie* case of retaliation, the plaintiff must
> produce evidence that his speech was at least
> a motivating factor — or, in philosophical
> terms, a sufficient condition — of the . . .
> decision to take retaliatory action against

him.  Then, the burden shifts to the [defendant] to rebut the causal inference raised by the plaintiff's evidence.  If the employer fails to counter the plaintiff's evidence, then the employer's retaliatory actions are considered a necessary condition of the plaintiff's harm, and the plaintiff has established the but-for causation needed to succeed on his claim.

*Kidwell v. Eisenhauer*, 679 F.3d 957, 965 (7th Cir. 2012) (internal citations and quotation marks omitted).

In their reply brief,[2] the State Defendants argue that Roman's letter was not protected speech.  They assert that because Roman's letter describes Defendant McAninch's "rudeness," it was simply an "airing of a private grievance" that was inadequate to qualify as a matter of public concern.  However, as stated in this Court's previous opinion, the Seventh Circuit has made it clear that:

> [t]he public criticism of governmental policy
> and those responsible for government
> operations is at the very core of the
> constitutionally protected free speech.  We
> think it plain that presenting complaints to
> responsible government officials about the
> conduct of their subordinates with whom the
> complainer has had official dealings is
> analogously central to the protections of the
> right to petition. It matters not that the
> subject of the grievance may not be political,
> in the sense of raising public policy issues.

---

[2]  In the motion itself, the State Defendants seemed to waive this factor when they stated, "[f]or purposes of argument, Defendants will treat the Finnegans' complaint to a legislator as constituting protected activity."

> . . . Indeed, the fact that a grievance may
> not arouse sufficient public concern to
> generate political support makes the
> individualized exercise of the right to
> petition all the more important. Unless the
> grievance embodies a violation of established
> and judicially enforceable state or federal
> right, individual petitioning may be the only
> available means of seeking redress.

*Stern v. U.S. Gypsum, Inc.*, 547 F.2d 1329, 1342-43 (7th Cir. 1977)

(internal citations omitted). Roman's letter to his state

legislator, Mary Kay Budak, set forth detailed criticisms of

Defendant McAninch's allegedly inappropriate conduct,

unprofessional behavior, and rudeness during their phone

conversation. (See DE #224-26, pp. 79-80.) In closing, Roman

asked Ms. Budak for "help or intervention" and asked that the

letter be forwarded to Mitch Robb. (*Id.*) This is exactly the type

of protected speech that the Seventh Circuit addressed in *Stern*,

and the State Defendants' arguments to the contrary fail.

The State Defendants do not attempt to dispute, nor should

they, that the allegedly retaliatory adverse action (that DCS

continued to investigate the Finnegan family and then arbitrarily

and capriciously substantiated medical neglect as to Jessica on

December 5, 2005) would be likely deter free speech. Instead, the

State Defendants assert that the Finnegans cannot show that the

protected activity was a motivating factor in the decision to take

that adverse action against them because they fall short of

establishing the necessary causation. Relying again on cases like

*Fairley v. Andrews*, 578 F.3d 518 (7th Cir. 2009) and *Gross v. Town of Cicero*, 619 F.3d 697 (7th Cir. 2010), the State Defendants argue that "but for" causation must be established at this stage. However, as in *Mays*, the State Defendants ignore the Seventh Circuit's opinion in *Greene*, which, in distinguishing both *Gross* and *Fairley*, held:

> that the rule of *Gross* and *Fairley* is inapplicable to First Amendment cases. They remain controlled by *Mt. Healthy Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), under which 'the burden of proof relating to causation is divided between the parties in First Amendment tort cases. To make a prima facie showing of causation the plaintiff must show only that the defendant's conduct was a sufficient condition of the plaintiff's injury [that is, sufficient to cause it]. The defendant can rebut, but only by showing that his conduct was not a necessary condition of the harm — the harm would have occurred anyway.' *Greene v. Doruff*, supra, 660 F.3d at 980; see also *Spiegla v. Hull*, 371 F.3d 928, 941–43 (7th Cir. 2004).

*Mays*, 719 F.3d at 634. As such, Plaintiffs only need to present evidence that Roman's letter was at least a motivating factor (or a sufficient condition) of DCS' decision to pursue a substantiation of medical neglect against them. This may be done in the form of either direct or circumstantial evidence. *Kidwell v. Eisenhauer*, 679 F.3d 957, 965-66 (7th Cir. 2012). Circumstantial evidence "is evidence from which a trier of fact may infer that retaliation occurred" and "may include suspicious timing, ambiguous oral or written statements, or behavior towards or comments directed at

other employees in the protected group." *Id.* (citing *Long v. Teachers' Retirement Sys. of Ill.*, 585 F.3d 344, 350 (7th Cir. 2009)).

In their response brief, Plaintiffs point out that, subsequent to the receipt of the letter by DCS, it is undisputed that DCS and the Finnegans met and reached an agreement regarding Jessica's care. As requested, Jessica was seen by Dr. Hurwitz; he adjusted her warfarin dosage and recommended blood testing be done by Dr. Bartush. The State Defendants do not dispute that Jessica saw Dr. Bartush on two occasions in October of 2005 or that the Finnegans provided the requested information regarding Jessica's health and medical care to the school. Plaintiffs contend that despite all indications that DCS was aware the Finnegans were complying with their requests/concerns and had been informed that Jessica was doing well (see e.g. DE #130-2, pp. 17-18 (confirmation of and findings pursuant to Jessica's September 15, 2005, appointment with Dr. Hurwitz had been sent to the family doctor and DCS); see also DE #224-27, p. 2 (Roman's declaration that, subsequent to the appointment with Dr. Hurwitz, he provided DCS with Dr. Hurwitz' conclusions that Jessica had been examined and was doing well)), DCS continued to pursue the Finnegans in retaliation for Roman's letter and ultimately substantiated Jessica's medical neglect on December 5, 2005, without justification or due cause, purposefully omitting reference to the aforementioned appointment/findings and

relevant medical records. Indeed, it is undisputed that Judge
Blankenship ruled that the December 5, 2005, substantiation was
arbitrary and capricious, finding that the substantiation ignored
Dr. Hurwitz' letter along with the voluminous stipulated medical
records. (DE #130-2, pp. 19-21, 58.) Plaintiffs argue that the
timing of the substantiation (within three months of Roman's
letter) was suspicious, especially in light of their continued
compliance. Furthermore, while the State Defendants assert that it
is unlikely one complaint letter would raise the consternation of
those at DCS, Plaintiffs have provided evidence that Defendant
Myers advised Ron Featherstone, who handled constituent services
for DCS and had forwarded Roman's letter to Defendant Myers for a
response, via email that she was "surprised" by Roman's complaint.
(DE #224-26, p. 81.) Also, on September 8, 2005 (prior to ever
meeting with the Finnegans), Defendant Myers emailed Mr.
Featherstone and indicated that "there likely is more going on in
this family than we know." (*Id*.) In a separate email to a
coworker that same day, Defendant Myers stated:

