```
               IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF INDIANA
                        SOUTH BEND DIVISION
```

ROMAN FINNEGAN, *et al.*,        )
                                 )
Plaintiffs,                      )
                                 )
vs.                              )   NO. 3:08-CV-503
                                 )
LAUREL MYERS, *et al.*,          )
                                 )
Defendants.                      )

## OPINION AND ORDER

This matter is before the Court on the Motion to Exclude or Limit Testimony of Eight of Plaintiffs' Expert Witnesses, filed by the State Defendants on October 17, 2014 (DE #205). For the reasons set forth below, the motion is **GRANTED IN PART** and **DENIED IN PART** as described in the body of this order.

BACKGROUND

Plaintiffs, Roman Finnegan, Lynnette Finnegan, Jonathon Abair, Tabitha Abair, and Katelynn Salyer (collectively, "Plaintiffs"), have sued several defendants in this case, including the following State Defendants: Laurel Myers, the Director of the Pulaski County Department of Child Services ("DCS") during the period in question ("Defendant Myers"), Regina McAninch, an investigator and caseworker for DCS ("Defendant McAninch"), Tracy Salyers, a family

case manager for DCS ("Defendant Salyers"), Reba James, a regional manager for the Department of Child Services ("Defendant James"), James Payne, former director of the Department of Child Services ("Defendant Payne"), and Jennifer McDonald, an Indiana State Police detective ("Defendant McDonald"). The claims involve the State Defendants' interactions with Plaintiffs over the course of several years related to the treatment and death of fourteen year old Jessica Salyer ("Jessica"). The State Defendants have filed the current motion seeking to exclude or limit the testimony of several of Plaintiffs' experts. Initially, the State Defendants objected to eight of Plaintiffs' experts, but they withdrew their motion as to five of those witnesses in their reply brief (DE #260); thus, only three experts remain in dispute, namely Bruce L. Lambert, Ph.D. ("Professor Lambert"), Shaku S. Teas, M.D. ("Dr. Teas"), and James A. Kenny, Ph.D. ("Dr. Kenny").

**DISCUSSION**

Federal Rule of Evidence 702, which governs expert testimony, provides the following:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based upon sufficient facts or data; (c) the testimony is

2

> the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

F.R.E. 702. In addition, in *Daubert v. Merrell Dow Pharms., Inc.*, the Supreme Court fashioned a two-prong test of admissibility for evidence based on the "scientific knowledge" mentioned in Rule 702. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 (1993). To be admissible, evidence must be both relevant and reliable. *Id.* at 589; *see also Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999) (noting the objective of court's gatekeeping requirement is to ensure reliability and relevancy of expert testimony).

Under the reliability prong, scientific evidence must be reliable in the sense that the expert's testimony must present genuine scientific knowledge. *Daubert*, 509 U.S. at 592-93; *Deimer v. Cincinnati Sub-Zero Prods. Inc.*, 58 F.3d 341, 344 (7th Cir. 1995). Generally, the expert witness must employ in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the witness's field. *Kumho*, 526 U.S. at 152. Specifically, a court may, but is not required to, consider a nonexclusive list of four factors in assessing reliability: (1) whether the expert's theories and techniques can be verified by the scientific method through testing; (2) whether the theories and techniques have been subjected to peer review and publication; (3) whether the theories and techniques have been evaluated for their potential rate of error; and (4) whether the theories and

techniques have been generally accepted by the relevant scientific community. *Daubert*, 509 U.S. at 593-94.

However, it is important to note that "the measure of intellectual rigor will vary by the field of expertise and the way of demonstrating expertise will also vary." *Tyus v. Urban Search Mgmt.*, 102 F.3d 256, 263 (7th Cir. 1996). As the Seventh Circuit pointed out in *United States v. Allen*, 269 F.3d 842, 846 (7th Cir. 2001), the Advisory Committee notes to Rule 702 note that "[i]n certain fields, experience is the predominant, if not the sole, basis for a great deal of reliable expert testimony." Fed. R. Evid. 702, 2000 advisory committee notes. "[T]he test of reliability is 'flexible,' and *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Kumho Tire Co., Ltd.*, 526 U.S. at 141-42.

