1              UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF INDIANA
2                  HAMMOND DIVISION

3   ROMAN FINNEGAN, et al.,            )
                                       )
4   Plaintiffs,                        )
                                       )
5   vs.                                ) Cause No. 3:08-CV-503
                                       )
6   LAUREL MYERS, et al.,              )
                                       )
7   Defendants.                        )

8            PARTIAL TRANSCRIPT OF JURY TRIAL
             OPENING STATEMENTS BY PLAINTIFFS
9                  SEPTEMBER 16, 2015
            BEFORE THE HONORABLE RUDY LOZANO
10               UNITED STATES DISTRICT COURT

11

12  A P P E A R A N C E S:

13  FOR THE PLAINTIFFS:

14
                            HEATHER M. KIRKWOOD
15                          Peterson Russell Kelly PLLC
                            4515 West Dravus Street
16                          Seattle, Washington 98199
                            (206) 286-9138
17
                            KEVIN C. TANKERSLEY
18                          Tankersley Law Office
                            115 West Main Street, PO Box 363
19                          Winamac, Indiana 46996-0363
                            (574) 946-4819
20

21                          RICHARD A. WAPLES
                            Waples & Hanger
22                          410 North Audubon Road
                            Indianapolis, Indiana 46219
23                          (317) 357-0275

24

25

```
 1    A P P E A R A N C E S: (Continued)

 2                              RONALD J. WAICUKAUSKI
                               Price Waicukauski Joven & Catlin
 3                              The Hammond Block Building
                               301 Massachusetts Avenue
 4                              Indianapolis, Indiana 46204
                               (317) 633-8787
 5

 6    FOR DEFENDANTS LAUREL MYERS,
      REGINA McANINCH, TRACY SALYERS,
 7    REBA JAMES, JAMES PAYNE,
      AND JENNIFER McDONALD:
 8
                               JEFFERSON GARN,
 9                             KELLY J. PAUTLER, and
                               APRIL A. WILSON
10                             Indiana Attorney General's Office
                               Indiana Government Center South
11                             302 West Washington Street
                               5th Floor
12                             Indianapolis, Indiana 46204-2770
                               (317) 232-6292
13
      FOR DEFENDANT
14    ANTOINETTE LASKEY:
                               KELLY PITCHER
15                             Clendening Johnson & Bohrer PC
                               409 W Patterson Drive, Suite 205
16                             PO Box 428
                               Bloomington, Indiana 47402-0428
17                             (812) 332-1000

18

19    ALSO PRESENT:

20
                               Roman Finnegan, Lynette Finnegan,
21                             Tabitha Abair, Johnathon Abair,
                               Regina McAninch, Tracy Salyers,
22                             Reba James, James Payne, Jennifer
                               McDonald, and Nancy Webb.
23

24

25
```

```
 1          (WHEREUPON, proceedings were had and reported, but not

 2          made a part of this excerpted record.)

 3          (The following proceedings were held in open court,

 4          transcribed as follows:)

 5                    OPENING STATEMENT BY MR. WAICUKAUSKI

 6                    May it please the Court, ladies and gentlemen of

 7   the jury.

 8                    As the Judge just explained to you, we now have the

 9   opportunity to tell you what we expect the evidence to show,

10   and I've prepared a timeline to review a series of events over

11   several years that are at issue in this case.

12                    During those years that are at issue, the Defendants,

13   Regina McAninch, Laurel Myers, Reba James, Tracy Salyers, and

14   James Payne, all five of them, worked at the Department of

15   Child Services, or DCS.  And as a result of their positions in

16   that Department, they were all vested by law with the power to

17   take children from their parents and from their homes and force

18   them to live with strangers in a strange place.

19                    The Defendant Jennifer McDonald is a detective with

20   the Indiana State Police; and as a result of her position, she

21   is and was vested by law with the power to conduct searches, to

22   arrest, to put people in jail, and to press criminal charges

23   against them.

24                    And the seventh and last Defendant, Dr. Antoinette

25   Laskey, is a pediatrician with a subspecialty in child abuse;
```

1    and as a result of her position, she had and has the power to

2    give expert medical opinions upon which critical decisions may

3    be made by police officers and DCS employees.

4            What all seven Defendants have in common is great

5    power.  And with great power comes great responsibility, and

6    with that responsibility comes accountability.

7            You will hear evidence in this case about how all of

8    these Defendants used their power to cause severe hardship and

9    unbearable pain to the five members of the Finnegan family who

10   are Plaintiffs in this case.

11           Your task will quite simply be to decide whether they

12   exercised that power responsibly or abused it.  You will, in

13   effect, decide whether the Defendants are held accountable for

14   their actions.

15           To understand this conduct, we need to go back 24

16   years to 1991.  In fact, it was almost exactly 24 years ago

17   that Jessica Salyer was born.

18           And I don't know whether you can read that on that

19   screen, but in the upper left-hand corner you'll see it shows

20   an entry that says:  1991 to 1996, extensive

21   treatments/surgeries at Riley Hospital in Indianapolis.

22           Jessica Salyer was born 24 years ago this week with a

23   birth defect.  She had a heart that was not properly formed

24   completely.  One of the valves wasn't working properly, and she

25   was promptly sent to Riley's Children's Hospital in

1    Indianapolis for treatment by expert cardiologists and heart

2    surgeons there.

3          And over the next five years, she had two major

4    surgeries, two major open heart surgeries, to treat that heart

5    birth defect, which, in effect, left her with a functioning

6    heart, but it only functioned with two chambers.  I didn't know

7    it was possible either, but they have a Fontan procedure that

8    makes that happen.

9          Jessica Salyer was born to her mother, Lynette.

10   Lynette had two older children, who were healthy and fine, and

11   she made sure, though, that Jessica got the treatment at Riley

12   Children's Hospital in Indianapolis, although it was more than

13   a hundred miles away from her home in Northern Indiana.

14         She did it over five years with numerous treatments,

15   numerous hospitalizations, and then in 1996 the last operation

16   was done.  The second Fontan procedure was done.  Jessica's

17   heart, though not completely normal, functioned fine.

18         But that was not the only problem that Jessica had.

19   Jessica also was born with a seizure disorder.  In fact, she

20   was the fourth generation of Lynette's family to have a seizure

21   disorder.  Lynette has a seizure disorder.

