IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

```
ROMAN FINNEGAN, et al.,      )
                             )
Plaintiffs,                  )
                             )
vs.                          )   NO. 3:08-CV-503
                             )
LAUREL MYERS, et al.,        )
                             )
Defendants.                  )
```

**OPINION AND ORDER**

This matter is before the Court on the State Defendants' Rule 59 Motion to Alter or Amend Judgment by Reducing Damages, filed by the State Defendants, Laurel Myers, Regina McAninch, Reba James, and Jennifer McDonald, on November 6, 2015. (DE #354.) For the reasons set forth below, the motion is **DENIED**.

BACKGROUND

Plaintiffs, Roman Finnegan, Lynnette Finnegan, Jonathon Abair, Tabitha Abair, and Katelynn Salyer (collectively, "Plaintiffs"), sued several defendants in this case, including the following State Defendants: Laurel Myers, the Director of the Pulaski County Department of Child Services ("DCS") during the period in question ("Defendant Myers"), Regina McAninch, an investigator and caseworker for DCS ("Defendant McAninch"), Tracy Salyers, a family case manager for DCS ("Defendant Salyers"), Reba James, a regional

manager for the Department of Child Services ("Defendant James"), James Payne, former director of the Department of Child Services ("Defendant Payne"), and Jennifer McDonald, an Indiana State Police detective ("Defendant McDonald") (collectively, the "State Defendants").[1] The claims involved the State Defendants' interactions with Plaintiffs directly prior to and for the course of several years after the death of fourteen year old Jessica Salyer ("Jessica"). In late September of 2015, the case proceeded to a fifteen day jury trial. Ultimately, the jury found in favor of Plaintiffs against four of the State Defendants on five of their claims[2] and awarded a total of over $31 million to the Plaintiffs in varying amounts.

**DISCUSSION**

A party may bring a post-trial motion to alter or amend a judgment by way of remittitur pursuant to Federal Rule of Federal Rule of Civil Procedure 59. See Fed.R.Civ.P. 59(e); *Baier v. Rohr-Mont Motors, Inc.*, No. 12 C 8234, 2016 WL 1247451, at *1 (N.D. Ill. Mar. 30, 2016). A court must review a jury's award of compensatory damages "with several considerations in mind: (1)

---

[1] Claims were also brought against Defendant Antoinette Laskey, M.D. ("Defendant Laskey), but any findings as to liability or damages against Defendant Laskey are not at issue for purposes of this motion.

[2] The jury found that Defendant Payne and Defendant Salyers were not liable for any of the claims. Additionally, not all of the claims were brought against all of the State Defendants; and, depending on the claim, not each Defendant who was named was held liable.

2

whether the award is 'monstrously excessive'; (2) whether there is no rational connection between the award and the evidence; and (3) whether the award is roughly comparable to awards made in similar cases." *Thompson v. Meml. Hosp. of Carbondale*, 625 F.3d 394, 408 (7th Cir. 2010) (citing *Marion Cnty. Coroner's Office v. E.E.O.C.*, 612 F.3d 924, 931 (7th Cir. 2010)). A verdict that is considered 'monstrously excessive' is "one that is a product of passion and prejudice." *Adams v. City of Chicago*, 798 F.3d 539, 543 (7th Cir. 2015) (internal quotation marks and citation omitted). The Seventh Circuit has clarified that the 'rational connection' standard is essentially the same one as the 'monstrously excessive' standard in that they are "really just two ways of describing the same inquiry: whether the jury verdict was irrational." *Id*. (citing *Harvey v. Office of Banks & Real Estate*, 377 F.3d 698, 713-14 (7th Cir. 2004)). An irrational verdict "is merely a product of the jury's fevered imaginings or personal vendettas." *Id*. (citing *G.G. v. Grindle*, 665 F.3d 795, 798 (7th Cir. 2011)). When determining whether a remittitur is warranted, "great deference" must be given to the jury's verdict because "[t]he district court and the jury are in a superior position to find facts and determine a proper damages award." *Grindle*, 665 F.3d at 799 (quoting *Farfaras v. Citizens Bank & Trust of Chi.*, 433 F.3d 558, 566 (7th Cir. 2006)); see also *Am. Nat. Bank & Trust Co. of Chicago v. Regl. Transp. Auth.*, 125 F.3d 420, 437 (7th Cir. 1997) (quoting *Dresser Indus.,*

*Inc., Waukesha Engine Div. v. Gradall Co.*, 965 F.2d 1442, 1446 (7th Cir. 1992) ("Because damage calculations are essentially an exercise in factfinding, our review of the jury's damage award is deferential."). The trial record as a whole must be viewed in the light most favorable to the verdict. *Adams*, 798 F.3d at 543. "This perspective is essential, if we are to preserve the jury's role as the trier of fact." *Id*.