> I cc'd you on my response to Ron Featherstone
> but wanted to add additional insight to you.
> I didn't think when I volunteered to be on the
> "complaint" team that my county would be the
> first!! At any rate, I witnessed the phone
> calls that Regina had with these people and
> she was in no way rude. Frustrated I will
> give you. . . . Evidently, [Roman] has gone
> out into the community lamenting his woes
> because I had a person call this morning and
> wonder 'what was going on' . . . of course I
> stated confidentiality and they understood

> that but that this family was so upset and
> didn't sleep all night because they were
> calling everyone they could think of!! . . . I
> am assuming there is much more going on with
> this family than first glance.

(DE #228.)[3]  Based on these emails, it is reasonable to infer that

Defendant Myers was sufficiently perturbed by the grievances Roman

aired to her superiors and others in the community.  Finally, while

the State Defendants assert that the intervening event of the

October 11, 2005, claim regarding a lack of food in the Finnegan

household (which was found to be unsubstantiated) destroys the

requisite causation, the Court agrees with Plaintiffs that it is

equally likely that the event was simply a continuation of DCS'

quest to investigate the Finnegans for wrongdoing.  In fact, it

could be reasonably inferred that the intervening investigation,

which resulted in no showing of neglect in the Finnegan household,

actually supports the Finnegans position that the December 5, 2005,

substantiation was wholly without merit.  The Court finds that the

foregoing circumstantial evidence, when viewed in the light most

favorable to Plaintiffs, is sufficient to show that Roman's letter

was at least a motivating factor of DCS' decision to pursue the

_____

[3]  This document was originally filed under seal because of potential
"clawback issues."  However, Plaintiffs have certified that the "clawback
issues" were resolved via agreement following the Court's November 4, 2014,
status conference. (See DE #257-2, p. 1.)  This is supported by Judge
Nuechterlein's April 21, 2015, order, wherein he noted that " [o]nly Documents
2-12, as withheld by DCS and described on the DCS Privilege Log, remain at
issue following DCS' production of Document 1 in April 2015."  (DE #279, p.
16.)  Therefore, the documents found at DE #226 through DE #230 are **ORDERED
UNSEALED**.

December 5, 2005, substantiation of medical neglect. Thus, Plaintiffs have sufficiently set forth a *prima facie* case of First Amendment retaliation.

As such, the burden shifts to the State Defendants to show, by a preponderance of the evidence, that the retaliatory motive was not a "but for" cause and that the harm would have occurred anyway. The State Defendants assert that both Defendant Myers and Defendant McAninch testified that independent grounds existed for the December 5, 2005, substantiation of medical neglect. During her deposition, when asked what facts weighed in favor of substantiation, Defendant Myers stated:

> Okay. The school needed information the family had not provided. And, therefore, without our department's involvement . . . it was felt without our department's involvement getting the appointment made at Riley, getting the information back to the school, the Finnegans would not have complied with the school's request. Based on all of the information [Defendant McAninch] gathered, that's how she determined that without our intervention or our involvement, that appointment and subsequent information to the school would not have been obtained.

(DE #201-2, pp. 12-13.) When pressed as to what information existed that Jessica's physical condition was seriously endangered by the Finnegans' alleged medical neglect, Defendant Myers reiterated that the "school was requiring medical information that they did not provide." (*Id.* at 14-15.) Defendant McAninch similarly testified that the substantiation of medical neglect was

33

justified because the school had asked for a "plan" and that the Finnegans had failed to comply with the school's request without DCS intervention. (DE #201-22, pp. 5-6.) This testimony, that DCS "felt" the Finnegans would not have complied with the school's requests without DCS intervention, is countered by the fact that DCS identifies no other evidence of medical neglect for the period in question. It is further countered by Lynnette's declaration, in which she disputes the State Defendants' claims that she had failed to give the school the requested information on several previous occasions and asserts that she "provided everything the school requested and also gave permission for the school to speak with Jessica's doctor and cardiologist." (DE #224-11, p. 2.) Lynnette also declares that there was not interruption in Jessica's care, as she scheduled appointments with Jessica's doctors whenever requested by the doctors or for "any other reason." (*Id.*)

In any event, it is undisputed that DCS knew Jessica was examined by Dr. Hurwitz only a little over a week after DCS' initial involvement, that the Finnegans provided the requested information to the school following that visit,[4] and that Jessica saw her local doctor, Dr. Bartush, on two occasions in October pursuant to follow-up direction from Dr. Hurwitz. Even looking at just these facts (and ignoring the references in Judge

---

[4]  As noted, Lynnette asserts that she provided the requested information to the school previously as well. (DE #224-11, p. 2.)

Blankenship's decision to the existence of voluminous medical records showing years of consistent care and to Lynnette's own declaration describing that care), it appears that the Finnegans were conscientious and compliant when it came to Jessica's health. It is unclear why DCS felt the need to substantiate medical neglect roughly three months after their first involvement, when no evidence of neglect was found during that time. Because DCS has not established that the harm would have occurred absent any retaliatory motive, summary judgment is inappropriate, and the Finnegans' First Amendment retaliation claims may proceed.

Fourth Amendment Rights

The State Defendants argue that all of the Finnegans' Fourth Amendment claims for unconstitutional searches or seizures fail because all actions by the State Defendants were reasonable. Plaintiffs disagree.

The Fourth Amendment provides that it is "the right of the people to be secure in their person, houses, papers, and effects against unreasonable searches and seizures[.]" U.S. Const. Am. IV. As the Seventh Circuit has explained:

> [b]ecause the basic purpose of the Fourth Amendment is to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials, the amendment's prohibition against unreasonable searches and seizures protects against warrantless intrusions during civil as well as criminal investigations by the government.

35

> Thus, the strictures of the Fourth Amendment
> apply to child welfare workers, as well as all
> other governmental employees.