Under the relevance prong, the testimony must assist the trier of fact to understand the evidence in the sense that it is relevant to or "fits" the facts of the case. *Daubert*, 509 U.S. at 591; *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). In other words, the testimony must be such that the jury can apply it in a meaningful way to the facts at hand. This "fit" analysis essentially represents an inquiry similar to if not indistinguishable from the basic evidentiary inquiries into whether evidence is relevant and, if so, whether its probative value is nonetheless substantially outweighed by, among others, the danger

4

of unfair prejudice and jury confusion.  *See Daubert*, 509 U.S. at 595; *Ayers v. Robinson*, 887 F. Supp. 1049, 1058-59 (N.D. Ill. 1995).

In this case, as noted above, the State Defendants have objected to the testimony of Professor Lambert, Dr. Teas, and Dr. Kenny.  The Court will address each objection in turn.

*Professor Lambert*

In their motion, the State Defendants ask that Professor Lambert's testimony be stricken or limited because they argue that there is no way to determine the reliability of his testimony and because he fails to provide an adequate basis for his opinions. They assert that his report is "sketchy and vague," and they take issue with his alleged lack of methodology, especially in light of the fact that he only reviewed "some" of the pharmaceutical information.  Ultimately, the State Defendants argue that "[i]t is impossible to test the reliability of [Professor Lambert's] conclusions when he provides no methodology or even analysis as to how he was able to make that conclusion when his review of the documents was severely limited." (DE #217-1, p. 9.)  Even if not totally excluded, the State Defendant's request that Professor Lambert's testimony be limited to the discussion of prescription

5

errors.[1]  Plaintiffs, on the other hand, argue that Professor Lambert is a leading national expert on prescription errors, and that his review of the relevant prescription records, along with the literature on warfarin, was sufficient to provide him with the information he needed to make a clear and concise report regarding the alleged errors in this case.

To the extent that the State Defendants take issue with Professor Lambert's credentials, the Court has considered his qualifications and finds them sufficient for purposes of this motion.  See *United States v. Vitek Supply Corp.*, 144 F.3d 476, 486 (7th Cir. 1988) ("Because an expert's qualifications bear upon whether he can offer special knowledge to the jury, the *Daubert* framework permits - indeed, encourages - a district judge to consider the qualifications of a witness.")  As Plaintiffs point out, although Professor Lambert's Ph.D. is in communications rather than medicine, he was a Professor in the Department of Pharmacy Administration and Clinical Professor of Pharmacy Practice at the University of Illinois at Chicago for over twenty years.  (DE #243-1, pp. 1, 5.)  Professor Lambert's substantial body of research focuses on "health communication, drug name confusion, patient and medication safety, health literacy, health information technology, prescribing behavior, pharmacoepidemilogy, pharmaceutical

---

[1] In their reply brief, the State Defendants seemingly give up their argument that Professor Lambert's testimony be excluded in its entirety and focus on their assertion that his opinion testimony should be limited to prescription errors.  (DE #260, p. 4.)

promotion, health outcomes associated with provider-patient communication, information retrieval, and medical liability reform." (*Id*. at 1.) Professor Lambert's publications have appeared in well-known peer-reviewed medical journals including JAMA (the Journal of the American Medical Association). (*Id*.; see generally *Id*. at 6-28). Among years of other professional service related to prescription errors and medication safety, Professor Lambert has served as a Special Government Employee for the U.S. FDA and as a member of the U.S. Pharmacopeia's Consumer Interest and Health Education Advisory Panel. (*Id*. at 1, 6.) Professor Lambert is qualified as an expert of prescription errors.