22         And during the next few years, Jessica, although her

23   heart was now functioning with two chambers, she had some

24   seizures, and they had to get her seizures under control.  But

25   with medications for the seizures and with medications for the

```
 1    heart, Jessica became an active, healthy, normal child.
 2            The meds were stabilized at a relatively low dose.
 3    By the way, I didn't give you that second entry about the
 4    seizures and the adjustment of meds.
 5            But then by the years 2000 to 2005, everything was
 6    stabilized.  She was an active child on low dose meds.
 7            What happened basically during this period from 1991
 8    to 2004 is that, after those initial procedures at Riley and
 9    after getting her meds under control, Lynette regularly filled
10    prescriptions and appointments, and we had at that point over a
11    thousand pages of medical records.
12            But Jessica was doing fine, and all she required as
13    of the period of 2000 to 2005 is to keep her meds up and an
14    annual appointment at Riley.  She would have a checkup with a
15    cardiologist there.  In 2002, she had her annual checkup.  In
16    the reports, you'll see she was doing well, and they said, "We
17    would like to re-evaluate in about one year."
18            About one year later, Jessica went back.  Lynette
19    brought her back for another checkup, in which she was found to
20    be doing, again, quite well, no need for any treatment, just
21    maintain the meds we're on, re-evaluate in one year.
22            2004, Lynette takes her back the hundred miles or so
23    to Riley for the annual checkup with the cardiologist.  The
24    report is, you'll see, she continues to do quite well, would
25    like to see back in one year.
```

1          And when I say doing quite well, she's riding bikes,

2     she is playing outside, she is roughhousing with her brother.

3     She's an active, outgoing child.  She has some limits in hot

4     weather.  She has some limits.  She can't play varsity sports.

5     But she is, by all appearances, a normal, active, healthy

6     child.  And that's really the way she is going into 2005.

7          And in 2005, in the second half, that's when -- Wait

8     a minute.  I didn't give you those entries there.  When this --

9     The 2002, 2003, and 2004 checkups show there on the left.  On

10    the right, we're going to go to the second half of 2005.

11         I'm going to show you details about the medical

12    attention that Lynette was giving to Jessica during this time

13    period, and I'm showing it to you because later DCS

14    substantiates medical neglect associated with this time period,

15    when the reality is this:  In May of 2005, the Finnegan family,

16    which at that point consisted of Lynette and her husband of

17    about a year, Roman Finnegan, stepfather of the four children,

18    and the four children, Johnathon, who in 2005 is about 17.  The

19    second child was Tabitha, who at that point is about 16.

20    Jessica is the third child in line, who is 14 in 2005, and then

21    the youngest child is Katelynn, who is 9 years old at the time.

22    That family moves from in the vicinity of Culver, where they've

23    been in school for some period of time.  They moved to

24    Francesville, which is a small community in Pulaski County.

25         They find a house in town not far from a pharmacy,

1    and it's also not far from where Roman works.  He's been a

2    career correctional officer with the Department of Corrections

3    in the Indiana Department of Corrections, and he goes to work

4    for the Medaryville facility of DOC.

5              And so they move.  They get adjusted to new schools.

6    And in June, they start using a pharmacy in Francesville.

7    Lynette gets Jessica's prescription filled.

8              In July, July 19th in particular, Lynette takes all

9    four children for back-to-school physicals, including

10   Lynette -- excuse me, including Jessica, into the family

11   physician they've been using for a number of years in Knox,

12   Indiana.

13             The day after that back-to-school physical, she has

14   prescriptions filled in Francesville.  She fills more

15   prescriptions on September 2nd.

16             On September 7th -- Let's go through those -- Let me

17   go back one day there before we talk about September 7th.

18             On September 6th, DCS receives a call from the school

19   nurse.  Jessica and the others are going to school for the

20   first time.  Lynette meets with the school nurse and others and

21   explains to the school nurse that Jessica has some medical

22   issues associated with the heart defect at birth, et cetera.

23   Discusses it with the school nurse.

24             But the school nurse seems to think following that

25   discussion that Jessica needs surgery, that Jessica has had an

1    appointment with her cardiologist in Indianapolis and failed to

2    show up for that appointment and also seems to think that

3    Jessica doesn't have insurance.

4            So she calls DCS, reporting those purported facts --

5    none of them were true -- reporting that.  And DCS then calls

6    the Finnegans on the morning -- excuse me, on September 7th.

7    Actually, they call about 1:00 in the afternoon about the

8    concerns expressed by the nurse.

9            Following that phone call -- Actually, let me just

10   read to you a letter or portions of a letter that Roman wrote

11   to his State representative after this call from Regina

12   McAninch.  He wrote:

13           "Dear Mary Kay Budak:  I'm contacting you in regards

14       to a situation my wife and I had today.  We received a

15       call from a child protective service worker from Pulaski

16       County in regards to her daughter -- that's Lynette's

17       daughter -- Jessica Salyer.  The case worker called and

18       commented to my wife, 'You don't care about your

19       daughter.'"

20           "When my wife mentioned that she, my wife, has

21       Epileptic seizure, the woman insinuated that my wife was

22       incapable of caring for her daughter.  This call was

23       received while we were asleep and not at all prepared for

24       this confrontation, by the way."

25           During this time frame Roman works a shift that

1    starts at 4:00 p.m. and ends at midnight Central time.  When he

2    comes home from work in the early morning, he's still kind of

3    wound up.  He doesn't get to sleep for a while.  Lynette gets

4    up early and gets the kids off to school, but then they sleep

5    in during the day.  That's their routine.  So when they call,

6    they're sleepy; and that's why they're sleeping in during the

7    day, because he essentially works at night.

8            Roman continues in this letter to his legislator.

9            Next he reports, "My wife became frustrated and hung

10   up on Ms. McAninch."  Then he says next, "I answered the

11   phone, she called back, and introduced myself as Lynette's

12   husband.  The caller asked where I worked and if I had

13   insurance.  When I attempted to explain the situation, she

14   became accusatory."

15           A little bit later in the letter he explains, "When I

16   gave the phone back, back to Lynette, the caller rudely

17   proclaimed to my wife that we had a 9:00 appointment on

18   September 9, 2005," that's a day-and-a-half later, "with

19   no regard to our schedule or ability to be present."

20   "This woman," this is in the letter, "has no idea how much

21   added stress and burden she has created for us.  She has

22   invaded our privacy and insulted us with her

23   unprofessional demeanor."

24           He continues, "I also called later that day."  This

25   is September 7th, 2005.  "I also called the Pulaski office

1        and talked to the Director, Laurel Myers," who is also a

2        Defendant in this case, "and said" -- and let me get this

3        precise, "that in my 15 years with the Department of

4        Corrections, I've never talked to an offender in the

5        manner that my wife and I have been talked to today.  I'm

6        hoping that you can either provide help or intervention.