*Verdict Size and Connection to the Evidence*

The State Defendants argue that "after two weeks of an emotionally charged trial, the jury awarded damages based largely on emotion rather than a dispassionate analysis of the evidence." (DE #353, p. 3.) In the State Defendants' view, the $31.35 million "verdict demonstrates the lack of rational connection between the jury's verdict and the evidence presented." (*Id*. at 4.) In response, Plaintiffs point out that the jury awarded the total of over $31 million not to one plaintiff for one claim but rather to the five individual Plaintiffs on numerous separate but interrelated claims against five different defendants, all of which were supported by evidence establishing "harrowing injuries of almost unfathomable magnitude." (DE #359, p. 1.) Before delving into the specifics of the evidence related to each award, Plaintiffs note that they "were facing the worst tragedy a family can suffer, the untimely death of a child." (*Id*.) Thus, they

argue, it was reasonable for the jury to conclude that the State Defendants "compounded that tragedy by their misconduct." (*Id.* at 1-2.) In reply, the State Defendants assert that Plaintiffs rely on "conflation and passive voice to paint the jury's compensatory damages award as rationally connected to the evidence they presented at trial" but fail to tie it to any particular defendant; thus, they argue, the jury must have awarded damages "at an emotional level" based on "passion and prejudice" related to the tragedy of Jessica's death rather than the actual evidence. (DE #365, pp. 1-3.)

The Seventh Circuit has recognized that "[t]he required 'rational connection' between the evidence and the award does not imply mathematical exactitude, especially where the compensatory damages are for pain and suffering. Such damages are very difficult to quantify, leaving it to the jury to select a dollar amount that it believes will fairly compensate the plaintiff." *Hendrickson v. Cooper*, 589 F.3d 887, 892-93 (7th Cir. 2009) (citing *Fenolio v. Smith*, 802 F.2d 256, 259-60 (7th Cir. 1986)). In fact, a verdict premised on "nonpecuniary loss can be supported, in certain circumstances, solely by a plaintiff's testimony about his or her emotional distress." *Deloughery v. City of Chicago*, 422 F.3d 611, 619-20 (7th Cir. 2005) (quoting *Tullis v. Townley Eng'g & Mfg. Co., Inc.*, 243 F.3d 1058, 1068 (7th Cir. 2001)). Although a defendant may consider such evidence of a plaintiff's emotional

5

distress "meager," a jury may properly view that same evidence in an entirely different light based, for example, on its own observations of a witness's demeanor at trial.  See *Id*. at 620.  Furthermore, it is permissible to establish emotional injuries without "extensive psychological or medical testimony" because the jury is capable of determining the impact of a defendant's actions on a plaintiff.  *Farfaras v. Citizens Bank and Trust of Chicago*, 433 F.3d 558, 566 (7th Cir. 2006).  Overall, it is imperative that a jury's damage calculations are given deference because they are "essentially an exercise in fact-finding."  *Dresser Indus., Inc.*, 965 F.2d at 1446.

Here, the State Defendants gloss over the fact that all of the Plaintiffs, with the exception of Katelynn Salyer whose damages were described by her family members in her stead, testified themselves as to the emotional anguish they experienced and continue to experience as a result of the events in question.  That testimony was oftentimes emotionally charged, and the jury was able to observe the demeanor and visceral reactions of each Plaintiff as they spoke about their anger, pain, and suffering.  Furthermore, witnesses including Tim Brown, John Majchrzach, Jean Majchrzach, Pam Graham Liston, Dr. Gordon Klockow, attorney David Geisler, Dr. James Kenny, Bonnie Schmidt, Tom Rausch, and Dr. Randall Krupshaw also testified about the harms suffered by Plaintiffs.  As Plaintiffs point out, the jury repeatedly heard evidence of the

following from multiple sources: that Roman and Lynnette Finnegan were falsely accused of causing Jessica's death and had their surviving daughters removed from the family home during their time of grief; that Tabitha Abair and Katelynn Salyer were told that their mother had killed Jessica, were separated from their parents, and underwent months of "investigative" therapy where they repeatedly discussed their sister's death and were prompted to incriminate their parents; and that Jonathon was told, falsely, that his mother was blaming him for Jessica's death. The jury was capable of sifting through such evidence and using their own sound judgment to determine what impact the actions of each State Defendant had on each Plaintiff. See *Farfaras*, 433 F.3d at 566; see also *Pickett v. Sheridan Health Care Ctr.*, 610 F.3d 434, 446 (7th Cir. 2010) (plaintiff was entitled to compensatory damages for emotional distress based on her own testimony, even without corroborating evidence from a third party).