*Doe v. Heck*, 327 F.3d 492, 509 (7th Cir. 2003) (internal citations and quotations marks omitted). A court must look to the conduct in question to determine whether it constituted a search or a seizure. *Id*. A search means to "look over or through for the purpose of finding something; to explore; to examine by inspection." *Id.* at 509-10. A person has been "seized" for purposes of the Fourth Amendment "if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). As noted in *Doe*, a court must:

> evaluate the search or seizure under
> traditional standards of reasonableness by
> assessing, on the one hand, the degree to
> which it intrudes upon an individual's privacy
> and, on the other, the degree to which it is
> needed for the promotion of legitimate
> governmental interests. In doing so, . . .
> the underlying command of the Fourth Amendment
> is always that searches and seizures be
> reasonable, what is reasonable depends on the
> context within which a search takes place.

*Doe*, 327 F.3d at 510. "The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, and its proper application requires careful attention to the facts and circumstances of each particular case." *Brokaw*, 235 F.3d at 1010 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

In *Brokaw*, the Seventh Circuit found that a caseworker who was not present for the actual seizure, but "directed those who removed the children to do so," could be liable under section 1983 for the Fourth Amendment violation. *Id*. at 1014. *See also Morris v. Dearborne*, 181 F.3d 657, 672 (5th Cir. 1999) (holding defendant, child's teacher, who was moving force behind the removal of children was responsible for causing allegedly unconstitutional removal). *Brokaw* teaches that a defendant is personally responsible if she "acts or fails to act with a deliberate or reckless disregard of plaintiff's constitutional rights, or if the conduct causing the constitutional deprivation occurs at her direction or with her knowledge or consent." *Id*. at 1012 (quoting *Smith v. Rowe*, 761 F.2d 360, 369 (7th Cir. 1985)). The *Brokaw* Court noted that "to the extent the defendants knew the allegations of child neglect were false, or withheld material information, and nonetheless caused, or conspired to cause [the child's] removal from his home, they violated the Fourth Amendment." *Brokaw*, 235 F.3d at 1012 (citation omitted).

*December 20, 2005*

Plaintiffs have alleged that the December 20, 2005, emergency detention and seizure of Jonathon, Tabitha, and Katelynn violated the Fourth Amendment. The State Defendants do not dispute the basic premise of these claims (i.e. that Defendant Myers and

Defendant McAninch seized the children from private property without a court order and detained them for five or six hours for questioning without parental consent).  In her declaration, Tabitha describes the seizures on December 20, 2005, as follows:

> On the day Jessica died, [Defendant] McAninch picked us up at our neighbor's house where we were having snacks.  She took us to the DCS offices in Winamac where they questioned us about our home and family.  We were there for at least four or five hours, though it felt much longer.  No one would tell us why we were there or what was happening.  Regina took Katelynn, who was nine years old at the time, out of the room and talked to her on her own. I saw a tape recorder in the room before we were interviewed.  They didn't tell us we were being recorded and seemed to be trying to hide this . . . . [N]one of us knew why we were being kept at the DCS office or why we were not allowed to call our parents or anyone else.

(DE #224-19, p. 1; see also DE #224-17, p. 1.)  The State Defendants argue that these actions were reasonable because a Fourth Amendment violation related to the interview of a child without the parents' permission only occurs where "the government's interest was nonexistent." *U.S. v. Hollingsworth*, 495 F.3d 795, 802 (7th Cir. 2007).  Here, they claim, the government interest was particularly strong because DCS has a duty to protect children and was therefore required to investigate Jessica's death as, only a few months before, school officials had reported to DCS that Lynnette was failing to attend to Jessica's medical condition and because it was reported that the Finnegan household did not have

sufficient food.

What the State Defendants fail to acknowledge, however, is that, as described in the preceding section, there is a genuine dispute as to whether DCS' actions and ultimate substantiation of medical neglect on December 5, 2005, were arbitrary, capricious, and performed only in retaliation for Roman's grievance letter. The Finnegans have presented evidence that they were consistent with Jessica's medical care, compliant with the school and DCS' requests, and that this information had been submitted to DCS yet had been ignored. (See e.g. DE #224-11, pp. 1-2; 224-27, pp. 1-2.) The State Defendants make reference to concerns over a much earlier (fifteen to twenty years prior) involvement with Lynnette, but Plaintiffs have countered this allegation (DE #224-11, p. 1), and it is undisputed that the children were returned to Lynnette with no findings of abuse against her. DCS also references the October 11, 2005, investigation into the allegation that the Finnegan household did not have sufficient food for the children, but it is undisputed that the report was unsubstantiated. It was therefore not a reasonable assumption that Jessica's death on December 20, 2005, placed her siblings in immediate jeopardy such that they needed to be seized and interviewed for five to six hours in order to "protect" them as the State Defendants claim. Against these facts, at the very least, there is a genuine dispute as to whether the State Defendants' actions were unreasonable. See *Doe*, 327 F.3d

39

at 514 ("[T]he seizure of a child by a government official on private property . . . is only reasonable if it is: (1) done pursuant to a court order; (2) supported by probable cause; or (3) justified by exigent circumstances, meaning that state officers had reason to believe that life or limb was in immediate jeopardy.") Even if not presumptively unreasonable, the State Defendants have not established that their actions were reasonable pursuant to a compelling interest in this case. See *Id*. at 515 (the state's general interest in protecting children from abuse is not enough to tip the balance in their favor; the government officials must show "some definite and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse.") Here, the State Defendants have not presented sufficient evidence that, on the day of the seizures, a reasonable caseworker would have believed that Jessica's death was related to any abuse or neglect; thus, when viewed objectively, a caseworker of reasonable caution could not have believed that Jonathon, Tabitha, and Katelynn faced an immediate threat of abuse at the time of their seizure based on the facts presented. Summary judgment is inappropriate.

Because the Court has determined that trial is necessary on at least one of Plaintiffs' Fourth Amendment search and seizure claims, it is unnecessary to analyze the additional Fourth Amendment claims in detail in this opinion. Suffice it to say,

after reviewing the parties' briefs and the evidence as a whole, the Court is convinced that genuine disputes remain as to whether the State Defendants acted reasonably during the rest of those alleged seizures.