The State Defendants also take issue with Professor Lambert's alleged lack of methodology and the fact that he only acknowledges reviewing "some" of the pharmaceutical information related to Jessica's death. They assert that there is "no way of knowing what all he reviewed, or whether he reviewed the full medical records related to [Jessica's] prescriptions." (DE #217-1, pp. 8-9.) The Court finds this argument unavailing. Professor Lambert's report clearly indicates (and even attaches as exhibits) the specific, relevant prescription information that he reviewed, including a printout of Jessica's medications from June 15 through November 8, 2005,[2] provided by Fagen Pharmacy, and handwritten prescriptions

---

[2] Professor Lambert's report indicates that the period was for those same months in 2006, but, based upon the factual background of this case as well as the actual pharmacy records attached to his report, it is clear that

dated October 12, 2005, from Jessica's family doctor, Dr. Bartush. (DE #243-1, pp. 29-31.) The Court agrees with Plaintiffs that this limited review of the relevant prescription records is appropriate in this case given Professor Lambert's area of expertise. Professor Lambert's report methodically sets forth the specific prescription records he reviewed, notes his understanding of Jessica's medical records as related to her cardiologist's most recent prescribing history of warfarin,[3] describes the large increase in warfarin in October of 2005 and its potential hazard,[4] cites to literature regarding the common occurrence of prescription errors in general and the risks and dangers of warfarin overdose in specific, notes that, because of those dangers, the FDA requires a

---

the reference to 2006 is a typographical error. (See DE #243-1, p. 29.)

[3] For example, after noting that the prescription records show an increase from 2.5 mg to 3 mg of warfarin on September 16, 2005, Professor Lambert states that "[i]t is my understanding that this change was made by Jessica's cardiologist in response to a relatively low INR of 1.18 (target 2)." (DE #243-1, p. 2.) Similarly, after noting that the prescription records indicate an increase from 3 mg to 7 mg of warfarin on October 13, 2005, Professor Lambert states that "[i]t is my understanding that the October prescription changes were not approved by Jessica's cardiologist and do not appear in Jessica's medical records." (*Id*.) These assumptions may be challenged by the State Defendants during cross-examination at trial, but they do not present a barrier to admissibility at this stage. See *Cooper v. Carl A. Nelson & Co.*, 211 F.3d 1008, 1021 (7th Cir. 2000) ("the accuracy and truthfulness of the underlying medical history is subject to meaningful exploration on cross-examination and ultimately to jury evaluation" and "goes to the weight of the medical testimony, not its admissibility.")

[4] Professor Lambert states that "[i]t is unlikely that an increase from 3 mg to 7 mg would have been deliberate since increases in warfarin should be done slowly and only in response to recent laboratory tests (e.g. PT/INR). Since individual reactions to changes in warfarin dose vary widely, even relatively minimal changes in doses must be carefully monitored. It does not appear that this warfarin dose increase, more than doubling the dose, was prompted by any specific laboratory test result." (DE #243-1, p. 2.)

8

black box warning label on warfarin for bleeding risk,[5] and arrives at his conclusions based on those factors. Professor Lambert concludes:

> 12. In this case, it appears that a prescription error may have led to an unintentional warfarin overdose. Given the magnitude of the error (which resulted in more than doubling the warfarin dosage), bleeding due to unintentional warfarin overdose should be considered as a cause of death.
>
> 13. Given the unexplained increase in Jessica's warfarin dose and the discontinuation of phenytoin, serious consideration should be given to the possibility that Jessica's death was caused by one or more prescribing errors, combined with her underlying heart condition and reported illness in the days before her death.

(DE #243-1, p. 3.)

While the State Defendants argue that Professor Lambert's report is sketchy and vague, the Court disagrees. As the Supreme Court noted in *Kumho Tire*, "[e]xperts of all kinds tie observations to conclusions through the use of what Judge Learned Hand called 'general truths derived from ... specialized experience.'" *Kumho Tire Co., Ltd.*, 526 U.S. at 148. Here, Professor Lambert has done just that. He has established specialized knowledge, experience, and training in the field of prescription errors; he used that experience to review the relevant prescription records and

---

[5] The warning begins: "WARNING: BLEEDING RISK. Warfarin sodium can cause major or fatal bleeding. Bleeding is more likely to occur during the starting period and with a higher dose (resulting in a higher INR.)" (DE #243-1, p. 32.)

literature and then tied those observations to his conclusions.[6]
Professor Lambert's report is not based on his subjective belief or
unsupported speculation and is thus reliable. And, because of this
and Professor Lambert's qualifications as described above, his
report can offer the trier of fact assistance in understanding the
evidence and determining a fact in issue. Thus, while the weight
of Professor Lambert's opinions may be vulnerable to challenge upon
cross examination, the testimony is admissible.