7        Thank you for your time and consideration.  Sincerely,

8        Roman Finnegan."

9            After he sent that letter, the letter got forwarded

10   to the Governor's office, then got forwarded to the Defendant

11   James Payne, the Director at DCS, and then got forwarded to

12   Laurel Myers, back at the Winamac office of DCS.

13            Ms. Myers responded to this letter by saying that

14   Ms. McAninch was not in any way rude; and Mr. Payne, after

15   getting feedback from Ms. McAninch and Ms. Myers, responded

16   that the local department had acted -- this is in a letter he

17   wrote to Roman Finnegan, quote, "in a manner consistent with

18   State law and best practice standards."  That's what Mr. Payne

19   and Ms. Myers said was appropriate.

20            Now, they proceeded to continue with the

21   investigation.  They had the meeting on Friday, September 9th,

22   and there, Roman Finnegan and Lynette Finnegan explained, one,

23   "I work for the Department of Corrections.  I have high quality

24   insurance with Anthem.  The notion we don't have insurance is

25   just not true."

12

```
1          They explained that the appointment at Riley that
2    summer, this annual checkup that you should do about then, was
3    canceled by the doctor.  There was no no-show.  It was canceled
4    by the doctor, and they were getting it rescheduled, once they
5    had gotten settled in and got adjusted to their new environment
6    in Francesville.  That all of the reasons for concern being
7    expressed by the nurse were really unjustified.
8          That's what was exchanged.  That's what was learned.
9    They were concerned that the appointment be made.  In fact,
10   what happened in the ensuing days was that on the 14th,
11   September 14th, after this meeting on September 9th, Lynette
12   takes Jessica to the family doctor, Dr. Bartush, in Knox, for
13   blood work to prepare for the meeting with Dr. Hurwitz, the
14   pediatric cardiologist in Indianapolis.
15         When I say blood work, you're going to hear during
16   the course of this trial a lot about something called an INR
17   test, or an International Normalized Ratio.  It's a test to
18   determine the coagulation of blood.  When you're on a
19   medication called warfarin or Coumadin -- Coumadin is the brand
20   name.  Warfarin is the generic name.  It's a drug that thins
21   the blood, that reduces the coagulation level of the blood.
22   And it does so in a non-linear way.  You never know with a
23   particular person what the reaction is going to be, so you need
24   to test on some sort of routine basis and particularly whenever
25   you change the dosage to see what the effect is going to be on
```

1    the coagulation of that particular person.

2            So before Lynette took Jessica to see Dr. Hurwitz,

3    she had this done.  On September 14th.

4            The next day, she took Jessica down to Indianapolis.

5    Actually, Lynette, because of her seizures, didn't drive.  Most

6    of the driving was done by Roman Finnegan throughout this time

7    period.  He's the one that drove her down to Riley.

8            Had the checkup, and what the checkup revealed was

9    essentially the same thing that had occurred in the prior three

10   years.  Jessica was doing, in his words, quite well, said that

11   we should have another re-evaluation in one year.  It was just

12   a routine checkup.

13           He did say that, based on the INR level that was

14   found in the drug test on the day before, or the blood test on

15   the day before, that we should increase the dosage for warfarin

16   or Coumadin from 2.5 milligrams to 3 milligrams, a small

17   dosage, to see if we could get closer to the target that he

18   wanted, which was in the 1.8 to 2.5 range under the units of

19   measure that they were.  And she was only at about 1.18 in the

20   test that was done the day before.

21           So they got a minor adjustment, a small adjustment in

22   the warfarin dosage.  With that new adjustment, Lynette got it

23   filled the next day in Francisville with the new prescription.

24           There was also a rash or something that looked like

25   flea bites that Jessica had over a period of time, and they

14

1    requested and received a consult with the dermatology

2    department at Riley, and Jessica went back on September 29th to

3    have that done in Indianapolis.

4            On October 3rd, Lynette had additional prescriptions

5    filled.  On October 4th, after the adjustment in the dosage by

6    Dr. Hurwitz on September 15th, he requested that they have an

7    INR done within a couple weeks.  They did one on October 4th.

8    Lynette took Jessica in for that.

9            The results of that were 1.7.  Very close to the 1.8

10   target.  The decision was made at that time that we shouldn't

11   adjust it further at this point, we should have another INR

12   test in about a week or so.  And eight days later, eight days

13   later, Lynette takes Jessica out of school.

14           She gives a release of documents saying it's for a

15   blood test.  She takes Jessica to see Dr. Bartush.  Dr. Bartush

16   doesn't do a blood test for reasons that are unexplained.  He

17   does, however, at Lynette's request, renew prescriptions.  And

18   he gives prescriptions at that time not for 2.5 milligrams of

19   warfarin or Coumadin and not for the new 3.0.  He gives

20   prescriptions totaling 7.0 milligrams, more than doubling the

21   dosage.

22           Why he does that is unexplained.  He doesn't put it

23   in his file, but we have the actual prescriptions that he wrote

24   and signed that day.  More than doubling her dosage.  And he

25   did not order any INRs.

15

1     The next day, Lynette fills the prescriptions that

2  she receives from him.  By the way, in addition to the

3  prescriptions for warfarin -- Historically Jessica has been

4  treated with three prescriptions.  She's been treated with a

5  warfarin prescription, a digoxin prescription, and a Dilantin

6  prescription.

7     The digoxin is another prescription for the heart to

8  help the heart work better at a better rhythm; and Dilantin is

9  the prescription she was receiving prior to October 12th for

10  treatment of her seizures.

11     But when Lynette asked Dr. Bartush to renew or refill

12  her prescriptions, he does not renew the Dilantin

13  prescriptions.  He gives the two prescriptions for warfarin and

14  the one prescription for digoxin.  She walks out with three

15  prescriptions, which she then takes to the drugstore and gets

16  filled.  But she now has no prescription for Dilantin.  She now

17  has more than a doubling of the dosage of warfarin.  That's not

18  realized by anybody at that time.

19     What is -- What happens, though, is that, after all

20  of these events, and after Lynette refills the prescriptions

21  given to her by the doctor on October 13th and November 18th,

22  on December 5th, the DCS had learned that the concerns were

23  unjustified.  DCS did what's called a substantiation.