The State Defendants argue that it is clear the jury improperly awarded damages at an emotional level based solely on the tragedy of Jessica's death. They assert that even Plaintiffs "implicitly recognize" Jessica's untimely death was the actual loss that created all of their pain and suffering. But this view is myopic; when considering the record in its entirety, the Court finds that it is more likely the jury believed the actions of the State Defendants compounded that loss and caused Plaintiffs

7

significant additional trauma at a time when they were most vulnerable and fragile.  The Seventh Circuit has acknowledged that a plaintiff's unique personal situation may appropriately play a role in evaluating and awarding damages, even when a defendant's actions did not cause all of the relevant underlying circumstances.  See, e.g., *U.S. E.E.O.C. v. AIC Sec. Investigations, Ltd.*, 55 F.3d 1276, 1285-86 (7th Cir. 1995) (finding a rational connection between the evidence and the damage award and specifically noting that "the emotional burden on a person dying of cancer, perceiving himself as unable to adequately provide for his family, is considerably greater than that suffered by the ordinary victim of a wrongful discharge").  Here, it is undisputed that none of the State Defendants caused Jessica's death or were responsible for it in any way.  The jury was specifically instructed that "[t]his case is not about who is liable for the death of Jessica Salyer.  Therefore, even if you find for any of the plaintiffs, you cannot award them damages solely for the loss of Jessica Salyer.[3]

The State Defendants point to no specific evidence to suggest that the jury failed to follow that instruction.  Instead, they argue that "passion and prejudice" can be inferred because the verdicts were not rationally connected to the evidence.  But an

---

[3] In fact, while it is not considered evidence, the Court notes that Plaintiffs' counsel addressed this matter within seconds of beginning his closing argument as follows: "On December 20, 2005, Jessica Salyer died.  She died because of prescription errors by her family doctor.  These Defendants that you will be considering today are not responsible for causing her death."

independent review of the record viewed in the light most favorable to Plaintiffs, as adequately outlined in their response brief, suggests otherwise. The Court notes that the overwhelming majority of the evidence described by Plaintiffs in their brief is undisputed by the State Defendants in their reply. Where differences do exist, the Court finds that it was reasonable for the jury to make inferences and conclusions in Plaintiffs' favor. (See generally DE #359, pp. 8-15 & DE #365, pp. 4-8.) Based on the foregoing, the Court finds that it was rational for the jury to conclude that great emotional harm arose from the State Defendants' actions that was separate and apart from the trauma of Jessica's death and to award them in kind for those injuries.

A continued theme in the State Defendants' reply brief is that the damages for each of the Plaintiffs cannot be tied to any specific State Defendant. They argue that Plaintiffs tried this "very complicated, very emotional case as if it were against the State of Indiana or the Department of Child Services, instead of – as would have been consistent with law – against individual people." (DE #365, p. 1.) However, the jury was given numerous instructions regarding its duties in that regard. For example, the jurors were instructed that "[e]ach party is entitled to have the case decided solely on the evidence that applies to that party." (DE #344, p. 9.) They were told to give "separate consideration to each claim and each party in this case" and were instructed that

9

[i]n considering a claims against a particular defendant, you must not consider evidence admitted only against another defendant or only as to another claim." (*Id.* at 19.) Furthermore, the jury was specifically told that "[d]efendants are being sued as individuals" and that the Indiana Department of Child Services was not a party to the lawsuit. (*Id.* at 27.) Finally, the jurors were given an instruction with regard to a conspiracy, which set out details and limitations in relation to potential conspiratorial relationships. (*Id.* at 344.) It is well-established that jurors are presumed to understand and apply the jury instructions that they are given during and at the close of the case. See, e.g., *Nat'l Org. for Women, Inc. v. Scheidler*, 267 F.3d 687, 705 (7th Cir. 2001); see also *Thomas v. Cook Cnty. Sheriff's Dept.*, 604 F.3d 293, 298 (7th Cir. 2010) (finding that the $4,000,000-plus damage award was not excessive, in part, "[b]ecause we presume that jurors follow the instructions given, we must interpret the jury verdict to be consistent whenever possible. As a result, we interpret the jury's allocation in this case as an attempt to split the total damages among the defendants, rather than an effort to issue duplicate awards for the same injury.") In this case, the presumption that the jury followed the Court's instructions and applied them when determining an appropriate damages award is bolstered by a review of the twenty-two page verdict form. As noted by Plaintiffs, the verdicts for each of the five Plaintiffs were internally consistent

and varied greatly based on the claim and the particular State Defendant they were considering. See *Adams*, 798 F.3d at 544. As a whole, the Court is convinced that the compensatory damages awards in this case were rationally connected to the evidence presented and were not, as the State Defendants suggest, simply a product of passion or prejudice.