<u>Fourteenth Amendment Rights to Due Process</u>

Plaintiffs have alleged that the State Defendants deprived them of their due process rights by refusing to comply with laws that protect "the constitutional rights to family relations, including the parents' right to raise their children and the children's right to be with their parents." The State Defendants now argue that it is undisputed that they did not violate any of Plaintiffs' substantive due process rights because they had "definite and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse." They also assert that their interest in ensuring that the children were not victims of abuse overrides any procedural due process claims. Plaintiffs argue that their due process claims withstand summary judgment.

*Substantive Due Process*

As this Court has found in its previous order on Defendant Antoinette Laskey's motion for judgment on the pleadings (DE #61) and as conceded by the State Defendants (DE #126, p. 22), due

process does encompass a parent's liberty interest in familial relations. *See Troxel v. Granville*, 530 U.S. 57, 65 (2000) (collecting cases); *M.L.B. v. S.L.J.*, 519 U.S. 102, 116 (1996); *Brokaw,* 235 F.3d at 1018 (reiterating "[t]he Supreme Court has long recognized as a component of substantive due process the right to family relations."). Although the Government has an interest in protecting children from abuse, the State does not have an interest in protecting children from their parents "unless it has some definite and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse." *Brokaw*, 235 F.3d at 1019 (citation omitted).

The State Defendants begin by arguing that *Brokaw* dictates that an initial removal of a child should be considered under the rubric of the Fourth Amendment, not under the rubric of substantive due process. *Brokaw*, 235 F.3d at 1017-18. While true, the State Defendants ignore that here, as in *Brokaw*, Plaintiffs have also alleged separate and distinct violations based upon the nearly nine month detention of the girls following their seizure in November of 2006. "This forced separation implicates substantive due process, or more specifically [the girls'] constitutional right to familial relations." *Id*. at 1018.

While the State Defendants assert that Plaintiffs' substantive due process rights were not violated because it is undisputed that they had "definite and articulable evidence giving rise to a

reasonable suspicion that a child has been abused or is in imminent danger of abuse," the Court disagrees. As described in the preceding sections, Plaintiffs have proffered evidence that, prior to Jessica's death, the Finnegans were consistent with Jessica's medical care, compliant with the school and DCS' requests, and that all requested information had been submitted to DCS yet had been ignored. DCS' investigation into the allegations that the Finnegan household lacked food for the children was found to be unsubstantiated. It is undisputed that, on the day Jessica died, DCS interviewed the children about issues relating to Jessica's condition prior to her death, her illness, and other matters, and yet determined that it was not necessary to remove them from the Finnegans' home at that time. Indeed, despite the State Defendants' claims that Jessica's death immediately aroused suspicions, DCS' own case notes indicate that the Coroner spoke with Defendant McAninch and informed her that the post-mortem examination of Jessica's body showed no signs of trauma except for "normal medical things" and that he fully expected the death to be related to natural causes. (DE #201-29, p. 4.) Importantly, there is no evidence in the record to suggest that Tabitha and Katelynn were abused or were doing anything other than well in the year following Jessica's death.

While it is true that Dr. Cavanaugh's May 2006 Report of Autopsy lists the cause of death as blunt force injury of the head

and references a right anterior basal skull fracture, Dr. Cavanaugh did not ever classify the death as a homicide or state that Jessica's injuries were likely due to an assault. (DE #243-10, p. 17-18, 21, 28.) Even in his November 2, 2006, letter to DCS which states that the extent of Jessica's injuries was "inconsistent with a simple fall," Dr. Cavanaugh noted that the manner of death was "undetermined." (DE #224-32.) And, as described more fully in this Court's opinion and order on Dr. Laskey's Motion for Summary Judgment at pages 30-36, there are serious disputes related to the accuracy of Dr. Laskey's findings detailed in her October 28, 2006, report (e.g. that the manner of Jessica's death was consistent with homicide and that Jessica sustained a fatal beating on the day she died which was the direct cause of her death) and the appropriateness of DCS' reliance on those findings to trigger the girls' removal from the Finnegan home based on the communications between Dr. Laskey and DCS during the period in question (e.g. that, with the exception of Dr. Laskey, DCS was aware that no one "other than the local Director and FCM" believed that Jessica had died from physical abuse). (See DE #201-4; DE #224-8, p. 1; DE #224-31, p. 1; DE #224-1, p. 1.)

Furthermore, in the months following the girls' removal from the Finnegans' home, Plaintiffs have presented evidence that the State Defendants were advised of the prescription error (DE #224-2) and knew that additional information had surfaced challenging Dr.

44

Laskey's report (e.g. DE #224-4; DE #224-14), yet continued to hold the girls. Even after receipt of both Dr. Cavanaugh's July 11, 2007, email – reporting "significant new information" that affected the claims that Jessica was beaten to death (DE #224-40) and the Coroner's Verdict ruling that Jessica had died an accidental death from the prescription errors and that the skull fractures were artifacts of the first autopsy (DE #224-26, pp. 183-84), DCS continued to detain Tabitha and Katelynn and press its claims against the Finnegans.

Based on the foregoing, the State Defendants' assertion that it is undisputed that they had "definite and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse" sufficient to remove Tabitha and Katelynn from the Finnegans' home for a period of nine months is unavailing. Plaintiffs' claims of Fourteenth Amendment substantive due process violations withstand summary judgment.


*Procedural Due Process*

The State Defendants also argue that Plaintiffs have failed to establish that any of their procedural due process rights were violated. Plaintiffs disagree.

The Seventh Circuit has made it clear that:

> [i]n contrast to substantive due process claims, in procedural due process claims, the deprivation by state action of a constitutionally protected interest in life,

> liberty, or property is not in itself
> unconstitutional; what is unconstitutional is
> the deprivation of such an interest without
> due process of law.  Thus, a procedural due
> process claim involves a two-part analysis:
> First, we determine whether the defendants
> deprived the plaintiff of a protected liberty
> or property interest, and if so, then we
> assess what process was due.

*Brokaw*, 235 F.3d at 1020 (internal citations, brackets, and quotation marks omitted).  In cases where parental rights and/or a child's right to be nurtured by his parents is at issue, due process requires an "opportunity for them to be heard at a meaningful time and in a meaningful manner." *Id.* (citing *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976).  "[N]o matter how much process is required, at a minimum, it requires the government officials not misrepresent the facts in order to obtain the removal of a child from his parents." *Id.* (citing *Malik v. Arapahoe Cnty. Dep't of Soc. Servs.*, 191 F.3d 1306, 1315 (10th Cir. 1999)).