*Dr. Teas*

Next, while the State Defendants do not argue that Dr. Teas is
unqualified, they do assert that her testimony should be limited to
the area of pathology. Specifically, they take issue with Dr.
Teas' testimony related to: (1) what the Department of Child
Services ("DCS") workers would have understood about certain
reports they may have received; (2) the qualifications of co-
defendant Dr. Antoinette Laskey ("Dr. Laskey"); and (3) the "normal
practice" regarding autopsy reports. (DE #217-1, pp. 10-11.) In
response, Plaintiffs provide a supplemental declaration of Dr.

---

[6] The State Defendants assert that Professor Lambert should be precluded from testifying as to the cause of Jessica's death because he is not a medical doctor; however, the Court finds Professor Lambert's report simply notes that "bleeding due to unintentional warfarin overdose should be *considered* as a cause of death" and that "*serious consideration* should be given to the *possibility* that Jessica's death was caused by one or more prescribing errors . . . ." (DE #243-1, p. 3) (emphasis added). Appropriately, Professor Lambert does not opine as to the ultimate conclusion regarding the cause or manner of Jessica's death, and his statements fall squarely within the scope of his expertise in prescription errors.

Teas. (DE #243-5.) They point out that she has performed over 6,000 autopsies, is board certified in anatomic, clinical, and forensic pathology, and was a member of the Aurora child death review team for ten years and was the Chair of that team for two years. (See *id*. at 1.) Plaintiffs assert that commenting on the reports and findings of other witnesses is well within Dr. Teas' area of expertise, and they note that she is familiar with the standards of normal autopsy reporting because she applies those standards to her own work and to her evaluation of autopsy reports written by others regularly. (DE #243, p. 15; see also DE #243-5.)

Dr. Teas' report indicates that she reviewed photographs from the first and second autopsies, the autopsy reports of John E. Cavanaugh, M.D., the forensic pathologist who was retained by the Jasper County Coroner to perform Jessica's autopsy ("Dr. Cavanaugh"), Dr. Laskey's report, the Coroner's Verdict with reports from Drs. Pless and Leestma, email communications and notes from Dr. Cavanaugh, email and other communications from Dr. Laskey, the depositions of Dr. Laskey, and the opinion of Judge Blankenship. (DE #213, p. 1.) She sets forth her analysis of the relevant documents in chronological order in her report. (*Id*. at 1-5.) Based upon her unchallenged expertise[7] in the areas of anatomic, clinical, and forensic pathology, the Court agrees with Plaintiffs' assertion that Dr. Teas is qualified to provide her

---

[7] At least for purposes of this motion.

opinion on the normal practice of autopsy reporting. As noted in her supplemental declaration, and as would be expected from someone with her background and qualifications, Dr. Teas states that she is current on the general standards for conducting autopsies as set forth in the checklists of the National Association of Medical Examiners. (DE #243-5, pp. 2-3; see also DE #199-5.) As such, it is not a great leap, nor is it outside her area of expertise, for Dr. Teas to review autopsy reports of others and provide conclusions as to whether those reports deviate from the normal reporting standards. Examining reports, noting the findings, and then applying the relevant standards to those reports to determine if deficiencies exist is hardly unreliable methodology. And, it is certainly relevant to the issues at hand. Thus, the Court finds that this testimony is admissible.