24     When DCS receives a complaint of child abuse or

25  neglect, they have a responsibility to either substantiate or

 1    unsubstantiate.  If they find that the evidence by a

 2    preponderance of the evidence shows child abuse or neglect,

 3    they are to substantiate.  If it doesn't, they are to

 4    unsubstantiate.

 5          They decided on December 5, 2005, to substantiate

 6    medical neglect in the face of all this history that you see in

 7    front of you.  And after Roman has complained to the legislator

 8    and the Governor and the others about the rudeness and the

 9    manner in which they dealt with this.

10          They don't, however, inform Roman or Lynette that

11    they are substantiating medical neglect.  They're certainly

12    going into the records and the child abuse index or registry as

13    child -- as abusers or neglectors of Jessica based on their

14    finding of neglect.

15          And I did think it's important to note that, when

16    I -- as I note in that part of the -- It says Judge

17    unsubstantiates later.  I'm going to talk a little bit more

18    about some of the proceedings that came later in this process

19    when the events got even more serious.

20          But this finding of substantiation of medical neglect

21    finally got reviewed by a Judge several years later, and he

22    ruled that it should be unsubstantiated because there was no

23    basis in fact or law to support the substantiation at that

24    time.

25          When I say law, we're going to be talking a lot about

1    child abuse and child neglect, and the Judge is going to give

2    you the law on that.  You may see some portions of the welfare

3    manual or the manual that DCS uses as to their operating

4    definition for child abuse.  It is when a child's physical or

5    mental health is seriously in danger due to injury by the act

6    or omission of the child's parents.

7           You've got to have physical health seriously

8    endangered due to injury or act or omission.  That's child

9    abuse.  Child neglect, by their own definition, is when a

10   child's physical or mental condition is seriously impaired or

11   seriously endangered as a result of the neglect of the child's

12   parent, guardian, or custodian to supply the child with

13   necessary food, shelter, or medical care.

14          In this instance, they were substantiating what they

15   said was necessary medical care which seriously endangered the

16   child.  And what they said was that DCS wasn't needed to get to

17   their checkups in all the prior years or the thousand pages

18   before, DCS was needed in order to make sure this happened in

19   2005.  But that, however, as I've told you, was unsubstantiated

20   later.

21          What occurred then -- That's really just the prologue

22   to the more serious stuff that came immediately thereafter.

23   And actually, it started the same day on that December 5th,

24   2005.  At the request of the school, Jessica had some -- two

25   additional vaccinations.  They were done at the -- in Winamac

1    at the Department of Public Health.

2           A few days later, Jessica started feeling badly.  And

3    on December 12th, she missed school with essentially flu-like

4    symptoms.  She was having vomiting and diarrhea and wasn't

5    feeling good.

6           And so the next day after she stayed home from school

7    the first day of December 12th, on December 13th, Lynette took

8    her to see the family doctor, Dr. Bartush, in Winamac.  He

9    examined her for the flu-like symptoms, and he prescribed a

10   liquid diet for her to address that.

11          He also found that he thought she had thrush, which

12   was kind of a film he observed within her mouth and he

13   prescribed an antibiotic for that, treatment for that.

14          And the next day, Lynette had that prescription

15   filled in Francesville.  Over that week of December --

16   December 12th was a Monday, Jessica stayed home from school

17   with those symptoms.  And she had one other thing going on.

18   That week was the week that she started her first period, and

19   she was having cramps and bleeding as a result of that.

20          And the bleeding, as you know, I told you that we had

21   those prescriptions significantly increasing the warfarin.  May

22   well have been affected by that.  But she stays at home.  She's

23   got the cramps.  The vomiting tends to go down with the liquid

24   diet, et cetera.  But she's not -- she seems to be somewhat

25   better, but she starts developing a little -- seems like she's

```
 1   bit her lip, and she's picking at a scab there, and there's
 2   blood arising at times on her lip at that point.
 3            But on Monday, December 19th, after she's been at
 4   home for about a week -- By the way, when Dr. Bartush saw her
 5   on December 13th with the flu-like symptoms, et cetera, he
 6   basically said, if she's not doing better in about a week, you
 7   know, come back.  And a week after that would have been the
 8   next day, December 20th.
 9            On December 19th, Lynette talks to Roman about
10   Jessica still not healing completely and says, "Look, if she's
11   not better by the next day Roman was off, which was
12   December 21st, we'll go to Riley and see what's going on
13   there."
14            Unfortunately, that never happened because, on
15   December 20th, 2005, after the kids went -- the other three
16   kids went off to school and Jessica appeared to be sleeping
17   fine that morning, that afternoon, about 2:00, Lynette walked
18   into her room and found her lying on the floor on her stomach
19   and tried to -- to arouse her, but failed to do so.  She
20   screamed for Roman.  He came into the room.  He's a CPR
21   instructor.  He tried to do CPR while Lynette made a 911 call,
22   hysterical to seek help.  An ambulance came.  The police came.
23   The deputy coroner came to the scene.  But Jessica had died.
24   And that death was then and remains now a heart-wrenching
25   experience for every family member.
```

 1          And this case is not about what caused her death,

 2    because these Defendants are not in any way responsible for

 3    causing her death, but what they proceeded to do after Jessica

 4    died was to make this tragedy far worse in every way.

 5          However, there are other professionals who came, were

 6    involved in considering what the circumstances were.  One of

 7    the first professionals that was involved at that point was a

 8    doctor in the emergency room at the hospital in Rensselaer in

 9    Jasper County where she was taken.  He examined Jessica.  He

10    called Dr. Hurwitz in Indianapolis to find out what Jessica's

11    situation was.  Based on what he knew at the time, he believed

12    and his diagnosis was in his report, which you'll see, sudden

13    death syndrome, congenital heart disease.  He also provided and

14    indicated there were no indication here of any abuse or

15    neglect.

16          There were police at the scene.  They investigated,

17    as well.  They found no bruises indicative of a beating or

18    anything like that.  They found no indication of abuse or

19    neglect.

20          The coroner came to the scene.  He, likewise, saw no

21    evidence of child abuse or neglect.  And the next -- well,

22    actually that day, DCS decided to go ahead and start taking

23    action.

24          They didn't initiate this action on their own.  The

25    police, who were at the scene were there when the other

1    children arrived home from school.  And the police called DCS

2    to have them come take care of the children because at that

3    point the parents were away at the hospital.

4          And so they took the children to DCS, but didn't just

5    take them.  They detained them for about four-and-a-half hours

6    and questioned them at some length about what was going on in

7    the home at the time, about what Jessica was feeling and doing,

8    and they got tape-recorded statements at that time, not the

9    highest quality, of what the other children observed and saw.