*Comparable Verdict Awards*

In their motion, the State Defendants argue that while there is little guidance for what the proper damages in this case should be, the guidance that exists "points dramatically downward." (DE #353, p. 6.) They cite to two cases in support of their position: *Cole v. Cnty. of Los Angeles*, 2012 WL 8718253 (W.D. Cal. 2012) and *Duran v. City of Chicago*, 23 Nat. J.V.R.A. 10:22, 2008 WL 9355823 (Ill. Cir. Ct.). In response, Plaintiffs argue that *Cole* is distinguishable from the case at bar and that *Duran* actually supports the jury's award here. Plaintiffs also cite to five additional cases for their contention that "[m]any other juries have recognized the significant pain of a parent's separation from children and demonstrate that it would be unwarranted to conclude that the jury's awards in this case were irrational." (DE #359, pp. 19-20.) In reply, the State Defendants reassert that there is "little guidance" as to proper damages and argue that *Duran* is not distinguishable from the present case. The State Defendants do not

11

attempt to address any of the additional cases cited by Plaintiffs.

As an initial matter, the Court notes the Seventh Circuit has repeatedly held that while awards in other cases can provide a "reference point" with regard to reasonableness, "they do not establish a range beyond which awards are necessarily excessive." *Deloughery v. City of Chicago*, 422 F.3d 611, 621 (7th Cir. 2005) (citing *Lampley v. Onyx Acceptance Corp.*, 340 F.3d 478, 485 (7th Cir. 2003)). Because the facts of each case are different, those types of comparisons are "rarely dispositive." *Id.*; see also *Hendrickson v. Cooper*, 589 F.3d 887, 892 (7th Cir. 2009) ("We may also compare the award with other compensatory damages awards upheld in similar cases, although such comparisons are rarely dispositive given the fact-specific nature of damages claims.") In *Lampley*, the Seventh Circuit cautioned courts against "substitut[ing] a jury's damages verdict with its own figure merely because a case with similar facts has not yet arisen, or because a plaintiff in a similar case was perhaps not able to plead his facts to the jury as well." *Lampley*, 340 F.3d at 485. It must be remembered that, "[i]ndividual cases can differ from each other enormously in terms of witness credibility, the quality of the presentation, the nature and extent of the injuries, the vulnerability of the victim, the reactions of jurors to the particular circumstances, and hosts of other variables." *Ibaenez v. Velasco*, No. 96 C 5990, 2002 WL 731778, at *11 (N.D. Ill. Apr.

12

25, 2002). And, when the facts presented are "out of the ordinary" as compared to other cases of its kind, the court has recognized that a jury award may appropriately reflect those considerations. See *Neal v. Honeywell, Inc.*, 191 F.3d 827, 832 (7th Cir. 1999).

Here, Plaintiffs argue that the "extensive and long-term harm caused by multiple child welfare workers to five family members on five factually and legally independent prevailing claims" makes this case unique in terms of damages awards. (DE #359, p. 17.) Because no other reported case has involved "welfare workers falsely accusing parents of causing their child's death, removing two young daughters from the home and subjecting them to nine months of investigative therapy, and alienating their brother from the family," Plaintiffs assert that comparisons to other cases are of "limited utility." (*Id.*) The Court agrees that this case is out of the ordinary given the nature and number of the claims and the facts presented throughout the course of the proceedings as described above. See *Neal*, 191 F.3d at 832 (particular circumstances of plaintiff's workplace led to emotional distress "exceeding the norm" as compared to a "slew" of other discrimination cases with smaller verdicts). That said, the additional cases cited by Plaintiffs are instructive in terms of giving credence to the view that juries have recognized significant emotional damages associated with forced familial separations. See *Fogarty-Hardwick v. Orange Cnty.*, 2007 WL 5187674 (Cal. March 2007)

13

($4,906,000 verdict for mother's emotional distress when two children were improperly removed from her custody and placed into foster care); *Lozoya v. Gracia*, 1993 WL 850565 (N. Mex. Jan. 1993) ($6 million to mother for lost custody); *Streeter v. Exec. Jet Mgmt.*, 2005 WL 4357633 (Conn. Super. Nov. 10, 2005) ($27 million jury award for mother separated from her child for 22 months); *Smith v. Smith*, 1985 WL 327994 (Tex. July 1985) ($7 million to mother for pain and suffering associated with loss of society with her children, who were abducted by another relative); *Weirich v. Weirich*, 1989 WL 387282 (Tex. Jan. 1989) ($6,247,684 for similar scenario).