Here, Plaintiffs have presented evidence that, when viewed in the light most favorable to them, shows that the State Defendants misrepresented the facts in order to obtain the removal of Tabitha and Katelynn.  Namely, email communications between Dr. Laskey and Defendant McAninch in late October establish that DCS was aware Dr. Laskey was alone in her opinion that Jessica's death was consistent with a homicide, yet proceeded to use it as the basis for the removal anyway.  (See DE #224-31, p. 1; DE #224-1, p. 1.)  While the State Defendants argue that DCS was justified in relying on Dr.

Laskey's expert opinion, that is subject to dispute. Given the lack of evidence of any abuse or neglect described in the preceding sections (along with DCS' acknowledgment that Dr. Laskey's opinion was not shared by anyone but DCS employees) it may certainly be inferred that the State Defendants intentionally misrepresented and/or withheld facts to obtain the result they desired.

Furthermore, evidence exists that, once the girls were removed, Tabitha was denied meaningful access to the CHINS court and the Coroner's Inquest. In her declaration, Tabitha contends that, after being removed from her home, she "knew that [Roman and Lynnette] hadn't hurt Jessica and I asked quite a few times to talk to the judge. I was told repeatedly that it wasn't time for that yet." (DE #224-19, p. 3.) Judge Blankenship's decision describes the underlying proceedings such that "Tabitha was not allowed to attend or testify in the CHINS proceedings or the Coroner's Inquest despite her desire to do so" and despite the Coroner's subpoena. (DE #130-2, p. 33.) In his declaration, the Coroner describes how he wished to speak with the girls regarding Jessica's condition in the days and weeks before her death, but agreed to withdraw his subpoena when he was informed via a motion to quash that the girls had "no useful information" and that "talking about their sister's death would adversely affect their mental health." (DE #224-20, p. 4.) He continues by stating, "I did not know at the time that DCS and ISP were already having the older girl relive her sister's

death in therapy and police interrogations, nor did I know that DCS had given a tape of an interview of the siblings on the day of Jessica's death to ISP." (*Id.*; see also Tabitha's declaration describing the interviews and interrogations at DE #224-19, pp. 1-5.) The Coroner also declares that:

> [i]f Tabitha and Katelynn had been allowed to testify at the February 21 Inquest, however, it is likely that I would have learned that they saw only flu-like symptoms in the days before death and that they were being provided with false information. This would have allowed me to conclude my investigation and produce a Verdict much earlier, likely averting the continued detention of the girls and the arrests of the mother and stepfather.

(DE #224-20, p. 4.) A reasonable jury may conclude that the State Defendants denied Tabitha an opportunity to be heard at precisely when it would have made a meaningful difference in the girls' continued detention.

Additionally, Plaintiffs have presented evidence that, if believed, shows the State Defendants consistently ignored exculpatory evidence and went so far as to deliberately withhold it from the Finnegans, the Coroner, and the courts during the post-deprivation process. (See e.g. DE #224-20, p. 4; DE #224-2; DE #224-4; DE #224-14; DE #224-40.) While the State Defendants try to pigeonhole these claims into a *Brady*[5] analysis in order to argue that the they should be absolved of liability due to the functional

---

[5] See *Brady v. Maryland*, 373 U.S. 83 (1963).

differences between caseworkers/detectives and prosecutors, the Court finds that these actions and/or inactions of the State Defendants fit squarely within the type of constitutionally inadequate post-deprivation processes described in *Brokaw*. See *Brokaw*, 235 F.3d at 1021.

For the aforementioned reasons, the Court finds that summary judgment is inappropriate on Plaintiffs' procedural due process claims.[6]


## 42 U.S.C. Section 1983 Conspiracy

The State Defendants argue that Plaintiffs offer no evidence that a conspiracy to create a case against the Finnegans existed.

_____

[6] While not determinative on this Court's decision to deny summary judgment, the Court notes that Judge Blankenship's decision describes the process in the underlying proceedings as follows:

> In addition to this obvious substantive problem, the record contains reports of numerous procedural irregularities . . . beginning with the six hour detention of the children for questioning on the day of Jessica's death, and culminating in nine months of detention in 2006-2007 that appeared to be largely if not entirely designed to obtain information from the children, rather than to protect them. The Finnegans also state (and DCS largely does not contest) that DCS did not provide case plans in a timely manner, did not allow Tabitha to participate in the CHINS proceedings, denied relative placement for what appear to be spurious reasons, failed to provide evidence to support the amended Petitions or continued detention in May 2007, had at least one *ex parte* contact with the Court in an effort to prevent reunification, offered Tabitha college funding if she would agree to remain in foster care rather than return home, and generally made reunification as difficult as possible . . . this pattern of conduct not only constituted bad faith but deprived the Finnegans of the due process of law guaranteed by the U.S. and Indiana constitutions.

(DE #130-2, pp. 69-70.)

Plaintiffs dispute this argument and outline the basis for their detailed conspiracy theory in their response brief. (DE #234-3, pp. 29-34.)

A civil conspiracy under section 1983 involves an agreement or understanding among more than one person that the individuals will violate another person's constitutional rights. See *Reynolds v. Jamison*, 488 F.3d 756, 764 (7th Cir. 2007). Put another way, the state officials involved in the conspiracy must reach an understanding as to the conspiracy and willfully participate in its activity. See e.g. *Lewis v. Mills*, 677 F.3d 324, 333 (7th Cir. 2012). Although a conspiracy can be established by circumstantial evidence, it cannot be based purely on speculation. See *Williams v. Seniff*, 342 F.3d 774, 785 (7th Cir. 2003).

Here, although the State Defendants argue that there is no evidence to support the existence of a conspiracy, Plaintiffs have presented circumstantial evidence that, if believed, could lead a reasonable jury to conclude that the State Defendants, Dr. Laskey, and Dr. Cavanaugh had reached an understanding to deprive Plaintiffs of their constitutional rights and that they participated willingly in furtherance of that goal. For example, emails between Dr. Laskey and DCS in October of 2005 show that, Defendant McAninch had expressed gratitude to Dr. Laskey that "someone other than the local Director and FCM" agreed that Jessica died from abuse. (DE #224-31, p. 1.) Dr. Laskey implicitly

acknowledged the lack of additional evidence to support that theory when she doubled down and replied:

> EVEN IF this child fell out of bed and IF she in fact had easier bleeding due to her meds, there IS NO WAY she would have sustained these injuries from a fall. In fact, I am contacting Dr. Cavanaugh to find out why he isn't calling it a homicide. This is NOT an ambiguous case.