However, to the extent that Dr. Teas intends to testify directly as to the state of mind of various DCS workers (i.e. "the DCS workers may not have been accurately understanding and reporting what Dr. Cavanaugh was saying"), the Court agrees with the State Defendants that this "balancing [of] the medical evidence with the thought processes of the defendants" should be excluded. That said, it is perfectly appropriate, based on the rationale described above, for Dr. Teas to testify regarding discrepancies between the actual medical findings of those reports and the notes of the DCS workers. For example, Dr. Teas describes the notes of

12

the DCS workers as being "inconsistent with the autopsy reports as well as with the effects of warfarin" and "inconsistent with the pathological findings, as reported by Dr. Cavanaugh and as seen in the autopsy slides and photographs." (DE #213, p. 3; DE #243-5, 2.) This is appropriate testimony. In her declaration, she also describes terminology specific to the fields of anatomic, clinical, and forensic pathology and how that terminology differs from the meaning and significance attributed to those same words in common, ordinary English.[8] Again, this is appropriate; however, Dr. Teas may not extrapolate further as to what the DCS defendants subjectively "understood" or what they personally reviewed.

Finally, to the extent that the State Defendants take issue with Dr. Teas' intent to testify as to the qualifications (or alleged lack thereof) of Dr. Laskey, the Court agrees that this testimony should be limited. In her report, Dr. Teas opines:

> Dr. Laskey did not have sufficient expertise to understand or interpret the autopsy reports, which do not describe extensive, severe or widespread hemorrhages. She did not have the expertise to evaluate the skull fractures. She also does not understand warfarin, which can cause spontaneous bleeding even on low doses. . . . Dr. Laskey further did not understand that a review of the microscopic slides would be needed in order to date the hemorrhages.

---

[8] Dr. Teas states, "To take a simple example, a pathologist uses the term 'blunt force trauma' to refer to any trauma that does not penetrate the skin. Thus, if a child stumbles and falls, with a minor bruise or even no bruise at all, he or she has suffered 'blunt force trauma.' Police officers and caseworkers often assign undue significance to this term even though all of the words are commonly used in ordinary English." (DE #243-5.)

(DE #213, p. 4; see also DE #243-5, p. 2.[9]) Dr. Teas may testify fully as to her own qualifications and those of similarly experienced and/or expert pathologists in her field, the alleged deficiencies, errors, and mistaken conclusions found within Dr. Laskey's report, the alleged discrepancies and inconsistencies between Dr. Laskey's findings and those of Dr. Cavanaugh, and Dr. Teas' interpretation of the what those discrepancies indicate. However, she may not directly opine as to Dr. Laskey's qualifications, background, or subjective understanding or misunderstanding, as Dr. Teas' report does not suggest that she reviewed Dr. Laskey's personal qualifications, nor does it identify anything in her education, training, or experience that would give her specialized knowledge sufficient to judge the general qualifications of other doctors.

To the extent that questions remain regarding Dr. Teas' testimony during trial, the parties may approach the Court to discuss the issue at sidebar.

---

[9] In her supplemental declaration, Dr. Teas states, "Dr. Laskey's report similarly did not reflect the pathological findings, as reported by Dr. Cavanaugh and as seen in the autopsy slides and photographs. This reflects a lack of expertise on the pathological issues and an apparent failure to consult with Dr. Cavanaugh or others with expertise in these areas. Most notably, Dr. Laskey failed to understand the possibility of postmortem fractures caused at autopsy as were evident in this case, or the need to examine the histology (microscopic slides) if the timing of particular findings was an issue. She also appeared to be unfamiliar with Jessica's heart condition (evident and well described at autopsy) and her medications, including warfarin, which is involved in cases handled by forensic pathologists."

*Dr. Kenny*

The State Defendants also ask this Court to limit the testimony of Dr. Kenny. While they do not oppose Dr. Kenny's qualifications as they relate to psychology at this time, they do oppose Dr. Kenny's testimony about DCS policy and state and federal law. Plaintiffs assert that Dr. Kenny is qualified to testify as to those matters because of his professional and personal background, which includes testifying regularly in CHINS courts and parenting over forty foster children of his own.