10   Nothing indicated abuse or neglect from the other three

11   children that they tape-recorded and interviewed during that

12   four and a half hour detention on the day that Jessica died.

13         The next day, an autopsy was done at the request of

14   the coroner to try to determine exactly what was the cause of

15   Jessica's death.  The person who performed the autopsy was a

16   Dr. John Cavanaugh, a forensic pathologist.  He did a

17   handwritten preliminary report.  In his preliminary report, he

18   noted Jessica had numerous hemorrhages at various points in her

19   body, hemorrhages that indicated to him as he wrote on the

20   report that she had a coagulopathy, that the coagulation of her

21   blood was not correct, she was not -- her blood wasn't clotting

22   like it was supposed to, that's why there was a variety of

23   internal hemorrhages going on.

24         He also said that -- he saw what was a bleeding

25   inside the skull, a subdural hematoma.  And he said what he saw

1  with respect to the subdural hematoma in his report was
2  consistent with a fall.  As a forensic pathologist, he's
3  familiar with the fact when you have people on warfarin on
4  Coumadin and they fall, they could have a subdural hematoma
5  because their coagulation isn't the same, and that can
6  contribute to or cause death.

7        So he identified that.  He identified the
8  circumstances.  He said in his initial handwritten report this
9  is consistent with a fall.  And then in talking with the other
10  people at the autopsy, the police, the coroner, the deputy
11  coroner.

12        They looked at the body and they said, well, there's
13  some old bruises on the legs, the kind you would expect from a
14  14-year-old teenager, nothing recent, very small, very
15  insignificant.  There were no bruises on the upper body or on
16  the face or on the head which would indicate a beating of any
17  kind.  They all agreed, every one of those professionals,
18  agreed that there was no evidence of foul play.

19        But that's not what DCS thought.  They already
20  substantiated medical neglect, right?  And they proceeded to
21  investigate over the next several months.

22        By the way, they questioned Roman and Lynette on the
23  day of her death.  They got that indication.  They proceeded to
24  do investigations.  About a few months later, Regina McAninch
25  sought to get records of the Indiana State Police from an

1    Indiana State Trooper by the name of Duane Datzman.  He had

2    come to the scene in order to take photographs and do some of

3    the death scene work.

4          And when Regina McAninch was asking Datzman for their

5    medical records, they had a conversation which went something

6    like this.  Datzman didn't understand why they were doing this

7    investigation, saying the pathologist stated she died of

8    natural causes.  And Ms. McAninch said, "Well, we had a

9    previous medical neglect on this family, and we have a duty to

10   investigate."

11         And Trooper Datzman responded, "I don't know why

12   you're doing this.  Whatever."  He gave them their report, and

13   she took it, and she got a supplemental -- or an interim

14   report, if you will, from Dr. Cavanaugh that was dated in

15   May, where he talked about some of the circumstances associated

16   with this death in more detail than in the preliminary report.

17         And then in October, the Defendants, McAninch and

18   Myers, arranged to hire the Defendant Antoinette Laskey to

19   review the records and see what she thought based on the

20   records, and Dr. Laskey did that.

21         She reviewed the records that were sent to her by

22   DCS.  She talked in the hallway about five minutes to

23   Dr. Hurwitz.  She reviewed what the pathologist had said in his

24   interim report, but she didn't call the pathologist.  She spent

25   a total of about three hours, roughly three hours in his words,

1    reviewing the records.

2         She wrote a three-page, single-spaced report

3    concluding with this statement.  "It is my expert medical

4    opinion that this child sustained a fatal beating on the day

5    that she died and that this beating was the direct cause of her

6    death.  I have grave concerns about the safety of other

7    children in the care of the caregivers at the time of these

8    injuries."

9         She sent that to Ms. McAninch and Ms. Myers on

10   October 31st.  Ms. McAninch said in an e-mail about the same

11   time, "Thank Heaven someone other than the local director and

12   FCM agree this child died from physical abuse."

13        That's October 31.  Thank Heaven -- This is now ten

14   months after the death.  The only people who think there's

15   physical abuse going on here is Ms. McAninch, Ms. Myers, and

16   now they've got a pediatrician to sign onto that, who doesn't

17   consult with the pathologist and who renders this opinion after

18   three hours of work.

19        So what do they do?  Well, the next thing they do is

20   they seize the girls.  The very next day after getting

21   Dr. Laskey's report, they come and take Tabitha and Katelynn

22   and take them off not to relatives, but to a foster home out of

23   the county, out of school, away from their homes, away from

24   their families, away from their friends, seizing them.

25        Why do they do it?  Ms. McAninch says she does it --

25

obviously she says because she's initiated this in part, but
she says she's been directed to do this by her director,
Ms. Myers.

     Ms. Myers, when asked about it, says that she does it
because the removal was ordered by the Defendant, James Payne,
the Director of DCS.

     Ms. McAninch then two days later tells a Judge why --
when asked, "Why are you detaining the children," she says
because of Dr. Laskey's report about the fatal beating and
grave risk of the children and quote, "to continue our
investigation," end quote.

     They wanted to question Tabitha and Katelynn further,
and they proceeded over the next several months to do that.
After putting the girls in foster care, they did something that
I think is fairly characterized as investigative therapy.  They
used the counselors or the therapists for the children to ask
questions about their sister's death for investigative
purposes.

     The result was uncontrolled stress by the children.
The result was, to make matters worse, neither of the girls
ever said anything that in any way indicated there was abuse or
neglect here in any meaningful way.

     But once the girls got seized, Roman started to,
"What's going on here?"  We got a doctor saying that there's
been a fatal beating on the day of death.  He starts to try to

1    figure out what is going on here.

2          And he finds an attorney in Seattle by the name of

3    Heather Kirkwood who does work of this kind for other people,

4    and she says, "Well, have you checked the pharmacy records?"

5    And he goes and gets the records at the Fagen Pharmacy there in

6    Francesville near their home, and that's when he finds that the

7    pharmacy records show that the prescriptions that have been

8    filled are for warfarin that's substantially greater than it

9    had been before.  They also show that these had been refilled

10   and that for about two months she's been on an overdose of

11   warfarin.

12          That wasn't known to DCS before they -- Their

13   extensive investigation didn't go so far as to get the pharmacy

14   records of the meds that she was on that might relate to

15   hemorrhages.