Moreover, while the State Defendants argue that a "dramatically downward" remittitur is justified based on the two allegedly comparable cases cited in their motion, the Court disagrees. In *Cole v. Cnty. of Los Angeles*, 2012 WL 8718253 (W.D. Cal. 2012), the Los Angeles Department of Children and Family Services ("DCFS") responded to a report of possible physical abuse and neglect of the plaintiff's son while he was in the care of his father. *Id*. The plaintiff claimed DCFS submitted a false report and wrongfully detained her two children even though there were no signs of abuse. *Id*. The plaintiff and her children alleged civil rights violations and intentional infliction of emotional distress among other claims against DCFS and individual county employees. *Id*. However, the case settled for $500,000 prior to trial, which,

despite the State Defendants' glossing over of in its reply, makes it immediately distinguishable from the present case as it was never submitted to a jury for a damages determination. (See DE #359-1 & DE #359-2.) Furthermore, according to the affidavit of Donnie R. Cox, one of the plaintiffs' counsel in the *Cole* matter, while the two children were detained,[4] the mother was allowed to stay with her infant child in the hospital the entire time, and her two year old child was also brought to the hospital to stay with her mother and sibling on most days. (DE #359-2.) Attorney Cox described the mother's psychological distress as "garden variety," and noted that the children exhibited no memory of the incident. (*Id*.) Clearly, in the instant case, both the factual circumstances surrounding Plaintiffs' interactions with the State Defendants and Plaintiffs' characterization of the resultant emotional harms are significantly different than the *Cole* plaintiffs' experiences; thus, it makes little sense to consider such a comparison persuasive evidence that the jury's award was too high in this case.

As to the second case cited by the State Defendants, *Duran v. City of Chicago*, 23 Nat. J.V.R.A. 10:22, 2008 WL 9355823 (Ill. Cir. Ct.), Plaintiffs argue that it does not undermine the award here. In *Duran*, the plaintiffs alleged that the Department of Child and

---

[4] The infant was kept in the hospital for approximately seven weeks, and the two year old was detained in foster care for forty-one days. (DE #359-2.)

15

Family Services was negligent in removing a six month old child from her parents' home based on unsubstantiated allegations of abuse. *Id*. The child and parents were separated for almost a year. *Id*. The plaintiffs alleged that, as a result of the defendants' knowingly deceptive claims, the defendants violated their constitutional due process rights. *Id*. The jury awarded plaintiffs a sum of $4,200,000.[5] *Id*. Plaintiffs contend that, when viewed in context, such an award for similar substantive due process claims is roughly comparable to the $3,000,000 to $4,000,000 individual awards[6] for the parallel claims in the instant case. The Court finds this argument persuasive. Although higher amounts were awarded here, any discrepancy can be attributed to the factual differences between the cases. For example, a six month old infant, such as the one in *Duran*, is unlikely to have experienced the same type of "permanent and life-altering" emotional damages associated with removal from its parents as two "cognitively-developed adolescent girls." Nor, as pointed out by Plaintiffs, would an infant and its parents be subject to the kinds of harms created by false allegations pertaining to the death of a

---

[5] The total award consisted of $2,500,000 to the infant plaintiff and $850,000 to each of the parent plaintiffs. *Id*.

[6] The jury awarded $3,000,000 each to Plaintiffs Roman Finnegan, Lynnette Finnegan, Tabitha Abair, and Katelynn Salyer, and $4,000,000 to Plaintiff Jonathon Abair on their substantive due process claims. (See DE #348, pp. 17-19.)

16

daughter/sibling, months of investigative therapy, or alienation as a result of a defendant's statements. The complex familial dynamics described and presented to the jury set this case apart from *Duran*. In sum, the Court finds no reason to conclude that the jury's award in this case was either excessive or unreasonable as compared to other similar (or dissimilar) cases. See *Deloughery*, 422 F.3d at 621.

CONCLUSION

For the reasons set forth above, State Defendants' Rule 59 Motion to Alter or Amend Judgment by Reducing Damages, filed by the State Defendants, Laurel Myers, Regina McAninch, Reba James, and Jennifer McDonald (DE #354), is **DENIED**.

**DATED: September 30, 2016**  /s/ RUDY LOZANO, Judge
United States District Court