(*Id.*) It is reasonable to infer that Dr. Laskey was intent on strong-arming Dr. Cavanaugh into the agreement between herself and DCS when, on October 24, 2006, she emailed Defendant McAninch to let her know that she was going to "contact[] Dr. Cavanaugh to find out why he isn't calling it a homicide. This is NOT an ambiguous case." (DE #224-1, p. 1.) Although Dr. Laskey rendered her report without having yet spoken with Dr. Cavanaugh (DE #169-7, p. 24), the timing of Dr. Cavanaugh's November 2, 2006, fax to Defendant McAninch (within days of Dr. Laskey's above email) suggesting for the first time that the "extent of [Jessica's] injuries is inconsistent with a simple fall of approximately two feet from a bed" could be viewed as suspicious.

In addition, Plaintiffs have presented evidence that, by December 18, 2006, both DCS and Dr. Laskey knew of the prescription error and its potential significance (DE #224-13) and, by that late spring to early summer of 2007, were aware that even more information had surfaced calling Dr. Laskey's findings into serious question (see e.g. DE #224-14; DE #224-4; DE #224-24). In April of

2007, Dr. Laskey communicated with Sheryl Pherson, DCS's retained local counsel in the CHINS and subsequent proceedings ("Pherson"), regarding her deposition, stating:

> So what is the deal, do I stick only to what I knew based on the info previously reviewed and my existing report or do I need "new" info? Additionally, you should know that 7mg of Coumadin would not kill a horse, or a person. There are people who take that dose. Whether Jessica was or not is questionable.

(DE #224-4, p 2. .) Pherson responded to Dr. Laskey, noting that "[o]bviously, your opinion could change based upon additional information, including the second autopsy, but you don't have that information at this time. You are not required to review [Plaintiffs' counsel's] 3 volumes of crap prior to your deposition, and so I decided not to provide it to you." (*Id.*) (See also DE #226.) In her August 18, 2011, deposition, Dr. Laskey testified that she was aware that numerous people disagreed with her findings yet she did not ever correct or update her report (see e.g. DE #224-44, pp. 5-8), and DCS did not move to withdraw it.

Furthermore, as described more fully (with citations to the record) in this Court's opinion and order on Dr. Cavanaugh's motion for summary judgment, evidence has been presented to show that Dr. Cavanaugh was also aware from early on that a prescription error existed calling into question both Dr. Laskey and his own later findings, that all parties were aware that CHINS proceedings had been instituted and that Tabitha and Katelynn were being detained

by DCS, that material exculpatory evidence relevant to Jessica's death and the girls' detention was reviewed and/or received by Dr. Cavanaugh, that he withheld such evidence from everyone except for DCS, and that DCS condoned and willfully participated in the withholding of this evidence. Importantly, on July 11, 2007, Dr. Cavanaugh sent an email only to Pherson which stated, in part:

> Thought I'd give you a heads-up on the final report. Although I didn't go into detail in the report, there has been some significant new information that changes certain opinion details: . . . 2. There is both new and old bleeding in the skull - certain portions of the clot examined microscopically after the 2nd autopsy (more specimens submitted) look to be in the 5-10 day range or older. This means more than one bleeding episode, with possibly 2 weeks of noticeable neurologic symptoms and/or pathologic bleeding. The scalp contusions also appear to be of two different ages. 3. Portions of the skull fracture are indeed autopsy artifact. . . .

(DE #40.) This information was not submitted to the Coroner or Plaintiffs; the next day, instead of acknowledging or addressing these "significant new findings," DCS moved for a continuance of the factfinding hearing, and the hearing was changed to a detention hearing on the amended CHINS petitions.

Finally, Plaintiffs point to emails concerning the Coroner's Inquest to show that DCS and Defendant McDonald were working together to prevent the girls from being interviewed by the Coroner. (DE #230.) Defendant Myers voiced her concerns regarding the Coroner's subpoena to Stephanie Beasley, who forwarded the

email to others including Defendant Payne. (*Id.* at 1.) On February 22, 2007, Myers sent an email stating:

> Yesterday I spent nearly 2 hours with ISP regarding the investigation and ramifications if in fact the Coroner's inquest went forward. It was their position that if the inquest occurred and family members were allowed to testify etc. the criminal investigation would be compromised beyond repair. . . . ISP was prepared to end their investigation if in fact today's inquest was held. Following our meeting, the PA and ISP met with the Coroner in an effort to convince him to cancel or even postpone the inquest until the medical results were in, the investigation was completed and/or fact finding was held. After multiple phone calls to me and 5 hours later, he did agree to halt the inquest. . . . So, the roller coaster is going uphill again!! I spoke with ISP late last night and they are back on track and will continue their investigation.

(*Id.* at 2.) By that time, as Plaintiffs point out, there is evidence in the record to show that DCS and Defendant McDonald knew of the prescription error and its significance and had access to medical records that called into question any findings of abuse. As noted preceding section, the fact that Tabitha was prevented from testifying in the CHINS proceedings or Coroner's Inquest was significant, especially in light of the fact that Defendant McDonald, Defendant McAninch, and others had been interviewing the girls regarding Jessica's death for some time. (See DE #224-19, p. 3; DE #224-20, p. 4; DE #224-19, pp. 1-5.) And, Tabitha's declaration calls into question the veracity of Defendant McDonald's reporting of those interviews and her April probable

cause testimony, which makes the State Defendants' "concern" over the Coroner's subpoena and the meeting between Defendant Myers and ISP all the more questionable. (DE #224-19, pp. 3-4; see also DE #224-17, p. 2; DE #224-26.)

Therefore, because the Court has found genuine disputes precluding summary judgment on Plaintiffs' constitutional claims, and, considering Plaintiffs' allegations in the First Amended Complaint of a continuous and growing conspiracy existing from September of 2005 through May of 2010 (see also DE #234-3, pp. 31-34) along with the circumstantial evidence presented above, the Court finds that a reasonable juror could conclude that the State Defendants, Dr. Laskey, and Dr. Cavanaugh entered into a conspiracy, reached an understanding to deprive Plaintiffs of their constitutional rights, and willfully participated in the conspiracy's activity. There are genuine disputes that preclude summary judgment as to Plaintiffs' section 1983 conspiracy claims.