Dr. Kenny, a licensed clinical psychologist with a background in social work, treated patients in his private practice from 1982 to 2011 for "mental and emotional disorders, addictions, parent-child problems, school problems, and marital and divorce counseling." (DE #246-6, p. 6.) He also performed "many evaluations of intelligence, personality, sanity, and bonding as well as custody evaluations and home studies for adoption. (*Id*.) Dr. Kenny was the Director and Clinical Psychologist of the Jasper-Newton Mental Health Center from 1975 to 1982, where he "completed approximately 15 adoptive Home Studies for the Jasper County DFC." (*Id*.) Prior to that, he was a caseworker for the Florida Department of Welfare and the Cook County Department of Public Welfare. (*Id*.) Dr. Kenny is a member of several professional associations including the American Psychological Association, the Indiana Psychological Association, and the National Association of

Social Workers and has published articles in various professional journals and popular magazines. (*Id*. at 7.) Dr. Kenny states that he and his wife have twelve children and were licenced foster parents for over twenty-five years, during which time they parented over forty foster children. (*Id*.)

In his report, Dr. Kenny states that he conducted psychological evaluations of Roman and Lynnette Finnegan in 2007 for the purpose of evaluating their psychological health and to provide a report for use by the court in the underlying CHINS proceedings. (*Id*. at 1.) He describes the results of those examinations, and he goes on to state that he continued to have some involvement with the family after the girls (Tabitha Abair and Katelynn Salyer) were returned home to the Finnegans. (*Id*.) Dr. Kenny describes his review of the reunification process and details his concerns with the investigative therapy that was used on the girls and with the reunification timetable's multiple required services. (*Id*. at 2.) As part of that review, Dr. Kenny indicates that he also examined the declaration of Dr. Randall Krupshaw and agreed with his conclusions. Dr. Kenny states:

> [i]t further appeared that DCS may have failed to follow other guidelines set forth in the DCS Welfare Manual and required by state and federal law, including relative placement and increased visitations with friends and family, including home/overnight visits with their parents.

(*Id*.) He opines that, "[i]f further services were needed, the

service plan should have been developed in conjunction with the family, as required by state and federal law." (*Id*. at 4.)

To the extent that the State Defendants take issue with Dr. Kenny's testimony related to state and federal law, the Court agrees that Dr. Kenny's report has not set forth a basis to conclude that he is qualified as an expert by knowledge, skill, experience, training, or education to testify as to the law. See *United States v. Caputo*, 517 F.3d 935, 942 (7th Cir. 2008) (district court was correct in keeping out proposed testimony of an expert who would have testified about the meaning of a statute and regulations because "[t]hat's a subject for the court, not for testimonial experts" and [t]he only legal expert in a federal courtroom is the judge"). As to the DCS Welfare Manual, the Court finds Dr. Kenny's proposed testimony (it "appeared that DCS may have failed to follow other guidelines set forth in the DCS Welfare Manual . . . including relative placement and increased visitations with friends and family, including home/overnight visits with their parents") troubling in that he does not state in his report, nor is it evident from his curriculum vitae, that he is familiar with the DCS Welfare Manual itself. The fact that Dr. Kenny and his wife parented over forty foster children, while admirable, does not necessarily lead to the conclusion that he had the requisite knowledge of the DCS Welfare Manual needed to testify as an expert to its content. Thus, specific reference by Dr. Kenny to DCS'

alleged failure to follow the guidelines of the Welfare Manual shall be limited during trial. That said, Dr. Kenny has established that he is qualified as an expert by knowledge, experience, training, and education to testify as to psychology; thus his conclusions as to whether DCS' specific practices in this case (i.e. placement and visitation procedures, the reunification process and timetable, investigative therapy techniques, etc.) caused Plaintiffs psychological damage and/or harm are appropriate.

Again, to the extent that questions remain regarding Dr. Kenny's testimony during trial, the parties may approach the Court to discuss the issue at sidebar.

CONCLUSION

For the reasons set forth above, the motion (DE #205) is **GRANTED IN PART** and **DENIED IN PART** as described in the body of this order.

DATED: September 14, 2015         /s/ RUDY LOZANO, Judge
                                  **United States District Court**