16          But within a couple weeks after the girls are taken,

17   the pharmacy records are obtained.  They show what appears to

18   be a prescription error and an overdose of warfarin, that that

19   explains it, and they proceed to provide that information on

20   December 13th to DCS.

21          And Dr. Laskey receives that information on

22   December 18th.  Dr. Laskey has assumed that Jessica has been on

23   her same dosage of -- the dosage that Dr. Hurwitz had ordered

24   back in September of 3.0.  But now the records show it's more

25   than double that, and apparently without any reason and without

1    any INR testing going on.

2          But that doesn't seem to dissuade DCS or the

3    Defendants or Dr. Laskey.  So more information is gathered.

4          Roman and others find out that there's an expert on

5    medical errors, on pharmaceutical errors, who teaches in the

6    pharmacy department at the University of Illinois, Professor

7    Bruce Lambert.

8          They ask him to take a look at it.  He examines it.

9    He does a declaration which is provided to DCS on January 4th

10   or shortly thereafter -- that's when the declaration is

11   dated -- in which he explains, among other things, that

12   warfarin overdose is a potential cause of this death that you

13   should be considering now that we've got this evidence.

14         They also obtain a declaration from a Dr. Innis.

15   Dr. Innis is a hematologist.  That's a doctor who specializes

16   in blood issues, including coagulation issues.  Dr. Michael

17   Innis is based in Australia.  He does a declaration that

18   explains, in his opinion based upon the records that he's

19   reviewing now, that to a reasonable degree of medical

20   certainty, Jessica's death was the result of an undetected

21   complication of Coumadin therapy.

22         By the way, these experts are doing this work on a

23   pro bono basis.  They're not saying it because some lawyer is

24   buying them.  They're saying it because they're looking at the

25   records, and that's the conclusion they're reaching.  It's

 1    being shared with DCS, but it doesn't dissuade them.

 2            And then we've got some other things going on about

 3    this time.  One of the things that happens -- I didn't note on

 4    November 1st, after Dr. Laskey sends her report on October 31,

 5    in addition to seizing the girls, they convince the State

 6    Police to start an investigation.

 7            They've closed their files a long time ago, but now

 8    we've got this report from Dr. Laskey, and they assign a

 9    relatively new detective.  Been in the business, doing this

10    work for about a year by the name of Jennifer McDonald.  She is

11    here as a defendant.  She begins her investigation on

12    November 1st.

13            And on January 15th, as part of her investigation,

14    she conducts a search of the Finnegan home to get a table in

15    order to match what she sees as interior bruising or bleeding

16    inside Jessica's head.  You will hear evidence that the whole

17    idea is ridiculous, but that search was done at her instigation

18    on that day.

19            Also at her instigation, there was a search done on

20    January 25th.  Jessica's body was exhumed, pulled out of the

21    ground, for a second autopsy.

22            Detective McDonald had seen a presentation by a world

23    famous pathologist, Dr. Michael Baden, and he offered to come

24    out and help State Police do investigations, and she contacted

25    him.  He agreed to come out and do an autopsy of Jessica's

29

```
 1    body, and he did that on January 25th.  The results of his
 2    autopsy were, in essence, no significant findings.  That's what
 3    the coroner reported when he issued his report not long --
 4    well, later that year.  This is now 2007.
 5            But McDonald is not only doing searches of the home
 6    and exhuming the body and having autopsies done.  She also is
 7    interviewing the children, and on January 29th, she does an
 8    interview of Johnathon, the older brother.
 9            And in this interview of Johnathon, she takes
10    significant liberties with the truth.  She thinks this is an
11    appropriate investigation tactic, to talk to the child of
12    Lynette and Roman.
13            And she tells Johnathon, who at this point is about
14    18, tells Johnathon that his mother, Lynette, has accused him
15    of causing Jessica's death, of killing Jessica.  Lynette and
16    Roman never said anything of the sort, but she thought she
17    could get Johnathon to turn on his parents by telling him that
18    lie.
19            Johnathon didn't turn on them in any way, but he
20    did -- he did call his parents after that interview, when the
21    State Police is telling him that they've accused him of killing
22    his sister.
23            He is almost hysterical himself.  He's upset that
24    they would do such a thing.  He doesn't want to ever see them
25    again.  And the relationship between Johnathon and his parents
```

1  for the next several years is either non-existent or extremely
2  strained as a result of the lie told by Jennifer McDonald.  She
3  thinks it's okay to kind of stretch the truth, if you will, in
4  order to serve the greater mission of her criminal
5  investigations.
6          While Jeanette -- excuse me, Jennifer McDonald is
7  carrying on her investigation in those fashions, Roman and
8  Heather Kirkwood are continuing to try to gather evidence that
9  would be pertinent to this matter.
10         In fact, Heather Kirkwood creates three volumes of
11  information, three large binders, over 800 pages of material,
12  including all the medical records of Jessica, all the medical
13  literature that tends to confirm exactly what appears to be
14  going on here, which is a warfarin overdose, and how it
15  manifests itself and results in -- may well result in a fall
16  that causes death.  And then she also provides these expert
17  opinions, in the binders, from Dr. Lambert and Dr. Innis as
18  well as a number of other declarations which you will see in
19  this case, but significant material provided to DCS on or about
20  March 1, 2007.  They ignore it.  They don't care what the
21  facts are.
22         On March 23, three weeks after giving this
23  information, after learning about the prescription overdose,
24  after learning about the implications of that, they
25  substantiate death from physical abuse.

31

1          They've got the job to substantiate or

2   unsubstantiate.  They substantiate there is death here by

3   physical abuse from Lynette and Roman based on that

4   investigation.

5          This substantiation does not mention the prescription

6   error.  It doesn't mention that throughout this time the

7   forensic pathologist who had done the autopsy believed that, to

8   the extent there were injuries, they were all consistent with a

9   fall.  Doesn't mention the fact that, when you have a warfarin

10  overdose, the symptoms are very much the flu-like symptoms, not

11  discernible to an ordinary person.

12         But they did.  That's what they substantiated on

13  March 23rd.

14         On March 17th, there is another report by Detective

15  McDonald, recording some of the things that she finds during

16  her investigation.

17         She writes this report and destroys all of her notes

18  that she has, a report that was in many respects false.  She

19  writes in this report that Tabitha and -- the children say that

20  Jessica had been begging to go to the hospital the night before

21  she died.  The children never said that, but it's in her

22  report.

23         You got the tapes the day -- the day of her death.

24  They never say anything like that.  But it's in her report, and

25  her notes are destroyed.