Statute of Limitations as to Jonathon's Claims

The State Defendants argue again, as they have done twice before this Court, that Jonathon's claims are time-barred. Plaintiffs contend that, at a minimum, there is a factual question for the jury as to when Jonathon knew or should have known that his constitutional rights had been violated.

As aptly set forth in Judge Nuechterlein's June 5, 2012, order

(DE #90), the statute of limitations for section 1983 claims is determined by the statute of limitations for personal injury actions in the state where the incident forming the basis of the action occurred. *King v. One Unknown Fed. Corr. Officer*, 201 F.3d 910, 913 (7th Cir. 2000). Indiana has a two year statute of limitations for personal injury actions. Ind. Code § 34-11-2-4. Although state law governs the length of the statute of limitations period, federal law governs when section 1983 claims accrue. *Savory v. Lyons*, 469 F.3d 667, 672 (7th Cir. 2006). "First, a court must identify the injury. Next, it must determine the date on which the plaintiff could have sued for that injury." *Hileman v. Maze*, 367 F.3d 694, 696 (7th Cir. 2004). That is the date the plaintiff knew or should have known that his constitutional rights had been violated. *Id*.

In response to the State Defendants earlier argument regarding this same issue, Judge Nuechterlein ruled as follows:

> Finnegan argues that at the earliest, Johnathon Abair knew or should have known that his constitutional rights had been violated when the underlying DCS case reached a final disposition on May 14, 2010. Finnegan argues that Johnathon Abair was not aware that his rights had been violated because he was not a party to the underlying action, did not retain counsel, never attended any hearings, never received therapy, and did not have access to the information related to the case. As a result, Abair was not aware that the claims against his parents were invalidated and that statements made to him that resulted in his estrangement were false. Thus, although Abair suffered the injury in 2007 when speaking to

> police about his sister's death, he could not
> have sued for that injury until he knew the
> statements were false, which occurred at the
> earliest on May 14, 2010. See Hileman, 367
> F.3d at 696. Finnegan filed this motion to
> amend on May 13, 2012, within the two-year
> statute of limitations. The Court finds that
> Finnegan has made the requisite showing that
> leave to amend the complaint would not be
> futile as it relates to adding Johnathon Abair
> as a plaintiff.

(DE #90, pp. 3-4.) This Court agreed with Judge Nuechterlein's ruling and overruled the State Defendants' objection. (DE #105, pp. 5-6.)

As to Jonathon, Plaintiffs' First Amended Complaint alleges that he had a good relationship with his mother and stepfather until January 29, 2007, when "Det. McDonald told him, falsely, that Jessica had been murdered and that his mother and stepfather were blaming him. These false claims destroyed Johnathon's relationship with his parents." (DE #91, p. 92.) The First Amended Complaint alleges that "Jonathon did not learn that Det. McDonald had provided him with false information and had falsely reported on the information that he had provided until the night before his August 2011 deposition." (*Id.* at 93.) Jonathon's declaration supports these assertions. (DE #224-17.) Defendant McDonald testified that she did indeed tell Jonathon that his mother was blaming him for Jessica's death. (DE #224-45.) Jonathon maintains that, as a result of Defendant McDonald's interrogation and false statements, he "did not speak to his parents for several months and we remained

quite distant for years." (DE #224-17, p. 2.) In their reply brief, the State Defendants attempt to create a dispute as to these statements, but the Court finds that Jonathon's deposition testimony does not conflict with his declaration.[7] Jonathon declares that he did not know who to trust until he began preparing for his August 2011 deposition and was confronted with Defendant McDonald's reports that "took liberties with the truth." (*Id.*; see also DE #224-19, pp. 3-6.) Finally, Jonathon points out that he was not represented in the prior CHINS proceedings, never attended any hearings, never received any therapy, and did not have access to even the limited information provided to his sisters. (DE #224-17, p. 1.) The State Defendants do not counter any of this evidence. Thus, the Court need not revise its previous rulings that Jonathon's claims were timely filed. (See DE #90, pp. 3-4; DE #102, pp. 5-6; DE #152, pp. 42-43.)


### Whether The State Defendants are Entitled to Immunity

The State Defendants assert that Defendant McAninch, Defendant Salyers, Defendant Myers, and Defendant McDonald are entitled to

---

[7] The State Defendants assert Jonathon testified that his relationship with Lynnette "had improved" after high school graduation, so he should have been aware that Defendant McDonald's statements were false by 2007. (DE #250, pp. 12-13.) However, the cited testimony actually establishes that Jonathon left for college and recalled having a "pretty good standstill with my mom, so - " (DE #250-1, pp. 2-3.) He agreed it had gotten better after he moved out because not being in the same household helped. (*Id.*) This testimony is not inconsistent with Jonathon's assertion that his relationship with his family suffered for years following the interrogation.

absolute, quasi-judicial immunity and/or qualified immunity for their actions.  Plaintiffs disagree.

*Absolute Immunity*

Because it is a complete defense to liability, "[a]bsolute immunity from civil liability for damages is of a rare and exceptional character," *Auriemma v. Montgomery*, 860 F.2d 273, 275 (7th Cir. 1988) (quotation omitted), and there is a presumption against granting it to government officials.  *Houston v. Partee*, 978 F.2d 362, 365 (7th Cir. 1992).  The burden of establishing absolute immunity rests on its proponent, who must show that overriding considerations of public policy require that the defendant be exempt from personal liability for unlawful conduct. *Auriemma*, 860 F.2d at 275; *Walrath v. United States*, 35 F.3d 277, 281 (7th Cir. 1994).

Here, the State Defendants argue that they are entitled to absolute immunity for actions taken in submitting petitions, requests for orders, and formulating and making recommendations to the Court.  Plaintiffs previously conceded that "the DCS defendants are entitled to immunity for in-court testimony and some aspects of court preparation," yet those actions constitute a small part of the actions Plaintiffs allege violated their Constitutional rights. (DE #130, p. 35.)