32

```
 1            And she writes this report, and then she goes to get

 2   arrest warrants.  And if things weren't already bad enough, on

 3   April 24, 2007, she obtains arrest warrants for Roman and

 4   Lynette.  They are arrested, and they are jailed on criminal

 5   charges.  She does the probable cause affidavit based on her

 6   investigation.

 7            You're going to hear some of the details about that

 8   arrest because Roman and Lynette were supposed to be meeting

 9   with a prosecutor that day to kind of explain why there was no

10   basis for this, but instead, they get arrested.

11            And then they get arraigned in circumstances where

12   Lynette is shackled and is forced to hop upstairs outside the

13   courthouse in an incredibly shameless set of circumstances

14   initiated by Detective McDonald.

15            And, in fact, the day after this arrest, Detective

16   McDonald issues a news release, and the Indiana State Police

17   do, in which she attributes this result to Dr. Baden's autopsy,

18   when he never does a report and never made any significant

19   findings.

20            But that's what she does.  And it's widely publicized

21   that these two, the parents, are now being accused of

22   responsibility for the death of their daughter.

23            After that, Roman and Heather and Lynette continue to

24   search for evidence.  They talk to Dr. Edith Nutescu, who is an

25   expert on coagulation and anti-coagulation treatment.
```

 1            She looks at these records.  She does a declaration

 2     explaining that, when you have warfarin overdose at this level,

 3     you are particularly prone to bruising.  You're going to have

 4     bruises if you're on warfarin, especially if you're on a

 5     warfarin overdose.  There are no bruises indicative of beating

 6     whatsoever.  It's completely inconsistent with it, as she makes

 7     clear in her declaration.  This was a prescription error, and

 8     to suggest that there's a beating in these circumstances is

 9     just unwarranted.

10            They also obtain a declaration from a Dr. Heinsen, a

11     family doctor in Winamac, because at this point they're trying

12     to get the children out of foster care.  They've been there now

13     for seven months, and he says, "Look, the children are not in

14     danger.  I'll make sure they're not in danger if you're

15     concerned about it," but they pay no attention to that.

16            They obtain a declaration from Dr. Jan Leestma, a

17     neuropathologist in Chicago who looks at all these

18     circumstances, and he says, "Look, this evidence here is death

19     due to warfarin overdose.  It's not death due to beating.

20     You're going to have bruising.  The circumstances here of the

21     warfarin overdose explain what's going on here."

22            On June 27th, they learn, after all this evidence has

23     been developed, that Laskey is not going to testify for them

24     any longer.  She says, "I really don't know that much about

25     Coumadin or warfarin, and I'm not going to testify for you in

support of this detention of the children or the petition

that's been filed for Child in Need of Services."

A declaration is also prepared by Dr. Krupsaw about

the damage from -- from the investigation therapy that has been

going on for years and how that's unethical for them to be

doing that.

There's a declaration by Dr. Pless that's provided.

Dr. John Pless is a forensic pathologist who had been at the IU

Medical School for a number of years who trained, among others,

Dr. Cavanaugh.  He looks at the facts and circumstances, and

concludes there's no evidence here of beating or abuse.

Dr. Cavanaugh sends an e-mail on July 11th explaining

to DCS that there have now been some slides done that show the

age of the bleeding that had occurred in the subdural and other

parts of the body, and it showed this wasn't a case of bleeding

on the day of death.  This was a case where bleeding had been

occurring over days or weeks as demonstrated by these slides.

He also said he had new information with respect to time of

death.  And after they get that e-mail, they cancel Cavanaugh's

deposition.

Now, they will tell you that they did this because

Dr. Cavanaugh mentioned in his May 20th report, May of 2006

report, that there was a skull fracture.  And there is mention

of a skull fracture in that report.  They had asked

Dr. Cavanaugh, he said it's all consistent with a fall.  "I see

a subdural hematoma.  I see some other injuries here that
reflect a fall, and a skull fracture occurs with a fall, and
this is all consistent with a fall."  And they say it may not
be consistent with a fall from 2 feet rolling off the bed, but
it's consistent with a fall.  He never suggested there was any
abuse, any neglect at any time.

        From the point of the initial autopsy, he says it's
undetermined in terms of whether this is an accidental death,
where somebody tripped and fell or maybe a medication error or
whether it was a natural death because she had a seizure; and
as a result of the seizure and these other complications, it
was a natural death.  From day one, his opinion was there's no
evidence here of foul play.

        Dr. Laskey is interpreting the report as well as the
other Defendants without any basis in fact or supported by the
actual author of the report.

        And by the way, with respect to that skull fracture,
there will also be evidence that, at the time of the initial
autopsy, everybody in the autopsy room heard a pop as
Dr. Cavanaugh was cutting into the skull.  They all believed
that, to the extent that there were fractures in the skull, it
was an artifact of the autopsy at the time.

        Dr. Cavanaugh, for him, it never really mattered
whether it was an artifact of the autopsy or not because there
was no evidence of abuse, the lack of bruising, et cetera.

1    Never indicated foul play.  But when he looked at the skull

2    after he had cut into it, there was a fracture, and so he felt

3    it was his duty to record the fracture.  He believed it was an

4    artifact of the autopsy initially.

5            When Dr. Baden came in and they looked at it a second

6    time, there was some blood inside the fracture, and he

7    thought -- Dr. Baden thought that one of the fractures may have

8    preexisted.  Still never thought it was of any consequence

9    because it was all consistent with a fall.  It was not

10   consistent with a beating.

11           They also use the words -- Dr. Cavanaugh used the

12   words blunt force injury of the head, which he will tell you

13   when he testifies that he means simply that, when you have a

14   fall and there's an impact that results in something like a

15   subdural hematoma, you have to have some impact, not a beating,

16   but some sort of impact, like a fall, and that's called blunt

17   force injury.

18           And he describes the direction of this fall or this

19   injury and the words pile driver force at one time.  At the

20   same time he says it's consistent with a fall; it's essentially

21   the body is flowing after the head.

22           At no time does he suggest that any of the things

23   mean there was anything other than an accidental or natural

24   death.  But that's what they are keying on.