As noted in this Court's previous opinion and order (DE #152,

p. 38), it is undisputed that Defendant McAninch was the only DCS defendant who testified in the CHINS proceedings, and she had a limited role. Rather, when looking at the nature of the function performed by the State Defendants, Plaintiffs point out their numerous allegations of reckless investigatory and out of court actions, which involve factual disputes and have been described in detail by the Court above.[8] These are out of court acts to which the State Defendants are not entitled immunity. *See, e.g., Brokaw*, 235 F.3d at 1012 (if defendants knew allegations of child neglect were false or withheld material information but nonetheless caused the child's removal from the home, they violated the Fourth Amendment and absolute immunity does not protect a social worker for her role in gathering evidence or initiating the child's removal); *Millspaugh v. Cnty. Dep't Of Pub. Welfare of Wabash Cnty.*, 937 F.2d 1172, 1176 (7th Cir. 1991) (holding "absolute immunity does not protect the gathering of evidence [by a social

---

[8] These actions include: the December 5, 2005, substantiation of medical neglect; the detention of the family on December 20, 2005; the retention of an allegedly unqualified pediatrician in October 2006 to subvert the Coroner's investigation; the seizure of the girls on November 1, 2006, for investigative purposes; the placement of the girls in a secret out-of-county location and refusal to consider relative placement; the refusal to comply with the Coroner's subpoenas; the direction of nine months of investigatory therapy designed to interrogate the girls as to Jessica's death; the failure to consider exculpatory information; the March 23, 2007, substantiation of death from physical abuse for Jessica and life/health endangering conditions for her siblings which was based on false information and omitted exculpatory information (including prescription errors and expert affidavits); the May 25 amendment of the CHINS petition and continued detention of the girls; the concealment of exculpatory information including information from Dr. Cavanaugh on July 11; the refusal to return the girls on August 3, as ordered by the court; and the confirmation of the substantiations and addition of new substantiations on December 13, 2007.

worker]"); *Pelham v. Albright*, No. 3:11-cv-99, 2012 WL 1600455, at *7 (N.D. Ind. May 4, 2012) (denying absolute immunity for investigatory actions). As such, the State Defendants have failed to satisfy the heavy burden that they are entitled to absolute immunity.

*Qualified Immunity*

The State Defendants also contend that they are entitled to qualified immunity. Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "The contours of a clearly established right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Sivard v. Pulaski Cnty.*, 17 F.3d 185, 189 (7th Cir. 1994) (quotation omitted). "[A] plaintiff need not always identify a closely analogous case; rather, he can establish a clearly established constitutional right by showing that the violation was so obvious that a reasonable person would have known of the unconstitutionality of the conduct at issue." *Brokaw v.*

*Mercer County*, 235 F.3d at 1022.[9]   Thus, this standard provides ample protection "to all but the plainly incompetent or those who knowingly violate the law." *Millspaugh*, 937 F.2d at 1176 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

As they did in their motion to dismiss, the State Defendants claim they did not knowingly violate the law and that their actions were reasonable; thus, they assert, as state actors, they are entitled to qualified immunity.   The State Defendants argue that, although Plaintiffs allege that DCS presented false information to the prosecutor and the court, "Plaintiffs' characterization of the information as false is solidly and exclusively from their perspective."   This is belied by the material factual disputes in

---

[9]   "Specifically, a reasonable person would have known that it was unconstitutional to use the government's power to cause, or conspire to cause, the unjustified removal of a six-year-old child from his parents in order to destroy the family, based simply on the family's religious beliefs. Cf. *Morris v. Dearborne*, 181 F.3d 657, 668 (5th Cir. 1999) ("It is beyond purview that any rational teacher could believe that governmental destruction of a family based on fabricated evidence is constitutionally allowed."); *id.* at 672 (making knowingly false statements of child neglect violates clearly established constitutional right to familial relations); *Malik*, 191 F.3d at 1316 ("[I]t is clearly established law that government official's procurement through distortion, misrepresentation and omission of a court order to seize a child is a violation of the Fourth Amendment.") (internal quotation omitted). Moreover, even if the individual defendants did not know the allegations of neglect were false, qualified immunity may still not protect them because, depending on the nature of the claims of neglect, it may well be that a reasonable law enforcement official would recognize that [plaintiff's] pre-hearing, pre-investigation seizure violated the Fourth Amendment. See, e.g., Good, 891 F.2d at 1094–95 (denying defendants' claim of qualified immunity because a reasonable person should have known that warrantless search was unconstitutional given that allegations of neglect would not cause a reasonable person to believe the child was in imminent danger of serious bodily injury); *Franz v. Lytle*, 997 F.2d 784, 791–92 (10th Cir. 1993) (no reasonable officer would believe that he could visually and physically inspect two-year old child's vagina based on one complaint that the child had a severe diaper rash)."   Brokaw, 235 F.3d at 1022-23.

the record as described above. Evidence has been presented that could lead to a finding that DCS arbitrarily and capriciously substantiated medical neglect against the Finnegans as to Jessica in retaliation for Roman's grievance letter and in doing so, ignored and withheld medical evidence to the contrary. And, as noted repeatedly throughout this opinion, genuine disputes exist as to whether it was reasonable rather than intentionally misleading to rely on Dr. Laskey's report as a basis for seizing the girls, considering both DCS and Dr. Laskey acknowledged that no one else (including the Coroner, Dr. Cavanaugh, and initial law enforcement investigators) agreed with it. There are also disputes as to whether the State Defendants consistently ignored exculpatory information and/or refused to disseminate it to the relevant fact finders, even when it became clear that the medical evidence confirmed it was not possible for Jessica to have suffered a fatal beating on the day of her death. When state actors use the government's power to cause, or conspire to cause, the unjustified removal of children based on retaliatory or other nefarious motives in order to destroy a family, those actors are not entitled to qualified immunity; neither are those who distort, misrepresent, and omit material information in order to seize a child. See *Brokaw*, 235 F.3d 1022-23.

Finally, as to Defendant McDonald specifically, the State Defendants argue that she is entitled to qualified immunity because

she did not knowingly or recklessly submit an affidavit with false statements. However, as Plaintiffs point out, it is disputed as to whether Defendant McDonald had an objectively reasonable basis for believing the facts in her affidavit were true. Both Tabitha and Jonathon have declared that she misrepresented their statements, and evidence exists to show that Defendant McDonald conspired with DCS to withhold relevant information (including access to the girls' interviews) from the Coroner. As such, the State Defendants' motion for summary judgment with respect to immunity is denied.

In closing, the Court notes that this case is particularly appropriate for resolution by trial. There is a voluminous amount of disputed material evidence that is inappropriate for summary adjudication.

CONCLUSION

For the reasons set forth above, the Motion for Summary Judgment (DE #200) and the Motion to Strike Plaintiffs' Inadmissible Evidence (DE #248) are **DENIED**.

DATED: September 8, 2015          **/s/ RUDY LOZANO, Judge**
                                 **United States District Court**