25           At no time does he determine that this is a homicide,

```
 1   but that's what they, the pediatrician and the DCS workers,

 2   conclude, and Detective McDonald pursuing criminal charges.

 3          So on December -- excuse me, July 17th, 2007, the

 4   coroner, Gordon Klockow, renders his verdict in this case.

 5          It's his job to determine the cause of death whenever

 6   there's a questionable death.  He does an extensive report, and

 7   he renders a verdict, saying this death was an accidental death

 8   due to prescription errors.

 9          In his opinion, to the extent there's a skull

10   fracture, it's an artifact of the first autopsy.  He was there.

11   He heard the pop.  He sees the evidence.

12          And by the way, Dr. Leestma and Dr. Pless and others

13   all think it's an artifact of the first autopsy.  Dr. Cavanaugh

14   thinks one of them is likely in his opinion to have preexisted,

15   but in his mind it is and never was of any consequence.

16          But that's his conclusion.

17          And the next day, there's finally going to be a

18   hearing, a fact-finding hearing as to why the girls are in need

19   of services or not, why they should need to be detained or not.

20          Roman and Lynette and their attorney, Heather

21   Kirkwood, have gathered 22 witnesses for this hearing.  In

22   defense of their position on July 18th, DCS, Ms. Myers,

23   Ms. McAninch, Mr. Payne, for this hearing they have zero

24   witnesses.  Zero.  But they maintain the substantiation.  They

25   keep the girls.  Although they do in the course of that week
```

1   agree to finally allow the girls to return home.

2       And on July -- Excuse me, August 9th, 2007, after

3   nine months of being away from their family, away from their

4   home, away from their school, they're finally allowed to

5   return.  But they're allowed to return with DCS still requiring

6   what they call a reunification plan.

7       In this reunification plan, they require an

8   assortment of services DCS provides, an assortment of services

9   that is nothing less than harassment.  They have people coming

10  to their home, several people, on a daily basis, up to four

11  hours a day, supposedly to help them.  They are not able to

12  return by any means to normal family life because of this

13  reunification harassment by DCS that starts upon their return.

14      The prosecutor finally comes around and dismisses

15  these charges that Detective McDonald has instigated.  On

16  October 24th, she dismisses the charges against Roman.  On

17  November 2nd, she dismisses the charges against Lynette.

18      On November 8th, there is an interesting hearing.

19  There's a motion that -- The coroner has been trying to work

20  with DCS in connection with his investigation.  They have not

21  worked in return, and the coroner gets DCS found in contempt

22  for resisting his investigation, to get to the bottom of this,

23  of what caused Jessica's death.

24      Finally, on November 27th, 2007, after all that, DCS

25  dismisses the CHINS case, acknowledging that there was no basis

1    for it.

2            But then, on December 13th, 2007, after all of that

3    evidence, after no evidence to the contrary, they have a

4    procedure called administrative review.

5            We still have the substantiations from March 23rd,

6    2007 saying this was death due to child abuse.  They still have

7    it.  And what they have is an administrative review.  They've

8    got an opportunity to ask in this instance Reba James, the

9    manager over Laurel Myers, to review it and reach her own

10   opinion as to whether this should be substantiated.  She not

11   only confirms the substantiation.  She adds two more charges.

12           In the next few months, January to April 2008, after

13   having this adverse result from Reba James in the

14   administrative review, Lynette and Roman attempt an

15   administrative appeal.  They're still on the registry as child

16   abusers.

17           And they identify all of the medical experts who are

18   going to testify on their behalf.  DCS has none.  And there's a

19   decision made at that time that this matter is going to be not

20   handled in the administrative review process but will have a

21   judicial review by an independent Judge in Pulaski County.

22           And in due course, an 8,000 page record with all this

23   evidence is gathered.  They agree that's the record to be

24   considered by Judge Blankenship; and after all of that, on

25   January 28th, 2010, he reviews it.  He considers everything

40

```
 1    that these Defendants through their attorney have to offer to
 2    substantiate these claims, and what he finds is that they
 3    should all be unsubstantiated.  They should all be
 4    unsubstantiated, and these are his words because those findings
 5    are arbitrary and capricious.  There was no evidence or facts
 6    to support them.
 7          So we've asserted civil rights claims.  We've
 8    asserted civil rights claims under the First Amendment because
 9    when Roman sent his letter, his petition to his legislator, to
10    the Governor, to say, look, there's something wrong here, and
11    what he gets in response is substantiated medical neglect, and
12    this course of conduct, that's a retaliatory conduct that
13    violates that amendment.
14          We've asserted claims here under the Fourth Amendment
15    that say searches have to be reasonable, they have to be based
16    on evidence and fact, and the searches that were conducted here
17    and the seizures that were conducted here, the seizure of the
18    arrest, the false arrest, the seizure of the detention of the
19    girls that extended for nine months, the detention even on the
20    day of the event, the exhumation of Jessica's body, they all
21    violate the Fourth Amendment's prohibition against unreasonable
22    searches and seizures.
23          Maybe most importantly is the claim under the
24    Fourteenth Amendment.  That's the claim that says every parent
25    and every child has a fundamental interest in the companions
```

```
1    and society of the other in these familial relationships, and
2    they cannot be separated by government other than in emergent
3    situations or to protect the child against imminent danger.
4              This substantive due process, the evidence will show,
5    establishes that is violated by the seizing of Tabitha and
6    Katelynn without probable cause to believe that they were in
7    any danger, detaining them for nine months for purposes of
8    investigative therapy, for providing false reports and
9    concealing exculpatory evidence in order to continue this
10   detention, to tell Johnathon and his sisters that their mother
11   had murdered their sister and to tell Johnathan in particular
12   that his mother was accusing him of killing his sister, and
13   thereby deliberately and systematically destroying family ties
14   and relationships.
15             You'll hear considerable evidence in this case about
16   the damages that those actions caused to each of these
17   Plaintiffs, and I won't detail them for you now, but you'll
18   hear about them over the next two weeks.  And at the end of
19   this case, I will ask you, based on the violations of those
20   civil rights and that course of action, to return a verdict for
21   full and fair compensation for the damages that were done to
22   each member of this family.
23             And I will also ask you to return a verdict for
24   punitive damages because that's the kind of damages that's
25   available to tell these Defendants and others in similar
```

1    positions that this isn't acceptable in Indiana, to give that

2    message by providing a punitive damage, as well.  Thank you.

3    * * *

4        (WHEREUPON, this concludes the partial transcript in this

5        case on this date.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        CERTIFICATE

 2          I, Angela Phipps, certify that the foregoing is a

 3   correct transcript from the excerpt of the record of

 4   proceedings in the above-entitled matter.

 5   Date:   SEPTEMBER 30, 2015

 6                                   S/Angela Phipps
                                     S/Angela Phipps
 7                                   Court Reporter
                                     U.S. District Court
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```